## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

---------------------------------------------------------x
:
In re : Chapter 11
:
**GULFMARK OFFSHORE, INC.,** : Case No. 17-_____ (___)
:
Debtor. [1] :
:
:
:
---------------------------------------------------------x

## DECLARATION OF BRIAN J. FOX IN SUPPORT OF
## THE DEBTOR'S CHAPTER 11 PETITION AND RELATED REQUESTS FOR RELIEF

I, Brian J. Fox, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.     I am a Managing Director of Alvarez & Marsal North America, LLC ("**A&M**"), the restructuring advisor to the debtor in this chapter 11 case (the "**Chapter 11 Case**"), GulfMark Offshore, Inc. ("**GulfMark Parent**" or the **Debtor**), the ultimate parent of a group of its direct and indirect subsidiaries (collectively, "**GulfMark**" or the "**Company**"). I submit this declaration (the "**Declaration**") in support of the Debtor's voluntary chapter 11 petition and motions seeking relief filed contemporaneously with this Declaration (the "**First Day Motions**").

2.     On March 1, 2017, the Debtor retained A&M, a global business advisory firm that, together with its affiliates, employs over 2,600 professionals in 47 offices worldwide, to evaluate and implement the Company's restructuring alternatives. As the lead Managing Director on the engagement, I have gained a detailed understanding of GulfMark's (including the

---

[1] The last four digits of the Debtor's federal tax identification number are 6032. The Debtor's principal mailing address is 842 West Sam Houston Parkway North, Suite 400, Houston, Texas 77024.

Debtor's) day-to-day operations, books and records, and business and financial affairs.  I have more than 25 years of turnaround and restructuring experience advising companies and parties-in-interest across a spectrum of industries.

3.    I submit this Declaration to assist the Court and other parties-in-interest in understanding the circumstances that compelled the commencement of this Chapter 11 Case and in support of (i) the petition for relief under the Bankruptcy Code filed on the date hereof (the "**Commencement Date**") and (ii) the First Day Motions.  Except as otherwise indicated, the facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based upon experience, knowledge, and information concerning GulfMark's operations and financial condition.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtor.

4.    The First Day Motions, described in detail below, seek, among other things, relief intended to preserve the value of the Company and maintain continuity of operations by, among other things, (i) preserving the Company's relationships with its customers, vendors, suppliers, and employees, many of whom are located in jurisdictions outside the United States, (ii) maintaining the Company's cash management system and other business operations without interruption, (iii) ensuring continued employee morale, and (iv) establishing certain administrative procedures to facilitate an orderly transition into, and uninterrupted operations throughout, this Chapter 11 Case.  This relief is critical to the Debtor's restructuring efforts.

5.    This declaration is organized into five sections.  The first section outlines the proposed restructuring.   The second section provides background information on the

Company's organizational structure and business.  The third section describes the Company's capital structure.  The fourth section discusses the events leading to the filing of the Chapter 11 Case and GulfMark's prepetition restructuring efforts.  Finally, the fifth section summarizes the relief requested in the First Day Motions.

## I.
## Overview

6.    As described below in more detail, the Debtor is the parent entity of a global offshore marine services company that, through various non-debtor affiliates and subsidiaries (collectively, the "**Non-Debtor Affiliates**"), is engaged in providing support and transportation services primarily to the offshore oil and gas industry.  The Debtor is also the issuer or the guarantor of substantially all of the Company's funded debt.

7.    The Debtor commenced this Chapter 11 Case to implement a pre-negotiated, comprehensive restructuring of the Company's consolidated balance sheet (the "**Restructuring**"), which is embodied in the *Chapter 11 Plan of Reorganization of GulfMark Offshore, Inc.* (as may be amended, modified or supplemented, the "**Plan**"), filed contemporaneously herewith.  The Restructuring will enable the Debtor to right-size its capital structure and provide the Company with the additional capital it requires to withstand an extended market downturn, capitalize on potential growth opportunities in the future, and continue to provide its customers with the high-quality services they have come to expect from GulfMark.

8.    Under the terms of the Restructuring, the Debtor will equitize all of its approximately $448.2 million of its unsecured bond obligations and substantially bolster the Company's liquidity through a $125 million offering of subscription rights to acquire 60% of the

Reorganized GulfMark Equity (as defined below), to be backstopped by certain holders of Senior Notes (as defined below).

9.      The Debtor's general unsecured creditors (which does not include holders of guaranty claims) will be unaffected by the Restructuring.

10.     The effect of the Restructuring on GulfMark's capital structure is summarized as follows:

| Current | Reorganized |
|---|---|
| $100 million secured Multicurrency Facility (as defined below)  with approximately $72 million outstanding as of the Commencement Date (Debtor provided unsecured guaranty) | Treatment will be reasonably acceptable to the Debtor and the Requisite Noteholders (as defined in the RSA); *provided*, that both the Debtor and Requisite Noteholders agree that any treatment that would meet the requirements for confirmation of a plan of reorganization under section 1129(b) of the Bankruptcy Code shall be deemed reasonably acceptable. |
| NOK600 million secured Norwegian Facility (as defined below) with approximately $44.3 million outstanding as of the Commencement Date (Debtor provided unsecured guaranty) | Treatment will be reasonably acceptable to the Debtor and the Requisite Noteholders.<br><br>DNB consent is required to the extent such treatment does not provide for payment in full in cash of all obligations under the Norwegian facility and termination of all commitments thereof on the effective date of the Plan. |
| $500 million Senior Notes due 2022 with $429.6 million in principal and $18.6 million in accrued interest outstanding as of the Commencement Date (Debtor is issuer) | Fully equitized for Reorganized GulfMark Equity and subscription rights to participate in the Rights Offerings (as defined below) |
| GulfMark Parent common equity | 0.75% of the Reorganized GulfMark Equity (subject to further dilution) and warrants issuable for 7.5% of the Reorganized GulfMark Equity |

11.     The Restructuring has been agreed to, and is supported by, the Debtor and approximately 47% of holders of Senior Notes (as defined below) (the "**Consenting Noteholders**").  To evidence their support of the Restructuring (and commitment to vote in favor

4

of the Plan), the Consenting Noteholders executed a restructuring support agreement with the Debtor (the "**RSA**"), a copy of which is attached hereto as **Exhibit A**.

12.    In addition to securing support of the Restructuring through the RSA, the Debtor negotiated an agreement with GulfMark Rederi AS ("**GulfMark Rederi**") to provide a $35 million intercompany debtor-in-possession credit facility (the "**DIP Intercompany Facility**").  The DIP Intercompany Facility will be used to finance the working capital needs of certain of the Debtor's operating subsidiaries and fund the Restructuring.  Upon the entry by the Bankruptcy Court of an order approving the DIP Intercompany Facility on an interim basis, GulfMark Rederi will obtain the funds necessary to provide the DIP Intercompany Facility from DNB Bank ASA ("**DNB**") through an amendment to the Norwegian Facility.  In exchange for such amendment, certain of the Debtor's affiliates are providing DNB with additional collateral and GulfMark Rederi is assigning to DNB its rights under the DIP Intercompany Facility. Pursuant to the Restructuring Support Agreement, the Debtor also agreed not to impair its guarantee of the Norwegian Facility under the Plan unless otherwise reasonably agreed among DNB, the Debtor, and the Requisite Noteholders.

13.    Although the Debtor has not yet obtained committed exit financing, the Debtor, its advisors, and the advisors for the Consenting Noteholders, have been in advanced negotiations with both of the Company's secured lending groups regarding the terms under which the existing lenders are willing to lend to the Company after the effective date of the Plan. The Debtor is hopeful that it will reach a resolution with its existing lenders in the near term.  If the Debtor is unsuccessful in reaching a resolution with its existing lender groups on such exit financing terms, it may seek exit financing from other sources.

14.    The Debtor and its advisors also continue to explore options to deleverage

RLF1 17564271V.1

the Company and maximize the value of its business. The Company is committed to pursuing consensual solutions with its secured lenders. Nevertheless, in the event that the Company determines feasible out-of-court solutions are not achievable within a reasonable time frame and in a manner consistent with the Debtor's obligations under the RSA, the Company may file chapter 11 petitions for certain of the Non-Debtor Affiliates.

## II.
## The Debtor's Business

### A.    Corporate History and Structure

15.    The Company was established in 1958 as a pipeline engineering company. Through the years, the Company focused on various opportunities in the oil and gas industry by concentrating, at various times, on pipeline engineering, energy transportation, storage, and distribution, ownership of pipeline and terminal systems, and oil and gas exploration. In 1990, the Company entered the international oil services industry when it purchased the marine division of Offshore Logistics, Inc. The Company continued to grow organically and through acquisitions. In 1997, the Company spun off its non-marine services business via a share distribution to its stockholders, and began to focus exclusively on the offshore marine services business, with GulfMark Parent at the top of its corporate structure. A diagram that reflects the Company's current corporate structure is annexed hereto as **Exhibit B**.

16.    GulfMark Parent, a Delaware corporation and the sole Debtor in this Chapter 11 Case, is the direct and indirect parent of all the entities comprising the Company. The Debtor is a holding company, the sole assets of which (other than bank accounts and the intercompany notes receivable), are shares and LLC interests in its immediate subsidiaries. GulfMark Parent is the sole borrower under the Senior Notes, a guarantor under the Multicurrency Facility, and a guarantor under the Norwegian Facility.

RLF1 17564271V.1

17.     Other significant GulfMark entities include:

a.  GulfMark Management, Inc.   ("**GulfMark Management**"), a Delaware corporation, is a wholly-owned direct subsidiary of the Debtor.  GulfMark Management is a holding company the sole assets of which (other than a bank account and the intercompany notes receivable) are shares of its direct wholly-owned subsidiary GulfMark Americas, Inc. ("**GulfMark Americas**"), which are pledged as collateral under the Multicurrency Facility;

b.  GulfMark Americas, Inc., a Delaware corporation, is a wholly-owned direct subsidiary of GulfMark Management and is the Debtor's main operating entity in the United States.  As such, GulfMark Americas owns 16 vessels, which constitute the majority of the Company's vessels operating in the Americas geographic region.  In addition, this entity employs all of the U.S.-based onshore and offshore personnel and the Company's management and professional staff.  GulfMark Americas is the borrower under the Multicurrency Facility and has pledged as collateral all of its owned vessels, 100% of common stock owned by its immediate parent, GulfMark Management, a bank account owned by GulfMark Americas at RBS and the funds held in that account, and an assignment of an insurance agreement insuring the vessels subject to the mortgages in favor of RBS;

c.  GulfMark North Sea Ltd.   ("**GulfMark North Sea**"), a limited company organized under the laws of England and Wales, is a wholly-owned indirect subsidiary of the Debtor.  GulfMark North Sea holds 100% of the shares of GulfMark UK Ltd and will pledge them as collateral under the Norwegian Facility, which will be amended and restated to provide for additional funding required to provide the DIP Intercompany Facility;

d.  GulfMark UK Ltd.  ("**GulfMark UK**"), a limited company organized under the laws of England and Wales, is a wholly-owned indirect subsidiary of the Debtor and the direct parent of its wholly owned subsidiary GulfMark Norge AS.  GulfMark UK, which is GulfMark's main operating entity in the United Kingdom, owns 16 vessels operating in the North Sea market and employs onshore personnel. GulfMark UK is a guarantor on the Norwegian Facility and has pledged certain of its owned vessels as collateral pursuant thereto, and will pledge additional vessels to DNB to provide for additional funding under the Norwegian facility to enable GulfMark Rederi to fund the DIP Intercompany Facility;

e.  GulfMark Norge AS ("**GulfMark Norge**"), a Norwegian private limited liability company, is an indirect subsidiary of the Debtor and a direct wholly owned subsidiary of GulfMark UK.  GulfMark Norge

7

holds 100% of the shares of GulfMark Rederi AS ("**GulfMark Rederi**") and pledged them as collateral under the Norwegian Facility. GulfMark Norge employs onshore personnel that provide support to GulfMark's Norwegian operations in the North Sea region; and

    f.   <u>GulfMark Rederi AS</u>, a Norwegian private limited liability company, is an indirect subsidiary of the Debtor and a direct wholly-owned subsidiary of GulfMark Norge. GulfMark Rederi <u>owns</u> six vessels that operate in the North Sea region. This entity is the borrower under the Norwegian Facility and has pledged (i) certain of its vessels, (ii) all of its accounts receivable, and (iii) two of its bank accounts and funds in those accounts as collateral pursuant thereto. GulfMark Rederi will pledge the remainder of its vessels to DNB to provide for additional funding under the Norwegian Facility to enable it to fund the DIP Intercompany Facility.

**B.**    <u>**GulfMark's Assets and Operations**</u>

    18.    Through its various operating Non-Debtor Affiliates, the Company provides offshore marine support and transportation services primarily to companies involved in the offshore exploration and production of oil and natural gas. The Company owns and operates a fleet of 66 offshore supply vessels ("**OSVs**") in three distinct geographic regions – the Americas, the North Sea, and Southeast Asia. The Company's OSVs transport materials, supplies, and personnel to offshore oil and gas exploration and production facilities; move and position drilling and production platforms; and carry the drilling mud and other supplies used during the drilling process. Of the Company's 66 vessels, 31 are located in the Americas, 25 are located in the North Sea region, and 10 are located in Southeast Asia. A list of the Company-owned vessels, their region of operation, and other characteristics is set forth on **Exhibit B** annexed hereto. The Company's fleet is one of the youngest, largest, and most geographically balanced in the industry. The average age of a GulfMark OSV is approximately 10 years.

    19.    The Company categorizes its OSVs into two main functional classifications derived from their primary operating characteristics or capabilities. These classifications are:

8

a. <u>Anchor Handling, Towing and Support Vessels</u> ("**AHTSs**") are used to set anchors for drilling rigs and to tow mobile drilling rigs and equipment from one location to another. They are characterized by shorter aft decks and special equipment such as towing winches. Vessels of this type with less than 10,000 brake horsepower, or BHP, are referred to as small AHTSs, or SmAHTSs, while AHTSs with greater than 10,000 BHP are referred to as large AHTSs, or LgAHTSs. The more powerful North Sea class AHTSs have up to 25,000 BHP and can function as platform supply vessels; and

b. <u>Platform Supply Vessels</u> ("**PSVs**") serve drilling and production facilities and support offshore construction and maintenance work. They are differentiated from other OSVs by their cargo handling capabilities, particularly their large capacity and versatility. PSVs utilize space on deck and below deck and are used to transport supplies such as fuel, water, drilling fluids, equipment and provisions. PSVs typically range in size from 150 to 300 feet in length overall. Large PSVs, or LgPSVs, generally range from 210 to 300 feet in length, with a few vessels somewhat larger, and are particularly suited for supporting large concentrations of offshore production locations because of their clear aft deck and below deck capacities.[2]

20.    The Company's principal customers are major integrated oil and natural gas companies, large independent oil and natural gas exploration and production companies working in international markets, and foreign government-owned or controlled oil and natural gas companies. The Company's customers also include companies that provide logistic, construction, and other services in the oil and natural gas industry.

21.    Generally, the Company's contracts are industry standard time charters for periods ranging from a few days or months to up to ten years. Contract terms vary and often are similar within geographic regions with certain contracts containing cancellation provisions (in some cases permitting cancellation for any reason including, without limitation, convenience)

---

[2] In addition to the two above-mentioned functional classes, the Company has <u>Fast Supply Vessels</u> ("**FSVs**"), or crewboats, which transport personnel and cargo to and from production platforms and rigs. Older FSVs (early 1980s build or earlier) are typically 100 to 120 feet in length, and are designed for speed and to transport personnel. Newer crewboat designs are generally larger, 130 to 185 feet in length, and can be longer with greater cargo carrying capacities. The Company has one Larger FSV, which is used primarily to transport cargo on a time-sensitive basis.

and others being non-cancellable except in the case of unsatisfactory performance by the OSV. For the year ended December 31, 2016, no customer accounted for 10% or more of the Company's total consolidated revenue.

22.     Additionally, the Company can be party to "evergreen" charters (also known as "life of field" charters), and at the other end of the spectrum, "spot" charters, and "short duration" charters, which can vary from a single voyage to charters of less than six months.  Longer duration charters are more common in those circumstances where equipment is not as readily available or specialized equipment is required.  In the North Sea region, multi-year charters were historically more common and have constituted a significant portion of the market. In the Americas, particularly in the U.S. Gulf of Mexico, charters vary in length from short-term to multi-year periods, many with thirty-day cancellation clauses.  Historically, in Brazil, Mexico, and Trinidad, contracts are generally multi-year term contracts.  Longer term charters in the Southeast Asia region have historically been less common than in the North Sea and generally have terms of less than two years.  In addition, charters for vessels in support of floating production are typically life of field or "full production horizon" charters.

C.     **Regulation of the Debtor's Business**

23.     The Debtor's multiple operating subsidiaries must comply with extensive government regulations in the form of international conventions; federal, state, and local laws; and other regulations in jurisdictions where their vessels operate and/or are registered. These conventions, laws, and regulations govern matters such as environmental protection, worker health, and safety; vessel and port security; and the staffing, construction, ownership, and operation of vessels.  Specifically, GulfMark Americas, which owns vessels operating primarily in the Gulf of Mexico, is subject to regulation by the United States Coast Guard (the "**U.S. Coast Guard**"), the National Transportation Safety Board (the "**NTSB**"), and the United States Custom

and Border Protection ("**CPB**").  GulfMark Rederi and GulfMark UK are subject to regulations by the foreign equivalents of the U.S. Coast Guard, NTSB, and CPB.  In addition, the Company is subject to regulation by private industry organizations such as the American Bureau of Shipping and Det Norske Veritas.

24.     Furthermore, the Debtor and certain Non-Debtor Affiliates are subject to the restrictions of the Jones Act, pursuant to which the privilege of transporting merchandise or passengers for hire in the coastwide trade of the United States is generally restricted to vessels built in the United States, registered under the U.S. flag, manned by predominantly U.S. crews, and owned and operated by U.S. Citizens within the meaning of the Jones Act.  The Debtor, and, where applicable, certain Non-Debtor Affiliates comply with the requirements of the Jones Act.

### III.
### Capital Structure and Prepetition Indebtedness

A.     **Equity Ownership**

25.     The Debtor was organized as a Delaware corporation in December 1997. The Debtor is a public company that files annual reports with, and furnishes other information to, the SEC.  On April 10, 2017, the NYSE announced that it determined to commence proceedings to delist the Debtor's common shares because they had fallen below the continued listing standards requiring listing companies to maintain an average closing price of no less than $1.00 over a consecutive 30 trading day period.  As of March 31, 2017, 60,000,000 of the Debtor's common shares, $0.01 par value, had been authorized, with 29,020,000 shares issued and 27,021,000 outstanding.  As of April 10, 2017, the last date on which the Debtor's common shares were trading on the NYSE, they closed at $0.31 per share.  The Debtor's common shares are currently trading on the OTC Pink Sheets.

RLF1 17564271V.1

B.    **Cash and Cash Equivalents**

26.    The Debtor holds only a *de minimis* amount of cash in its bank accounts as of the Commencement Date, as substantially all of the Company's cash is generally held by the Debtor's subsidiaries.

C.    **Prepetition Funded Indebtedness**

27.    As of the Commencement Date, the total principal amount of the Debtor's prepetition indebtedness is approximately $565.2 million, which is comprised of the following:

i.    **6.375% Senior Notes due 2022**

28.    The Debtor is a party to that certain Indenture (the "**Senior Notes Indenture**"), dated as of March 12, 2012, between the Debtor, as issuer, and U.S. Bank National Association, as trustee, pursuant to which, the Debtor issued 6.375% Senior Notes due 2022 in the aggregate principal amount of $500 million (the "**Senior Notes**"). Interest on the Senior Notes is payable semi-annually in arrears on March 15 and September 15 of each year. Between December 2015 and during the first half of 2016, the Debtor repurchased in the open market $70.4 million of principal amount of the Senior Notes. As of the Commencement Date, the aggregate amount outstanding with respect to the Senior Notes is approximately $429.6 million in principal and approximately $18.6 million in accrued and unpaid interest through March 17, 2017.

29.    In addition, the Debtor provided unsecured guarantees with respect to each the following obligations of its operating subsidiaries:

i.    **The Multicurrency Facility**

30.    GulfMark Americas is the borrower under that certain Multicurrency Facility Agreement dated as of September 26, 2014 with The Royal Bank of Scotland plc, as Agent and Security Agent, and certain lenders parties thereto (the "***Multicurrency Facility***").

The total line of credit under the Multicurrency Facility is $100 million, of which $72 million in principal amount is outstanding as of the Commencement Date.[3]   The Debtor is a guarantor under the Multicurrency Facility.  The borrower's obligations are secured by:  (i) mortgages on certain vessels (identified on **Exhibit C** annexed hereto); (ii) a pledge of 100% of common stock of the borrower by its immediate parent, GulfMark Management; (iii) pledge of GulfMark Americas' account with RBS and the funds held in that account; and (iv) an assignment of an insurance agreement insuring the vessels subject to the mortgages in favor of RBS.

### ii.  The Norwegian Facility

31.     GulfMark Rederi is the borrower under that certain Amended and Restated Multi-Currency Revolving Credit Facility Agreement dated as of December 27, 2012 with DNB as agent and arranger, and certain lenders parties thereto (the "**Norwegian Facility**").  The total available line of credit under the Norwegian Facility is NOK600 million (approximately $69.9 million), of which approximately $45 million in principal amount is outstanding as of the Commencement Date.[4]   The Debtor and GulfMark UK, an indirect parent of GulfMark Rederi, are guarantors under the Norwegian Facility.  The borrower's obligations are secured by:  (i) liens on all the previously unencumbered vessels of each of GulfMark UK and GulfMark Rederi thereto (identified on **Exhibit B** annexed hereto); (ii) a pledge of 100% of common stock of the borrower by its immediate parent, GulfMark Norge; (iii) a pledge of GulfMark Rederi's accounts

---

[3] As further discussed below, pursuant to that certain utilisation letter, dated March 8, 2017, between GulfMark Americas, the Debtor, and The Royal Bank of Scotland, plc ("***RBS***") in its capacity as agent under the Multicurrency Facility (the "***Multicurrency Interim Utilisation Letter***"), GulfMark Americas agreed to refrain from submitting additional draw requests under the Multicurrency Facility without prior written consent of the lenders under the facility.

[4] As further discussed below, pursuant to that certain utilization letter, dated March 17, 2017, between GulfMark Rederi and DNB in its capacity as agent under the Norwegian Facility (the "***Norwegian Interim Utilisation Letter***"), GulfMark Rederi agreed to refrain from submitting additional draw requests under the Norwegian Facility without prior written consent of the lenders under the facility.

receivable; (iv) a pledge of two earnings accounts with DNB (one denominated in NOK and one in USD) and the funds held in those accounts; and (v) an assignment of an insurance agreement insuring the vessels subject to the mortgages in favor of DNB. Upon entry by the Bankruptcy Court of an interim order approving the DIP Intercompany Facility, the Norwegian Facility will be amended and restated to provide additional borrowings of up to $35 million, which funds GulfMark Rederi will make available to the Debtor under the DIP Intercompany Facility, and DNB will receive additional collateral in the form of: (i) liens on the previously unencumbered vessels of GulfMark UK and GulfMark Rederi and assignment of insurance agreements related thereto; (ii) a deposit control agreement over a cash collateral account owned by GulfMark Rederi; and (iii) a pledge of shares of GulfMark UK by its immediate parent GulfMark North Sea.

**IV.**
**Events Leading to Commencement of this Chapter 11 Case**

A.       **Downturn in the Oil and Gas Sector**

32.       The Company's business has been impacted by the level of activity in worldwide offshore oil and natural gas exploration, development and production, which in turn is influenced by trends in oil and natural gas prices. In addition, oil and natural gas prices are affected by a host of geopolitical and economic forces. In particular, the price of oil is significantly influenced by actions of the Organization of Petroleum Exporting Countries ("**OPEC**"), overall global economic slowdown, and increases in supply due to increased U.S. shale production. Beginning in late 2014, the industry experienced a significant decline in the price of oil, causing an industry-wide downturn that continued into 2017. The decline was in part a result of an OPEC decision to increase production. The price of oil declined significantly from over $100 per barrel in July 2014 to below $30 per barrel in February 2016. This downturn

14

has significantly impacted the operational plans for oil companies, resulting in reduced expenditures for exploration and production activities, and consequently has adversely affected the drilling and support service sector.

33.    These changes in industry dynamics decreased demand for OSV services and, coupled with new construction of OSVs commenced prior to the industry downturn, led to an excess number of vessels in all of the GulfMark's operating regions.  Although OPEC met in November 2016 and agreed to limit production going forward, the cost of offshore oil and gas operations continues to exceed that of onshore operations by a significant margin, further depressing the demand for OSVs.  Moreover, day rates for the charters of vessels such as the ones offered by the Company have only recently stopped declining and begun a moderate recovery, primarily in the North Sea region.

34.    During the prolonged downturn in many regions where the Company operates, day rates for OSV services have fallen below the levels needed to sustain the Company's profitability.  As a result, the Company has removed nearly 50% of its vessels from active service (what is referred in the O&G industry as "stacking").  Specifically, of the Company's 66 vessels, 31 are stacked as of the Commencement Date (19 in the Americas, eight in the North Sea, and four in South-East Asia).

**B.    Market Analysis and Recovery Outlook**

35.    The prospect of recovery in the offshore services industry varies by geographic region and is driven by the unique characteristics of each market.

**i.    The Americas Market**

36.    The Americas market includes the United States (primarily the Gulf of Mexico), Mexico, Trinidad, and Brazil.  All of the Company's vessels based in the Americas (the majority of which, as noted above, are owned by GulfMark Americas) are supported from the

Company's onshore bases in the United States, Mexico, Trinidad, and Brazil. During 2015 and 2016, due to the continued decline in the commodities market and the resulting negative impact on demand for OSVs, the Company continued to experience significant downward pressure on its utilization and day rates. In response, the Company stacked approximately 61% of its vessels to reduce operating expenses and preserve cash. As of the Commencement Date, 17 vessels located in the Gulf of Mexico are "cold stacked" (*i.e.*, stored at dock, with skeleton crew and minimal maintenance) and two such vessels are "warm stacked" (*i.e.*, are inactive at dock, but with a full crew on standby and ready to engage on a 24-hour notice).

37. The Company's eight vessels operating in the Gulf of Mexico are primarily active in the deepwater and ultra-deepwater areas of the region. The Debtor does not expect a significant recovery in these operating areas until the price for oil stabilizes for several consecutive quarters above the level for promoting offshore drilling at between $60 and $65 per barrel and the supply of OSVs is decreased through attrition. When market conditions improve, the Debtor anticipates Mexico to become a growing market for expanded deepwater activity due in part to a December 2013 constitutional amendment that ended the Mexican government's controlled monopoly on oil and natural gas extraction and production and allowed private investment in Mexico's energy sector. The Company currently has one active and two cold stacked vessels overseen by the Company's Mexican subsidiaries. In addition, GulfMark currently operates two active vessels in Trinidad and remains committed to that market. Finally, the outlook in Brazil, which was once considered a promising market for long term PSV charters, has suffered substantially from cancellations and renegotiated terms of numerous PSV charters. In addition, many local operators have challenged the rights of foreign flagged vessels

to operate charters in Brazil.   As a result, in 2016, the Company began to wind down its operations in Brazil.

### ii.   The North Sea Market

38.     GulfMark also owns and operates vessels in the North Sea market segment (defined to include offshore Norway, Great Britain, the Netherlands, Denmark, Germany, Ireland, the Faeroe Islands, Greenland, and the Barents Sea), which is the most important geographic market for the Company.   The North Sea market has been historically the most demanding for vessel operators due to harsh weather and erratic sea conditions.   Projects in the North Sea tend to be large in scope with long planning horizons.   As a result, vessel demand in the North Sea has historically been more stable and less susceptible to abrupt swings than in other regions.   GulfMark's fleet in the North Sea market is supported from onshore bases in Aberdeen, Scotland and Sandnes, Norway.

39.     Although cost efficiencies are currently a priority of operators in this market, the Debtor believes that the Company is well positioned to benefit from the overall expected recovery in this market because of the following factors: (i) reliable and safe operations; (ii) strong brand recognition and operating reputation; (iii) vast distributor networks; (iv) proven vessels; (v) in place workforce; (vi) increased demand from several large field explorations in the Norwegian sector, as forecast by industry analysts, (vii) decommissioning work and projects in the renewables sector, and (viii) an expected upturn in drilling in remote northern areas such as the Barents Sea, Kara Sea, and offshore Greenland.

### iii.   The South-East Asia Market

40.     The Southeast Asia market is defined as offshore Asia bounded roughly on the west by the Indian subcontinent and on the north by China, then south to Australia and east to the Pacific Islands. This market includes offshore Brunei, Indonesia, Malaysia, Myanmar,

the Philippines, Thailand, Australia, New Zealand, Bangladesh, Timor-Leste, Papua New Guinea, and Vietnam.  Traditionally, the design requirements for vessels in this market called for smaller more versatile vessels.  Recently, advanced exploration technology and rapid growth in energy demand among many Pacific Rim countries have led to more remote drilling locations, which has increased both the overall demand and the technical requirements for vessels.  All of GulfMark's vessels based out of this region are supported through the Company's onshore base in Singapore.

41.    Southeast Asia's customer environment is broadly characterized by national oil companies of smaller nations and a large number of mid-sized companies, in contrast to many of the other major offshore exploration and production areas of the world, where a few large operators dominate the market.  Affiliations with local companies are generally necessary to maintain a viable marketing presence.  GulfMark has been involved in the region for many years and currently maintains long-standing business relationships with a number of local companies.

42.    Operators in the Southeast Asia market, both national oil companies and independent operators, are experiencing significant pressure to reduce their costs in light of depressed oil prices, and, as a result, their capital expenditure budgets may continue to fall.  GulfMark expects exploration and drilling activities in this region to remain flat in 2017.

C.    **Company's Efforts to Restructure Its Financial Obligations**

43.    As a result of the downturn in the oil and gas sector, the Company incurred significant losses from operations and had negative cash flow from operating activities in 2015 and 2016.  In response to the market pressures, the Company undertook a number of initiatives, including reducing direct operating expenses, lowering general and administrative

expenses, selling certain vessels opportunistically, and concentrating on strong franchise positions and its customer base.

44.     To improve its liquidity, in November 2016, the Debtor entered into a securities purchase agreement (the "**Purchase Agreement**") with certain investors to sell preferred shares of the Debtor for an aggregate purchase price of $50 million in a private placement.  Pursuant to the Purchase Agreement, the Debtor sought to raise $100 million in new term loan financing and to obtain access to a new $100 million revolving credit facility in connection with the transaction.  The Debtor intended to use some of the proceeds of the private placement and the new financing to fund a tender offer for no less than $250 million and up to $300 million in principal amount of Senior Notes, which was launched on November 30, 2016 (the "**Tender Offer**").  On December 30, 2016, the Debtor terminated the Tender Offer due to its inability to satisfy the required minimum tender condition.  On January 6, 2017, the investor parties to the Purchase Agreement terminated the agreement.

45.     Despite efforts to undertake transactions to reduce long-term debt and spending, the Debtor determined that with its current capital structure, it was unable to withstand the sustained low pricing environment for in oil and gas prices and the corresponding decline in the Company's revenues and cash flows.  Based on current market conditions, the Debtor determined that a reduction in its long-term debt and cash interest obligations was required to improve its financial position and flexibility.  To that end, the Debtor retained Weil, Gotshal & Manges LLP ("**Weil**"), as counsel, Evercore Group L.L.C. ("**Evercore**"), as investment banker, and Alvarez & Marsal North America, LLC ("**A&M**," and collectively with Weil and Evercore, the "**Advisors**") as financial advisor, to assist it in developing and implementing a comprehensive restructuring plan.

46.     As the need for a comprehensive restructuring of the Debtor's balance sheet became apparent, the Debtor sought to shore up its near-term liquidity.  To that end, on February 22, 2017, the Company submitted a request to borrow £29 million (approximately $36.2 million) from the Multicurrency Facility, which request was not funded by the Multicurrency Facility lenders.  After approximately two weeks of negotiations, on March 8, 2017, GulfMark Americas, the Debtor, and RBS entered into the Multicurrency Interim Utilisation Letter, pursuant to which the lenders agreed to fund $10 million.  The Multicurrency Interim Utilisation Letter provided as conditions to funding that, among other thing, the GulfMark entities pay for the retention of FTI Consulting, Inc., as financial advisor to RBS, and Sullivan & Cromwell LLP, as counsel to RBS, and reimburse RBS for certain costs and expenses.  In addition, GulfMark Americas agreed that it will not submit any further borrowing requests under the Multicurrency Facility without the prior written consent of RBS.

47.     In addition, on March 8, 2017, GulfMark Rederi requested to borrow $10 million under the Norwegian Facility.  On March 17, 2017, GulfMark Rederi and DNB entered into the Norwegian Interim Utilisation Letter, pursuant to which DNB consented to the funding request, and GulfMark Rederi agreed to be jointly liable for all legal fees and costs related to DNB's engaging Hughes Hubbard & Reed LLP, as its U.S. legal counsel, and Advokatfirmaet Thommessen AS, as its Norwegian legal counsel and Guggenheim Securities LLC as its financial advisor.

48.     On March 13, 2017, the Debtor elected to utilize the 30-day grace period with respect to the March 15, 2017 interest payment on the Senior Notes (the "***Grace Period***") to continue working with the Advisors to review strategic alternatives for restructuring the Company's debt and for negotiating with key stakeholders.

D.      **Negotiations with Creditors**

49.     Since early March 2017, the Company and its Advisors have been actively engaged in discussions and negotiations regarding restructuring alternatives with an ad hoc group of holders of Senior Notes (the "**Ad Hoc Group**") and agreed to pay for the engagements of Milbank, Tweed, Hadley & McCloy LLP, as the Ad Hoc Group's legal counsel, and Houlihan Lokey Capital, Inc., as the Ad Hoc Group's financial advisor, effective November 15, 2016.[5] During these negotiations, the Company and its Advisors assisted the Ad Hoc Group and its advisors in conducting diligence, and the parties exchanged several comprehensive restructuring proposals and counterproposals.  During this same time and leading up to the Commencement Date, the Debtor's Board of Directors convened periodically to consider proposals to be provided to, and received from, the Ad Hoc Group and consider other strategic options.

50.     In early March 2017, as the Company's consolidated financial statements for the year ended December 31, 2016 were being completed, it became clear that the Company would likely not be able to meet certain financial covenants measured as of March 31, 2017.  As a result, the Debtor expected to receive an independent auditor report to accompany the Debtor's audited consolidated financial statements for the fiscal year ending December 31, 2016 (the "**Audit Opinion**") that would contain a qualification regarding GulfMark's ability to continue as a going concern.  The failure to receive an unqualified Audit Opinion would have been considered an Event of Default and allowed the Multicurrency Facility lenders to accelerate the indebtedness thereunder, which could have caused a cross-acceleration of indebtedness under the Norwegian Facility and the Senior Notes.  To avoid this outcome, on March 14, 2017, the Company negotiated and obtained a temporary forbearance agreement (the "**RBS Support**

---

[5] In addition, the Ad Hoc Group engaged Morris Nichols, Arsht & Tunnell LLP as local counsel and Seward & Kissel LLP as maritime counsel.

**Letter**") from the Multicurrency Facility lenders, pursuant to which the Multicurrency Facility lenders agreed to forbear from exercising remedies based on certain enumerated defaults during the forbearance period, which ran conterminously with the Grace Period and was scheduled to expire on April 14, 2017, the last date of the Grace Period.

51.     Upon expiration of the Grace Period, the Debtor did not make the interest payment on the Senior Notes and entered into a forbearance agreement with the Ad Hoc Group (the "**Senior Notes Forbearance Agreement**") for a period of two weeks, which agreement was subsequently extended several times.   The Company also entered into further extensions of the forbearance period with the Multicurrency Facility lenders (the "**RBS Support Extension**") and obtained a forbearance from DNB as the agent and sole lender under the Norwegian Facility (the "**DNB Support Letter**"), which was subsequently extended.   The Senior Notes Forbearance Agreement, the RBS Support Extension, and the DNB Support Letter each require that other forbearance agreements remain in effect as a condition to continued effectiveness.

**E.**     **The Terms of the Restructuring and the RSA**

    **i.**   **The Signing of the RSA and the Backstop Agreement**

52.     The Debtor used the time afforded by the waivers and forbearances to continue negotiations with its creditors on two parallel fronts.   First, the Debtor, together with its advisors and the advisors for the Ad Hoc Group, engaged in negotiations with the Company's secured lenders regarding the Debtor's exit financing options.     Additionally, the Debtor continued negotiations with the Ad Hoc Group regarding a comprehensive financial restructuring for the Company.   These negotiations included in-person meetings, conference calls, and a number of term sheet iterations, which ultimately culminated in an agreement with respect to the Restructuring and the execution of the RSA.   The Debtor believes that the Restructuring is in the best interest of its estate and creditors.   The Restructuring will enable the Debtor to emerge from

chapter 11 as a deleveraged and properly capitalized company poised to succeed in a difficult offshore energy services market.

53.     Under the RSA, each of the Consenting Noteholders agreed, subject to the terms and conditions of the RSA, among other things, to:  (i) vote any claim it holds against the Debtor to approve the Plan and not (a) change or withdraw (or cause to be changed or withdrawn) its vote to accept the Plan, (b) object to, delay, impede, or take any other action to interfere with, delay, or postpone acceptance, consummation, or implementation of the Plan, or (c) propose, file, support, or vote for any restructuring, sale of assets, workout, or plan of reorganization for the Debtor other than the Plan and, (ii) subject to certain exceptions, limit its ability to transfer the indebtedness it holds.

54.     Further, under the RSA, the Debtor agreed, among other things:  (i) to support and use commercially reasonable efforts to (a) pursue and complete the Restructuring and all the related transactions contemplated under the RSA (and, once filed, the Plan), (b) take any and all reasonably necessary actions in furtherance of the Restructuring and all the related transactions contemplated under the RSA (and, once filed, the Plan), and (c) obtain all required regulatory and/or third-party approvals necessary to consummate the Restructuring; (ii) to take no action directly or indirectly that is inconsistent with the RSA or the Plan or that would materially delay approvals of the disclosure statement, the solicitation procedures, or confirmation or consummation of the Plan; (iii) to not encourage any other person to take any action which would, or would reasonably be expected to, breach or be inconsistent with the RSA or delay, impede, appeal, or take any other negative action, directly or indirectly, to interfere with the acceptable implementation of the Restructuring; and (iv) to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the

restructuring, negotiate in good faith appropriate additional or alternative provisions to address any such impediment.

55.     The RSA contemplates that the Debtor will proceed through the Chapter 11 Case in accordance with the deadlines set forth below (which may be extended by written consent of the Requisite Noteholders).  The Consenting Noteholders' obligations under the RSA may be terminated in the event that the following milestones are not achieved:

i.      no later than May 24, 2017, the Debtor will file with the Bankruptcy Court motions seeking entry of orders (x) authorizing the Debtor to assume the Backstop Agreement (as defined below) and the RSA and the Debtor's obligations thereunder, and (y) approving procedures for the Rights Offerings (together, the "**RSA and Backstop Motions**");

ii.     by not later than May 28, 2017, the Debtor will file with the Bankruptcy Court the Acceptable Plan (as defined in the RSA), the Disclosure Statement, and a motion seeking a hearing to consider the adequacy of the Disclosure Statement and approval of the solicitation procedures;

iii.    the Debtor will seek to have the RSA and Backstop Motions heard at the hearing scheduled to consider the "first day" motions on a final basis (the "**Second Day Hearing**");

iv.     by not later than the date that is the earlier of (x) the day that is two (2) business days following the Second Day Hearing, and (y) June 26, 2017, the Bankruptcy Court will have entered an order approving the RSA Motion (the "**RSA Order**");

v.      by not later than July 7, 2017, the Bankruptcy Court will have entered an order approving the Backstop Motion (the "**Backstop Order**") and an order approving the adequacy of the Disclosure Statement and the solicitation procedures; *provided*, that the Debtor will use commercially reasonable efforts to seek entry of the forgoing orders as soon as reasonably practicable before July 7, 2017;

vi.     within twenty (20) business days following the entry of the Backstop Order, but in no event later than August 4, 2017, the Debtor will complete the solicitation in connection with the Rights Offerings (other than funding in connection with the Backstop Commitments (as defined in the Backstop Agreement));

vii.   by not later than August 21, 2017, the Bankruptcy Court will have entered an order confirming the Plan; *provided*, that the Company will use commercially reasonable efforts to seek entry of the foregoing order as soon as reasonably practicable before August 21, 2017; and

viii.   by not later than September 4, 2017, the Debtor will consummate the transactions contemplated by the Plan (the date of such consummation, the "**Effective Date**"), it being understood that the satisfaction of the conditions precedent to the Effective Date (as set forth in the Plan) are conditions precedent to the occurrence of the Effective Date.

56.   The Plan will provide the Debtor with additional capital via two Rights Offerings designed to generate $125 million.  Pursuant to the Rights Offerings, the holders of Senior Notes will receive subscription rights to purchase their pro rata share of new common shares of the Reorganized Debtor (the "**New Common Stock**") and Jones Act-compliant warrants (the "**New Noteholder Warrants**"; the shares issuable pursuant to such warrants, together with the New Common Stock, the **"Reorganized GulfMark Equity**").[6]  Additionally, certain of the Consenting Noteholders (collectively, the "**Backstop Parties**") have entered into that certain Backstop Commitment Agreement, dated as of May 15, 2017 (the "**Backstop Agreement**"), to ensure that the Rights Offerings are fully subscribed.  In exchange for their commitment to backstop the Rights Offerings, the Backstop Parties will receive a payment of $7.5 million, paid in New Common Stock, which amounts to 3.6% of the Reorganized GulfMark Equity (the "**Commitment Premium**").

57.   To assure sufficient funding of the operations of its operating subsidiaries after the Debtor emerges from this Chapter 11 Case, the Debtor continues to negotiate the terms of exit financing with the existing lenders under the Multicurrency Facility and the Norwegian Facility and other parties.

---

[6] The securities issued upon the exercise of the subscription rights will be exempt from registration pursuant to either (i) section 1145 of the Bankruptcy Code or (ii) Section 4(a)(2) of the Securities Act of 1933, as amended, and Regulation D thereunder.

### ii. The Highlights of the Plan

58.     The Plan provides for the following treatment of the major stakeholders of

GulfMark:

> i.   Treatment of the RBS Guaranty Claims will be reasonably agreed among the Debtor and the Requisite Noteholders; *provided*, that both the Debtor and Requisite Noteholders agree that any treatment that would meet the requirements for confirmation of a plan of reorganization under section 1129(b) of the Bankruptcy Code shall be deemed reasonably acceptable;
>
> ii.  Treatment of the DNB Guaranty Claims will be unimpaired or otherwise reasonably agreed among DNB, the Debtor, and the Requisite Noteholders;[7]
>
> iii. Each holder of the Senior Notes claims will receive, subject to the Jones Act Procedures outlined in the Plan, (a) its *pro rata* share of the Reorganized GulfMark Equity representing in the aggregate 35.65% of Reorganized GulfMark Equity, subject to dilution by the Common Shares issuable under a management incentive plan (the "**MIP**") and the exercise of certain warrants; and (b) the right to participate in the Rights Offerings;
>
> iv.  Holders of general unsecured claims will not be impaired under the Plan.  The Debtor or the Reorganized Debtor will continue to pay such claims in the ordinary course of business or provide the holders of general unsecured claims with such other treatment that would render them unimpaired; and
>
> v.   Existing equity of GulfMark Parent will be cancelled on the Effective Date, and the holders of such interests will receive (i) their pro rata share of 0.75% of the Reorganized GulfMark Equity in the form of New Common Stock and (ii) warrants (the "**Warrants**") to purchase 7.5% of the total outstanding equity (before giving effect to the dilution by the New Common Stock issuable under the MIP) exercisable for a seven (7) year period at a per share price based upon a total equity value of reorganized GulfMark Parent of $1 billion.

---

[7] The term sheet that is an exhibit to the RSA provides that the treatment of the Norwegian Credit Facility (including, without limitation, any refinancing thereof) will be reasonably acceptable to the Debtor and the Requisite Noteholders.  DNB consent is required to the extent such treatment does not provide for payment in full in cash of all obligations under the Norwegian Credit Facility and termination of all commitments thereof on the Effective Date.

59.     Upon the implementation of the Plan, the Debtor will achieve a significant deleveraging of GulfMark's capital structure by eliminating approximately $429.6 million in principal amount of unsecured bond debt, while obtaining $125 million in new equity capital. The reduced debt burden and new funds will enhance the Debtor's liquidity to enable it to continue funding the Company's operations and to make the necessary capital expenditures and investments to ensure that the Company will not only be competitive, but well positioned to capitalize on the recovery in the offshore energy services industry.

## V.
## Relief Sought in First Day Motions

60.     Below is an overview of the First Day Motions, pursuant to which the Debtor seeks relief intended to facilitate a smooth transition into this Chapter 11 Case and minimize disruptions to the Debtor's business operations.[8]

**Motion of Debtor Pursuant to 11 U.S.C. §§ 105(a), 363(b), 507(a), and 541(d) and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Orders (I) Authorizing Debtor to Pay Certain Prepetition Taxes and Assessments, and (II) Granting Related Relief**

61.     In this motion (the "**Tax Motion**"), the Debtor requests (i) authority to satisfy all Franchise Taxes, Property Taxes, and Income Taxes (each as defined in the Tax Motion, and collectively, the "**Taxes**") due and owing to various local, state, and federal taxing authorities (collectively, the "**Taxing Authorities**")[9] that arose prior to the Commencement Date, including all Taxes subsequently determined by audit or otherwise to be owed for periods prior to the Commencement Date, and (ii) that the Court direct applicable banks and other

---

[8] Capitalized terms used by not defined in this Section V of this Declaration have the meanings ascribed to them in the respective motion.

[9] The definition of "Taxing Authorities" includes, but is not limited to, those parties set forth on the Taxing Authority List (as defined in the Tax Motion). The inclusion of any entity on, or the omission of any entity from, the Taxing Authority List is not an admission by the Debtor that such entity is, or is not, a Taxing Authority to which the Debtor owes any amount, and the Debtor reserves all rights with respect to any such determination.

financial institutions to receive, honor, process, and pay all checks issued or to be issued and electronic funds transfers requested or to be requested relating to the above.

62.     The Debtor seeks to pay the prepetition Taxes to, among other things, prevent the Taxing Authorities from taking actions that may interfere with the Debtor's continued business operations.  It is my understanding that nonpayment of these obligations may cause the Taxing Authorities to take precipitous action, including, but not limited to, asserting liens or seeking to lift the automatic stay, which would disrupt the Debtor's day-to-day operations and could potentially impose significant costs on the Debtor's estate.  Failure to satisfy the prepetition Taxes may jeopardize the Debtor's maintenance of good standing to operate in the jurisdictions in which it does business.

63.     The Debtor's failure to pay Taxes, such as the Property Taxes, may increase the amount of secured claims held by the Taxing Authorities against the Debtor's estate. Specifically, it is my understanding that the Taxing Authorities may also assert liens against any personal property for which these Taxes are due and owing.  Moreover, to the extent the Taxing Authorities hold oversecured claims, if the prepetition Taxes are not paid, postpetition interest, fees, penalties, and other charges may accrue.  Paying the prepetition Taxes now will avoid the potential imposition of liens and the accrual of interest charges and unnecessary fees and penalties on such claims, thereby preserving the value of the Debtor's estate and maximizing the distribution available for other creditors.  Accordingly, it is my belief that the foregoing reasons, granting the Debtor authority to pay the prepetition Taxes in the ordinary course is necessary, appropriate, and in the best interests of the Debtor, its estate, and all other parties in interest in this case.

**Motion of Debtor Pursuant to 11 U.S.C. §§ 105(a), 345(b), 363(b)(1), 363(c)(1), and 364(a) and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Orders**

**(I) Authorizing Debtor to (A) Continue Its Existing Cash Management System, as Modified, (B) Maintain Business Forms and Existing Bank Accounts, and (C) Continue Intercompany Arrangements and Transactions; (II) Granting Administrative Claim Status for Postpetition Intercompany Claims; (III) Extending Time to Comply with, or Seek Waiver of, Requirements of 11 U.S.C. § 345(b); and (IV) Granting Related Relief**

64.    Through this motion, the Debtor requests (i) interim and final authority to (a) continue to participate in the Company's Cash Management System (as defined below), including the continued maintenance of existing Bank Accounts; (b) maintain existing business forms; and (c) continue its intercompany transactions; (ii) that this Court grant administrative claim status for postpetition Intercompany Claims; (iii) an extension of time to comply with, or seek waiver of the requirements of, section 345(b) of the Bankruptcy Code; and (iv) related relief.

65.    Historically, the Debtor has used the Cash Management System in the ordinary course of business to fund its operations, as well as the operations of its Non-Debtor Affiliates.  The Cash Management System is tailored to meet GulfMark's operating needs as an international offshore shipping company.  It allows the Debtor and its Non-Debtor Affiliates to collect and transfer the cash generated by their businesses and pay their financial and other obligations in an efficient manner.  It also enables the Company to facilitate its cash forecasting and reporting, monitor its collection and disbursement of funds, and maintain control over the administration of the Bank Accounts.

66.    In my review of the Debtor's business operations, I have determined that the "**Cash Management System**" is comprised of sixty-nine (69) bank accounts that are maintained at various banks in the United States and internationally.  Of these bank accounts, only two (2) (each, a "**Bank Account**" and collectively, the "**Bank Accounts**") are held by the Debtor and the remaining sixty-seven (67) are held by the Non-Debtor Affiliates.  My review of

the relevant account documents has revealed that one of the Debtor's Bank Accounts, the Existing Chase Account, is maintained with Chase. This bank is an authorized depository (as such, an "**Authorized Depository**") under the Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees ("**UST Operating Guidelines**") published by the U.S. Trustee. The other Bank Account is maintained by DNB. This bank is not an Authorized Depository under UST Operating Guidelines and is not a party to a Uniform Depository Agreement with the U.S. Trustee.

67.     The Debtor historically has maintained only two (2) Bank Accounts; one active Bank Account with JPMorgan Chase & Co. ("**Chase**") (No. x1876) (the "**Existing Chase Account**") and one inactive Bank Account with DNB (together with Chase, the "**Banks**") (No. x4002), which holds *de minimis* funds as of the Commencement Date.

68.     Prior to the Commencement Date, the Debtor used the Existing Chase Account to make payments on account of interest due on the Senior Notes, fees to professionals it retains on behalf of the entire enterprise, insurance expenses, board fees and expenses, and miscellaneous vendor expenses. It also used the Existing Chase Account to collect certain distributions from its foreign subsidiaries.

69.     Historically, the Existing Chase Account was a zero balance account ("**ZBA**") that was funded from an account (the "**Americas Concentration Account**") owned by the Non-Debtor Affiliate GulfMark Americas. Amounts collected in the Existing Chase Account were swept into the Americas Concentration Account. The Americas Concentration Account is a key element of the Cash Management System; it is used for cash collections generated by the operations of GulfMark Americas, certain disbursements related to operations and corporate overhead, and concentrating cash in the Americas Cash Management System. Traditionally, the

RLF1 17564271V.1

Existing Chase Account received, on average, approximately $4.3 million each month from the Americas Concentration Account, and the Americas Concentration Account received, on average, approximately $22,000 each month from the Existing Chase Account.  The transfers of funds between the Existing Chase Account and the Americas Concentration Account were reflected as payables and receivables in the corresponding entities' books and records as described below.

70.    The Debtor is required to modify the prepetition Cash Management System to satisfy requirements under the DIP Intercompany Facility under a credit agreement (the "**DIP Intercompany Credit Agreement**") between the Debtor, as the borrower, Non-Debtor Affiliate GulfMark Rederi, as the Lender, and DNB as the Issuing Bank.  Specifically, pursuant to the DIP Intercompany Credit Agreement, the Debtor is required to enter into a deposit account control agreement ("**DACA**") with Chase over the Existing Chase Account, which will hold proceeds from the DIP Intercompany Facility.  The DACA will limit Chase's set off rights against the Existing Chase Account.   Chase will also remove the Existing Bank Account's ZBA functionality.

71.    The Debtor will use the proceeds from the DIP Intercompany Facility to fund operations of GulfMark Americas, in which case the proceeds of the DIP Intercompany Facility will be transferred from the Existing Chase Account to the Americas Concentration Account, consistent with the budget attached to the Interim DIP Order (the "**DIP Budget**") and subject to a condition that no more than $3.0 million be held in the Americas Concentration Account by the close of business on the Friday of each week, without giving effect to cash receipts in the Americas Concentration Account on such Friday, subject to certain exceptions. Such transfers from the Debtor to GulfMark Americas will be reflected as Intercompany Loans

(defined below).  The Debtor will also use the proceeds of the DIP Intercompany Facility and the Existing Chase Account to pay its own expenses.   Accordingly, funds will no longer be transferred from the Americas Concentration Account to the Existing Chase Account for the primary purpose of funding the Debtor's expenses.

72.    Historically, the Debtor engaged in numerous intercompany transactions (the "**Intercompany Transactions**") with various Non-Debtor Affiliates, including GulfMark Americas and GulfMark Management, Inc. ("**GulfMark Management**").  These Intercompany Transactions took the form of either (i) documented intercompany loans by the Debtor (the "**Intercompany Loans**") or (ii) accounting entries on the books of the Debtor and the relevant Non-Debtor Affiliates where such intercompany transactions were in the ordinary course (the "**Ordinary Course Intercompany Transactions**").

73.    The Debtor used proceeds from the issuance of the Senior Notes and dividends that it received from foreign subsidiaries to make Intercompany Loans to each of GulfMark Americas and GulfMark Management.  The books and records of the Debtor reflect an approximate amount of $344.2 million due from those two entities on account of Intercompany Loans.

74.    In addition, the Debtor and GulfMark Americas engaged in Ordinary Course Intercompany Transactions with each other.  The books and records of the Debtor reflect approximately $19.2 million of net accounts receivable due from GulfMark Americas as a result of such transactions.   Such balances arose as a result of the Debtor paying certain ordinary course expenses of GulfMark Americas.  However, over the last 12 months, only approximately $5,000 of such payments have been made.  In other instances, GulfMark Americas pays certain

expenses of the Debtor.[10]   Such payments are setoff against the GulfMark Americas account receivable balance on the books of the Debtor.

75.     Thus, the Debtor is seeking authority, during the pendency of this chapter 11 case, to continue to (a) engage in the Ordinary Course Intercompany Transactions and (b) extend Intercompany Loans to certain Non-Debtor Affiliates, subject to the limitations set forth in the DIP Intercompany Credit Agreement and the Interim DIP Order.   The Debtor is requesting that any claims arising from Ordinary Course Intercompany Transactions between the Debtor and a Non-Debtor Affiliate arising postpetition be afforded administrative claim status.

76.     In my opinion, the Intercompany Transactions are the sorts of transactions that are common and routine among many business enterprises that operate through multiple affiliates.   Intercompany Transactions allow the Debtor and certain of its Non-Debtor Affiliates (i) to transfer cash throughout different operations within GulfMark's business and (ii) to provide professional support to entities within the GulfMark enterprise that do not employ certain professionals and rely on, primarily, the Debtor and GulfMark Americas to hire outside professionals and to deliver managerial services to the enterprise.

77.     Furthermore, I believe that allowing the Debtor to engage in the Intercompany Transactions is necessary to preserve the value of the Company's entire corporate enterprise.   The Debtor's only assets are the stock in its subsidiaries and its Intercompany Claims.   Operationally, GulfMark Americas is cash flow negative, and it does not have its own funding source currently.   Allowing the Debtor to lend proceeds from the DIP Intercompany Facility to its subsidiary GulfMark Americas to satisfy its operational needs will directly benefit the Debtor by preserving the value of one of its assets.   This will allow the Debtor to engage in a

---

[10] For example, GulfMark Americas makes lease payments on certain equipment leases, which are  approximately $1,500 per month

smooth restructuring, without the risk of portions of its business enterprise collapsing from liquidity shortages, and maximize the value of its assets for the benefit of its estate and its creditors.

79. It is my belief that the movement of cash between the Debtor and its Non-Debtor Affiliates is a component of the Cash Management System that is integral to the Debtor's and its Non-Debtor Affiliates' ability to conduct their global operations.  In my opinion, the Cash Management System constitutes an ordinary course and essential business practice providing significant benefits to the Debtor, including the ability to control corporate funds, ensure the maximum availability of funds when and where necessary, reduce borrowing costs and administrative expenses by facilitating the movement of funds, and ensure the availability of timely and accurate account balance information consistent with prepetition practices. Accordingly, I believe that the continued use of the Cash Management System without interruption is vital to the Debtor's business operations and the success of this chapter 11 case.

**Motion of Debtors Pursuant to Sections 362 and 105(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 for Interim and Final Orders Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interests in the Debtors**

79. Pursuant to sections 105(a) and 362 of the Bankruptcy Code, the Debtor seeks entry of interim and final orders authorizing the Debtor to establish procedures (the "**Procedures**") to protect the potential value of the Debtor's consolidated net operating loss carryforwards ("**NOLs**") for use in connection with its reorganization (the "**NOL Motion**").  The Procedures apply to common stock of the Debtor (the "**Common Stock**") and any options or similar rights (within the meaning of applicable U.S. Treasury regulations) to acquire such stock ("**Options**" and together with Common Stock, the "**GulfMark Stock**").  The Debtor also seeks

to expressly reserve the right, in the event the Proposed Plan is withdrawn, to seek amendments to the Procedures to also apply to claims against the Debtor.

80.     The Debtor has certain valuable tax attributes, which include, as of May 16, 2017, estimated NOLs in excess of $160 million (the "**Tax Attributes**").  Title 26 of the United States Code (the "**Tax Code**") generally permits corporations to carry forward their tax attributes to reduce future taxable income.  Accordingly, the Tax Attributes are available to offset any income realized through the taxable year that includes the effective date of a chapter 11 plan, and potentially thereafter.  Accordingly, I believe the Tax Attributes could translate into future tax savings over time and any such savings could enhance the Debtor's cash position for the benefit of all parties in interest and contribute to the Debtor's efforts toward a successful reorganization.

81.     The Debtor's ability to use the Tax Attributes to reduce future tax liability is subject to certain statutory limitations.  Sections 382 and 383 of the Tax Code limit a corporation's use of its tax attributes to offset future income after that corporation has undergone an "ownership change" within the meaning of section 382 of the Tax Code ("**Section 382**" and such ownership change, an "**Ownership Change**").  Pursuant to section 382, an Ownership Change generally occurs when the percentage of a corporation's equity held by its "5-percent shareholders" (within the meaning of section 382) increases by more than 50 percentage points above the lowest percentage of ownership owned by such shareholder(s) at any time during the relevant testing period (usually three years).

82.     I believe that the Debtors' Tax Attributes would be adversely affected (and could be effectively eliminated) by an Ownership Change during the pendency of the Chapter 11 Case.  If such an Ownership Change occurs, the valuation for determining the annual

amount of useable Tax Attributes is expected to be at or close to zero, which may effectively eliminate the availability of such Tax Attributes.  It is therefore in the best interests of the Debtor and its stakeholders to restrict trading that could result in an Ownership Change before the effective date of a chapter 11 plan or other applicable Bankruptcy Court order.  This would protect the Debtor's ability to use the Tax Attributes during the pendency of these Chapter 11 Case or, potentially, in the event of a future transaction, to offset gain or other income recognized in connection with the Debtor's sale or ownership of its assets, which may be significant in amount.  Although the limitations imposed by Section 382 of the Tax Code may be significantly lessened when an Ownership Change occurs pursuant to a confirmed chapter 11 plan (or applicable court order), the benefits of a confirmed plan (or court order) would not be applied retroactively to reduce limitations on tax attributes imposed by a previous Ownership Change.

83.     The Restructuring contemplates a reorganization of the Debtor that will involve the issuance of new common stock in the Reorganized Debtor (or any successor to the Debtor) and the distribution of such stock to certain creditors in satisfaction, in whole or in part, of their respective claims against the Debtor.  This issuance and distribution likely would result in an Ownership Change.  In such event, it is possible that the special relief afforded by section 382(l)(5) of the Tax Code could be available to and beneficial for the Debtor, and that the Debtor would, therefore, seek to qualify the restructuring for such relief.  The Proposed Plan is not predicated on qualifying for such relief.  However, in the event the Plan is withdrawn, such relief may become unavailable if certain procedures and potential restrictions relating to the trading and accumulation of certain claims prior to the effective date of a chapter 11 plan are not effective *nunc pro tunc* to the Commencement Date.  Accordingly, in the event the Proposed

RLF1 17564271V.1

Plan is withdrawn, the Debtors expressly reserve the right to request a court order amending the Procedures.

84.     I believe the Procedures are necessary to preserve the Debtor's ability to use the Tax Attributes, while providing certain latitude for trading.  The Debtor's ability to preserve the Tax Attributes may be seriously jeopardized unless procedures are established immediately and *nunc pro tunc* to the Commencement Date to ensure that trading in certain interests in is either precluded or closely monitored and made subject to Court approval.

**Emergency Motion of Debtor Pursuant to 11 U.S.C 105(a), 362(d), 363(b), and 503(b) and Fed. R. Bankr. P. 4001, 6003, and 6004 Authorizing the Debtor to Continue Insurance Programs and Pay All Obligations with Respect Thereto**

85.     Through the Insurance Motion, the Debtor requests entry of interim and final orders (i) authorizing the Debtor (a) to continue its Insurance Programs (as defined in the Insurance Motion) in the ordinary course of business and (b) to pay any prepetition obligations arising with respect thereto; (ii) authorizing all financial institutions to honor all related checks and transfers; and (iii) modifying the automatic stay imposed by section 362 of the Bankruptcy Code with respect to the P&I Programs (as defined in the Insurance Motion).

86.     In the ordinary course of their business, the Debtor participates in various insurance programs (each, an "**Insurance Program**") in accordance with its respective insurance policies (each, an "**Insurance Policy**") with several insurance carriers (each, an "**Insurance Carrier**"), including: (i) protection and indemnity insurance for both the American and international fleets; (ii) coverage of the Debtors' general liability; (iii) coverage for each of the Debtors' vessels' hull, machinery, and cargo; (iv) coverage over risks associated with war; (v) coverage for pollution caused by the Debtors' vessels; (vi) coverage for automobiles in the United States; (vii) general coverage of workers' compensation and employer liability; (viii)  an international package covering general liability, employee benefits liability, and contingent auto

liability for the Debtors' operations outside the United States; (ix) general, excess, and tail coverages of director and officer liability and indemnification; (x) fiduciary liability regarding employment practices and benefits programs; (xi) reimbursement coverage against certain liabilities, such as crime, cyber security, and general property liability; (xii) coverage for various U.K. employer liability insurance; (xiii) excess liability coverage for marine insurance programs; and (xiv) other insurance policies relevant to their business.

87.     As of the Petition Date, the Debtor is obligated to make payments under insurance financing arrangements or to make premium installment payments related to several Insurance Policies, which total approximately $2.2 million, of which approximately $1.1 million is due during the interim period. Although these amounts primarily consist of postpetition obligations, the Debtor is seeking relief to pay these amounts out of an abundance of caution.

88.     In my opinion, the Insurance Programs are vital to the Company's continued operations.  Specifically, applicable state laws mandate that certain Debtors maintain workers' compensation coverage for their employees.  The Debtor's failure to pay its obligations under the Workers' Compensation Program could jeopardize its coverage and expose the Company to significant liability in fines by state workers' compensation boards.  In addition, federal laws provide that the Debtor cannot engage in its operations without providing proof of existing vessel pollution coverage.  Moreover, under the laws of the U.S. states where the Company does business, the Company cannot operate its fleet of vehicles without auto liability insurance.  Accordingly, I believe that the Debtor must continue to make payments related to these programs in the ordinary course.

RLF1 17564271V.1

**Debtor's Motion for Order Approving the Notice to Customers, Suppliers, and Other Stakeholders of Debtor's Non-Debtor Affiliates**

89.    In this motion (the "**Non-Debtor Affiliate Motion**"), the Debtor requests entry of an order approving the form of notice to distribute, in the Debtor's discretion, to customers, suppliers, and other stakeholders of the Debtor's non-Debtor subsidiaries and affiliates, substantially in the form of the notice annexed to the Non-Debtor Affiliate Motion as **Exhibit A** (the "**Notice**").

90.    I believe that the relief requested in the Non-Debtor Affiliate Motion will aid in the administration of this chapter 11 case and to help ensure that the Debtor's global business operations are not disrupted.  As an industry leader in the offshore marine services industry, word of this chapter 11 case will quickly spread internationally to various third parties that deal with the Debtor and the Debtor's non-Debtor Affiliates (the "**Non-Debtor Affiliates**"), likely creating confusion as to which affiliates are, and which affiliates are not, debtors in this chapter 11 case.  As a result of this confusion, the Debtor believes that some third parties may be hesitant or, worse yet, refuse to deal with the Non-Debtor Affiliates under the mistaken assumption that such affiliates are part of this bankruptcy case.  Such a result would impair the operations of the Non-Debtor Affiliates, which would ultimately prejudice the Debtor's reorganization efforts.  Accordingly, to sustain customer confidence and to minimize the risk of an interruption in the supply of goods, the Debtor believes that it is beneficial to communicate to the Company's non-U.S. customers and suppliers that the Non-Debtor Affiliates are not included in this chapter 11 case and thus, are not subject to this Court's supervision or the chapter 11 process.

RLF1 17564271V.1

91.     Based on the foregoing, I believe that the relief requested in the Non-Debtor Affiliate Motion is in the best interests of the Debtor, its estate, and all parties in interest and should be granted in all respects.

## Conclusion

92.     The above describes the Debtor's business and capital structure, the factors that precipitated the commencement of this chapter 11 case, the terms of the Debtor's balance sheet restructuring, and the critical need for the Debtor to restructure its financial affairs and operations.  The provisions of the Bankruptcy Code will assist the Debtor in achieving its financial reorganization and reestablishing itself as a healthy economic enterprise able to compete effectively in its industry for the benefit of its stakeholders and the Company's employees.

RLF1 17564271V.1

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 17, 2017
        Wilmington, Delaware

                                        /s/ Brian J. Fox
                                        Brian J. Fox
                                        Alvarez & Marsal North America, LLC

## Exhibit A

**Restructuring Support Agreement**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF VOTES WITH RESPECT TO A PLAN OF REORGANIZATION. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

**THE REGULATORY, TAX, ACCOUNTING, AND OTHER LEGAL AND FINANCIAL MATTERS AND EFFECTS RELATED TO THIS TRANSACTION HAVE NOT BEEN FULLY EVALUATED, AND ANY SUCH EVALUATION MAY AFFECT THE TERMS AND STRUCTURE OF ANY TRANSACTION. THE TRANSACTIONS CONTEMPLATED IN THIS RESTRUCTURING SUPPORT AGREEMENT ARE SUBJECT IN ALL RESPECTS TO CONTINUED DILIGENCE AND THE NEGOTIATION, EXECUTION, APPROVALS, AND DELIVERY OF DEFINITIVE DOCUMENTS.**

---

### GulfMark Offshore, Inc.

### <u>RESTRUCTURING SUPPORT AGREEMENT</u>

### May 15, 2017

---

This Restructuring Support Agreement (together with the exhibits and schedules attached hereto, as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "***Agreement***"),[1] dated as of May 15, 2017, is entered into by and among:

(i) GulfMark Offshore, Inc., ("***GulfMark***", the "***Debtor***" or the "***Company***"); and

(ii) the undersigned beneficial holders, or investment advisers or managers for the account of beneficial holders of the 6.375% Senior Notes due 2022 (the "***Noteholders***") issued pursuant to that certain indenture dated as of March 12, 2012 (the "***Indenture***"), among the Issuer and U.S. Bank National Association, a national banking association, as trustee (the "***Notes***"), together with their respective successors and permitted assigns that subsequently become party hereto in accordance with the terms hereof (collectively, the "***Consenting Noteholders***").

---

[1] Unless otherwise noted, capitalized terms used but not immediately defined have the meanings given to such terms elsewhere in this Agreement, or in the Restructuring Term Sheet, or in the Bankruptcy Code, as applicable.

The Company, the Consenting Noteholders, and any subsequent person or entity ("***Person***") that becomes a party hereto in accordance with the terms hereof is referred to herein as a "***Party***" and collectively as the "***Parties***."

## RECITALS

**WHEREAS**, the Parties have negotiated in good faith at arm's length regarding a financial restructuring of the existing debt of the Company (the "***Restructuring***") pursuant to the terms and conditions set forth in this Agreement, including, without limitation, the term sheet attached hereto as **Exhibit A** (the "***Restructuring Term Sheet***") and incorporated herein by reference pursuant to Section 2 hereof;

**WHEREAS**, it is contemplated that the Restructuring will be implemented, pursuant to a pre-negotiated joint plan of reorganization, on terms consistent with this Agreement and otherwise reasonably acceptable to the Company and the Requisite Noteholders (as defined herein) (including any schedules and exhibits thereto and as may be amended, modified, or supplemented in accordance with this Agreement, the "***Acceptable Plan***"), to be filed in a case (the "***Chapter 11 Case***") commenced under Title 11 of the United States Code, 11 U.S.C. §§ 101- 1532, as may be amended from time to time (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***");

**WHEREAS**, in connection with the Restructuring, it is expected that certain of the Consenting Noteholders (the "***Backstop Parties***") will agree to backstop two offerings for shares of common stock and warrants of GulfMark for an aggregate of $125,000,000, representing 60% of the equity of GulfMark under section 1145 of the Bankruptcy Code and Section 4(a)(2) of the U.S. Securities Act of 1933 (together, the "***Rights Offering***") in accordance with the terms and conditions specified in this Agreement and a backstop commitment agreement to be entered into concurrently with this Agreement, substantially in the form attached hereto as **Exhibit B** (together with the exhibits and schedules thereto, the "***Backstop Agreement***");

**WHEREAS**, the Company has requested that each Consenting Noteholder sign this Agreement to support the Restructuring in the interests of all Parties; and

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters discussed in the Acceptable Plan and hereunder.

**NOW, THEREFORE**, in consideration of the promises, mutual covenants, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties, intending to be legally bound, hereby agrees as follows:

#4849-4507-1688v5
WEIL:\96134743\11\51067.0003

## AGREEMENT

1. **RSA Effective Date.** This Agreement shall become effective, and the obligations contained herein shall become binding upon the Parties, upon the first date (the "***RSA Effective Date***") that:

(a)    The Backstop Agreement has been executed and is effective in accordance with its terms;

(b)    The Company has paid in cash all invoiced, reasonable and documented costs, fees, and expenses of the Consenting Noteholders, including, without limitation, the invoiced, reasonable and documented fees and expenses of (a) Milbank, Tweed, Hadley & McCloy LLP ("***Milbank***"), counsel to the Consenting Noteholders, (b) one maritime counsel to the Consenting Noteholders, (c) Morris, Nichols, Arsht & Tunnell LLP ("***Morris Nichols***"), counsel to the Consenting Noteholders, and (d) Houlihan Lokey Capital, Inc. ("***Houlihan***"), financial advisor to the Consenting Noteholders, in each case, in accordance with their existing engagement letters;  and

(c)    This Agreement shall be executed by all of the following:

(i)    the Company; and

(ii)    the Consenting Noteholders; <u>provided</u> that signature pages executed by the Consenting Noteholders showing their holdings shall not be delivered to other Consenting Noteholders and shall be delivered to Weil, Gotshal & Manges LLP ("***Weil***") in an unredacted form (to be held by Weil on a confidential and professionals' eyes only basis; <u>provided</u> that Weil may disclose such signature pages on a confidential basis to the Company and its financial advisors), in each case, except as required by applicable law and subject to the provisions of <u>Section 22</u> hereof.

2. **Incorporation of Exhibits.** Each of the exhibits and schedules attached hereto, including, without limitation, the Restructuring Term Sheet and the Backstop Agreement, and each of the schedules to such exhibits (collectively, the "***Exhibits***") are expressly incorporated herein and made part of this Agreement.  In the event of a conflict between any term or provision contained in this Agreement and a term or provision of the Exhibits, the applicable terms and provisions of the applicable Exhibit shall govern.

3. **Definitive Documentation.**

(a)    The definitive documents and agreements governing the Restructuring (collectively, the "***Definitive Documents***") shall include the following:

(i)    documents implementing, achieving, and relating to the Restructuring and any amendments thereto, including, without limitation, the Acceptable Plan, a disclosure statement describing the Acceptable Plan (including, without limitation, all exhibits and schedules thereto, the "***Disclosure Statement***"), any new warrant agreement(s), the Backstop Agreement, procedures related to the Rights Offering, the registration rights agreement, the solicitation materials and procedures

3

relating to the Acceptable Plan, the plan supplement and its exhibits, any debtor-in-possession financing agreement(s) or agreement(s) for the use of cash collateral, any exit financing agreement(s), organizational documents of the reorganized Debtor or other related transactional or corporate documents; and

(ii)     interim and final orders approving, authorizing the assumption of, or confirming, as applicable, any of the foregoing.

(b)     Except as otherwise set forth herein, the Definitive Documents identified in <u>Section 3(a)</u> will, after the RSA Effective Date, remain subject to negotiation and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement and be in form and substance reasonably satisfactory to the Company and the Requisite Noteholders. "***Requisite Noteholders***" means, as of the RSA Effective Date, the Consenting Noteholders holding at least a majority of the outstanding principal amount of the Notes held by all Consenting Noteholders.

**4.     <u>The Restructuring</u>.**

(a)     <u>Implementation</u>.   The Restructuring will be implemented through the filing of a voluntary petition for relief under chapter 11 of the Bankruptcy Code and any and all other documents necessary to commence the Chapter 11 Case.   The Debtor shall use commercially reasonable efforts to obtain confirmation of the Acceptable Plan in accordance with the Bankruptcy Code and on terms consistent with this Agreement, and each Consenting Noteholder shall use its commercially reasonable efforts to cooperate fully in connection therewith.

(b)     <u>Milestones</u>.   The Debtor shall complete the Restructuring in accordance with the deadlines specified below, which deadlines in all cases may be extended by written agreement of the Requisite Noteholders (collectively, the "***Milestones***"); <u>provided</u>, that, in the event that any of the Company's subsidiaries file for chapter 11 protection in accordance with this Agreement, the Requisite Noteholders and the Company agree to engage in good faith discussions to extend the deadlines set forth in 4(b)(vi) through (ix) as reasonably necessary:

(i)     by not later than May 21, 2017, the Debtor shall commence the Chapter 11 Case (such filing date, the "***Petition Date***");

(ii)     by three (3) days after the Petition Date, but in no event later than May 24, 2017, the Debtor shall file with the Bankruptcy Court motions seeking entry of orders (x) authorizing the Debtor to assume the Backstop Agreement and this Agreement and the Debtor's obligations thereunder and hereunder, and (y) approving procedures for the Rights Offering (together, the "***RSA and Backstop Motions***");

(iii)     by seven (7) days after the Petition Date, but in no event later than May 28, 2017, the Debtor shall file with the Bankruptcy Court the Acceptable Plan, the Disclosure Statement, and a motion seeking a hearing to consider the adequacy of the Disclosure Statement and approval of the Debtor's solicitation procedures;

(iv)    the Debtor shall seek to have the RSA and Backstop Motions heard at the hearing scheduled to consider the "first day" motions on a final basis (the "***Second Day Hearing***");

(v)    by the day that is the earlier of (x) two (2) business days following the Second Day Hearing, and (y) thirty-five (35) days after the Petition Date, but in no event later than June 26, 2017, the Bankruptcy Court shall have entered an order approving the RSA Motion (the "***RSA Order***");

(vi)    by forty-five (45) days after the Petition Date, but in no event later than July 7, 2017, the Bankruptcy Court shall have entered an order approving the Backstop Motion (the "***Backstop Order***") and an order approving the adequacy of the Disclosure Statement and the Debtor's solicitation procedures; provided, that the Company shall use commercially reasonable efforts to seek entry of the forgoing orders as soon as reasonably practicable before July 7, 2017;

(vii)    within twenty (20) business days following the entry of the Backstop Order, but in no event later than August 4, 2017, the Company shall complete the solicitation in connection with the Rights Offering (other than funding in connection with the Backstop Commitments (as defined in the Backstop Agreement));

(viii)    by ninety (90) days after the Petition Date, but in no event later than August 21, 2017, the Bankruptcy Court shall have entered an order confirming the Acceptable Plan; provided, that the Company shall use commercially reasonable efforts to seek entry of the foregoing order as soon as reasonably practicable before August 21, 2017; and

(ix)    by fourteen (14) days after entry of an order confirming the Acceptable Plan, but in no event later than September 4, 2017, the Debtor shall consummate the transactions contemplated by the Acceptable Plan (the date of such consummation, the "***Effective Date***"), it being understood that the satisfaction of the conditions precedent to the Effective Date (as set forth in the Acceptable Plan) shall be conditions precedent to the occurrence of the Effective Date.

## 5.    Agreements of the Consenting Noteholders.

(a)    Agreement to Vote.  Subject to the receipt by each of the Consenting Noteholders of the Disclosure Statement and other solicitation materials in respect of the Acceptable Plan, from the RSA Effective Date through the Termination Date (as defined in Section 7), each Consenting Noteholder shall (severally and not jointly), without limiting the consent and approval rights provided by this Agreement:

(i)    vote any claims it holds or controls against the Company to accept the Acceptable Plan and grant the releases thereunder by delivering a duly executed and completed ballot accepting the Acceptable Plan and granting the releases under the Acceptable Plan on a timely basis following the commencement of the solicitation of the Acceptable Plan;

5

(ii)     not change or withdraw (or cause to be changed or withdrawn) any such vote or releases described in clause (i) above;

(iii)    not (x) object to, delay, impede or take any other action to interfere with, delay, or postpone acceptance, confirmation, or implementation of the Acceptable Plan, (y) directly or indirectly solicit, encourage, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets, merger, workout or plan of reorganization for the Debtor other than the Acceptable Plan or (z) otherwise take any action that would in any material respect interfere with, delay or postpone the consummation of the Restructuring;

(iv)    not direct the indenture trustee to take any action inconsistent with such Consenting Noteholder's obligations under this Agreement, and, if the indenture trustee takes any action inconsistent with such Consenting Noteholder's obligations under this Agreement, such Consenting Noteholder shall use its commercially reasonable efforts to request that the indenture trustee cease and refrain from taking any such action (it being understood that the Consenting Noteholders shall not be required to incur any indemnification obligations, costs, expense, or liability in connection therewith or otherwise); and

(v)     support the Acceptable Plan and the transactions contemplated therein and in the Disclosure Statement and take all commercially reasonable actions reasonably requested by the Company to facilitate the solicitation of votes on the Acceptable Plan, approval and entry of any debtor-in-possession financing orders, approval of the Disclosure Statement, and confirmation and consummation of the Acceptable Plan.

(b)     Transfers.  (i) Each Consenting Noteholder agrees that, for the duration of the period commencing on the date hereof and ending on the date on which this Agreement is terminated in accordance with Section 7, such Consenting Noteholder shall not (i) sell, transfer, assign, pledge, grant a participation interest in, or otherwise dispose of, directly or indirectly, its right, title, or interest in respect of any of such Consenting Noteholder's claims against, or interests in, the Company, in whole or in part, or (ii) deposit any of such Consenting Noteholder's claims against or interests in the Company into a voting trust, or grant any proxies, or enter into a voting agreement with respect to any such claims or interests (the actions described in clauses (i) and (ii) are collectively referred to herein as a "*Transfer*" and the Consenting Noteholder making such Transfer is referred to herein as the "*Transferor*"), unless such Transfer is to (i) another Consenting Noteholder and notice in the Form attached as Annex 1 is delivered to the Company, Weil, and Milbank, or (ii) any other entity that first agrees in writing to be bound by the terms of this Agreement by executing and delivering to Weil and Milbank, a Transferee Joinder substantially in the form attached hereto as **Exhibit C** (the "*Transferee Joinder Agreement*") so that it is received within two (2) business days following such execution.  With respect to claims against or interests in the Company held by the relevant transferee upon consummation of a Transfer in accordance herewith, such transferee is deemed to make all of the representations, warranties, and covenants of a Consenting Noteholder, as applicable, set forth in this Agreement.  Upon compliance with the foregoing, the Transferor shall be deemed to relinquish its rights (and be released from its obligations, except for any claim

6

for breach of this Agreement that occurs prior to such Transfer) under this Agreement to the extent of such transferred rights and obligations. Any Transfer made in violation of this subsection (b) of <u>Section 5</u> shall be deemed null and void *ab initio* and of no force or effect, regardless of any notice provided to the Company and/or any Consenting Noteholder, and shall not create any obligation or liability of the Company or any other Consenting Noteholder to the purported transferee.

(c)     <u>Notwithstanding Section 5(b)</u>: (i) a Consenting Noteholder may Transfer any claim to an entity that is acting in its capacity as a Qualified Marketmaker (as defined herein) (a "***Qualified Transfer***") without the requirement that the Qualified Marketmaker be or become a Consenting Noteholder, as applicable, provided that such Qualified Transfer shall only be valid if the Qualified Marketmaker subsequently Transfers such claim to a transferee that is a Consenting Noteholder (or becomes a Consenting Noteholder at the time of the Transfer pursuant to a Transferee Joinder Agreement) prior to the voting record date for the Acceptable Plan (the "***Voting Record Date***"), and (ii) if a Consenting Noteholder, acting in its capacity as a Qualified Marketmaker, acquires a claim from a holder of claims that is not a Consenting Noteholder, as applicable, it may Transfer such claim without the requirement that the transferee be or become a Consenting Noteholder. For purposes hereof, a "***Qualified Marketmaker***" shall mean an entity that (a) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against the Company (including debt securities or other debt) or enter with customers into long and short positions in claims against the Company (including debt securities or other debt), in its capacity as a dealer or market maker in such claims and (b) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

(d)     <u>Additional Claims</u>. This Agreement shall in no way be construed to preclude the Consenting Noteholders from acquiring additional Claims or transferring Claims in accordance with this <u>Section 5</u>, and each Consenting Noteholder agrees that if any Consenting Noteholder acquires additional Claims or transfers Claims on or after the RSA Effective Date, then (i) such Claims shall be subject to this Agreement (including the obligations of the Consenting Noteholders under this <u>Section 5</u>) and (ii) such Consenting Noteholder shall notify Milbank and Weil of such acquisition or transfer (as applicable) as soon as reasonably practicable, in each case other than with respect to any Claims acquired by such Consenting Noteholder in its capacity as a Qualified Marketmaker. A confidential schedule of the principal amount of debt held by the Consenting Noteholders and any transfer notices provided to Milbank in connection with the foregoing will be maintained by Milbank and will be made available on a confidential basis to Weil but shall not be disclosed to any third party except (y) as required by law, subpoena, or other legal process or regulation, and (z) on a confidential basis to the Company and its financial advisors retained to assist with the Restructuring.

(e)     <u>Forbearance</u>. During the period commencing on the RSA Effective Date and ending on the termination of this Agreement in accordance with its terms, the Consenting Noteholders hereby agree to forbear from the exercise of any rights or remedies they may have under the Indenture, and under applicable United States or foreign law or otherwise, in each case, with respect to GulfMark's failure to make the interest payment due on March 15, 2017. For the avoidance of doubt, the forbearance set forth in this <u>Section 5(e)</u> shall not constitute a waiver with respect to any defaults or events of default under the Indenture, and shall not bar any

7

Consenting Noteholder from filing a proof of claim or taking action to establish the amount of such claim. If the transactions contemplated hereby are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. The Company hereby confirms that no defaults or events of default exist under the Indenture as of the RSA Effective Date except as to the failure to make the interest payment due on March 15, 2017.

(f)     The agreements of the Consenting Noteholders in this <u>Section 5</u> shall be solely on such Consenting Noteholder's own behalf and not on behalf of any other Consenting Noteholders and shall be several and not joint.

6.     **Agreements of the Company.** From the RSA Effective Date until the termination of this Agreement, the Company covenants and agrees:

(a)     To support and use commercially reasonable efforts to (i) pursue and complete the Restructuring and all transactions contemplated under this Agreement (and, once filed, the Acceptable Plan) in accordance with this Agreement and the Milestones, (ii) take any and all reasonably necessary actions in furtherance of the Restructuring and transactions contemplated under this Agreement (and, once filed, the Acceptable Plan), and (iii) obtain any and all required regulatory and/or third-party approvals necessary to consummate the Restructuring;

(b)     To take no action, directly or indirectly that is inconsistent with this Agreement or the Acceptable Plan or that would materially delay approvals of the Disclosure Statement, the solicitation procedures, or confirmation or consummation of the Acceptable Plan, including soliciting or causing or allowing any of its affiliates, or any of their respective directors, officers, employees, agents, advisors or other representatives to seek, solicit, or support any dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, joint venture, partnership sale of assets, financing (debt or equity), or restructuring of the Debtor (including, for the avoidance of doubt, a transaction premised on an asset sale under section 363 of the Bankruptcy Code), other than the Acceptable Plan and Restructuring (an "***Alternative Transaction***"); <u>provided</u> that, (i) if the Debtor receives a written or oral proposal or expression of interest regarding any Alternative Transaction, the Debtor shall promptly notify counsel to the Consenting Noteholders of any such proposal or expression of interest, with such notice to include the material terms thereof, including (unless prohibited by a separate agreement) the identity of the person or group of persons involved, and (ii) the Debtor shall promptly furnish counsel to the Consenting Noteholders with copies of any written offer or any other information delivered to the Debtor in writing that it receives relating to the foregoing and shall promptly inform counsel to the Consenting Noteholders of any material changes to such written or oral proposals or expressions of interest;

(c)     To not encourage any other Person to take any action which would, or would reasonably be expected to, breach or be inconsistent with this Agreement or delay, impede, appeal, or take any other negative action, directly or indirectly, to interfere with the acceptable implementation of the Restructuring;

8

(d)       To the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional or alternative provisions to address any such impediment;

(e)       To provide draft copies of all material motions or applications and other documents (including, but not limited to, all "first day" and "second day" motions and proposed orders, the Acceptable Plan, the Disclosure Statement, ballots and other solicitation materials in respect of the Acceptable Plan, a proposed confirmation order, and any amended versions of any of the foregoing) the Company intends to file with the Bankruptcy Court to Milbank, at least three (3) business days prior to the date when the Company intends to file any such pleading or other document (provided that if delivery of such motions, orders or materials (other than the Acceptable Plan, the Disclosure Statement or a confirmation order) at least three (3) business days in advance is not reasonably practicable, such motion, order or material shall be delivered as soon as reasonably practicable prior to filing) and to only file such motions or applications that are in form and substance consistent with this Agreement and, solely with respect to proposed orders, such orders otherwise reasonably acceptable to the Company and the Consenting Noteholders; and

(f)       To timely pay or reimburse when due (after the Petition Date, subject to the entry of the RSA Order), whether incurred before or after the Petition Date, the reasonable and documented costs, fees, and expenses of (i) Milbank, (ii) one maritime counsel to the Consenting Noteholders, (iii) Morris Nichols, (iv) Houlihan, and (v) such other professional advisors retained by the Consenting Noteholders with the consent of the Company (which consent shall not be unreasonably delayed, conditioned or withheld), in each case subject to the terms of any applicable engagement letter or reimbursement letter, as the case may be.  For the avoidance of doubt, the Company shall pay any accrued but unpaid amounts owing under this Section 6(f) upon the termination of this Agreement, but shall not be responsible for any fees and expenses incurred after such termination (after taking into account any termination notice requirements set forth in this Agreement).  The expense reimbursement accrued through the date on which the RSA Order is entered shall be paid within three (3) calendar days of the Debtor's receipt of invoices therefor.

## 7.       Termination of Agreement.

This Agreement shall automatically terminate two (2) business days following the delivery of written notice to the Company (in accordance with Section 20) from the Requisite Noteholders at any time after and during the continuance of any Creditor Termination Event (as defined herein).  In addition, this Agreement shall automatically terminate two (2) business days following delivery of notice from the Company to the Consenting Noteholders (in accordance with Section 20) at any time after the occurrence and during the continuance of any Company Termination Event (as defined herein).

(a)       A "*Creditor Termination Event*" shall mean any of the following:

(i)       the failure to meet any of the Milestones in Section 4(b) unless such Milestone is extended in accordance with Section 4(b);

9

(ii)    the conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code;

(iii)    the appointment of a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in the Chapter 11 Case;

(iv)    entry of an order by the Bankruptcy Court terminating the Debtor's exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code or if the Debtor loses exclusivity by failing to make a timely motion to extend the exclusive period and exclusivity lapses or the Bankruptcy Court denies the Debtor's motion to extend the exclusive period;

(v)    the Bankruptcy Court denies approval of the RSA Motion or the Backstop Motion;

(vi)    the breach in any material respect by the Company of any of the undertakings, representations, warranties or covenants of the Company set forth herein which remains uncured for a period of three (3) business days after the receipt of written notice of such breach from the Requisite Noteholders pursuant to this Section 7 and in accordance with Section 20 (as applicable), which notice period shall run concurrently with the notice of termination of this Agreement set forth above;

(vii)    the Debtor amends, modifies, or files a pleading seeking authority to amend or modify, the Definitive Documents, unless such amendment or modification is (x) consistent with this Agreement and (y) reasonably acceptable to the Requisite Noteholders;

(viii)    entry of an order by the Bankruptcy Court amending or modifying the Definitive Documents, unless such amendment or modification is (i) consistent with this Agreement and (ii) reasonably acceptable to the Requisite Noteholders;

(ix)    if any of the orders approving the Definitive Documents are reversed, stayed, dismissed, vacated, reconsidered, modified, or amended without the reasonable consent of the Requisite Noteholders;

(x)    the Company files, propounds or otherwise supports an Alternative Transaction or any plan of reorganization other than the Acceptable Plan;

(xi)    the Company withdraws the Acceptable Plan or Disclosure Statement, files any motion or pleading with the Bankruptcy Court that is not consistent with this Agreement or the Acceptable Plan and such motion or pleading has not been withdrawn prior to the earlier of (x) two (2) business days after the Company receives written notice from the Requisite Noteholders (in accordance with Section 20) that such motion or pleading is inconsistent with this Agreement or the Acceptable Plan, which notice period shall run concurrently with the notice of termination of this Agreement set forth above, and (y) entry of an order of the Bankruptcy Court approving such motion or pleading;

10

(xii)    the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining consummation of the Restructuring; provided, however, that the Company shall have five (5) business days after the issuance of such ruling or order to obtain relief that would allow consummation of the Restructuring in a manner that (i) does not prevent or diminish in a material way compliance with the terms of the Acceptable Plan and this Agreement and (ii) is reasonably acceptable to the Requisite Noteholders;

(xiii)    any court of competent jurisdiction has entered a judgment or order declaring this Agreement or the Backstop Agreement to be unenforceable;

(xiv)    the termination of the Backstop Agreement in accordance with its terms;

(xv)    upon an event of default under any order authorizing debtor-in-possession financing or use of cash collateral that is not cured within the requisite cure period provided for therein, which results in the termination thereof;

(xvi)    the Company seeks approval of any debtor-in-possession financing on terms that are not consistent with the Restructuring Term Sheet;

(xvii)    the occurrence of the maturity date for any debtor-in-possession financing;

(xviii)    in the event that the Effective Date shall not have occurred by the date set forth in Section 4(b)(ix) (as such date may be extended in accordance with this Agreement);

(xix)    if an order is entered by the Bankruptcy Court or other court of competent jurisdiction denying confirmation of the Acceptable Plan (unless caused by a default by the Consenting Noteholders hereunder, in which event the Consenting Noteholders shall not have the right to terminate under this clause (a)(xix)) or refusing to approve the Disclosure Statement; and

(xx)    failure to conduct the Rights Offering in accordance with the Backstop Agreement and the procedures set forth therein.

(b)    A "*Company Termination Event*" shall mean any of the following:

(i)    The breach in any material respect by one or more of the Consenting Noteholders, of any of the undertakings, representations, warranties or covenants of the Consenting Noteholders set forth herein, which remains uncured for a period of three (3) business days after the receipt of written notice of such breach pursuant to this Section 7 and Section 20 (as applicable);

(ii)    The board of directors of GulfMark reasonably determines in good faith based upon the advice of outside counsel that continued performance under this

11

Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law; provided, that GulfMark provides written notice of such determination to the Consenting Noteholders within five (5) business days after the date thereof;

(iii)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Restructuring, which ruling, judgment or order has not been not stayed, reversed or vacated within ten (10) business days after such issuance, notwithstanding the Company having made commercially reasonable efforts to obtain such stay, reversal or vacatur;

(iv)    at 11:59 p.m. prevailing Eastern Time on the date that is twenty (20) business days following the deadline set forth in Section 4(b)(viii) (as such date may be extended in accordance with this Agreement), if the Bankruptcy Court shall not have entered an order in form and substance reasonably satisfactory to the Company and the Requisite Noteholders confirming the Plan;

(v)    in the event that the Effective Date shall not have occurred by the date that is twenty (20) business days following the deadline set forth in Section 4(b)(ix) (as such date may be extended in accordance with this Agreement); and

(vi)    if an order is entered by the Bankruptcy Court or other court of competent jurisdiction denying confirmation of the Acceptable Plan (unless caused by a default by the Company of its obligations hereunder, in which event the Company shall not have the right to terminate under this clause (b)(vi)) or refusing to approve the Disclosure Statement.

(c)    Individual Termination. Any Consenting Noteholder may terminate this Agreement as to itself only, upon written notice to the Company and the other Consenting Noteholders (in each case, in accordance with Section 20), in the event that:

(i)    there is any modification, amendment, or change to (x) the definition of "Consenting Noteholders" or "Requisite Noteholders," (y) this Section 7(c), or (z) the transfer provisions in Section 5, in each case without the consent of such Consenting Noteholder (provided that such Consenting Noteholder is affected thereby);

(ii)    there is any waiver, change, modification, or amendment to this Agreement, the Restructuring Term Sheet, or the Acceptable Plan that materially adversely affects the economic recoveries or treatment of any Consenting Noteholder compared to the recoveries or treatment set forth in the Restructuring Term Sheet without the consent of such Consenting Noteholder; or

(iii)    five (5) days prior to the hearing to consider confirmation of the Acceptable Plan, the Debtor does not obtain commitments for an exit facility of at least $100 million in principal amount with terms and conditions that are acceptable to each Consenting Noteholder.

12

In the event that a Consenting Noteholder either terminates this Agreement pursuant to Section 7(c)(iii) or does not consent to a waiver, change, modification, or amendment to this Agreement requiring the consent of each Consenting Noteholder (in each case, a "*Non-Consenting Noteholder*"), but the Consenting Noteholders holding at least 66% of the Notes held by the Consenting Noteholders do not elect to terminate this Agreement, this Agreement shall be deemed to have been terminated only as to such Non-Consenting Noteholder, but this Agreement shall continue in full force and effect in respect to all other Consenting Noteholders.

(d)     Mutual Termination; Automatic Termination.  This Agreement may be terminated by mutual written agreement of the Company and the Requisite Noteholders upon the receipt and acknowledged acceptance (whether oral or by electronic mail) of written notice delivered in accordance with Section 20.  Notwithstanding anything in this Agreement to the contrary, this Agreement shall terminate automatically without any further required action or notice on the Effective Date.

(e)     Effect of Termination.  The earliest date on which termination of this Agreement as to a Party is effective in accordance with this Agreement shall be referred to as a "*Termination Date*."  Upon the occurrence of a Termination Date in accordance with this Section 7, this Agreement shall become void and of no further force or effect with respect to any Party, and, except as otherwise provided in this Agreement, each Party shall be immediately released from its respective liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement, shall have no further rights, benefits or privileges hereunder, and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement; provided that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to a Termination Date; provided, further, that each of the following shall survive any such termination: (x) any claim for breach of this Agreement that occurs prior to such Termination Date and all rights and remedies with respect to such claims shall not be prejudiced in any way; (y) the Debtor's obligations in Section 6(f) of this Agreement accrued up to and including such Termination Date; and (z) Sections 11, 12, 13, 15, 16, 19, 23 and 24 hereof.  For the avoidance of doubt, the automatic stay applicable under section 362 of the Bankruptcy Code shall not prohibit a Party from taking any action necessary to effectuate the termination of this Agreement pursuant to and in accordance with the terms hereof.

**8.     Good Faith Cooperation and Further Assurances.**     Each     Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to, the pursuit, approval, implementation, and consummation of the Restructuring as well as the negotiation, drafting, execution, and delivery of the Definitive Documents.  Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.  From and after the date hereof, each of the Parties agrees to execute and deliver all such agreements, instruments, and documents and to take all such further actions as the Parties may reasonably deem necessary from time to time to carry out the intent and purpose of this Agreement and the Restructuring, and to consummate the transactions contemplated thereby.

13

9.    **Representations and Warranties.**

(a)    Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or as of the date a Consenting Noteholder becomes a party hereto):

(i)    Such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder.   The execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part and no other proceedings on the part of the Company is necessary to authorize and approve this Agreement or any other transaction contemplated herein, (after the Petition Date, subject to the entry of the RSA Order).

(ii)    The execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any material provision of law, rule or regulation applicable to it or its charter or bylaws (or other similar governing documents), or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party, except, in the case of the Company, for the filing of the Chapter 11 Case.

(iii)    The execution, delivery and performance by such Party of this Agreement does not and will not require any material registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary or required by the Bankruptcy Court or the United States Securities and Exchange Commission (the "*SEC*") or other securities regulatory authorities under applicable securities laws.

(iv)    This Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(b)    Each Consenting Noteholder severally (and not jointly) represents and warrants to the Company that, as of the date hereof (or as of the date such Consenting Noteholder becomes a party hereto), such Consenting Noteholder (i) is the holder of the aggregate principal amount of (x) the Notes set forth below its name on the signature page hereto (or below its name on the signature page of a Transferee Joinder Agreement for any Consenting Noteholder that becomes a party hereto after the date hereof), or (y) is the nominee, investment manager, or advisor for one or more beneficial holders thereof, and/or (ii) has, with respect to the beneficial owner(s) of the aggregate principal amount under the Notes set forth below its name on the signature page hereto (or below its name on the signature page of a Transferee Joinder Agreement for any Consenting Noteholder that becomes a party hereto after the date hereof), (A)

14

sole investment or voting discretion with respect to the Notes, (B) full power and authority to vote on and consent to matters concerning the Notes or to exchange, assign or transfer the Notes, and (C) full power and authority to bind or act on the behalf of, such beneficial owner(s).

(c)     Each Consenting Noteholder, and any holder for which any such person acts as investment adviser or manager, is an Accredited Investor (as such term is defined in Rule 501(a) of Regulation D promulgated under the U.S. Securities Act of 1933).

**10.     No Solicitation; Adequate Information.**  This Agreement is not and shall not be deemed to be a solicitation for consents to the Acceptable Plan.  The votes of the holders of claims against the Company will not be solicited until such holders who are entitled to vote on the Acceptable Plan have received the Acceptable Plan, the Disclosure Statement and related ballots, and other required solicitation materials.  In addition, this Agreement does not constitute an offer to issue or sell securities to any person or entity, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.

**11.     Creditors' Committee.**  The Parties agree not to request that the United States Trustee appoint an official committee of creditors in the Chapter 11 Case. Notwithstanding anything herein to the contrary, if any Consenting Noteholder is appointed to and serves on an official committee of unsecured creditors in the Chapter 11 Case, the terms of this Agreement shall not be construed so as to limit such Consenting Noteholder's exercise of its fiduciary duties to any person arising from its service on such committee, and any such exercise of such fiduciary duties shall not be deemed to constitute a breach of the terms of this Agreement.  All Parties agree that they shall not oppose the participation of any of the Consenting Noteholders or the trustee for the Notes on any official committee of unsecured creditors formed in the Chapter 11 Case.

**12.     Specific Performance/Remedies.**  It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy.  Each Party hereby waives any requirement for the security or posting of any bond in connection with such remedies.

**13.     Governing Law; Jurisdiction; Waiver of Jury Trial.**

(a)     This Agreement shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York, without giving effect to the conflict of laws principles thereof.  Each of the Parties irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Agreement brought by any Party or its successors or assigns shall be brought and determined in any federal or state court in the Borough of Manhattan, the City of New York (the "***New York Courts***"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the New York Courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement and the Restructuring.  Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in the New York Courts, other

15

than proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any New York Court.  Each of the Parties further agrees that notice as provided in <u>Section 20</u> shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient.  Each of the Parties hereby irrevocably and unconditionally waives and agrees not to assert that a proceeding in any New York Court is brought in an inconvenient forum or the venue of such proceeding is improper.  Notwithstanding the foregoing, during the pendency of the Chapter 11 Case, all proceedings contemplated by this <u>Section 13(a)</u> shall be brought in the Bankruptcy Court unless the Bankruptcy Court grants an order to lift the automatic stay or withdraw the reference for the purpose of bringing such proceeding.

(b)     Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Agreement or the transactions contemplated hereby (whether based on contract, tort or any other theory).

**14.     <u>Successors and Assigns; Severability.</u>**  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; <u>provided</u> that nothing contained in this <u>Section 14</u> shall be deemed to permit Transfers of the Notes or any Claims other than in accordance with the express terms of this Agreement.  If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable, in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

**15.     <u>Survival of Agreement.</u>**  Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning a possible financial restructuring of the Debtor and in contemplation of possible chapter 11 filings by the Debtor and the rights granted in this Agreement are enforceable by each signatory hereto without approval of any court subject, however, after the Petition Date to the entry of the RSA Order; <u>provided</u>, that the Company has obligated itself hereunder to seek the entry of the RSA Order.

**16.     <u>No Waiver.</u>**  If the transactions contemplated herein are not consummated, or following the occurrence of a Termination Date, if applicable, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights. The Parties acknowledge that this Agreement, the Acceptable Plan, and all negotiations relating hereto are part of a proposed settlement of matters that could otherwise be the subject of litigation.  Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement, the Acceptable Plan, any related documents, and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

#4849-4507-1688v5
WEIL:\96134743\11\51067.0003

17.  **Several, Not Joint, Obligations.**  The agreements, representations and obligations of each Consenting Noteholder under this Agreement are, in all respects, several and not joint.

18.  **Relationship Among Parties.**  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.  No Party shall have any responsibility for any trading by any other entity by virtue of this Agreement.  No prior history, pattern or practice of sharing confidences among or between the Parties shall in any way affect or negate this understanding and agreement.  The Parties have no agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting or disposing of any equity securities of the Company and do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended.

19.  **Prior Negotiations; Entire Agreement.**  This Agreement, including the exhibits and schedules hereto (including the Acceptable Plan), constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements executed between GulfMark and each Consenting Noteholder prior to the execution of this Agreement shall continue in full force and effect for the duration of such confidentiality agreements.

20.  **Notices.**  All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, facsimile, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers:

(a)  If to the Company, to:

GulfMark Offshore Inc.
842 West Sam Houston Parkway North, Suite 400
Houston, Texas 77024
Facsimile: (713) 369-7386
Attention: James M. Mitchell
Email: james.mitchell@gulfmark.com

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP (as counsel to the Company)
767 Fifth Avenue
New York, NY 10153
Facsimile: (212) 310-8007
Attention: Gary Holtzer and Ted Waksman
Email: gary.holtzer@weil.com and ted.waksman@weil.com

17

(b)    If to the Consenting Noteholders, to the address set forth on each Consenting Noteholders' signature page (or to a transferee, to the address set forth on the applicable Transferee Joinder Agreement), with a copy (which shall not constitute notice) to:

Milbank, Tweed, Hadley & McCloy LLP
28 Liberty Street
New York, NY 10005
Facsimile: 212-822-5567
Attention: Evan R. Fleck and Nelly Almeida
Email:  efleck@milbank.com and nalmeida@milbank.com

Any notice given by delivery, mail or courier shall be effective when received.  Any notice given by facsimile or electronic mail shall be effective upon oral, machine or electronic mail (as applicable) confirmation of receipt.

**21.    Amendments and Modifications.**  Except as otherwise expressly set forth herein (including Section 7(c) herein), this Agreement and the Acceptable Plan may not be waived, modified, amended, or supplemented except in a writing signed by the Company and the Requisite Noteholders.

**22.    Counterparts.**  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this Agreement delivered by facsimile or email shall be deemed to be an original for the purposes of this Section 22.

**23.    Disclosure; Publicity.**  The Company shall submit drafts to Milbank of any press releases, public documents and any and all filings with the SEC that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least two (2) business days prior to making any such disclosure.  Except as required by applicable law or otherwise permitted under the terms of any other agreement between the Company and any Consenting Noteholder, no Party or its advisors shall disclose to any person or entity (including, for the avoidance of doubt, any other Consenting Noteholder), other than advisors to the Company, the principal amount or percentage of Notes held by any Consenting Noteholder, in each case, without such Consenting Noteholder's prior written consent; provided that (a) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Noteholder a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure to the extent required by such law, subpoena, or other legal process, and (b) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of the Notes held by all the Consenting Noteholders collectively.  Any public filing of this Agreement, with the Bankruptcy Court or otherwise, which includes executed signature pages to this Agreement shall include such signature pages only in redacted form with respect to the holdings of each Consenting Noteholder (provided that the holdings disclosed in such signature pages may be filed in unredacted form with the Bankruptcy Court under seal).

18

24. **Headings.** The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

25. **Interpretation; Rules of Construction; Representation by Counsel.** When a reference is made in this Agreement to a Section, Exhibit, Schedule, or Annex, such reference shall be to a Section, Exhibit, Schedule, or Annex, respectively, of or attached to this Agreement unless otherwise indicated. Unless the context of this Agreement otherwise requires, (a) words using the singular or plural number also include the plural or singular number, respectively, (b) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement, (c) the words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (d) the word "or" shall not be exclusive and shall be read to mean "and/or."  The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

*[Signature Pages Follow]*

19

# **EXHIBIT A**

## *Restructuring Term Sheet*

# GULFMARK OFFSHORE, INC.
# RESTRUCTURING TERM SHEET

## MAY 15, 2017

This Restructuring Term Sheet (together with the exhibits and schedules attached hereto, as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, the "***Restructuring Term Sheet***") sets forth the principal terms of a proposed restructuring (the "***Restructuring***") of the existing debt of GulfMark Offshore, Inc. ("***GulfMark Parent***" or the "***Debtor***").  The Restructuring will be consummated through a case (the "***Chapter 11 Case***") commenced under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***").  As reflected in the Restructuring Support Agreement (the "***RSA***"), to which this Restructuring Term Sheet is an Exhibit, the Restructuring is supported by the Debtor and the Consenting Noteholders.[1]

THIS RESTRUCTURING TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND OTHER APPLICABLE LAWS.

THIS RESTRUCTURING TERM SHEET DOES NOT ADDRESS ALL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL RESTRUCTURING AND ENTRY INTO OR THE CREATION OF ANY BINDING AGREEMENT IS SUBJECT TO THE EXECUTION OF DEFINITIVE DOCUMENTS IN FORM AND SUBSTANCE CONSISTENT WITH THIS RESTRUCTURING TERM SHEET AND OTHERWISE REASONABLY SATISFACTORY IN ALL RESPECTS TO THE DEBTOR AND THE REQUISITE NOTEHOLDERS.  THIS RESTRUCTURING TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL RULES.

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in either **Annex 1** attached hereto or the RSA.  To the extent of any conflict between this Restructuring Term Sheet and the RSA, this Restructuring Term Sheet will govern and control.

| **Transaction Overview** |
|---|

| **Overview of the Restructuring**: | The Debtor will implement the Restructuring pursuant to the Acceptable Plan.<br><br>The Acceptable Plan will provide for the classification and treatment of Claims and Interests as described below under the heading "*Classification and Treatment of Claims and Interests.*" |
|---|---|
| **Claims and Interests to be Restructured**: | <u>Unsecured Notes Claims</u>:  The "***Unsecured Notes Claims***" consist of approximately $429.6 million in unpaid principal, plus interest, fees and other expenses due as of the Petition Date under the 6.375% Senior Notes due 2022 (the "***Unsecured Notes***") issued by GulfMark Parent pursuant to that certain indenture dated as of March 12, 2012 (the "***Indenture***"), between GulfMark Parent and U.S. Bank National Association, as trustee.  The holders of the Unsecured Notes are referred to herein as the "***Unsecured Noteholders***."<br><br><u>RBS Guaranty Claims</u>:  The "***RBS Guaranty Claims***" consist of all Claims arising under or in connection with GulfMark Parent's guaranty of the borrower's obligations under that certain facility (the "***Multicurrency Revolving Credit Facility***") available under that certain Multicurrency Facility Agreement (the "***Multicurrency Facility Agreement***") dated as of September 26, 2014 (as may be amended or amended and restated), among GulfMark Americas, Inc., as borrower, and The Royal Bank of Scotland plc, as agent and security agent (in such capacities, "***RBS***").<br><br><u>DNB Guaranty Claims</u>:  The "***DNB Guaranty Claims***" consist of all Claims arising under or in connection with GulfMark Parent's guaranty of the borrower's obligations under that certain facility (the "***Norwegian Credit Facility***") available under that certain Amended and Restated Multi-Currency Revolving Credit Facility Agreement originally dated 27 December 2012, as amended and restated by an amendment and restatement agreement dated 23 October 2014 (as may be amended or amended and restated), among GulfMark Rederi AS, as borrower, DNB Bank ASA, as agent (in such capacity, "***DNB***"), and the lenders party thereto from time to time.<br><br><u>General Unsecured Claims</u>: The "***General Unsecured Claims***" consist of all Claims as of the Petition Date (other than the Unsecured Notes Claims, the RBS Guaranty Claims, the DNB Guaranty Claims, and the Intercompany Claims (as defined below)) that are neither secured nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court. |

| | |
|---|---|
| | Intercompany Claims: The "***Intercompany Claims***" consist of all Claims against GulfMark Parent by a wholly-owned (directly or indirectly) subsidiary of GulfMark Parent, except any DNB DIP Facility Claims (defined below).<br><br>GulfMark Parent Interests: The "***GulfMark Parent Interests***" consist of all Interests in GulfMark Parent. |
| **Rights Offering**: | Subsequent to the Petition Date, to provide for the capital needs of the Reorganized Debtor (the "***Reorganized Debtor***"), the Debtor will launch a $125 million Rights Offering.<br><br>Subject to the Jones Act Procedures described below, each Eligible Unsecured Noteholder (as defined below) shall have the right to purchase on the effective date of the Acceptable Plan (the "***Effective Date***") its pro rata share of 60.0% of "Reorganized GulfMark Equity," which shall consist of the total number of Common Shares issued pursuant to the Acceptable Plan on account of the Equity Interests, the Common Shares and Jones Act Warrants issued pursuant to the Acceptable Plan on account of the Unsecured Notes Claims, and the Common Shares and Jones Act Warrants issued pursuant to the Rights Offering and the Commitment Premium, subject to dilution by Common Shares issuable under the MIP (as defined below) and Reorganized GulfMark Equity issued upon exercise of the Warrants (as defined below).<br><br>"***Eligible Unsecured Noteholder***" means, as to the 1145 Rights Offering, each Unsecured Noteholder, and, as to the 4(a)(2)/Regulation D Rights Offering, each Unsecured Noteholder which is an accredited investor as defined in Rule 501(a) under the Securities Act of 1933 (as amended, the "***Securities Act***").<br><br>The Rights Offering will be backstopped by certain of the Unsecured Noteholders (the "***Backstop Parties***") pursuant to, and subject to, the terms and conditions of the Backstop Agreement.  On the Effective Date, in exchange for the commitment to backstop the Rights Offering, subject to the Jones Act Procedures described below, the Backstop Parties will receive a backstop commitment fee in an amount equal to 6% of the Rights Offering in the form of 3.6% of Reorganized GulfMark Equity (the "***Commitment Premium***"), subject to dilution by Common Shares issuable under the MIP and Reorganized GulfMark Equity issued upon exercise of the Warrants (each as defined below).<br><br>The proceeds from the Rights Offering will be used by the Reorganized Debtor to (1) fund working capital and general corporate |

WEIL:\96134947\9\51067.0003

|  | purposes; (2) pay all reasonable and documented restructuring expenses; (3) unless otherwise agreed, pay in cash in full any outstanding Claims arising under the DNB DIP Facility; (4) fund other Acceptable Plan distributions; and (5) pay for the reasonable and documented fees and expenses as set forth in Section 3.3 of the Backstop Agreement.<br><br>The terms of the Rights Offering are set forth in the procedures (the "**Rights Offering Procedures**") annexed to the Backstop Agreement. |
|---|---|
| **DIP Financing**: | The Debtor will enter into the DNB DIP facility (the "**DNB DIP Facility**") on terms and conditions set forth in that certain DIP Commitment Letter, dated May 15, 2017, which terms and conditions are reasonably acceptable to the Debtor and the Requisite Noteholders.<br><br>Upon commencement of the Chapter 11 Case, the Debtor will seek entry of interim and final orders authorizing the Debtor to, among other things, incur obligations under the DNB DIP Facility (the "**Interim DIP Order**" and the "**Final DIP Order,**" respectively), each of which will be reasonably acceptable, in form and substance, to DNB, as lender under the DIP Facility, the Debtor, and the Requisite Noteholders. |

| **Classification and Treatment of Claims and Interests** |
|---|

| **DNB DIP Facility Claims**: | Unless otherwise agreed to by DNB, the Debtor, and the Requisite Noteholders, on the Effective Date all Claims arising under or in connection with the DNB DIP Facility (the "**DNB DIP Facility Claims**") will be paid in full in cash.<br><br>*Unimpaired – Presumed to Accept* |
|---|---|
| **Administrative, Priority Tax, and Other Priority Claims**: | Unless some other treatment is agreed to by the relevant parties (that is reasonably acceptable to the Requisite Noteholders), on the Effective Date, or as soon as practicable thereafter, each Allowed Administrative Expense Claim, Priority Tax Claim, and Other Priority Claim shall be (i) paid in full in cash, (ii) paid in the ordinary course of business, or (iii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.<br><br>*Unimpaired – Presumed to Accept* |
| **Secured Claims**: | On the Effective Date, or as soon as practicable thereafter, to the extent any Secured Claims (as defined below) exist, all Allowed Secured Claims shall be satisfied by either (a) payment in full in cash, |

WEIL:\96134947\9\51067.0003

| | |
|---|---|
| | (b) reinstatement pursuant to section 1124 of the Bankruptcy Code, or (c) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code. *Unimpaired – Presumed to Accept* |
| **RBS Guaranty Claims**: | Treatment of the RBS Guaranty Claims will be reasonably agreed among the Debtor and the Requisite Noteholders; *provided*, that both the Debtor and Requisite Noteholders agree that any treatment that would meet the requirements for confirmation of a plan of reorganization under section 1129(b) of the Bankruptcy Code shall be deemed reasonably acceptable. *Impairment TBD* |
| **DNB Guaranty Claims**: | Treatment of the DNB Guaranty Claims will be reasonably agreed among DNB, the Debtor, and the Requisite Noteholders. *Unimpaired or Otherwise Reasonably Agreed* |
| **Unsecured Notes Claims**: | On the Effective Date, each holder of an Allowed Unsecured Notes Claim will be entitled to receive, in full and final satisfaction of such Claim, subject to the Jones Act Procedures described below: (a) its *pro rata* share (based on all Allowed Unsecured Notes Claims) of the Reorganized GulfMark Equity representing in the aggregate 35.65% of Reorganized GulfMark Equity, subject to dilution by the Common Shares issuable under the MIP and Reorganized GulfMark Equity issued upon the exercise of the Warrants; and (b) the right to participate in the Rights Offering in accordance with the Rights Offering Procedures. *Impaired – Entitled to Vote* |
| **General Unsecured Claims**: | Unless otherwise agreed to by the Debtor and the Requisite Noteholders, on the Effective Date, except to the extent that a holder of a General Unsecured Claim agrees to different treatment, the Debtor or Reorganized Debtor, as applicable, will continue to pay or dispute each General Unsecured Claim in the ordinary course of business as if the Chapter 11 Case had never been commenced. *Unimpaired – Presumed to Accept* |

5

| | |
|---|---|
| **Intercompany Claims**: | All Intercompany Claims will be paid, adjusted, reinstated or discharged as reasonably acceptable to the Debtor and the Requisite Noteholders.<br><br>*Unimpaired – Presumed to Accept* |
| **GulfMark Parent Interests**: | On the Effective Date, all GulfMark Parent Interests will be cancelled, and each Existing GulfMark Shareholder will receive, in consideration of its GulfMark Parent Common Shares, its *pro rata* shares of the following:<br><br>(a) Common Shares representing in the aggregate 0.75% of Reorganized GulfMark Equity, subject to dilution from the Common Shares issuable under the MIP and Reorganized GulfMark Equity issued upon exercise of the Warrants;<br><br>*and*<br><br>(b) warrants for 7.5% of the Reorganized GulfMark Equity, subject to dilution by the Common Shares issuable under the MIP, with a 7-year term and with an exercise price based on an equity value of $1 billion on terms similar to conventional listed warrants (the "***Warrants***").<br><br>For the avoidance of doubt, the distribution of Common Shares to Existing GulfMark Shareholders will not be subject to the Jones Act Procedures described below.<br><br>*Impaired – Deemed to Reject* |
| **Section 510(b) Claims**: | No holder of a Claim of the type described in section 510(b) of the Bankruptcy Code shall receive a distribution under the Acceptable Plan and such Claims shall be cancelled, released, discharged, and extinguished.<br><br>*Impaired – Deemed to Reject* |

6

| **Other Terms** |
|---|

| **Norwegian Credit Facility**: | Treatment of the Norwegian Credit Facility (including, without limitation, any refinancing thereof) will be reasonably acceptable to the Debtor and the Requisite Noteholders.<br><br>DNB consent is required to the extent such treatment does not provide for payment in full in cash of all obligations under the Norwegian Credit Facility and termination of all commitments thereof on the Effective Date. |
| **Multicurrency Revolving Credit Facility**: | Treatment of the Multicurrency Revolving Credit Facility (including, without limitation, any refinancing thereof) will be reasonably acceptable to the Debtor and the Requisite Noteholders; *provided*, that both the Debtor and Requisite Noteholders agree that any treatment that would meet the requirements for confirmation of a plan of reorganization under section 1129(b) of the Bankruptcy Code shall be deemed reasonably acceptable. |
| **Exit Financing**: | Five (5) days prior to the hearing to consider confirmation of the Acceptable Plan, the Debtor shall have obtained commitments for an exit facility of at least $100 million in principal amount, the terms and conditions of which shall be acceptable to the Consenting Noteholders. |
| **Registration Rights Agreement**: | On the Effective Date each Consenting Noteholder and any affiliates or related funds thereof that receive new common stock or new noteholder warrants under the Acceptable Plan and each Commitment Party (as defined in the Backstop Agreement) and any affiliates or related funds thereof that receive new common stock or new noteholder warrants under the Acceptable Plan shall enter into the Registration Rights Agreement (as defined in the Backstop Agreement). |

7

| | |
|---|---|
| **Conditions Precedent to Confirmation and Emergence**: | Conditions precedent to confirmation of the Acceptable Plan and the occurrence of the Effective Date, each of which may be waived in writing by the Requisite Noteholders, shall include, without limitation, the following:<br><br>Conditions to Confirmation<br><br>• Each of the Definitive Documents shall be approved in accordance with the RSA (as applicable) on terms reasonably acceptable to the Requisite Noteholders and remain in full force and effect;<br><br>• The Bankruptcy Court has entered an order approving the Disclosure Statement and confirming the Acceptable Plan, in form and in substance reasonably acceptable to the Requisite Noteholders; and<br><br>• The orders authorizing the Debtor to assume the RSA and the Backstop Agreement (collectively, the "*Approval Orders*") shall have been entered, and shall not have been reversed or vacated, and each of the RSA and the Backstop Agreement remain in full force and effect.<br><br>Conditions to the Effective Date<br><br>• The Bankruptcy Court enters the order confirming the Acceptable Plan, in form and in substance reasonably acceptable to the Requisite Noteholders;<br><br>• The Approval Orders shall each remain in full force and effect, and all conditions precedent thereto have been satisfied or waived; and<br><br>• All requisite governmental authorities and third parties shall have approved or consented to the Restructuring, to the extent required. |
| **Diligence**: | The Debtor shall comply with all reasonable due diligence requests from the Consenting Noteholders in connection with finalizing the Definitive Documents and obtaining consents. |
| **Jones Act Procedures**: | To comply with the Jones Act and the reorganized GulfMark Parent's charter, at least 76% of the Common Shares to be issued and outstanding as of the Effective Date pursuant to the Distribution Documents will be issued to U.S. Citizens. In no event shall Non-U.S. Citizens in the aggregate own more than 24% of the Common |

Shares.

The Debtor shall request that each Person receiving Common Shares under the Distribution Documents, except for Existing GulfMark Shareholders, furnish to the Debtor an affidavit of citizenship. If a Person, excluding Existing GulfMark Shareholders, does not furnish an affidavit of citizenship to the Debtor on or before the date set forth in the Acceptable Plan, or if the affidavit of citizenship has not been accepted or has been rejected by the Debtor, in its reasonable discretion, within a reasonable period after the Subscription Expiration Deadline (as defined in the Rights Offering Procedures), such Person will be considered a Non-U.S. Citizen for the purposes of calculating the distribution of Common Shares or Jones Act Warrants.

All Persons eligible to receive an interest under the Distribution Documents that are determined by the Debtor to be U.S. Citizens shall receive Common Shares on the date specified in the Acceptable Plan. Jones Act Warrants will be issued in lieu of Common Shares to ensure compliance with the Jones Act. The method of allocation of Jones Act Warrants and Common Shares will be set forth in the Acceptable Plan.

"***Common Shares***" means those certain shares of Class A common stock, par value $0.01 per share, issued by the reorganized GulfMark Parent.

"***Jones Act Warrants***" means those certain warrants to be issued in lieu of Common Shares with terms reasonably acceptable, in form and substance, to the Debtor and the Requisite Noteholders.

"***Distribution Documents***" means the Acceptable Plan, the Rights Offering, the Backstop Agreement, and the MIP.

"***Jones Act***" means, collectively, the U.S. citizenship and cabotage laws principally contained in 46 U.S.C. § 50501(a), (b) and (d) and 46 U.S.C. Chapters 121 and 551 and any successor statutes thereto, together with the rules and regulations promulgated thereunder by the U.S. Coast Guard and the U.S. Maritime Administration and their practices enforcing, administering, and interpreting such laws, statutes, rules, and regulations, in each case as amended or supplemented from time to time, relating to the ownership and operation of U.S.-flag vessels in the U.S. coastwise trade.

"**Non-U.S. Citizen**" means any Person that is not a U.S. Citizen and any Person that fails to deliver the Requisite Documentation.

"***U.S. Citizen***" means a Person that is a citizen of the United States

9

| | |
|---|---|
| | within the meaning of the Jones Act, eligible and qualified to own and operate U.S.-flag vessels in the U.S. coastwise trade. |
| **Definitive Documents**: | Any final agreement with respect to the Restructuring shall be subject to the Definitive Documents as set forth in the RSA.  The Definitive Documents will contain terms, conditions, representations, warranties, and covenants, each customary for the transactions described herein and consistent with the terms of this Restructuring Term Sheet. |
| **Executory Contracts and Unexpired Leases**: | The Debtor reserves the right to reject certain executory contracts and unexpired leases (with the consent, not to be unreasonably withheld, of the Requisite Noteholders).  All executory contracts and unexpired leases not expressly rejected will be deemed assumed pursuant to the Acceptable Plan. |
| **Corporate Governance**: | The board of directors for the Reorganized Debtor (the "***New Board***") shall be composed of seven (7) members, all of whom shall be designated by the Requisite Noteholders; *provided*, that one of the members of the New Board shall be the CEO of the Reorganized Debtor, and *provided*, that the number, independence and other characteristics of the directors on the New Board will satisfy applicable listing standards and any Jones Act requirements.  The members of the New Board shall be identified no later than the date of the confirmation hearing or otherwise in accordance with section 1129(a)(5) of the Bankruptcy Code.<br><br>On the Effective Date, the terms of the current members of the board of directors of GulfMark Parent shall expire.  The terms and conditions of the new corporate governance documents of the Reorganized Debtor (including the bylaws, and certificate of incorporation) shall be in form and substance reasonably acceptable to GulfMark Parent and the Requisite Noteholders. |
| **Corporate Structure**: | The Reorganized Debtor will be structured in a manner determined by the Requisite Noteholders, with the consent of the Debtor, which consent shall not be unreasonably withheld, delayed, or conditioned. |
| **Cancellation of Existing Securities and Agreements**: | Except as expressly provided in the Acceptable Plan, on the Effective Date, all notes, instruments, certificates evidencing debt of, or Interests in, the Debtor, including, without limitation, the Unsecured Notes, the Indenture, the GulfMark Parent Interests, and all warrants, options, and other entitlements to purchase and/or receive GulfMark Parent Interests, shall be deemed surrendered and cancelled and any |

10

| | |
|---|---|
| | obligation of the Debtor thereunder shall be discharged. |
| **Listing of New Common Shares and Warrants and Jones Act Warrants**: | The Reorganized Debtor shall use all commercially reasonable efforts to promptly secure listing privileges for the New Common Shares and the Warrants. The Reorganized Debtor also agree to cooperate with the Backstop Parties in connection with investigation of a possible listing of the Jones Act Warrants on a stock exchange. |
| **Survival of Indemnification Obligations and D&O Insurance**: | Subject to confirmation that the Debtor has provided counsel to the Consenting Noteholders with all relevant documentation, the obligations of the Debtor pursuant to its certificate of incorporation, bylaws or other agreements to indemnify current and former officers, directors, agents, and/or employees with respect to all present and future actions, suits, and proceedings against the Debtor or such directors, officers, agents, and/or employees, based upon any act or omission for or on behalf of the Debtor will not be discharged or impaired by confirmation of the Acceptable Plan.  All such obligations will be deemed and treated as executory contracts to be assumed by the Debtor under the Acceptable Plan and will continue as obligations of the Reorganized Debtor; *provided, that*, the Reorganized Debtor shall not indemnify directors of the Debtor for any claims or causes of action arising out of or relating to any act or omission resulting from gross negligence, willful misconduct, breach of fiduciary duty, intentional tort, a criminal act or intentional fraud.

In addition, after the Effective Date, the Reorganized Debtor will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect as of the Petition Date, and all directors and officers of the Debtor who served in such capacity at any time prior to the Effective Date will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Effective Date. |
| **Management Incentive Plan**: | A post-Restructuring management incentive plan ("***MIP***") will be approved and implemented by the New Board in accordance with the following:

• 7.5% of the Common Shares outstanding on the Effective Date will be reserved for the MIP (on a fully diluted basis, including by taking into account the Reorganized GulfMark Equity issued upon exercise of the Warrants and issued pursuant to the MIP).

• MIP awards will be granted as soon as reasonably practicable after the Effective Date at the discretion of the New Board on terms determined by the New Board (including with respect to allocation, |

11

| | |
|---|---|
| | timing, vesting conditions and the structure of any award) |
| | • The MIP will be subject to the terms and conditions of the MIP and the underlying award agreement and will not be subject to the terms of the employment and/or severance agreements. |
| **Executive Employment Agreements**: | The Debtor agrees, and the Plan and Confirmation Order will provide, that the executive employment contracts (collectively, the "***Executive Employment Agreements***") for the Reorganized Debtor's senior management team (collectively, "***Management***") will be assumed as modified, subject to further amendment as agreed by each individual member of Management and the New Board during the Negotiation Period (as defined below), as follows:  (1) Management will not be entitled to any tax gross up under any provisions of the Internal Revenue Code of 1986, as amended, including provisions relating to Sections 280G, 4999 and 409A of the Internal Revenue Code, (2) the Effective Date will not constitute a change of control for purposes of the Executive Employment Agreements or any other employment, severance, change of control, or similar type of agreement or arrangement covering any employee or other service provider of the Debtor; provided, however, for that certain member of Management who is party to a Change in Control Agreement only, such individual will be provided with a cash severance consistent with the terms set forth in the Executive Severance Agreements currently in effect for other members of Management, except that (A) such severance shall not exceed 2x such individual's base salary in effect on the date hereof, (B) such severance shall only be payable in the event such individual's employment is terminated by the Company without Cause (as such term is defined in such individual's Change in Control Agreement as in effect on the date hereof) and (C) such termination occurs within 30 days following the Effective Date, (3) with respect to members of Management, any provision relating to equity based awards, including without limitation any termination related provisions, will solely be governed by the terms of the MIP, and (4) for any Executive Employment Agreement covering any Management Employee that provides that a notice of non-extension may be delivered by the Debtor or Reorganized Debtor on or before December 31, 2017, the applicable Executive Employment Agreements will be amended to provide that such notice of non-extension  will be treated as a termination by the Company without Cause for purposes of non-change in control severance benefits under the applicable Executive Employment Agreement; provided, further, that the Reorganized Debtor retains the right to reject any Executive Employment Agreement if the applicable member of Management does not consent to the modifications described in (1)-(4) above. |

WEIL:\96134947\9\51067.0003

| | |
|---|---|
| | In addition, the following terms will apply: <br><br> • Prior to the Reorganized Debtor's assumption or rejection of the Executive Employment Agreements, the New Board and Management will engage in good faith negotiations regarding amendments to the Executive Employment Agreements during a thirty (30) day period following the Effective Date (the "**Negotiation Period**"). <br><br> • The Negotiation Period may be extended or shortened for some or all of the Executive Employment Agreements by mutual written agreement of the New Board and the applicable counterparties to the Executive Employment Agreements without further notice. |
| **Releases and Exculpations**: | The Acceptable Plan will provide for standard releases and exculpations to the extent permitted by law. The released and exculpated parties shall include, without limitation, DNB, to the extent permitted by law. |
| **Discharge of the Debtor**: | The Acceptable Plan will contain standard and customary discharge provisions. |
| **Injunction**: | The Acceptable Plan will contain standard and customary injunction provisions. |
| **Securities Exemptions**: | The issuance and distribution of (i) the Common Shares, (ii) the Warrants, (iii) the Jones Act Warrants, and (iv) the Common Shares issuable upon exercise of the Warrants and the Jones Act Warrants will be exempt from registration under the Securities Act or other applicable securities laws without further action by any Person (x) with respect to the above securities issued and distributed pursuant to the Acceptable Plan, the 1145 Rights Offering and the Commitment Premium pursuant to the Backstop Agreement, pursuant to section 1145(a) of the Bankruptcy Code (to the extent applicable), and/or any other applicable exemption, and (y) with respect to the above securities issued and distributed pursuant to the 4(a)(2)/Regulation D Rights Offering and issuance of the Unsubscribed Shares (as defined in the Backstop Agreement), pursuant to 4(a)(2)/ Regulation D of the Securities Act, and/or any other applicable exemptions. |
| **Retention of Jurisdiction**: | The Acceptable Plan will provide for a broad retention of jurisdiction by the Bankruptcy Court for (a) resolution of Claims, (b) allowance of compensation and expenses for professionals, (c) resolution of |

WEIL:\96134947\9\51067.0003

| | motions, adversary proceedings or other contested matters, (d) entering such orders as necessary to implement or consummate the Acceptable Plan and any related documents or agreements and (e) other purposes. |
| --- | --- |

EXECUTION VERSION

# ANNEX 1

## Defined Terms

| **Certain Bankruptcy Terms** | |
|---|---|
| "***Administrative Expense Claim***" | A Claim for costs and expenses of administration of the Chapter 11 Case pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b) or 507(a)(2) of the Bankruptcy Code, including, (a) the actual and necessary costs and expenses incurred from and after the Petition Date and through the Effective Date of preserving the Debtor's estate and operating its business; (b) Fee Claims; and (c) all fees and charges assessed against the estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1-1401. |
| "***Allowed***" | With reference to any Claim, a Claim arising on or before the Effective Date (a) that has been scheduled on the Debtor's schedules as undisputed, liquidated and non-contingent, (b) (i) as to which no objection to allowance has been interposed within the time period set forth in the Acceptable Plan, or (ii) as to which any objection has been determined by a final order of the Bankruptcy Court in favor of the holder, (c) any Claim as to which the Debtor's liability and the amount thereof are determined by a final order of a court of competent jurisdiction other than the Bankruptcy Court or (d) any Claim expressly allowed under the Acceptable Plan; *provided*, *however*, that notwithstanding the foregoing, the Reorganized Debtor shall retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise unimpaired pursuant to the Acceptable Plan. |
| "***Claim***" | A "claim," as defined in section 101(5) of the Bankruptcy Code, against the Debtor. |
| "***Class***" | Any group of Claims or Interests classified by the Acceptable Plan pursuant to section 1122(a)(1) of the Bankruptcy Code. |
| "***Disclosure Statement***" | The disclosure statement for the Acceptable Plan prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018 and/or other applicable law. |
| "***Existing GulfMark Shareholder***" | Any holder of GulfMark Parent Common Shares as of a certain date set forth in the Disclosure Statement. |
| "***Fee Claim***" | A Claim for professional services rendered or costs incurred on or after the Petition Date and on or before the Effective Date by professional persons retained in the Chapter 11 Case by the Debtor or any statutory committee appointed in the Chapter 11 Case pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code. |

| Certain Bankruptcy Terms | |
|---|---|
| *"GulfMark Parent Common Shares"* | GulfMark Parent's issued and outstanding Class A Common Stock, $0.01 par value. |
| *"Interest"* | Any equity security (as defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all shares, common stock, preferred stock, or other instrument evidencing any fixed or contingent ownership interest in a Debtor, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in a Debtor, whether or not transferable and whether fully vested or vesting in the future, that existed immediately before the Effective Date. |
| *"Other Priority Claim"* | Any Claim entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code (other than an Administrative Expense Claim or a Priority Tax Claim). |
| *"Priority Tax Claim"* | Any secured or unsecured Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code. |
| *"Secured Claim"* | Any Claim (other than Claims arising under or related to the Multicurrency Facility Agreement to the extent (a) secured by property of a Debtor's estate, the amount of which is equal to or less than the value of such property (i) as set forth in the Acceptable Plan, (ii) as agreed to by the holder of such Claim and the applicable Debtor, or (iii) as determined by a final order in accordance with section 506(a) of the Bankruptcy Code, or (b) secured by the right of setoff of the holder thereof under section 553 of the Bankruptcy Code. |

WEIL:\96134947\9\51067.0003

# **EXHIBIT B**

### *Backstop Agreement*

**EXECUTION VERSION**

BACKSTOP COMMITMENT AGREEMENT

AMONG

GULFMARK OFFSHORE, INC.

AND

THE COMMITMENT PARTIES PARTY HERETO

Dated as of May 15, 2017

## TABLE OF CONTENTS

| | | Page |
|---|---|---|

ARTICLE I DEFINITIONS ..................................................................................1

    Section 1.1    Definitions .........................................................................1

    Section 1.2    Construction.....................................................................17

ARTICLE II BACKSTOP COMMITMENT ........................................................18

    Section 2.1    The Rights Offering .........................................................18

    Section 2.2    The Backstop Commitment ..............................................18

    Section 2.3    Commitment Party Default................................................19

    Section 2.4    Subscription Account Funding ..........................................20

    Section 2.5    Closing ...........................................................................21

    Section 2.6    Transfer of Backstop Commitments ..................................21

    Section 2.7    Designation Rights...........................................................23

    Section 2.8    Consent to Transfers of Subscription Rights by Commitment Parties ...........................................................................23

    Section 2.9    Jones Act Restrictions on Transfers of Backstop Commitment ...............23

    Section 2.10    Authority to Reallocate Common Shares to Maintain Jones Act Compliance ....................................................................24

    Section 2.11    Notification of Aggregate Number of Exercised Subscription Rights .............................................................................24

ARTICLE III BACKSTOP COMMITMENT PREMIUM AND EXPENSE REIMBURSEMENT .................................................................24

    Section 3.1    Premium Payable by the Debtor .......................................24

    Section 3.2    Payment of Premium .......................................................25

    Section 3.3    Expense Reimbursement ..................................................25

    Section 3.4    Tax Treatment .................................................................26

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE DEBTOR .....................26

    Section 4.1    Organization and Qualification..........................................26

    Section 4.2    Corporate Power and Authority.........................................27

    Section 4.3    Execution and Delivery; Enforceability .............................27

    Section 4.4    Authorized and Issued Capital Stock..................................27

    Section 4.5    Issuance..........................................................................28

    Section 4.6    No Conflict .....................................................................28

    Section 4.7    Consents and Approvals ...................................................29

    Section 4.8    [Reserved].......................................................................29

WEIL:\96135016\8\51067.0003

TABLE OF CONTENTS

Page

Section 4.9     Financial Statements ................................................................29

Section 4.10    Company SEC Documents and Disclosure Statements ............29

Section 4.11    Absence of Certain Changes ......................................................30

Section 4.12    No Violation; Compliance with Laws .......................................30

Section 4.13    Legal Proceedings .....................................................................30

Section 4.14    Labor Relations ..........................................................................30

Section 4.15    Intellectual Property ...................................................................31

Section 4.16    Title to Personal Property; Leased Real Property ......................31

Section 4.17    No Undisclosed Relationships ...................................................31

Section 4.18    Licenses and Permits .................................................................32

Section 4.19    Environmental ............................................................................32

Section 4.20    Tax Matters .................................................................................33

Section 4.21    Employee Benefit Plans .............................................................33

Section 4.22    Internal Control Over Financial Reporting ................................34

Section 4.23    Disclosure Controls and Procedures ..........................................35

Section 4.24    Material Contracts ......................................................................35

Section 4.25    No Unlawful Payments ...............................................................35

Section 4.26    Compliance with Money Laundering Laws ...............................35

Section 4.27    Compliance with Sanctions Laws ..............................................36

Section 4.28    No Broker's Fees ........................................................................36

Section 4.29    Takeover Statutes .......................................................................36

Section 4.30    Investment Company Act ...........................................................36

Section 4.31    Insurance ....................................................................................36

Section 4.32    Alternative Transactions ............................................................37

Section 4.33    U.S. Coastwise Trade .................................................................37

Section 4.34    Common Stock Owned by Non-U.S. Citizens ...........................37

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE COMMITMENT
            PARTIES ....................................................................................37

Section 5.1     Incorporation ..............................................................................37

Section 5.2     Corporate Power and Authority ..................................................37

Section 5.3     Execution and Delivery ..............................................................37

Section 5.4     No Registration ..........................................................................38

ii

TABLE OF CONTENTS

Section 5.5    Purchasing Intent ..................................................................38

Section 5.6    Accredited Investor ..............................................................38

Section 5.7    Unsecured Notes Claims ......................................................38

Section 5.8    No Conflict ............................................................................39

Section 5.9    Consents and Approvals .......................................................39

Section 5.10   Legal Proceedings .................................................................39

Section 5.11   Sufficiency of Funds .............................................................39

Section 5.12   No Broker's Fees ...................................................................39

ARTICLE VI ADDITIONAL COVENANTS ....................................................39

Section 6.1    Assumption Orders ................................................................39

Section 6.2    Confirmation Order; Plan and Disclosure Statement ...............40

Section 6.3    Conduct of Business .............................................................40

Section 6.4    Access to Information; Confidentiality; Cleansing Materials ..................41

Section 6.5    Financial Information ............................................................43

Section 6.6    Commercially Reasonable Efforts ..........................................43

Section 6.7    Registration Rights Agreement; Reorganized Company Corporate Documents ..................................................................44

Section 6.8    Form D and Blue Sky ...........................................................44

Section 6.9    DIP Facility ...........................................................................45

Section 6.10   DTC Eligibility .....................................................................45

Section 6.11   Use of Proceeds ....................................................................45

Section 6.12   Securities Legend ..................................................................45

Section 6.13   [Reserved] .............................................................................46

Section 6.14   Alternative Transactions .......................................................46

Section 6.15   U.S. Coastwise Trade ............................................................46

Section 6.16   Vessel Operation and Registration ........................................46

Section 6.17   Allocation of Common Shares and Jones Act Warrants ...............47

Section 6.18   Listing on the Effective Date ................................................48

Section 6.19   Requisite Documentation .......................................................48

Section 6.20   Certificate of Incorporation ...................................................49

Section 6.21   Milestones .............................................................................49

TABLE OF CONTENTS

Page

Section 6.22   Common Shares to be Issued Upon the Exercise of Jones Act Warrants .................................................................................50

ARTICLE VII CONDITIONS TO THE OBLIGATIONS OF THE PARTIES ..........................50

Section 7.1   Conditions to the Obligations of the Commitment Parties .......................50

Section 7.2   Waiver of Conditions to Obligations of Commitment Parties ..................53

Section 7.3   Conditions to the Obligations of the Debtor ...........................................53

ARTICLE VIII INDEMNIFICATION AND CONTRIBUTION .................................................54

Section 8.1   Indemnification Obligations .................................................................54

Section 8.2   Indemnification Procedure ...................................................................55

Section 8.3   Settlement of Indemnified Claims ........................................................56

Section 8.4   Contribution .......................................................................................56

Section 8.5   Treatment of Indemnification Payments ...............................................56

Section 8.6   No Survival ........................................................................................57

ARTICLE IX TERMINATION ...............................................................................................57

Section 9.1   Consensual Termination .....................................................................57

Section 9.2   Automatic Termination .......................................................................57

Section 9.3   Termination by the Company ..............................................................57

Section 9.4   Termination by the Requisite Commitment Parties ...............................58

Section 9.5   Termination by any Commitment Party ................................................60

Section 9.6   Effect of Termination .........................................................................61

ARTICLE X GENERAL PROVISIONS ................................................................................62

Section 10.1   Notices ............................................................................................62

Section 10.2   Assignment; Third-Party Beneficiaries .............................................63

Section 10.3   Prior Negotiations; Entire Agreement ...............................................63

Section 10.4   Governing Law; Venue ....................................................................63

Section 10.5   Waiver of Jury Trial .........................................................................64

Section 10.6   Counterparts ....................................................................................64

Section 10.7   Waivers and Amendments; Rights Cumulative; Consent .....................64

Section 10.8   Headings .........................................................................................65

Section 10.9   Specific Performance .......................................................................65

Section 10.10  Damages .........................................................................................65

Section 10.11  No Reliance .....................................................................................65

iv

TABLE OF CONTENTS

Page

Section 10.12  Publicity ................................................................................................65

Section 10.13  Settlement Discussions .........................................................................66

Section 10.14  No Recourse............................................................................................66

Section 10.15  Severability ............................................................................................66

SCHEDULES

Schedule 1      Backstop Commitment Percentages
Schedule 2      Unsecured Notes Claims
Schedule 3      Notice Addresses for Commitment Parties
Schedule 4      Vessels
Schedule 5      Company Disclosure Schedule

EXHIBITS

Exhibit A-1     Form of 1145 Rights Offering Procedures
Exhibit A-2     Form of 4(a)(2) Rights Offering Procedures
Exhibit B       Form of Joinder Agreement for Related Purchaser
Exhibit C-1     Form of Joinder Agreement for Existing Commitment Party Purchaser
Exhibit C-2     Form of Amendment for Existing Commitment Party Purchaser
Exhibit D       Form of Joinder Agreement for Third-Party Purchaser
Exhibit E       Form of Transfer Notice

WEIL:\96135016\8\51067.0003

## BACKSTOP COMMITMENT AGREEMENT

THIS BACKSTOP COMMITMENT AGREEMENT (this "**Agreement**"), dated as of May 15, 2017, is made by and among (i) GulfMark Offshore, Inc. (the "**Company**" or the "**Debtor**"), on the one hand, and (ii) each of the Commitment Parties (as defined below), on the other hand.  The Debtor and each Commitment Party is referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**".

## RECITALS

WHEREAS, the Company has entered into an RSA, which provides for the restructuring of its capital structure and financial obligations pursuant to a plan of reorganization to be filed (the "**Chapter 11 Case**") (such filing date, the "**Petition Date**") under Title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended from time to time, the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (together with any court with jurisdiction over the Chapter 11 Case, the "**Bankruptcy Court**"), pursuant to a plan of reorganization (the "**Plan**") implementing the terms and conditions of the restructuring term sheet attached as Exhibit A thereto (the "**Term Sheet**"), in accordance with the RSA;

WHEREAS, in connection with the Chapter 11 Case, the Debtor have engaged in good faith, arm's-length negotiations with certain parties in interest regarding the terms of the Plan;

WHEREAS, pursuant to the Plan and this Agreement, and in accordance with the Rights Offering Procedures, the Company will conduct two rights offerings for the Rights Offering Securities; and

WHEREAS, subject to the terms and conditions contained in this Agreement, each Commitment Party has agreed to purchase (on a several and not joint basis) its Backstop Commitment Percentage of the Unsubscribed Securities, if any.

NOW, THEREFORE, in consideration of the mutual promises, agreements, representations, warranties and covenants contained herein, the receipt and sufficiency of which are hereby acknowledged, each of the Parties hereby agrees as follows:

ARTICLE I

## DEFINITIONS

Section 1.1    Definitions.    Except as otherwise expressly provided in this Agreement, whenever used in this Agreement (including any Exhibits and Schedules hereto), the following terms shall have the respective meanings specified therefor below:

"**1145 Rights Offering**" means the rights offering for Common Shares and Jones Act Warrants to be conducted in reliance upon the exemption from registration under the Securities Act provided in Section 1145 of the Bankruptcy Code, in accordance with the 1145 Rights Offering Procedures.

"**1145 Rights Offering Procedures**" means the procedures set forth in <u>Exhibit A-1</u>, as they may be amended or modified in a manner that is reasonably acceptable to the Requisite Commitment Parties and the Company.

"**1145 Rights Offering Shares**" means the Common Shares issued in the 1145 Rights Offering.

"**1145 Rights Offering Warrants**" means the Jones Act Warrants issued in the 1145 Rights Offering.

"**4(a)(2) Rights Offering**" means the rights offering for Common Shares and Jones Act Warrants to be conducted in reliance upon the exemption from registration under the Securities Act provided in Section 4(a)(2) of the Securities Act, in accordance with the 4(a)(2) Rights Offering Procedures.

"**4(a)(2) Rights Offering Procedures**" means the procedures set forth in <u>Exhibit A-2</u>, as they may be amended or modified in a manner that is acceptable to the Requisite Commitment Parties and the Company.

"**4(a)(2) Rights Offering Shares**" means the Common Shares issued in the 4(a)(2) Rights Offering.

"**4(a)(2) Rights Offering Warrants**" means the Jones Act Warrants issued in the 4(a)(2) Rights Offering.

"**4(a)(2) Rights Offering Securities**" means, collectively, the 4(a)(2) Rights Offering Shares and the 4(a)(2) Rights Offering Warrants.

"**Advisors**" means Milbank, Tweed, Hadley & McCloy LLP, one maritime counsel, Morris, Nichols, Arsht & Tunnell LLP, and Houlihan Lokey Capital, Inc., in their capacities as legal, and financial and strategic advisors, respectively, to the Commitment Parties.

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made (including any Related Funds of such Person); <u>provided</u>, that for purposes of this Agreement, no Commitment Party shall be deemed an Affiliate of the Company or any of its Subsidiaries. For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities, by Contract or otherwise.

"**Aggregate Emergence Equity**" means, collectively, the Aggregate Pre-Closing Equity Interests, Rights Offering Securities and Commitment Premium.

"**Aggregate Pre-Closing Equity Interests**" means the total number of Common Shares and Jones Act Warrants issued pursuant to the Plan on account of the Equity Interests and

WEIL:\96135016\8\51067.0003

the Unsecured Notes Claims (but for the avoidance of doubt, excluding any Rights Offering Securities).

"**Agreement**" has the meaning set forth in the Preamble.

"**Alternative Transaction**" means any dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, joint venture, partnership, sale of assets, financing (debt or equity), or restructuring of the Debtor, other than the Restructuring.

"**Applicable Consent**" has the meaning set forth in Section 4.7.

"**Available Securities**" means the Unsubscribed Securities that any Commitment Party fails to purchase as a result of a Commitment Party Default by such Commitment Party.

"**Backstop Commitment**" has the meaning set forth in Section 2.2(b).

"**Backstop Commitment Percentage**" means, with respect to any Commitment Party, such Commitment Party's percentage of the Backstop Commitment as set forth opposite such Commitment Party's name under the column titled "**Backstop Commitment Percentage**" on Schedule 1 (as it may be amended, supplemented or otherwise modified from time to time in accordance with this Agreement). Any reference to "Backstop Commitment Percentage" in this Agreement means the Backstop Commitment Percentage in effect at the time of the relevant determination.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and the local rules and general orders of the Bankruptcy Court, as in effect on the Petition Date, together with all amendments and modifications thereto subsequently made applicable to the Chapter 11 Case.

"**BCA Assumption Order**" means an Order, in form and substance reasonably satisfactory to the Requisite Commitment Parties and the Company, entered by the Bankruptcy Court authorizing the Debtor to assume this Agreement and approving the Rights Offering Procedures.

"**Blow Out Event**" means any of (i) the receipt by the Company of a request from the Requisite Commitment Parties to disclose the Disclosure Information following the occurrence of any Milestone and (ii) termination of this Agreement.

"**Business Day**" means any day, other than a Saturday, Sunday or legal holiday, as defined in Bankruptcy Rule 9006(a).

"**Bylaws**" means the amended and restated bylaws of the reorganized Company as of the Closing Date, which shall be consistent with the terms set forth in the Term Sheet and

otherwise be in form and substance reasonably satisfactory to the Requisite Commitment Parties and the Company.

"**Certificate of Incorporation**" means the amended and restated certificate of incorporation of the reorganized Company as of the Closing Date, which shall be consistent with the terms set forth in the Term Sheet and otherwise be in form and substance reasonably satisfactory to the Requisite Commitment Parties and the Company.

"**Chapter 11 Case**" has the meaning set forth in the Recitals.

"**Claim**" means any "claim" against the Debtor as defined in Section 101(5) of the Bankruptcy Code, including, without limitation, any Claim arising after the Petition Date.

"**Classification Society**" with respect to a Vessel means (a) DNV-GL or the classification society under which such Vessel is classed on the date hereof, or (b) one of the members of the International Association of Classification Societies, as may be approved by the Requisite Commitment Parties, such approval not to be unreasonably withheld, conditioned or delayed.

"**Cleansing Materials**" has the meaning set forth in Section 6.4(d).

"**Closing**" has the meaning set forth in Section 2.5(a).

"**Closing Date**" has the meaning set forth in Section 2.5(a).

"**Code**" means the Internal Revenue Code of 1986.

"**Commitment Party**" means each holder of a Backstop Commitment that is party to this Agreement, including without limitation, any holder of a Backstop Commitment that is a Related Purchaser, Existing Commitment Party Purchaser or a New Purchaser that has joined this Agreement pursuant to a joinder entered into pursuant to Section 2.6(b), Section 2.6(c)(iii)(1) or Section 2.6(d)(iii), respectively.

"**Commitment Party Default**" means the failure by any Commitment Party to (a) deliver and pay the aggregate Purchase Price for such Commitment Party's Backstop Commitment Percentage of any Unsubscribed Securities by the Subscription Funding Date (as it may be extended by the Company pursuant to the proviso in Section 2.4(b)) in accordance with Section 2.4(b) or (b) fully exercise all its Subscription Rights pursuant to and in accordance with the Plan in accordance with Section 2.2(a).

"**Commitment Party Replacement**" has the meaning set forth in Section 2.3(a).

"**Commitment Party Replacement Period**" has the meaning set forth in Section 2.3(a).

"**Commitment Party Withdrawal Replacement Period**" has the meaning set forth in Section 9.5(b).

"**Commitment Premium**" has the meaning set forth in <u>Section 3.1</u>.

"**Commitment Premium Share Amount**" means, with respect to a Commitment Party, the number of Common Shares equal to the product of (i) such Commitment Party's Backstop Commitment Percentage and (ii) the quotient obtained by dividing (a) the Commitment Premium by (b) the Rights Offering Common Share Purchase Price.

"**Common Equity Interests**" means, collectively, the Common Shares, the Jones Act Warrants and the Equity Class Warrants.

"**Common Shares**" means those certain shares of Class A common stock, par value $0.01 per share, or other membership units, partnership interests or other equity interests issued by the reorganized Company.

"**Company**" has the meaning set forth in the Preamble.

"**Company Disclosure Schedule**" means the disclosure schedule delivered by the Company to the Commitment Parties on the date of this Agreement.

"**Company Plan**" means any employee pension benefit plan, as such term is defined in Section 3(2) of ERISA (other than a Multiemployer Plan), subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and (i) sponsored or maintained (at the time of determination or at any time within the five years prior thereto) by the Company or any of its Subsidiaries or any ERISA Affiliate, or for which any such entity has liability or (ii) in respect of which the Company or any of its Subsidiaries or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"**Company SEC Documents**" has the meaning set forth in <u>Section 4.10</u>.

"**Complete Business Day**" means on any Business Day, the time from 12:00 AM to 11:59 PM (inclusive) on such Business Day.

"**Confirmation Order**" means an Order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code, which remains in full force and effect and is not subject to a stay.

"**Consenting Noteholders**" has the meaning set forth in the RSA.

"**Contract**" means any agreement, contract or instrument, including any loan, note, bond, mortgage, indenture, guarantee, deed of trust, license, franchise, commitment, lease, franchise agreement, letter of intent, memorandum of understanding or other obligation, and any amendments thereto, whether written or oral, but excluding the Plan.

"**Debtor**" has the meaning set forth in the Preamble.

"**Defaulting Commitment Party**" means in respect of a Commitment Party Default that is continuing, the applicable defaulting Commitment Party.

"**Definitive Documentation**" means the definitive documents and agreements governing the Restructuring as set forth in the RSA.

"**DIP Facility**" means that certain debtor-in-possession financing agreement entered into by and among the Company, as borrower, and the financial institutions party thereto, as lenders.

"**Disclosure Information**" has the meaning set forth in Section 6.4(d).

"**Disclosure Statement**" means the disclosure statement for the Plan approved by the Bankruptcy Court (including all exhibits and schedules thereto), in form and substance reasonably satisfactory to the Requisite Commitment Parties and the Company and each as may be further amended, supplemented or otherwise modified from time to time in a manner that is reasonably satisfactory to the Requisite Commitment Parties and the Company.

"**DNB Credit Agreement**" means that certain NOK 600,000,000 multicurrency revolving credit facility agreement dated as of December 27, 2012 (as amended, restated, modified, supplemented, or replaced from time to time), by and among Gulfmark Rederi AS, as borrower, the financial institutions party thereto, as lenders, and DNB Bank ASA, as arranger and agent.

"**DNB Facility Agent**" means DNB Bank ASA, as facility agent under the DNB Credit Agreement.

"**Effective Date**" means the effective date of the Plan.

"**Environmental Laws**" means all applicable laws (including common law), rules, regulations, codes, ordinances, orders in council, orders, decrees, treaties, legally binding directives, judgments or legally binding agreements promulgated or entered into by or with any Governmental Entity, relating in any way to the protection of the environment, preservation or reclamation of natural resources, the generation, management, transportation, storage, use, Release or threatened Release of, or exposure to, any Hazardous Material or to health and safety matters (to the extent relating to the environment or Hazardous Materials).

"**Equity Class Warrants**" means the warrants for the reorganized Company issued on the Effective Date and to be distributed to the holders of the Equity Interests under the Plan, which warrants shall be on the terms reasonably satisfactory to the Company and the Requisite Commitment Parties.

"**Equity Interests**" means the claims and interests of existing equity holders of the Company.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that, together with the Company or any of its Subsidiaries, is treated as a single employer under Section 414(b) or (c) of the Code, or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

WEIL:\96135016\8\51067.0003

"**ERISA Event**" means (a) any Reportable Event or the requirements of Section 4043(b) of ERISA apply with respect to a Company Plan; (b) any failure by any Company Plan to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Company Plan, whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Company Plan, the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Company Plan or the failure to make any required contribution to a Multiemployer Plan; (d) the incurrence by the Company or any of its Subsidiaries or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Company Plan or Multiemployer Plan; (e) a determination that any Company Plan is, or is expected to be, in "at-risk" status (within the meaning of Section 303 of ERISA or Section 430 of the Code); (f) the receipt by the Company or any of its Subsidiaries or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Company Plan or to appoint a trustee to administer any Company Plan under Section 4042 of ERISA; (g) the incurrence by the Company or any of its Subsidiaries or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Company Plan or Multiemployer Plan; (h) the receipt by the Company or any of its Subsidiaries or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Company or any of its Subsidiaries or any ERISA Affiliate of any notice, concerning the impending imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, "insolvent" (within the meaning of Section 4245 of ERISA), or in "endangered" or "critical status " (within the meaning of Section 305 of ERISA or Section 432 of the Code); or (i) the conditions for imposition of a lien under Section 303(k) of ERISA shall have been met with respect to any Company Plan.

"**Event**" means any event, development, occurrence, circumstance, effect, condition, result, state of facts or change.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Existing Commitment Party Purchaser**" has the meaning set forth in Section 2.6(c).

"**Exit Facilities**" means one or more credit agreements on terms reasonably satisfactory to the Company and the Requisite Commitment Parties.

"**Expense Reimbursement**" has the meaning set forth in Section 3.3(a).

"**Final Order**" means, as applicable, an Order of the Bankruptcy Court or other court of competent jurisdiction, which has not been reversed, stayed, reconsidered, readjudicated, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the Order could be appealed or from which certiorari could be sought or the new trial, re-argument or rehearing shall have been denied, resulted in no modification of such Order or has otherwise been dismissed with prejudice; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, as made applicable by Rule 9024 of the

WEIL:\96135016\8\51067.0003

Bankruptcy Rules, may be filed relating to such Order shall not cause such Order to not be a Final Order.

"**Final Outside Date**" has the meaning set forth in Section 9.4(i).

"**Financial Statements**" has the meaning set forth in Section 4.9(a).

"**Funding Amount**" has the meaning set forth in Section 2.4(a)(iv).

"**Funding Notice**" has the meaning set forth in Section 2.4(a).

"**GAAP**" has the meaning set forth in Section 4.9(a).

"**Governmental Entity**" means any U.S. or non-U.S. international, regional, federal, state, municipal or local governmental, judicial, administrative, legislative or regulatory authority, entity, instrumentality, agency, department, commission, court or tribunal of competent jurisdiction (including any branch, department or official thereof).

"**Hazardous Materials**" means all pollutants, contaminants, wastes, chemicals, materials, substances and constituents, exposure to which or the Release of which can pose a hazard to human health or the environment or are listed, regulated or defined as hazardous, toxic, pollutants or contaminants under any Environmental Laws, including materials defined as "hazardous substances" under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 et seq., and any radioactive substances or petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls or radon gas.

"**Highly Confidential Information**" has the meaning set forth in Section 6.4(c).

"**Indemnified Claim**" has the meaning set forth in Section 8.2.

"**Indemnified Person**" has the meaning set forth in Section 8.1.

"**Indemnifying Party**" has the meaning set forth in Section 8.1.

"**Indenture**" means that certain indenture, dated as of March 12, 2012 (as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof), among the Company, as issuer, the guarantors party thereto and U.S. Bank National Association, as trustee, related to the Notes, including all agreements, documents, notes, instruments and any other agreements delivered pursuant thereto or in connection therewith (in each case, as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof).

"**Intellectual Property Rights**" has the meaning set forth in Section 4.15.

"**IRS**" means the United States Internal Revenue Service.

WEIL:\96135016\8\51067.0003

"**ISM Code**" means the International Safety Management Code for the Safe Operation of Ships and for Pollution Prevention adopted by the International Maritime Organization as the same may be amended or supplemented from time to time.

"**ISM Code Documentation**" includes, with respect to each Vessel subject to the ISM Code:  (a) the Document of Compliance and Safety Management Certificate issued pursuant to the ISM Code in relation to such Vessel within the periods specified by the ISM Code; and (b) any documents which are required to establish and maintain the compliance of such Vessel or the compliance of the Company or any of its Subsidiaries with the ISM Code.

"**ISPS Code**" means the International Ship and Port Facility Security Code as adopted by the International Maritime Organization, as the same may be amended or supplemented from time to time.

"**ISPS Code Documentation**" includes with respect to each Vessel subject to the ISPS Code, (a) the ISSC Certificate issued under the ISPS Code, and (b) any other documents any documents which are required to establish and maintain the compliance of such Vessel or the compliance of the Company or any of its Subsidiaries with the ISPS Code.

"**ISSC Certificate**" means, with respect to each Vessel, subject to the ISPS Code, a valid and current International Ship Security Certificate issued under the ISPS Code with respect to such Vessel.

"**Jones Act**" means, collectively, the U.S. citizenship and cabotage laws principally contained in 46 U.S.C. § 50501(a), (b) and (d) and 46 U.S.C. Chapters 121 and 551 and any successor statutes thereto, together with the rules and regulations promulgated thereunder by the U.S. Coast Guard and the U.S. Maritime Administration and their practices enforcing, administering, and interpreting such laws, statutes, rules, and regulations, in each case as amended or supplemented from time to time, relating to the ownership and operation of U.S.-flag vessels in the U.S. Coastwise Trade.

"**Jones Act Compliance**" means compliance by the Company with the U.S. citizenship requirements of the Jones Act to be eligible to own and operate U.S.-flag vessels in U.S. Coastwise Trade or to obtain a coastwise endorsement.

"**Jones Act Warrants**" means, collectively, the Rights Offering Warrants and warrants to be distributed under the Plan on account of allowed Unsecured Notes Claims, which will be distributed in lieu of Common Shares on account of such claims for Jones Act Compliance.  For the avoidance of doubt, the Jones Act Warrants do not include the Equity Class Warrants.

"**Knowledge of the Company**" means the actual knowledge, after reasonable inquiry of their direct reports, of the chief executive officer, chief financial officer, chief operating officer and general counsel of the Company. As used herein, "actual knowledge" means information that is personally known by the listed individual(s).

"**Law**" means any law (statutory or common), statute, regulation, rule, code or ordinance enacted, adopted, issued or promulgated by any Governmental Entity.

WEIL:\96135016\8\51067.0003

"**Legal Proceedings**" has the meaning set forth in Section 4.13.

"**Legend**" has the meaning set forth in Section 6.12.

"**Lien**" means any lien, adverse claim, charge, option, right of first refusal, servitude, security interest, mortgage, pledge, deed of trust, easement, encumbrance, restriction on transfer, conditional sale or other title retention agreement, defect in title, lien or judicial lien as defined in Sections 101(36) and (37) of the Bankruptcy Code or other restrictions of a similar kind.

"**Losses**" has the meaning set forth in Section 8.1.

"**Material Adverse Effect**" means any Event after December 31, 2016, which individually, or together with all other Events, has had or would reasonably be expected to have a material and adverse effect on (a) the business, assets (including Vessels), liabilities, finances, properties, results of operations or condition (financial or otherwise) of the Company and its Subsidiaries, taken as a whole, or (b) the ability of the Company and its Subsidiaries, taken as a whole, to perform their respective obligations under, or to consummate the transactions contemplated by, the Transaction Agreements, including the Rights Offering, in each case, except to the extent such Event results from, arises out of, or is attributable to, the following (either alone or in combination):  (i) any Event after the date hereof in global, national or regional political conditions (including acts of war, terrorism or natural disasters, escalation or material worsening of hostilities) or in the general business, market, financial or economic conditions; (ii) any Event generally affecting the industries, regions and markets in which the Company and its Subsidiaries operate; (iii) any Event after the date hereof in applicable Law or GAAP, or in the interpretation or enforcement thereof; (iv) the execution, announcement or performance of this Agreement or the other Transaction Agreements or the transactions contemplated hereby or thereby, including, without limitation, the Restructuring; (v) changes in the market price or trading volume of the claims or equity or debt securities of the Company or any of its Subsidiaries (but not the underlying facts giving rise to such changes unless such facts are otherwise excluded pursuant to the clauses contained in this definition); or (vi) the filing or pendency of the Chapter 11 Case or actions taken in connection with the Chapter 11 Case in compliance with the Bankruptcy Code and Bankruptcy Rules; provided, that the exceptions set forth in clauses (i), (ii) and (iii) of this definition shall not apply to the extent that such Event is disproportionately adverse to the Company and its Subsidiaries, taken as a whole, as compared to other companies comparable in size and scale to the Company and its Subsidiaries operating in the industries in which the Company and its Subsidiaries operate.

"**Material Contracts**" means (a) all "plans of acquisition, reorganization, arrangement, liquidation or succession" and "material contracts" (as such terms are defined in Items 601(b)(2) and 601(b)(10) of Regulation S-K under the Exchange Act) to which the Company or any of its Subsidiaries is a party and (b) any Contracts to which the Company or any of its Subsidiaries is a party that is likely to reasonably involve consideration of more than $6,500,000, in the aggregate, over a consecutive twelve-month period.

"**Maximum Permitted Percentage**" means direct or indirect ownership of twenty-four percent (24.0%) of the total number of issued and outstanding Common Shares.

"**Milestones**" has the meaning set forth in <u>Section 6.21</u>.

"**MIP**" has the meaning set forth in <u>Section 4.4(a)(i)</u>.

"**MNPI**" has the meaning set forth in <u>Section 6.4(c)</u>.

"**Money Laundering Laws**" has the meaning set forth in <u>Section 4.26</u>.

"**Multiemployer Plan**" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which the Company or any of its Subsidiaries or any ERISA Affiliate (other than one considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Code Section 414) is making or accruing an obligation to make contributions, has within any of the preceding six plan years made or accrued an obligation to make contributions, or each such plan for which any such entity has liability.

"**New Purchaser**" has the meaning set forth in <u>Section 2.6(d)</u>.

"**Non-Breaching RSA Commitment Parties**" has the meaning set forth in <u>Section 9.3(c)</u>.

"**Non-U.S. Citizen**" means any Person that is not a U.S. Citizen and any Person that fails to deliver the Requisite Documentation.

"**Notes**" means the 6.375% Notes due 2022, issued pursuant to the Indenture, in the original aggregate principal amount of $500,000,000.

"**Operating Certificates**" means, with respect to a Vessel, to the extent required by applicable Law:  (i) in the case of U.S. Vessels, a Certificate of Inspection issued by the U.S. Coast Guard; (ii) a load line certificate; (iii) all ISM Code Documentation; (iv) all ISPS Code Documentation; (v) a tonnage certificate; (vi) in the case of Vessels operating in U.S. waters, a Certificate of Financial Responsibility issued under the Oil Pollution Act 1990; and (vii) all other trading certificates required for such Vessel.

"**Order**" means any judgment, order, award, injunction, writ, permit, license or decree of any Governmental Entity or arbitrator of applicable jurisdiction.

"**Outside Date**" has the meaning set forth in <u>Section 9.4(i)</u>.

"**Party**" has the meaning set forth in the Preamble.

"**PBGC**" means the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"**Permitted Liens**" means (a) Liens for Taxes that (i) are not due and payable or (ii) are being contested in good faith by appropriate proceedings and for which adequate reserves have been made with respect thereto; (b) mechanics Liens and similar Liens for labor, materials or supplies provided with respect to any Real Property or personal property incurred in the ordinary course of business consistent with past practice; (c) zoning, building codes and other

11

land use Laws regulating the use or occupancy of any Real Property or the activities conducted thereon that are imposed by any Governmental Entity having jurisdiction over such Real Property; provided, that no such zoning, building codes and other land use Laws prohibit the use or occupancy of such Real Property; (d) easements, covenants, conditions, restrictions and other similar matters adversely affecting title to any Real Property and other title defects that do not or would not materially impair the use or occupancy of such Real Property or the operation of the Company's or any of its Subsidiaries' business; (e) from and after the occurrence of the Effective Date, Liens granted in connection with the Exit Facilities; (f) Liens listed on Section 1.1 of the Company Disclosure Schedule; (g) Liens that, pursuant to the Confirmation Order, will not survive beyond the Effective Date; and (h) with respect to Vessels, Vessel Permitted Liens.

"**Person**" means an individual, firm, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, associate, trust, Governmental Entity or other entity or organization.

"**Petition Date**" has the meaning set forth in the Recitals.

"**Plan**" has the meaning set forth in the Recitals.

"**Portfolio Company**" means an entity primarily engaged in the operation of a non-financial services business that primarily derives its revenues from the sale of products or the provision of services to customers.

"**Pre-Closing Period**" has the meaning set forth in Section 6.3.

"**Purchase Price**" means, collectively, the Rights Offering Common Share Purchase Price and the Rights Offering Warrant Purchase Price.

"**Q1 Financial Statements**" has the meaning set forth in Section 4.9(b).

"**RBS Credit Agreement**" means that certain $300,000,000 multicurrency credit facility agreement (as amended, restated, modified, supplemented, or replaced from time to time), dated as of September 26, 2014, by and among GulfMark Americas, Inc., as borrower, the Company, as guarantor, the financial institutions party thereto, as lenders, the arrangers party thereto, and The Royal Bank of Scotland plc, as agent and security trustee.

"**RBS Facility Agent**" means The Royal Bank of Scotland plc, as agent under the RBS Credit Agreement.

"**Real Property**" means, collectively, all right, title and interest (including any leasehold estate) in and to any and all parcels of or interests in real property owned in fee simple or leased by the Company or any of its Subsidiaries, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures incidental to the ownership or lease thereof.

"**Registration Rights Agreement**" has the meaning set forth in Section 6.7(a).

12

"**Related Fund**" means (i) any investment funds or other entities who are advised by the same investment advisor and (ii) any investment advisor with respect to an investment fund or entity it advises.

"**Related Party**" means with respect to any Person, (i) any former, current or future director, officer, agent, Representative, Affiliate, employee, general or limited partner, member, manager or stockholder of such Person and (ii) any former, current or future director, officer, agent, Representative, Affiliate, employee, general or limited partner, member, manager or stockholder of any of the foregoing, in each case solely in their respective capacity as such.

"**Related Purchaser**" has the meaning set forth in Section 2.6(b).

"**Release**" means any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, emanating or migrating in, into, onto or through the environment.

"**Reorganized Company Corporate Documents**" means the Bylaws and the Certificate of Incorporation.

"**Replacement Commitment Parties**" has the meaning set forth in Section 2.3(a).

"**Reportable Event**" means any reportable event as defined in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the 30-day notice period referred to in Section 4043(c) of ERISA has been waived, with respect to a Company Plan (other than a Company Plan maintained by an ERISA Affiliate that is considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Section 414 of the Code).

"**Reports**" has the meaning set forth in Section 6.5(a).

"**Representatives**" means, with respect to any Person, such Person's directors, officers, members, partners, managers, employees, agents, investment bankers, attorneys, accountants, advisors and other representatives.

"**Requisite Commitment Parties**" means the Commitment Parties holding at least a majority of the aggregate Backstop Commitment Percentages as of the date on which the consent or approval is solicited; provided, however, the votes and commitments of any Defaulting Commitment Party shall be excluded from the calculation of Backstop Commitment Percentages for purposes of this definition.

"**Requisite Documentation**" has the meaning set forth in Section 2.9(b).

"**Requisite Noteholders**" has the meaning set forth in the RSA.

"**Restructuring**" has the meaning set forth in the RSA.

13

"**Rights Offering**" means, collectively, the 1145 Rights Offering and the 4(a)(2) Rights Offering that is backstopped by the Commitment Parties in connection with the Restructuring on the terms reflected in the RSA and this Agreement.

"**Rights Offering Amount**" means an aggregate amount of Rights Offering Securities with an aggregate Purchase Price equal to $125,000,000, subject to adjustment solely for the Purchase Price difference in the exercise and issuance of the Jones Act Warrants.

"**Rights Offering Common Share Purchase Price**" means a price per share of Common Shares, assuming the Rights Offering Amount shall comprise 60.0% of the Company's Aggregate Emergence Equity, subject to dilution from Common Shares issued pursuant to the MIP or exercise of the Equity Class Warrants.

"**Rights Offering Expiration Time**" means the time and the date on which the applicable Rights Offering subscription forms must be duly delivered to the Rights Offering Subscription Agent in accordance with the applicable Rights Offering Procedures, together with the applicable Purchase Price.

"**Rights Offering Participants**" means those Persons who duly subscribe for Rights Offering Securities in accordance with the Rights Offering Procedures.

"**Rights Offering Procedures**" means, collectively, the 1145 Rights Offering Procedures and the 4(a)(2) Rights Offering Procedures, that are approved by the Bankruptcy Court pursuant to the BCA Assumption Order, which procedures shall be in form and substance substantially as set forth in Exhibit A-1 and Exhibit A-2 hereto.

"**Rights Offering Shares**" means, collectively, the 1145 Rights Offering Shares and the 4(a)(2) Rights Offering Shares (including all Unsubscribed Shares purchased by the Commitment Parties pursuant to this Agreement) distributed pursuant to and in accordance with the Rights Offering Procedures.

"**Rights Offering Securities**" means the Rights Offering Shares and Rights Offering Warrants issued by the reorganized Company to the Rights Offering Participants.

"**Rights Offering Subscription Agent**" means Prime Clerk LLC or another subscription agent appointed by the Company and reasonably satisfactory to the Requisite Commitment Parties.

"**Rights Offering Warrant Purchase Price**" means a price per Rights Offering Warrant, assuming the Rights Offering Amount shall comprise 60.0% of the Company's Aggregate Emergence Equity, subject to dilution from Common Shares issued pursuant to the MIP or exercise of the Equity Class Warrants.  The Rights Offering Warrant Purchase Price shall be $0.01 less than the Rights Offering Common Share Purchase Price in order to take into account the $0.01 exercise price for the Jones Act Warrants.

"**Rights Offering Warrants**" means the 1145 Rights Offering Warrants and the 4(a)(2) Rights Offering Warrants (including all Unsubscribed Warrants purchased by the

Commitment Parties pursuant to this Agreement), which shall be on the terms reasonably satisfactory to the Company and the Requisite Commitment Parties.

"**RSA**" means that certain Restructuring Support Agreement entered into by and among the Company and the Consenting Noteholders, dated as of the date hereof (as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof), including the exhibits and schedules thereto.

"**RSA and Backstop Motions**" has the meaning set forth in Section 6.21(b).

"**RSA Assumption Order**" means an Order entered by the Bankruptcy Court, in form and substance reasonably satisfactory to the Requisite Commitment Parties and the Company, authorizing the Company to assume the RSA.

"**Sanctioned Jurisdiction**" has the meaning set forth in Section 4.27.

"**Sanctions**" has the meaning set forth in Section 4.27.

"**SEC**" means the U.S. Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Significant Terms**" means, collectively, (i) the definitions of Alternative Transaction, Purchase Price, Requisite Commitment Parties, Rights Offering Common Share Purchase Price, Rights Offering Warrant Purchase Price, Significant Terms, and (ii) the terms of Section 2.2, Section 2.3, Section 2.6, Section 2.7, Section 3.1, Section 3.2 and Section 6.14.

"**Subscription Account**" has the meaning set forth in Section 2.4(a)(v).

"**Subscription Amount**" has the meaning set forth in Section 2.4(a)(ii).

"**Subscription Escrow Agreement**" has the meaning set forth in Section 2.4(b).

"**Subscription Funding Date**" has the meaning set forth in Section 2.4(b).

"**Subscription Rights**" means those certain rights to purchase the Rights Offering Securities at the applicable Purchase Price which the reorganized Company will issue to the holders of Unsecured Notes Claims pursuant to the Plan.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, joint venture or other legal entity as to which such Person (either alone or through or together with any other subsidiary or Affiliate), (a) owns, directly or indirectly, more than fifty percent (50%) of the stock or other equity interests, (b) has the power to elect a majority of the board of directors or similar governing body thereof or (c) has the power to direct, or otherwise control, the business and policies thereof.

"**Takeover Statute**" means any restrictions contained in any "fair price," "moratorium," "control share acquisition," "business combination" or other similar anti-takeover statute or regulation.

"**Taxes**" means all taxes, assessments, duties, levies or other similar mandatory governmental charges paid to a Governmental Entity, including all federal, state, local, foreign and other income, franchise, profits, gross receipts, capital gains, capital stock, transfer, property, sales, use, value-added, occupation, excise, severance, windfall profits, stamp, payroll, social security, withholding and other taxes (whether payable directly or by withholding and whether or not requiring the filing of a return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest thereon and any liability for such amounts as a result of being a member of a combined, consolidated, unitary or affiliated group.

"**Term Sheet**" has the meaning set forth in the Recitals.

"**Termination Fee**" means $7,500,000.

"**Transaction Agreements**" means, collectively, this Agreement, the Plan, the Disclosure Statement, the RSA, the Registration Rights Agreement, the Exit Facilities, any documentation or agreements relating to the Registration Rights Agreement and the Exit Facilities, and such other agreements and documents referred to herein or in the Plan.

"**Transfer**" means sell, transfer, assign, pledge, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions in which any Person receives the right to own or acquire any current or future interest in) a Backstop Commitment, a Subscription Right, an Unsecured Notes Claim, a Common Equity Interest or the act of any of the aforementioned actions.

"**Unfunded Pension Liability**" means the excess of a Company Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Company Plan's assets, determined in accordance with the assumptions used for funding the Company Plan pursuant to Section 412 of the Code for the applicable plan year.

"**Unsecured Notes Claims**" means all Claims against the Company, as issuer, arising under or in connection with the Notes and the Indenture.

"**Unsubscribed Securities**" means the Unsubscribed Shares and Unsubscribed Warrants.

"**Unsubscribed Securities Amount**" has the meaning set forth in <u>Section 2.4(a)(iv)</u>.

"**Unsubscribed Shares**" means the Rights Offering Shares that have not been duly purchased by the Rights Offering Participants in accordance with the Rights Offering Procedures and the Plan.

16

"**Unsubscribed Warrants**" means the Rights Offering Warrants that have not been duly purchased by the Rights Offering Participants in accordance with the Rights Offering Procedures and the Plan.

"**U.S. Citizen**" means a Person that is a citizen of the United States within the meaning of 46 U.S.C. § 50501(a), (b) and (d), and the regulations promulgated thereunder (as each is as now in effect and as the same may be from time to time amended), eligible and qualified to own and operate U.S.-flag vessels in the U.S. Coastwise Trade.

"**U.S. Coastwise Trade**" means the carriage or transport of merchandise and/or other materials and/or passengers in the coastwise trade of the United States of America within the meaning of 46 U.S.C. Chapter 551 as now in effect and as the same may be from time to time amended.

"**U.S. Vessel**" means any vessel owned or bareboat chartered by the Company or its Subsidiaries and documented under the laws of the United States with a coastwise endorsement.

"**Vessel**" means any vessel owned by the Company or its Subsidiaries, including any U.S. Vessel.

"**Vessel Permitted Liens**" means any of the following to the extent incurred and, from time to time discharged, in the ordinary course of business: (i) Liens for crew wages (including, without limitation, wages of the master of a Vessel); (ii) Liens for the wages of a stevedore when employed directly by the charterers, master or agent of a Vessel; (iii) Liens for general average and salvage (including contract salvage); (iv) Liens for necessaries provided to a Vessel; (v) Liens for damages arising from maritime torts; (vi) Liens arising by operation of law in the ordinary course of business in operating, maintaining or repairing a Vessel;  (vii) Liens with respect to any changes or modifications required to be made to a Vessel under applicable Law; and (viii) Liens for any bareboat charter or time charter entered into with respect to a Vessel.

"**Warrants**" mean the Jones Act Warrants and the Equity Class Warrants.

"**willful or intentional breach**" has the meaning set forth in Section 9.6(a)(iii).

"**Withdrawal Liability**" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

Section 1.2    Construction.   In this Agreement, unless the context otherwise requires:

(a)    references to Articles, Sections, Exhibits and Schedules are references to the articles and sections or subsections of, and the exhibits and schedules attached to, this Agreement;

WEIL:\96135016\8\51067.0003

(b)     references in this Agreement to "writing" or comparable expressions include a reference to a written document transmitted by means of electronic mail in portable document format (pdf), facsimile transmission or comparable means of communication;

(c)     words expressed in the singular number shall include the plural and vice versa; words expressed in the masculine shall include the feminine and neuter gender and vice versa;

(d)     the words "hereof," "herein," "hereto" and "hereunder," and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole, including all Exhibits and Schedules attached to this Agreement, and not to any provision of this Agreement;

(e)     the term this "Agreement" shall be construed as a reference to this Agreement as the same may have been, or may from time to time be, amended, modified, varied, novated or supplemented;

(f)     "include," "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words;

(g)     references to "day" or "days" are to calendar days;

(h)     references to "the date hereof" means the date of this Agreement;

(i)     unless otherwise specified, references to a statute means such statute as amended from time to time and includes any successor legislation thereto and any rules or regulations promulgated thereunder in effect from time to time; and

(j)     references to "dollars" or "$" are to United States of America dollars.

ARTICLE II

**BACKSTOP COMMITMENT**

Section 2.1     The Rights Offering.  On and subject to the terms and conditions hereof, including entry of the BCA Assumption Order, the Company shall conduct the Rights Offering pursuant to, and in accordance with, the Rights Offering Procedures, this Agreement and the Plan.

Section 2.2     The Backstop Commitment.  (a) On and subject to the terms and conditions hereof, including entry of the Confirmation Order, each Commitment Party agrees, severally and not jointly, to fully exercise all Subscription Rights that are properly issued to it and its Affiliates based on the Unsecured Notes Claims listed on Schedule 2 pursuant to the Rights Offering and duly purchase all Rights Offering Securities issuable to it and its Affiliates pursuant to such exercise at the applicable Purchase Price, in accordance with the Rights Offering Procedures and the Plan.

18

(b)     On and subject to the terms and conditions hereof, including entry of the Confirmation Order, each Commitment Party agrees, severally and not jointly, to purchase, and the Company agrees to sell to such Commitment Party, on the Closing Date for the applicable Purchase Price, the number of Unsubscribed Securities equal to (a) such Commitment Party's Backstop Commitment Percentage multiplied by (b) the aggregate number of Unsubscribed Securities, rounded among the Commitment Parties solely to avoid fractional securities as the Commitment Parties may determine in their sole discretion.  The obligations of the Commitment Parties to purchase such Unsubscribed Securities as described in this Section 2.2(b) shall be referred to as the "**Backstop Commitment**."

Section 2.3     Commitment Party Default.    (a)  Upon the occurrence of a Commitment Party Default, the Commitment Parties (other than any Defaulting Commitment Party) shall have the right, but not the obligation, within five (5) Business Days after receipt of written notice from the Company to all Commitment Parties of such Commitment Party Default, which notice shall be given promptly following the occurrence of such Commitment Party Default and to all Commitment Parties substantially concurrently (such five (5) Business Day period, the "**Commitment Party Replacement Period**"), to make arrangements for one or more of the Commitment Parties (other than any Defaulting Commitment Party) to purchase all or any portion of the Available Securities (such purchase, a "**Commitment Party Replacement**") on the terms and subject to the conditions set forth in this Agreement (and subject to, if necessary, an allocation of the Available Securities between Rights Offering Shares and Rights Offering Warrants as reasonably determined by the Company and agreed to by the Requisite Commitment Parties in order to maintain Jones Act Compliance and in such amounts as may be agreed upon by all of the Commitment Parties electing to purchase all or any portion of the Available Securities (such Commitment Parties, the "**Replacement Commitment Parties**")).  Any such Available Securities purchased by a Replacement Commitment Party shall be included, among other things, in the determination of (x) the Unsubscribed Securities to be purchased by such Replacement Commitment Party for all purposes hereunder, (y) the Backstop Commitment Percentage of such Replacement Commitment Party for all purposes hereunder, including the allocations of the Commitment Premium, and (z) the Backstop Commitment of such Replacement Commitment Party for purposes of the definition of Requisite Commitment Parties. If a Commitment Party Default occurs, the Outside Date shall be delayed only to the extent necessary to allow for the Commitment Party Replacement to be completed within the Commitment Party Replacement Period.

(b)     Subject to the Company's prior written consent (which consent may be granted in its sole discretion), the amount of the Commitment Premium payable by the Company to a Replacement Commitment Party with respect to any Available Securities purchased by such Replacement Commitment Party in a Commitment Party Replacement pursuant to Article III shall be multiplied by 150%.  For the avoidance of doubt, any such increase in the Commitment Premium will result in an overall increase in the Commitment Premium and not in a reallocation from other Commitment Parties.

(c)     Notwithstanding anything in this Agreement to the contrary, if a Commitment Party is a Defaulting Commitment Party, it shall not be entitled to any of the Commitment Premium, Termination Fee, expense reimbursement applicable solely to such

Defaulting Commitment Party (including the Expense Reimbursement) provided, or to be provided, under or in connection with this Agreement.

(d)    Nothing in this Agreement shall be deemed to require a Commitment Party to purchase more than its Backstop Commitment Percentage of the Unsubscribed Securities, unless otherwise agreed by such Commitment Party pursuant to <u>Section 2.2</u>.

(e)    For the avoidance of doubt, notwithstanding anything to the contrary set forth in <u>Section 9.6</u>, but subject to <u>Section 10.10</u>, no provision of this Agreement shall relieve any Defaulting Commitment Party from any liability hereunder, or limit the availability of the remedies set forth in <u>Section 10.9</u>, in connection with any such Defaulting Commitment Party's Commitment Party Default.

Section 2.4    Subscription Account Funding.    (a) No later than the seventh (7th) Business Day following the Rights Offering Expiration Time, the Rights Offering Subscription Agent shall deliver to each Commitment Party a written notice (the "**Funding Notice**") of:

(i)    the number of Rights Offering Securities elected to be purchased by the Rights Offering Participants and the aggregate Purchase Price therefor, with a breakdown of Rights Offering Shares and Rights Offering Warrants;

(ii)    the number of Rights Offering Securities to be issued and sold by the Company to such Commitment Party and the aggregate Purchase Price therefor (the "**Subscription Amount**"), as well as a breakdown of the Subscription Amount to indicate the aggregate number of Rights Offering Shares and Rights Offering Warrants, and associated aggregate Purchase Prices for the Rights Offering Shares and Rights Offering Warrants, which comprise the Subscription Amount for each Commitment Party;

(iii)    the aggregate number of Unsubscribed Securities, if any, and the aggregate Purchase Price required for the purchase thereof;

(iv)    the number of Unsubscribed Securities (based upon such Commitment Party's Backstop Commitment Percentage) to be issued and sold by the Company to such Commitment Party (as it relates to each Commitment Party, such Commitment Party's "**Unsubscribed Securities Amount**") and the aggregate Purchase Price therefor (as it relates to each Commitment Party, such Commitment Party's "**Funding Amount**"), as well as a breakdown of the Unsubscribed Securities to indicate the aggregate number of Rights Offering Shares and Rights Offering Warrants, and associated aggregate Purchase Prices for the Rights Offering Shares and Rights Offering Warrants, which comprise the Unsubscribed Securities Amount for each Commitment Party; and

(v)    the account information (including wiring instructions) for the account to which such Commitment Party shall deliver and pay the Subscription Amount, which account may be an escrow account pursuant to <u>Section 2.4(b)</u>, and the Funding Amount (the "**Subscription Account**").

The Company shall promptly direct the Rights Offering Subscription Agent to provide any written backup, information and documentation relating to the information contained in the applicable Funding Notice as any Commitment Party may reasonably request.

(b)    No earlier than the fourth (4th) Complete Business Day following receipt of the Funding Notice and no later than three (3) Business Days prior to the Effective Date (such date, the "**Subscription Funding Date**"), each Commitment Party shall deliver and pay its Funding Amount by wire transfer in immediately available funds in U.S. dollars into the Subscription Account in satisfaction of such Commitment Party's Backstop Commitment.  At the option of the Requisite Commitment Parties, the Subscription Account shall be established with an escrow agent reasonably satisfactory to the Requisite Commitment Parties and the Company pursuant to an escrow agreement(s) in form and substance reasonably satisfactory to the Requisite Commitment Parties and the Company (the "**Subscription Escrow Agreement**"). If this Agreement is terminated in accordance with its terms, the funds held in the Subscription Account shall be released, and each Commitment Party shall receive from the Subscription Account the cash amount actually funded to the Subscription Account by such Commitment Party, without any interest, promptly following such termination.

Section 2.5    Closing.  (a) Subject to <u>Article VII</u>, unless otherwise mutually agreed in writing between the Company and the Requisite Commitment Parties, the closing of the Backstop Commitments (the "**Closing**") shall take place at the offices of Milbank, Tweed, Hadley & McCloy LLP, 28 Liberty Street, New York, New York 10005, at 11:00 a.m., New York City time, within three (3) Business Days of the date on which all of the conditions set forth in <u>Article VII</u> shall have been satisfied or waived in accordance with this Agreement (other than conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions).  The date on which the Closing actually occurs shall be referred to herein as the "**Closing Date**".

(b)    At the Closing, the funds held in the Subscription Account shall be released to the Company and utilized in accordance with the Plan and Disclosure Statement.

(c)    At the Closing, issuance of the Unsubscribed Securities will be made by the reorganized Company to each Commitment Party (or to its designee in accordance with <u>Section 2.7</u>) against payment of such Commitment Party's Funding Amount, in satisfaction of such Commitment Party's Backstop Commitment.  Unless a Commitment Party requests delivery of a physical certificate, any Unsubscribed Securities shall be delivered into the account of a Commitment Party through the facilities of The Depository Trust Company. Notwithstanding anything to the contrary in this Agreement, all Unsubscribed Securities will be delivered with all issue, stamp, transfer, sales and use, or similar transfer Taxes or duties that are due and payable (if any) in connection with such delivery duly paid by the Company.

Section 2.6    Transfer of Backstop Commitments.  (a) Other than as expressly set forth in this <u>Section 2.6</u>, no Commitment Party shall be permitted to Transfer its Backstop Commitment.

(b)    Subject to <u>Section 2.6(e)</u>, each Commitment Party shall have the right to Transfer all or any portion of its Backstop Commitment to any creditworthy Affiliate or Related

Fund (other than any Portfolio Company of such Commitment Party or its Affiliates) (each, a "**Related Purchaser**"), provided, that such Commitment Party shall deliver to the Company and the Rights Offering Subscription Agent a joinder to this Agreement, substantially in the form attached hereto as Exhibit B, executed by such Commitment Party and such Related Purchaser.

(c)    Subject to Section 2.6(e), each Commitment Party shall have the right to Transfer all or any portion of its Backstop Commitment to any other Commitment Party or such other Commitment Party's Related Purchaser (each, an "**Existing Commitment Party Purchaser**"), provided, that (i) such Transfer shall have been consented to by the Requisite Commitment Parties (such consent shall not to be unreasonably withheld or conditioned and shall be deemed to have been given after two (2) Complete Business Days following notification in writing to Milbank, Tweed, Hadley & McCloy LLP and the Company of a proposed Transfer by such Commitment Party), (ii) such Existing Commitment Party Purchaser or such Existing Commitment Party Purchaser's Affiliate or Related Fund shall have been a Commitment Party as of immediately prior to such Transfer, and (iii)(1) to the extent such Existing Commitment Party Purchaser is not a Commitment Party hereunder, such Commitment Party shall deliver to the Company and the Rights Offering Subscription Agent a joinder to this Agreement, substantially in the form attached hereto as Exhibit C-1, executed by such Commitment Party and such Existing Commitment Party Purchaser and (2) to the extent such Existing Commitment Party Purchaser is already a Commitment Party hereunder, such Commitment Party shall deliver to the Company and the Rights Offering Subscription Agent an amendment to this Agreement, substantially in the form attached hereto as Exhibit C-2, executed by such Commitment Party and such Existing Commitment Party Purchaser; provided, that the Company's consent shall be required for any Transfer that, when taken together with all other Transfers to which the Company has not previously consented, shall increase such Commitment Party's and its Related Purchaser's Backstop Commitment by more than 10.0% and result in such Commitment Party and its Related Purchasers committing to more than 20.0% of the Backstop Commitment.

(d)    Subject to Section 2.6(e), each Commitment Party shall have the right to Transfer all or any portion of its Backstop Commitment to any Person that is not an Existing Commitment Party Purchaser (each of the Persons to whom a Transfer is made, a "**New Purchaser**"), provided, that (i) such Transfer shall have been consented to by the Requisite Commitment Parties (such consent shall not be unreasonably withheld or conditioned and shall be deemed to have been given after two (2) Complete Business Days following notification in writing to Milbank, Tweed, Hadley & McCloy LLP of a proposed Transfer by such Commitment Party); (ii) such Transfer shall have been consented to by the Company in writing (such consent shall not be unreasonably withheld or conditioned and shall be deemed to have been given after two (2) Business Days following written notification of a proposed Transfer by such Commitment Party to the Company, unless any written objection is provided by the Company to such Commitment Party during such two Business Day period), and (iii) such Commitment Party shall deliver to the Company and the Rights Offering Subscription Agent a joinder to this Agreement, substantially in the form attached hereto as Exhibit D executed by such Commitment Party, such New Purchaser and the Company.

(e)    No Commitment Party may Transfer all or any portion of its Backstop Commitment to the Company or any of its Subsidiaries.  No Commitment Party shall have the right to Transfer all or any portion of its Backstop Commitment to any other Person that is not a

WEIL:\96135016\8\51067.0003

Related Purchaser unless it also agrees to (and does) concurrently Transfer a corresponding number and amount of the Unsecured Notes Claims to such Person, provided that, the Company may consent to Transfers of a Commitment Party's Backstop Commitment absent a simultaneous transfer of a corresponding amount of the Unsecured Notes Claims.  No Commitment Party shall have the right to Transfer all or any portion of its Backstop Commitment to any other Person following receipt of the Funding Notice pursuant to, and in accordance with, Section 2.4.  Any Commitment Party seeking to Transfer its Backstop Commitment to any other Person must provide the Company, the Rights Offering Subscription Agent and Milbank, Tweed, Hadley & McCloy LLP with prior written notice of such proposed Transfer, in the form attached hereto as Exhibit E, no less than two (2) Complete Business Days prior to the date of the consummation of such proposed Transfer. Any Transfer made (or attempted to be made) in violation of this Agreement shall be deemed null and void *ab initio* and of no force or effect, regardless of any prior notice provided to the Parties or any Commitment Party, and shall not create (or be deemed to create) any obligation or liability of any other Commitment Party or the Debtor to the purported transferee or limit, alter or impair any agreements, covenants, or obligations of the proposed transferor under this Agreement.  After the Closing Date, nothing in this Agreement shall limit or restrict in any way the ability of any Commitment Party (or any permitted transferee thereof) to Transfer any of the Common Equity Interests or any interest therein.

Section 2.7    Designation Rights.  Each Commitment Party shall have the right to designate by written notice to the Company no later than two (2) Business Days prior to the Closing Date that some or all of the Unsubscribed Securities and Rights Offering Securities that it is obligated to purchase hereunder be issued in the name of, and delivered to a Related Purchaser of such Commitment Party upon receipt by the Company of payment therefor in accordance with the terms hereof, which notice of designation shall (i) be addressed to the Company and signed by such Commitment Party and each such Related Purchaser, (ii) specify the number of Unsubscribed Securities and Rights Offering Securities to be delivered to or issued in the name of such Related Purchaser and (iii) contain a confirmation by each such Related Purchaser of the accuracy of the representations set forth in Sections 5.4 through 5.6 as applied to such Related Purchaser; provided, after issuance of the Funding Notice, any Related Purchaser designated to receive Common Shares from a Commitment Party that is a U.S. Citizen, shall be a U.S. Citizen; provided, further, that no such designation pursuant to this Section 2.7 shall relieve such Commitment Party from its obligations under this Agreement.

Section 2.8    Consent to Transfers of Subscription Rights by Commitment Parties.  The Company hereby consents to any Transfer of the Subscription Rights held by any Commitment Party to any such Commitment Party's Related Purchaser, provided, however, for the avoidance of doubt, such Transfer must occur prior to the receipt of the Funding Notice, and such Transfer must be accompanied with a Transfer of such Commitment Party's interest in the corresponding Unsecured Notes Claims.

Section 2.9    Jones Act Restrictions on Transfers of Backstop Commitment.

(a)    Notwithstanding anything to the contrary contained herein and in addition to the remedies available to the Company under the Certificate of Incorporation or otherwise, (i) in no event shall Non-U.S. Citizens in the aggregate own Common Shares in excess of the Maximum Permitted Percentage, (ii) any purported Transfer of the Backstop Commitment or the

Commitment Premium, the effect of which would be to cause one or more Non-U.S. Citizens in the aggregate to own Common Shares in excess of the Maximum Permitted Percentage, shall be void and ineffective, (iii) to the extent that the Company becomes aware that any purported Transfer would have such effect, the Company shall not register such purported Transfer, and (iv) the Company shall not recognize or be required to recognize the purported transferee thereof as a holder of Subscription Rights, the Backstop Commitment or the Commitment Premium for any purpose whatsoever except to the extent necessary to effect any remedy available to the Company.

(b)     An affidavit of citizenship and any other documentation as the Company, together with the Requisite Commitment Parties, deem advisable to fulfill the purpose or implement the provisions of its Certificate of Incorporation in order to maintain Jones Act Compliance (the "**Requisite Documentation**"), will be required by the Company from all transferees of the Backstop Commitment or the Commitment Premium and, if such transferee is acting as a fiduciary, agent or nominee for an owner, with respect to such owner, and registration of any Transfer shall be denied upon refusal to furnish such Requisite Documentation; provided, however, that a failure to deliver an affidavit of citizenship will result in treating such Commitment Party as a Non-U.S. Citizen, but shall not prevent such Commitment Party from receiving Common Shares (to the extent that there is capacity for Non-U.S. Citizens to receive Common Shares pursuant to Section 6.17 of this Agreement) or Jones Act Warrants.

Section 2.10   Authority to Reallocate Common Shares to Maintain Jones Act Compliance.   The Company, together with the Requisite Commitment Parties, in their sole discretion and without the consent of the transferee, shall have the authority to reallocate any Rights Offering Shares as Rights Offering Warrants in order to maintain Jones Act Compliance.

Section 2.11   Notification of Aggregate Number of Exercised Subscription Rights.   Upon request from the Requisite Commitment Parties from time to time prior to the Rights Offering Expiration Time (and any permitted extensions thereto), the Company shall promptly notify, or cause the Rights Offering Subscription Agent to promptly notify, the Commitment Parties of the aggregate number of Subscription Rights known by the Company or the Rights Offering Subscription Agent to have been exercised pursuant to the Rights Offering as of the most recent practicable time before such request.

ARTICLE III

**BACKSTOP COMMITMENT PREMIUM AND EXPENSE REIMBURSEMENT**

Section 3.1     Premium Payable by the Debtor.   Subject to Section 3.2 and to entry of the BCA Assumption Order, as consideration for the Backstop Commitment and the other agreements of the Commitment Parties in this Agreement, the Debtor shall pay or cause to be paid a nonrefundable aggregate premium in an amount equal to $7,500,000 (the "**Commitment Premium**"). The Commitment Premium shall be payable, in accordance with Section 3.2, to the Commitment Parties (including any Replacement Commitment Party, but excluding any Defaulting Commitment Party) or their designees, provided such designees are U.S. Citizens in the case of any payment in the form of Common Shares, in proportion to their

WEIL:\96135016\8\51067.0003

respective Backstop Commitment Percentages at the time the payment of the Commitment Premium is made.

The provisions for the payment of the Commitment Premium, the Termination Fee and Expense Reimbursement, and the indemnification provided herein, are an integral part of the transactions contemplated by this Agreement and without these provisions the Commitment Parties would not have entered into this Agreement.

Section 3.2    Payment of Premium.  The Commitment Premium shall be fully earned, nonrefundable and non-avoidable and shall be paid by the Debtor, free and clear of any withholding or deduction for any applicable Taxes, on the Closing Date as set forth above.  For the avoidance of doubt, to the extent payable in accordance with the terms of this Agreement, the Commitment Premium will be payable regardless of the amount of Unsubscribed Shares (if any) actually purchased.  The Company shall satisfy its obligation to pay the Commitment Premium on the Closing Date, in lieu of any cash payment, by issuing the number of additional Common Shares (rounding down to the nearest whole share solely to avoid fractional shares) to each Commitment Party (or its designee) equal to such Commitment Party's Commitment Premium Share Amount; provided, that if the Closing does not occur, the Termination Fee shall be payable (in lieu of the Commitment Premium) in cash, to the extent provided in (and in accordance with) Section 9.6.  Subject to the Bankruptcy Court's approval, the BCA Assumption Order and the Plan shall provide that the Commitment Premium and the Termination Fee shall constitute allowed administrative expenses of the Debtor's estates under Sections 503(b) and 507 of the Bankruptcy Code.  In addition and as a result thereof, the proposed Confirmation Order and the Plan filed by the Company shall provide that the Commitment Premium is issuable under Section 1145 of the Bankruptcy Code; provided, that the Bankruptcy Court's failure to approve the Commitment Premium as an allowed administrative expense, and as a result be issuable under Section 1145 of the Bankruptcy Code, shall not constitute a breach by the Company of any covenant in this Agreement.

Section 3.3    Expense Reimbursement.  (a) Until the earlier to occur of (i) the Closing and (ii) the termination of this Agreement in accordance with its terms, the Debtor agrees to pay in accordance with Section 3.3(b): (A) the reasonable and documented out-of-pocket fees and expenses (including reasonable travel costs and expenses), whether incurred before or after the Petition Date, of Milbank, Tweed, Hadley & McCloy LLP, as counsel to the Commitment Parties, one maritime counsel to the Commitment Parties, Morris, Nichols, Arsht & Tunnell LLP, as local (Delaware) counsel to the Commitment Parties, Houlihan Lokey Capital, Inc. as primary financial advisors to the Commitment Parties, and other professional advisors for specialized areas of expertise as circumstances warrant retained by the Commitment Parties, with the consent of the Company (which consent shall not be unreasonably delayed, conditioned or withheld), in each case that have been and are actually incurred in connection with (x) the negotiation, preparation and implementation of the Transaction Agreements and the other agreements and transactions contemplated thereby and (y) the Restructuring and the Chapter 11 Case; and (B) all reasonable and documented out-of-pocket fees and expenses, up to a total of $50,000, incurred in connection with any required initial regulatory filings in connection with the transactions contemplated by this Agreement (including, without limitation, any initial filings done on Schedule 13D, Schedule 13G, Form 3 or Form 4, in each case, promulgated under the Exchange Act), in each case, that have been paid or are payable by the Commitment Parties to

one firm (such payment obligations set forth in clauses (A) and (B) above, collectively, the "**Expense Reimbursement**").    The Expense Reimbursement shall, pursuant to the BCA Assumption Order, constitute allowed administrative expenses of the Debtor's estate under Sections 503(b) and 507 of the Bankruptcy Code.

(b)    The Expense Reimbursement accrued through the date on which the BCA Assumption Order is entered shall be paid within five (5) Complete Business Days of the Company's receipt of invoices therefor. The Expense Reimbursement accrued thereafter shall be payable by the Debtor within five (5) Complete Business Days after receipt of monthly invoices therefor; provided, that the Debtor's final payment shall be made contemporaneously with the Closing or the termination of this Agreement, as applicable, pursuant to Article IX.

Section 3.4    Tax Treatment.    The parties hereto agree for all Tax purposes to treat the exchange of the Backstop Commitment for the Commitment Premium as an issuance by the Commitment Parties to the Company of a put right with respect to the Unsubscribed Securities in exchange for the Commitment Premium.

ARTICLE IV

**REPRESENTATIONS AND WARRANTIES OF THE DEBTOR**

Except (i) as set forth in the corresponding section of the Company Disclosure Schedule or (ii) as disclosed in the Company SEC Documents and publicly available on the SEC's Electronic Data-Gathering, Analysis and Retrieval System prior to the date hereof (excluding any disclosure contained in the "Forward-Looking Statements" or "Risk Factors" sections thereof, or any other statements that are similarly predictive or forward looking in nature), the Debtor hereby represents and warrants to the Commitment Parties (unless otherwise set forth herein, as of the date of this Agreement) as set forth below.

Section 4.1    Organization and Qualification.    The Company and each of its Subsidiaries (i) is a duly organized and validly existing corporation, limited liability company or limited partnership, as the case may be, and, if applicable, in good standing (or the equivalent thereof) under the Laws of the jurisdiction of its incorporation or organization (except where the failure to be in good standing (or the equivalent) would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect), (ii) has the corporate or other applicable power and authority to own its property and assets and to transact the business in which it is currently engaged and presently proposes to engage and (iii) except as set forth on Section 4.1 of the Company Disclosure Schedule, is duly qualified and is authorized to do business and is in good standing in each jurisdiction where the conduct of its business as currently conducted requires such qualifications, except in the cases of clauses (ii) and (iii) of this Section 4.1 where the failure to have such power and authority or qualification would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.2    Corporate Power and Authority.    The Debtor has the requisite corporate power and authority (i) to enter into, execute and deliver this Agreement, (ii) subject to entry of the BCA Assumption Order, to perform their obligations hereunder, and (iii) subject to entry of the BCA Assumption Order and the Confirmation Order, to consummate the

26

transactions contemplated herein and in the Plan, to enter into, execute and deliver each of the Transaction Agreements and to perform its obligations thereunder (other than this Agreement). The execution and delivery of this Agreement and, subject to the receipt of the foregoing Orders, as applicable, of each of the other Transaction Agreements and the consummation of the transactions contemplated hereby and thereby have been or will be duly authorized by all requisite corporate action on behalf of the Debtor, and no other corporate proceedings on the part of the Company are or will be necessary to authorize this Agreement or any of the other Transaction Agreements or to consummate the transactions contemplated hereby or thereby.

Section 4.3    Execution and Delivery; Enforceability.    Subject to entry of the BCA Assumption Order, this Agreement will have been, and subject to entry of the BCA Assumption Order and the Confirmation Order, each other Transaction Agreement will be, duly executed and delivered by the Company.    Upon entry of the BCA Assumption Order and, as applicable, the Confirmation Order, and assuming due and valid execution and delivery hereof by the Commitment Parties, the Debtor's obligations hereunder will constitute the valid and legally binding obligations of the Debtor enforceable against the Debtor in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium and other similar Laws now or hereafter in effect relating to creditor's rights generally and subject to general principles of equity.    Upon entry of the Confirmation Order and assuming due and valid execution and delivery of this Agreement and the other Transaction Agreements by the Commitment Parties and, to the extent applicable, any other parties hereof or thereof, each of the obligations of the Company under the Transaction Agreements will constitute the valid and legally binding obligations of the Company enforceable against the Company in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium and other similar Laws now or hereafter in effect relating to creditor's rights generally and subject to general principles of equity.

Section 4.4    Authorized and Issued Capital Stock. (a) On the Closing Date, (i) the total issued capital stock of the reorganized Company will consist of the Aggregate Pre-Closing Equity Interests, plus the Rights Offering Shares and Rights Offering Warrants issued pursuant to the Rights Offering, plus the Common Shares issued in respect of the Commitment Premium pursuant to Article III, plus the Equity Class Warrants, plus any shares issued pursuant to the management incentive plan referenced in the Term Sheet (the "**MIP**") (ii) no Common Equity Interests will be held by the reorganized Company in its treasury, and (iii) no warrants to purchase shares of Common Equity Interests, other than the Warrants described above, will be issued and outstanding.

(b)    As of the Closing Date, all issued and outstanding Common Equity Interests will have been duly authorized and validly issued and will be fully paid and non-assessable, and will not be subject to any preemptive rights.

(c)    Except as set forth in Section 4.4(a) and Section 6.22, and except for a sufficient number of Common Shares reserved for issuance pursuant to the MIP and upon the exercise of the Equity Class Warrants, as of the Closing Date, no shares of capital stock or other equity securities or voting interest in the reorganized Company will have been issued, reserved for issuance or outstanding.

(d)     Except as described in this Section 4.4 and except as set forth in the Registration Rights Agreement, the Reorganized Company Corporate Documents, the Exit Facilities, the Warrants and any warrant agreement related thereto, and the MIP, as of the Closing, neither the reorganized Company nor any of its Subsidiaries will be party to or otherwise bound by or subject to any outstanding option, warrant, call, right, security, commitment, Contract, arrangement or undertaking (including any preemptive right) that (i) obligates the reorganized Company or any of its Subsidiaries to issue, deliver, sell or transfer, or repurchase, redeem or otherwise acquire, or cause to be issued, delivered, sold or transferred, or repurchased, redeemed or otherwise acquired, any shares of the capital stock of, or other equity or voting interests in, the reorganized Company or any of its Subsidiaries or any security convertible or exercisable for or exchangeable into any capital stock of, or other equity or voting interest in, the reorganized Company or any of its Subsidiaries, (ii) obligates the reorganized Company or any of its Subsidiaries to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, Contract, arrangement or undertaking, (iii) restricts the Transfer of any shares of capital stock of the Company or any of its Subsidiaries (other than any restrictions included in the Exit Facilities or any corresponding pledge agreement) or (iv) relates to the voting of any shares of capital stock of the reorganized Company.

Section 4.5     Issuance.  Subject to entry of the BCA Assumption Order and the Confirmation Order, the Rights Offering Securities to be issued in connection with the consummation of the Rights Offering and pursuant to the terms hereof, will, when issued and delivered on the Closing Date in exchange for the aggregate Purchase Price therefor, be duly and validly authorized, issued and delivered and shall be fully paid and non-assessable, and free and clear of all Taxes, Liens (other than Transfer restrictions imposed hereunder or under the Reorganized Company Corporate Documents or by applicable Law), preemptive rights, subscription and similar rights (other than any rights set forth in the Reorganized Company Corporate Documents, the Registration Rights Agreement and the Rights Offering Warrants).

Section 4.6     No Conflict.  Assuming the consents described in clauses (a) through (e) of Section 4.7 are obtained, the execution and delivery by the Company of this Agreement, the Plan and the other Transaction Agreements, the compliance by the Company and, if applicable, its Subsidiaries, with the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein will not (a) conflict with, or result in a breach, modification or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, except to the extent contemplated by the Plan, in the acceleration of, or the creation of any Lien under, or cause any payment or consent to be required under any Contract to which the reorganized Company or any of its Subsidiaries will be bound as of the Closing Date after giving effect to the Plan or to which any of the property or assets of the reorganized Company or any of its Subsidiaries will be subject as of the Closing Date after giving effect to the Plan, (b) result in any violation of the provisions of the Reorganized Company Corporate Documents or any of the organizational documents of any of the Company's Subsidiaries (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of the Chapter 11 Case or the Company's undertaking to implement the Restructuring through the Chapter 11 Case), or (c) result in any violation of any Law or Order applicable to the reorganized Company or any of its Subsidiaries or any of their properties, except in each of the cases described in clauses (a) and (c) of this

28

Section 4.6, which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.7     Consents and Approvals.   No consent, approval, authorization, order, registration or qualification of or with any Governmental Entity having jurisdiction over the Company or any of its Subsidiaries or any of their respective properties (each, an "**Applicable Consent**") is required for the execution and delivery by the Company (or the reorganized Company, as applicable) of this Agreement, the Plan and the other Transaction Agreements, the compliance by the Company (or the reorganized Company, as applicable) and, to the extent relevant, their Subsidiaries with the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein, except for (a) the entry of the BCA Assumption Order authorizing the Company to perform its obligations hereunder, (b) the entry of the Confirmation Order authorizing the Company to perform its obligations under the Plan, (c) the entry by the Bankruptcy Court of orders as may be necessary in the Chapter 11 Case from time to time, (d) such consents, approvals, authorizations, registrations or qualifications as may be required under state securities or "Blue Sky" Laws in connection with the purchase of the Unsubscribed Securities by the Commitment Parties, the issuance of the Subscription Rights, the issuance of the Rights Offering Securities pursuant to the exercise of the Subscription Rights, the issuance of Common Shares and Jones Act Warrants in satisfaction of Unsecured Notes Claims pursuant to the Plan and the issuance of Common Shares as payment of the Commitment Premium, and (e) any Applicable Consents that, if not made or obtained, would not reasonably be expected to have a Material Adverse Effect.

Section 4.8     [Reserved].

Section 4.9     Financial Statements.  (a) The audited consolidated balance sheets of the Company as of December 31, 2016 and the related consolidated statements of operations and of cash flows for the fiscal year then ended, accompanied by a report thereon by KPMG LLP (collectively, the "**Financial Statements**"), present fairly, in all material respects, the consolidated financial position of the Company as at such date, and the consolidated results of its operations and its consolidated cash flows for the fiscal year then ended.   All such Financial Statements, including the related schedules and notes thereto, have been prepared, in all material respects, in accordance with U.S. generally accepted accounting principles ("**GAAP**") applied consistently throughout the periods involved (except as disclosed therein).

(b)     The unaudited consolidated balance sheet of the Company as of March 31, 2017 and the related consolidated statements of operations and of cash flows (collectively, the "**Q1 Financial Statements**"), that the Company filed with the SEC present fairly, in all material respects, the consolidated financial position of the Company as of March 31, 2017 and the consolidated results of its operations and its consolidated cash flows for the quarter then ended.

Section 4.10   Company SEC Documents and Disclosure Statements.   Since January 1, 2017, the Company has filed all required reports, schedules, forms and statements with the SEC (the "**Company SEC Documents**") under the Exchange Act or the Securities Act. As of their respective dates, and giving effect to any amendments or supplements thereto filed prior to the date of this Agreement, each of the Company SEC Documents that have been filed after December 31, 2016 and as of the date of this Agreement complied in all material respects

with the requirements of the Securities Act or the Exchange Act applicable to such Company SEC Documents.  The Company has filed with the SEC all Material Contracts that are required to be filed as exhibits to the Company SEC Documents that have been filed as of the date of this Agreement.  No Company SEC Document that has been filed after December 31, 2016 and prior to the date of this Agreement, after giving effect to any amendments or supplements thereto and to any subsequently filed Company SEC Documents, in each case filed prior to the date of this Agreement, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.  The Disclosure Statement as approved by the Bankruptcy Court will conform in all material respects with Section 1125 of the Bankruptcy Code.

Section 4.11    Absence of Certain Changes.  Since December 31, 2016, no Event has occurred or exists that constitutes, individually or in the aggregate, a Material Adverse Effect except as disclosed in the Company SEC Documents as of the date hereof.

Section 4.12    No Violation; Compliance with Laws  (i) The Company is not in violation of its certificate of incorporation or Bylaws and (ii) no Subsidiary of the Company is in violation of its respective certificate of incorporation or Bylaws or similar organizational document in any material respect.  To the Knowledge of the Company, neither the Company nor any of its Subsidiaries is or has been at any time since January 1, 2017 in violation of any applicable Law or Order, except for any such violations that have not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.13    Legal Proceedings.  Other than the Chapter 11 Case, any adversary proceedings or contested matters commenced in connection therewith, except as set forth on Section 4.13 of the Company Disclosure Schedule, there are no material legal, governmental, administrative, judicial or regulatory investigations, audits, actions, suits, claims, arbitrations, demands, demand letters or proceedings ("**Legal Proceedings**") pending or, to the Knowledge of the Company, threatened to which the Company or any of its Subsidiaries is a party or to which any property of the Company or any of its Subsidiaries is the subject, in each case that in any manner draws into question the validity or enforceability of this Agreement, the Plan or the other Transaction Agreements or that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.14    Labor Relations.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (a) there are no strikes or other labor disputes pending or, to the Knowledge of the Company, threatened against the Company or any of its Subsidiaries; and (b) all material payments due from the Company or any of its Subsidiaries or for which any claim may be made against the Company or any of its Subsidiaries on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of the Company or such Subsidiaries to the extent required by GAAP.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the consummation of the transactions contemplated by the Transaction Agreements will not give rise to a right of termination or right of renegotiation on the part of any union under any material collective bargaining agreement to which the Company

WEIL:\96135016\8\51067.0003

or any of its Subsidiaries (or any predecessor) is a party or by which the Company or any of its Subsidiaries (or any predecessor) is bound.

Section 4.15    Intellectual Property.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) each of the Company and its Subsidiaries owns, or possesses the right to use, all of the patents, patent rights, trademarks, service marks, trade names, copyrights,  and domain names (collectively, "**Intellectual Property Rights**") that are necessary for the operation of their respective businesses, (b) to the Knowledge of the Company, none of the Company or any of its Subsidiaries is interfering with, infringing upon, misappropriating or otherwise violating in any material respect any valid Intellectual Property Rights of any Person, and (c) no claim or litigation regarding any of the foregoing that is (or would be) reasonably expected to have a Material Adverse Effect is pending or, to the Knowledge of the Company, threatened.

Section 4.16    Title to Personal Property; Leased Real Property.  (a) Each of the Company and its Subsidiaries has valid fee simple title to, or valid leasehold interests in, its assets (including Vessels), in each case, except for Permitted Liens and except for defects in title that do not materially interfere with its ability to conduct its business as currently conducted or to utilize such assets for their respective currently intended purposes and except where the failure (or failures) to have such valid title would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Schedule 4 lists as of the date hereof, the name, official number, flag, region, type, year built, length, brake horsepower, deadweight tons and flag of each Vessel and, with respect to Vessels that are laid up  as of the date hereof, whether the Operating Certificates of such Vessels are current and valid.

(b)    Each of the Company and its Subsidiaries has a valid leasehold interest in the Real Property and is in compliance with all obligations under all leases to which it is a party that have not been or will not be rejected in the Chapter 11 Case, except where the failure to comply would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and the Debtor has not received written notice of any good faith claim asserting that such leases are not in full force and effect, except with respect to those leases in respect of which the failure to be in full force and effect would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Each of the Company and its Subsidiaries enjoys peaceful and undisturbed possession under all such leases, other than leases in respect of which the failure to enjoy peaceful and undisturbed possession of the Real Property thereunder would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.17    No Undisclosed Relationships.   Other than Contracts or other direct or indirect relationships between or among the Company and its Subsidiaries or between the Subsidiaries of the Company and each other, there are no Contracts or other direct or indirect relationships existing as of the date hereof between or among the Company or any of its Subsidiaries, on the one hand, and any director, officer or greater than five percent (5%) stockholder of the Company or any of its Subsidiaries, on the other hand, that is required by the Exchange Act to be described in the Company's filings with the SEC and that is not so described, except for the transactions contemplated by this Agreement.  Any material Contract existing as of the date hereof between or among the Company or any of its Subsidiaries, on the

one hand, and any director, officer or greater than five percent (5%) stockholder of the Company or any of its Subsidiaries, on the other hand, that is required by the Exchange Act to be described in the Company's filings with the SEC is filed as an exhibit to, or incorporated by reference as indicated in, the Annual Report on Form 10-K for the year ended December 31, 2016 that the Company filed on March 16, 2017 or another Company SEC Document filed between March 16, 2017 and the date hereof.

Section 4.18    Licenses and Permits.  Except as set forth on Schedule 4.18 of the Company Disclosure Schedule, the Company and its Subsidiaries possess all licenses, certificates, permits and other authorizations issued by, and have made since January 1, 2017, in all material respects, all declarations and filings with, the appropriate Governmental Entities, in each case, that are necessary for the ownership or lease of their respective properties and the conduct of the business of the Company and its Subsidiaries, except where the failure to possess, make or give the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Since January 1, 2017, neither the Company nor any of its Subsidiaries (i) has received written notice of any revocation or modification of any such license, certificate, permit or authorization from the applicable Governmental Entity with authority with respect thereto or (ii) has any reason to believe that any such license, certificate, permit or authorization will not be renewed in the ordinary course, except to the extent that any of the foregoing would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.19    Environmental.  (a) Except as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect,  since January 1, 2017, no written notice, claim, demand, request for information, order, complaint or penalty has been received by the Company or any of its Subsidiaries, and there are no judicial, administrative or other actions, suits or proceedings pending or, to the Knowledge of the Company, threatened which allege a violation of or liability under any applicable Environmental Laws, in each case relating to the Company or any of its Subsidiaries; (b) except as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, since January 1, 2017, the Company and each of its Subsidiaries has been in compliance with all applicable Environmental Laws; (c) except as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the Company and each of its Subsidiaries has obtained all permits, licenses and other approvals required pursuant to Environmental Law for the operations of the business of the Company and its Subsidiaries, and since January 1, 2017 has maintained all financial assurances, necessary for its operations to comply, in all respects, with all applicable Environmental Laws and is, and since January 1, 2017, to the Knowledge of the Company, has been, in compliance with the terms of such permits, licenses and other approvals and financial assurance requirements; (d) no Hazardous Material is located at, on or under any property currently owned, operated or leased by the Company or any of its Subsidiaries that would reasonably be expected to give rise to any cost, liability or obligation of the Company or any of its Subsidiaries under any applicable Environmental Laws other than costs, liabilities or obligations related to asset retirement obligations incurred or anticipated to be incurred pursuant to Environmental Laws or costs, liabilities or obligations that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; and (e) since January 1, 2017, no Hazardous Materials have been generated, owned, treated, stored, handled, controlled, transported or Released by (or

32

on behalf of) the Company or any of its Subsidiaries, or Released at any location, in a manner that would reasonably be expected to give rise to any cost, liability or obligation of the Company or any of its Subsidiaries under any applicable Environmental Laws that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.20   Tax Matters.  (a) Except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, (i) each of the Company and its Subsidiaries has filed or caused to be filed all U.S. federal, state, provincial, local and non-U.S. Tax returns required to have been filed by it and (ii) each such Tax return is true and correct in all material respects.

(b)   Except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, each of the Company and its Subsidiaries has timely paid or caused to be timely paid all Taxes of or payable by the Company or any of its Subsidiaries, with respect to all periods or portions thereof ending on or before the date hereof.

(c)   Except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, and except as set forth on Section 4.19(c) of the Company Disclosure Schedule, as of the date hereof, with respect to the Company and its Subsidiaries, (i) no claims for deficiency have been asserted in writing by a Governmental Entity with respect to any Taxes, which claims have not been satisfied, settled or withdrawn, (ii) no presently effective waivers or extensions of statutes of limitation with respect to Taxes have been given or requested and (iii) no Tax returns are being examined by, and no written notification of intention to examine has been received from, the IRS or any other Governmental Entity.

Section 4.21   Employee Benefit Plans.  (a) Except for the filing and pendency of the Chapter 11 Case or otherwise as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect: (i) each Company Plan is in compliance with the applicable provisions of ERISA and the Code; (ii) no Reportable Event has occurred during the past six years; (iii) no Company Plan has any Unfunded Pension Liability in excess of $2,500,000 with respect to any single Company Plan and in excess of $3,500,000 with respect to all Company Plans in the aggregate; (iv) no ERISA Event has occurred; (v) none of the Company or any of its Subsidiaries has engaged in a non-exempt "prohibited transaction" (as defined in Section 406 of ERISA and Section 4975 of the Code) in connection with any employee pension benefit plan (as defined in Section 3(2) of ERISA) that would subject the Company or any of its Subsidiaries to Tax; and (vi) no employee welfare plan (as defined in Section 3(1) of ERISA) maintained or contributed to by the Company or any of its Subsidiaries provides benefits to retired employees or other former employees (other than as required by Section 601 of ERISA) and other than for post-separation benefits provided under individual employment agreements.

(b)   Except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect or as set forth on Section 4.21(b) of the Company Disclosure Schedule, neither the Company nor any of its Subsidiaries has established, sponsored or maintained, or has any liability with respect to, any employee pension benefit plan or other employee benefit plan, program, policy, agreement or arrangement governed by or subject to the Laws of a jurisdiction other than the United States of America.

(c)     Except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, except as set forth on Section 4.21(c) of the Company Disclosure Schedule, there are no pending, or to the Knowledge of the Company, threatened claims, sanctions, actions or lawsuits, asserted or instituted against any Company Plan or any Person as fiduciary or sponsor of any Company Plan, in each case other than claims for benefits in the ordinary course.

(d)     Within the last six years, no Company Plan has been terminated, whether or not in a "standard termination" as that term is used in Section 4041(b)(1) of ERISA, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect nor has any Company Plan with Unfunded Pension Liabilities been transferred outside of the "controlled group" (within the meaning of Section 4001(a)(14) of ERISA).

(e)     Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, except as set forth on Section 4.21(e) of the Company Disclosure Schedule, each employee benefit plan within the meaning of Section 3(3) of ERISA that is sponsored, maintained or contributed to by the Company or its Subsidiaries (other than any Multiemployer Plan) complies and has complied in both form and operation with its terms and all applicable Laws and legal requirements, and neither the Company, nor any of its Subsidiaries, could reasonably be expected to have any obligation to provide any individual with a "gross up" or similar payment in respect of any Taxes that may become payable under Section 409A or 4999 of the Code.

(f)     Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) the Company and each of its Subsidiaries has complied and is currently in compliance with all Laws and legal requirements in respect of personnel, employment and employment practices; (ii) all service providers of the Company or its Subsidiaries are correctly classified as employees, independent contractors, or otherwise for all purposes (including any applicable tax and employment policies or law); and (iii) the Company and its Subsidiaries have not and are not engaged in any unfair labor practice.

Section 4.22   Internal Control Over Financial Reporting.   The Company has established and maintains a system of internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) promulgated under the Exchange Act) that complies in all material respects with the requirements of the Exchange Act and has been designed to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP. The Company's management concluded that the Company's internal control over financial reporting was effective as of December 31, 2016 and no changes in the Company's internal control over financial reporting occurred from December 31, 2016 through March 31, 2017 that have materially affected, or were, as of those dates, reasonably likely to materially affect, the Company's internal control over financial reporting.

Section 4.23   Disclosure Controls and Procedures.   The Company maintains disclosure controls and procedures (within the meaning of Rules 13a-15(e) and 15d-15(e) promulgated under the Exchange Act) that are designed to provide reasonable assurance that information required to be disclosed in its reports under the Exchange Act is recorded, processed,

summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to management of the Company as appropriate to allow timely decisions regarding required disclosure.

Section 4.24    Material Contracts.    Other than as a result of the filing of the Chapter 11 Case, and except as set forth on Section 4.24 of the Company Disclosure Schedule, the Material Contracts are valid, binding and enforceable by and against the Company or its relevant Subsidiary party thereto and, to the Knowledge of the Company, each other party thereto (except where the failure to be valid, binding or enforceable would not constitute a Material Adverse Effect), and, since March 31, 2017, no written notice to terminate, in whole or a material portion thereof, any Material Contract has been delivered to the Company or any of its Subsidiaries (except where such termination would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect).    Other than as a result of the filing of the Chapter 11 Case, except as set forth on Section 4.24 of the Company Disclosure Schedule, neither the Company nor any of its Subsidiaries nor, to the Knowledge of the Company, any other party to any Material Contract, is in material default or breach under the terms thereof, in each case, except for such instances of material default or breach that would not reasonably be expected to have individually, or in the aggregate, a Material Adverse Effect.

Section 4.25    No Unlawful Payments.    Since January 1, 2014, none of the Company, any of its Subsidiaries or any of their respective directors, officers or, to the Knowledge of the Company, employees, agents or other Persons while acting on behalf of the Company or any of its Subsidiaries, as applicable, with express authority to so act has: (a) used any funds of the Company or any of its Subsidiaries for any unlawful contribution, gift, entertainment or other unlawful expense for the purpose of corruptly influencing any foreign government official, including a foreign candidate for office or member of a foreign political party; (b) made any direct or indirect corrupt payment to any foreign government official or employee from corporate funds of the Company or any of its Subsidiaries; (c) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977 or any other applicable anti-corruption Law concerning or relating to foreign bribery or corruption; or (d) made any bribe, rebate, payoff, influence payment, kickback or other similar unlawful payment to any foreign government official or any private party.

Section 4.26    Compliance with Money Laundering Laws.    The operations of the Company and its Subsidiaries are and, since January 1, 2014 have been at all times, conducted in compliance in all material respects with applicable financial recordkeeping and reporting requirements of the U.S. Currency and Foreign Transactions Reporting Act of 1970, the money laundering statutes of all jurisdictions in which the Company and its Subsidiaries operate (and the rules and regulations promulgated thereunder) and any related or similar applicable Laws (collectively, the "**Money Laundering Laws**") and no Legal Proceeding by or before any Governmental Entity or any arbitrator involving the Company or any of its Subsidiaries with respect to Money Laundering Laws is pending or, to the Knowledge of the Company, threatened.

Section 4.27    Compliance with Sanctions Laws.    None of the Company, any of its Subsidiaries or any of their respective directors, officers or, to the Knowledge of the Company, employees, Affiliates, agents or other Persons acting on their behalf with express authority to so act, nor any Vessel, is or is controlled by one or more Persons that are: (i) the

subject or target of any economic or financial sanctions imposed, administered or enforced by the U.S. government (including by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State), the European Union or any of its member states, the United Nations Security Council or the United Kingdom (including by the Office of Financial Sanctions Implementation of Her Majesty's Treasury) (collectively, "**Sanctions**"); or (ii) domiciled, organized or resident in any country or territory that is, or whose government is, the subject or target of country-wide or territory-wide U.S. Sanctions broadly prohibiting or restricting dealings in, with or involving such country or territory (a "**Sanctioned Jurisdiction**"). The Company will not directly or indirectly use the proceeds of the Rights Offering, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other Person: (A) to fund or finance any activities or business of or with any Person that is the subject or target of any Sanctions in violation of applicable Sanctions or other applicable law; (B) to fund or finance any activities or business of, with or in any Sanctioned Jurisdiction in violation of applicable Sanctions or other applicable law; or (C) in any manner that would constitute or give rise to a violation of Sanctions by any Party hereto (including the Commitment Parties).

Section 4.28   No Broker's Fees.   Neither the Company nor any of its Subsidiaries is a party to any Contract with any Person (other than this Agreement) that would give rise to a valid claim against the Commitment Parties for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the sale of the Unsubscribed Securities.

Section 4.29   Takeover Statutes.   No Takeover Statute is applicable to this Agreement, the Backstop Commitment and the other transactions contemplated by this Agreement.

Section 4.30   Investment Company Act.   Neither the Company nor any of its Subsidiaries is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

Section 4.31   Insurance.   Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the Company and its Subsidiaries have insured their properties and assets against such risks and in such amounts as are customary for companies engaged in similar businesses.   All premiums due and payable in respect of material insurance policies maintained by the Company and its Subsidiaries have been paid.   The Company reasonably believes that the insurance maintained by or on behalf of the Company and its Subsidiaries is adequate in all material respects.   As of the date hereof, to the Knowledge of the Company, neither the Company nor any of its Subsidiaries has received notice from any insurer or agent of such insurer with respect to any material insurance policies of the Company and its Subsidiaries of cancellation or termination of such policies, other than such notices which are received in the ordinary course of business or for policies that have expired in accordance with their terms.

Section 4.32   Alternative Transactions. As of the date hereof, the Debtor is not pursuing, or is in discussions regarding, any solicitation, offer or proposal from any Person concerning any actual or proposed Alternative Transaction.

Section 4.33   U.S. Coastwise Trade.   Each of (x) the Company, (y) any Subsidiary which owns any U.S. Vessel or operates any other vessel engaged in the U.S. Coastwise Trade, and (z) any Subsidiary (i) having an ownership interest in any Subsidiary which owns any U.S. Vessel or operates any other vessel engaged in the U.S. Coastwise Trade and (ii) which the Company relies upon to establish that the ownership or operation of such U.S. Vessel or other vessel complies with the U.S. Citizen requirements of the Jones Act, is a U.S. Citizen.

Section 4.34   Common Stock Owned by Non-U.S. Citizens.   Based on the alien ownership report, dated May 5, 2017, from The Depository Trust and Clearing Corporation with respect to shares of the Company's common stock owned by Non-U.S. Citizens through Cede & Co. and the reports from American Stock Transfer and Trust Company, LLC, dated May 9, 2017, with respect to shares of the Company's common stock owned by its current and previous employees who are Non-U.S. Citizens, the number of shares of the Company's common stock owned by Non-U.S. Citizens as of May 5, 2017 is approximately 5,247,710, or 19.33% of the total number of outstanding shares of the Company's common stock.

ARTICLE V

**REPRESENTATIONS AND WARRANTIES OF THE COMMITMENT PARTIES**

Each Commitment Party represents and warrants as to itself only (unless otherwise set forth herein, as of the date of this Agreement and as of the Closing Date) as set forth below.

Section 5.1   Incorporation.   Such Commitment Party is a legal entity duly organized, validly existing and, if applicable, in good standing (or the equivalent thereof) under the Laws of its jurisdiction of incorporation or organization.

Section 5.2   Corporate Power and Authority.   Such Commitment Party has the requisite power and authority (corporate or otherwise) to enter into, execute and deliver this Agreement and each other Transaction Agreement to which such Commitment Party is a party and to perform its obligations hereunder and thereunder and has taken all necessary action (corporate or otherwise) required for the due authorization, execution, delivery and performance by it of this Agreement and the other Transaction Agreements.

Section 5.3   Execution and Delivery.   This Agreement and each other Transaction Agreement to which such Commitment Party is a party (a) has been, or prior to its execution and delivery will be, duly and validly executed and delivered by such Commitment Party and (b) upon entry of the BCA Assumption Order and, as applicable, the Confirmation Order and assuming due and valid execution and delivery hereof and thereof by the Company, will constitute valid and legally binding obligations of such Commitment Party, enforceable against such Commitment Party in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization or other similar Laws limiting creditors' rights generally or by equitable principles relating to enforceability.

Section 5.4    No Registration.   Such Commitment Party understands that (a) the Unsubscribed Securities, the Rights Offering Securities and any Common Shares issued to such Commitment Party in satisfaction of the Commitment Premium have not been registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends on, among other things, the bona fide nature of the investment intent and the accuracy of such Commitment Party's representations as expressed herein or otherwise made pursuant hereto, and (b) the Unsubscribed Securities, 4(a)(2) Rights Offering Securities and any 1145 Rights Offering Shares or 1145 Rights Offering Warrants issued to an underwriter as defined in Section 1145 of the Bankruptcy Code cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available.

Section 5.5    Purchasing Intent.    Such Commitment Party is acquiring the Unsubscribed Securities, the Rights Offering Securities and any Common Shares issued to such Commitment Party in satisfaction of the Commitment Premium for its own account, not as a nominee or agent, and not with the view to, or for resale in connection with, any distribution thereof not in compliance with applicable securities Laws, and such Commitment Party has no present intention of selling, granting any participation in, or otherwise distributing the same, except in compliance with applicable securities Laws.

Section 5.6    Accredited Investor.   Such Commitment Party is an "accredited investor" within the meaning of Rule 501(a) of the Securities Act or a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act.   Such Commitment Party understands and is able to bear any economic risks associated with such investment (including the necessity of holding such securities for an indefinite period of time).   Except for the representations and warranties expressly set forth in this Agreement or any other Transaction Agreement, such Commitment Party has independently evaluated the merits and risks of its decision to enter into this Agreement.

Section 5.7    Unsecured Notes Claims.    (a) As of the date hereof, such Commitment Party and its Affiliates were, collectively, the beneficial owner of, or the investment advisor or manager for the beneficial owner of, the aggregate principal amount of Unsecured Notes Claims as set forth opposite such Commitment Party's name under the column titled "Unsecured Notes Claims" on Schedule 2 attached hereto.

(b)    As of the date hereof, such Commitment Party or its applicable Affiliates has the full power to vote, dispose of and compromise at least the aggregate principal amount of the Unsecured Notes Claims set forth opposite such Commitment Party's name under the column titled "Unsecured Notes Claims" on Schedule 2 attached hereto.

(c)    Such Commitment Party has not entered into any Contract to Transfer, in whole or in part, any portion of its right, title or interest in such Unsecured Notes Claims where such Transfer would prohibit such Commitment Party from complying with the terms of this Agreement or the RSA.

Section 5.8    No Conflict.   The execution and delivery by such Commitment Party of this Agreement and the other Transaction Agreements to which it is a party, the

WEIL:\96135016\8\51067.0003

compliance by such Commitment Party with the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein will not (a) result in any violation of the provisions of the organization or governing documents of such Commitment Party, or (b) result in any violation of any Law or Order applicable to such Commitment Party or any of its properties.

Section 5.9    Consents and Approvals.  No consent, approval, authorization, Order, registration or qualification of or with any Governmental Entity having jurisdiction over such Commitment Party or any of its properties is required for the execution and delivery by such Commitment Party of this Agreement and each other Transaction Agreement to which such Commitment Party is a party, the compliance by such Commitment Party with the provisions hereof and thereof and the consummation of the transactions (including the purchase by such Commitment Party of its Backstop Commitment Percentage or its portion of the Rights Offering Securities) contemplated herein and therein.

Section 5.10    Legal Proceedings.  There are no Legal Proceedings pending or, to the knowledge of such Commitment Party, threatened to which the Commitment Party or any of its Subsidiaries is a party or to which any property of the Commitment Party or any of its Subsidiaries is the subject, in each case that will (or would be reasonably likely to) prohibit, delay, or adversely impact such Commitment Party's performance of its obligations under this Agreement or the other Transaction Agreements.

Section 5.11    Sufficiency of Funds.  Such Commitment Party has, or will have as of the Closing, sufficient available funds to fulfill its obligations under this Agreement and the other Transaction Agreements (including the Rights Offering).  For the avoidance of doubt, such Commitment Party acknowledges that its obligations under this Agreement and the other Transaction Agreements are not conditioned in any manner upon its obtaining financing.

Section 5.12    No Broker's Fees.  Such Commitment Party is not a party to any Contract with any Person (other than this Agreement) that would give rise to a valid claim against the Debtor for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the sale of Unsubscribed Securities.

ARTICLE VI

**ADDITIONAL COVENANTS**

Section 6.1    Assumption Orders.  The Company shall, consistent with the RSA, use its commercially reasonable efforts to (a) obtain the entry of the BCA Assumption Order and the RSA Assumption Order and (b) cause each of the BCA Assumption Order and the RSA Assumption Order to become a Final Order (and request that such Orders be effective immediately upon entry by the Bankruptcy Court pursuant to a waiver of Bankruptcy Rules 3020 and 6004(h), as applicable), in each case, as soon as reasonably practicable, and in a manner consistent with the RSA.  The Company shall provide to each of the Commitment Parties and its counsel copies of the proposed motions seeking entry of the BCA Assumption Order and the RSA Assumption Order and a reasonable opportunity to review and comment on such motions and Orders prior to such motions and Orders being filed with the Bankruptcy Court, in

accordance with Section 6(e) of the RSA, and such Orders shall be in form and substance reasonably satisfactory to the Requisite Commitment Parties and the Company.   Any amendments, modifications, changes or supplements to any of the BCA Assumption Order, RSA Assumption Order and Confirmation Order, shall be in form and substance reasonably satisfactory to the Requisite Commitment Parties and the Company.

Section 6.2     Confirmation Order; Plan and Disclosure Statement.     The Company shall provide to each of the Commitment Parties and its counsel a copy of the proposed Plan and the Disclosure Statement (together with copies of any briefs, pleadings and motions related thereto), as well as any proposed amendment, modification, supplement or change to the Plan or the Disclosure Statement, and a reasonable opportunity to review and comment on such documents, and each such document, amendment, modification, supplement or change must be in form and substance reasonably satisfactory to each of the Requisite Commitment Parties and the Company.  The Company shall provide draft copies of all material motions or applications and other documents the Company intends to file with the Bankruptcy Court to Milbank, Tweed, Hadley & McCloy LLP in accordance with Section 6(e) of the RSA.

Section 6.3     Conduct of Business.  Except as set forth in this Agreement or the RSA or with the prior written consent of Requisite Commitment Parties, which consent shall not be unreasonably withheld, conditioned or delayed (requests for which, including related information, shall be directed to the counsel and financial advisors to the Commitment Parties), during the period from the date of this Agreement to the earlier of (1) the Closing Date and (2) the date on which this Agreement is terminated in accordance with its terms (the "**Pre-Closing Period**"), (a) the Company shall, and shall cause each of its Subsidiaries to, carry on its business in the ordinary course and, consistent with the RSA, use its commercially reasonable efforts to: (i) preserve intact its business; (ii) keep available the services of its officers and employees; (iii) preserve its material relationships with customers, suppliers, licensors, licensees, distributors and others having material business dealings with the Company or its Subsidiaries in connection with their business; and (iv) with respect to the Company, file Company SEC Documents (including, without limitation, its financial statements) with the SEC within the time periods required under the Exchange Act; and (b) the Company shall not, and shall not permit any of its Subsidiaries to, enter into any transaction that is material to their business other than:  (A) transactions in the ordinary course of business; (B) other transactions after prior notice to the Commitment Parties and consent by the Requisite Commitment Parties to implement Tax planning  and  (C) transactions  expressly  contemplated  by  the  RSA  or  the  Transaction Agreements.

For the avoidance of doubt, the following shall be deemed to occur outside of the ordinary course of business of the Company and shall require the prior written consent of the Requisite Commitment Parties to the extent not contemplated by the RSA or the Transaction Agreements:  (1) any material amendment, material modification, termination, material waiver, material supplement, material restatement or other material change to any Material Contract (other than any Material Contracts that are otherwise addressed by clause (3) below); (2) entry into, or any amendment, modification, termination (other than for cause), waiver, supplement or other change to, any employment agreement to which the Company or any of its Subsidiaries is a party or any assumption of any such employment agreement in connection with the Chapter 11 Case; (3) the adoption or material amendment of any management incentive or equity plan by the

Debtor except for the MIP; or (4) the sale of any Vessel listed on <u>Schedule 4</u>, except for (A) the Vessel named HAMMERHEAD, the sale of which may be completed pursuant to the existing purchase and sale agreement relating to such Vessel and (B) the Vessel named Highland Scout, pursuant to the memorandum of agreement relating to such Vessel. Except as otherwise expressly provided in this Agreement, nothing in this Agreement shall give the Commitment Parties, directly or indirectly, any right to control or direct the operations of the Company and its Subsidiaries. Prior to the Closing Date, the Company and its Subsidiaries shall exercise, consistent with the terms and conditions of this Agreement and the RSA, complete control and supervision of the business of the Company and its Subsidiaries.

In addition, for the avoidance of doubt, the Company and its Subsidiaries may lay up any of its Vessels or other vessels that it operates or reactivate such Vessels or vessels consistent with ordinary business practices generally followed in the offshore industry under current market conditions.

Section 6.4    Access to Information; Confidentiality; Cleansing Materials. (a) Subject to applicable Law, <u>Section 6.4(b)</u> and <u>Section 6.4(c)</u>, upon reasonable notice during the Pre-Closing Period, the Company shall (and shall cause its Subsidiaries to) (i) afford the Commitment Parties and their Representatives, reasonably promptly upon their written request, reasonable access, during normal business hours and without unreasonable disruption or interference with the Company's and its Subsidiaries' business or operations, to the Company's and its Subsidiaries' employees, properties, books, Contracts and records and, (ii) furnish reasonably promptly to the Commitment Parties and their Representatives all reasonably relevant information concerning the Company's and its Subsidiaries' business, properties and personnel as may reasonably be requested by any such party, <u>provided</u> that the foregoing shall not require the Company (a) to permit any inspection, or to disclose any information, that in the reasonable judgment of the Company will cause the Company or any of its Subsidiaries to violate any of their respective obligations with respect to confidentiality to a third party if the Company, or such Subsidiary, as applicable, shall have used commercially reasonable efforts to obtain, but failed to obtain, the consent of such third party to such inspection or disclosure; (b) to disclose any legally or otherwise privileged information of the Company or any of its Subsidiaries; or (c) to violate any applicable Laws or Orders. All requests for information and access made in accordance with this <u>Section 6.4</u> shall be directed to Weil, Gotshal & Manges LLP, as counsel for the Company, or such other Person as may be designated in writing by the Company's executive officers.

(b)    From and after the date hereof until the date that is one (1) year after the expiration of the Pre-Closing Period, each Commitment Party shall, and shall cause its Representatives to, (i) keep confidential and not provide or disclose to any Person any documents or information received or otherwise obtained by such Commitment Party or its Representatives pursuant to or in connection with this Agreement (including pursuant to <u>Section 6.4(a)</u>, <u>Section 6.5</u> or in connection with a request for approval pursuant to <u>Section 6.3</u>), except that provision or disclosure of such documents or information may be made to any Affiliate or Representative of such Commitment Party who needs to know such information for purposes of this Agreement or the other Transaction Agreements and who agrees to observe the terms of this <u>Section 6.4(b)</u>, and (ii) not use such documents or information for any purpose other than in connection with this Agreement or the other Transaction Agreements or the transactions

contemplated hereby or thereby.  Notwithstanding the foregoing, the immediately preceding sentence shall not apply in respect of documents or information that (1) is now or subsequently becomes generally available to the public through no violation or breach of this Agreement by a Commitment Party or its Representatives; (2) becomes available to a Commitment Party or its Representatives on a non-confidential basis from a source other than the Company or any of its Subsidiaries or any of their respective Representatives, which is not, to the actual knowledge of such Commitment Party or Representative, after reasonable inquiry, prohibited from disclosing such document or information to such Commitment Party or Representative; (3) becomes available to a Commitment Party or its Representatives through document production or discovery in connection with the Chapter 11 Case or other judicial or administrative process, but subject to any confidentiality restrictions imposed by the Chapter 11 Case or other such document production or discovery process; or (4) such Commitment Party or any Representative thereof is required to disclose pursuant to applicable judicial, administrative or regulatory process (including, but not limited to, by court order, deposition, interrogatory, request for documents, subpoena, inspection, audit, civil investigative demand, legal, regulatory, or similar formal or informal process) or pursuant to applicable law or applicable securities exchange rules; provided, that, such Commitment Party or such Representative shall provide the Company with prompt written notice of such legal compulsion and use reasonable best efforts to cooperate with the Company to obtain a protective order or similar remedy to cause such information or documents not to be disclosed, including interposing all available objections thereto, at the Company's sole cost and expense; provided, however, that notwithstanding the foregoing, no such notice shall be required in the case of a routine supervisory examination or routine audit by a banking, governmental, or other financial regulatory or self-regulatory authority not specifically related to the Company, the transaction or the information provided hereunder; provided, further, that in the event that no such protective order or other similar remedy is obtained, the disclosing party shall furnish only that portion of such information or documents that is legally required to be disclosed and shall exercise its reasonable best efforts (at the Company's sole cost and expense) to obtain assurance that confidential treatment will be accorded such disclosed information or documents.

(c)     Notwithstanding anything to the contrary in this Agreement, the Commitment Parties acknowledge and agree that the Company may, in its sole discretion, mark any document or information to be provided pursuant to or in connection with this Agreement, prior to providing such document or information, as "*Limited Distribution Information; For Professional Eyes Only*" (such marked document or information, the "**Highly Confidential Information**").  Highly Confidential Information shall be provided solely to the Advisors, and the Commitment Parties and their respective Representatives will not be entitled to review the Highly Confidential Information.  None of the Highly Confidential Information shall be subject to disclosure pursuant to Section 6.4(d), and such Highly Confidential Information will only be disclosed to the public in the sole discretion of the Company; provided, however, that if any Highly Confidential Information is provided by the Company to any Commitment Party or any of their respective Representatives (other than the Advisors) without such Commitment Party's express prior written consent (given in its sole discretion), then such Highly Confidential Information shall be subject to disclosure pursuant to Section 6.4(d), provided, further, that the Company agrees (i) to reasonably cooperate with the Commitment Parties to create summary forms of any such Highly Confidential Information that constitutes material non-public information ("**MNPI**") and (ii) that such summary forms are subject to disclosure pursuant to

Section 6.4(d).    The Company shall not provide to the Commitment Parties or any of their respective Representatives (other than the Advisors) any Highly Confidential Information without such Commitment Party's express prior written consent given in its sole discretion. The Commitment Parties acknowledge and agree that the Advisors are not permitted, pursuant to separate confidentiality agreements with the Company, to send to them, or otherwise share with them, any of the Highly Confidential Information (unless otherwise agreed in writing by the Company in its sole discretion). The Company acknowledges and agrees that the Commitment Parties shall not, solely by virtue of the Advisors having such Highly Confidential Information, be deemed to have received any Highly Confidential Information unless and until such Highly Confidential Information is provided to them.

(d)    The Company shall make public such document or documents (the "**Cleansing Materials**") containing the information (or an appropriate summary that, at a minimum, includes the material portions thereof) that constitutes MNPI that was provided by the Company or the Company Representatives pursuant to this Agreement to the Commitment Parties or to the Commitment Parties' respective Representatives (the "**Disclosure Information**") as promptly as practicable upon the occurrence of a Blow Out Event in accordance with the procedures for such a disclosure as set forth in the confidentiality agreements between the Commitment Parties and the Company, as though such confidentiality agreements remained in full force and effect beyond their stated terms.

Section 6.5    Financial Information.    (a) During the Pre-Closing Period, the Company shall deliver to the counsel and financial advisors to the Commitment Parties, all statements and reports the Company is required to, and in fact does, deliver to the DNB Facility Agent pursuant to Section 19 of the DNB Credit Agreement and the RBS Facility Agent pursuant to Section 27 of the RBS Credit Agreement, respectively (as in effect on the date hereof) (the "**Reports**").

(b)    Information required to be delivered pursuant to Sections 19 and 27 of the DNB Credit Agreement and RBS Credit Agreement, respectively (as in effect on the date hereof) shall be deemed to have been delivered in accordance with Section 6.5(a) on the date on which the Company provides written notice to the counsel and financial advisors to the Commitment Parties such information that such information is available via the EDGAR system of the SEC on the internet (to the extent such information has been posted or is available as described in such notice).

(c)    Each Commitment Party agrees that all information and reports delivered pursuant to this Section 6.5 (except to the extent provided pursuant to Section 6.5(b)) shall be subject to the provisions of Section 6.4(b) and (c).

Section 6.6    Commercially Reasonable Efforts.    (a) Without in any way limiting any other respective obligation of the Company or any Commitment Party in this Agreement, each Party shall, consistent with the RSA, use commercially reasonable efforts to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, proper or advisable in order to consummate and make effective the transactions contemplated by this Agreement and the Plan, including using commercially reasonable efforts in:

43

(i)        timely preparing and filing all documentation reasonably necessary to effect all necessary notices, reports and other filings of such Person and to obtain as promptly as practicable all consents, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any third party or Governmental Entity;

(ii)        defending any Legal Proceedings in any way challenging (A) this Agreement, the Plan or any other Transaction Agreement, (B) the BCA Assumption Order, RSA Assumption Order or Confirmation Order or (C) the consummation of the transactions contemplated hereby and thereby, including seeking to have any stay or temporary restraining Order entered by any Governmental Entity vacated or reversed; and

(iii)        working together in good faith to finalize the Reorganized Company Corporate Documents, Transaction Agreements and all other documents relating thereto for timely inclusion in the Plan and filing with the Bankruptcy Court.

(b)        Without limitation to Sections 6.1 and 6.2, to the extent exigencies permit, the Company shall provide or cause to be provided a draft of all motions, applications, pleadings, schedules, Orders, reports or other material papers (including all material memoranda, exhibits, supporting affidavits and evidence and other supporting documentation) in the Chapter 11 Case relating to or affecting the Transaction Agreements in advance of filing the same with the Bankruptcy Court.  All such Orders shall be in form and substance satisfactory to the Requisite Commitment Parties and the Company.

(c)        Nothing contained in this Section 6.6 shall limit the ability of any Commitment Party to consult with the Debtor, to appear and be heard, or to file objections, concerning any matter arising in the Chapter 11 Case to the extent not inconsistent with the RSA.

Section 6.7        Registration Rights Agreement; Reorganized Company Corporate Documents.  (a) The Plan will provide that from and after the Effective Date, each Consenting Noteholder and any Affiliates or Related Funds thereof that receive Common Shares or Jones Act Warrants under the Plan shall enter into a registration rights agreement, which agreement shall be in form and substance reasonably acceptable to the Requisite Commitment Parties and the Company (the "**Registration Rights Agreement**").  A form of the Registration Rights Agreement shall be filed with the Bankruptcy Court as part of the Plan supplement.

(b)        The Plan will provide that on or prior to the Effective Date the Reorganized Company Corporate Documents will be approved, adopted and effective as of the Effective Date.  Forms of the Reorganized Company Corporate Documents shall be filed with the Bankruptcy Court as part of the Plan supplement.

Section 6.8        Form D and Blue Sky.  Following the Closing, the Company shall timely file a Form D with the SEC with respect to the 4(a)(2) Rights Offering Securities and the Unsubscribed Securities issued hereunder to the extent required under Regulation D of the Securities Act and shall provide, upon request, a copy thereof to each Commitment Party.  The Company shall, on or before the Closing Date, take such action as the Company shall reasonably determine is necessary in order to obtain an exemption for, or to qualify the 4(a)(2) Rights

Offering Securities and Unsubscribed Securities issued hereunder for sale to the Commitment Parties at the Closing Date pursuant to this Agreement under applicable securities and "Blue Sky" Laws of the states of the United States (or to obtain an exemption from such qualification) and any applicable foreign jurisdictions, and shall provide evidence of any such action so taken to the Commitment Parties on or prior to the Closing Date.  The Company shall timely make all filings and reports relating to the offer and sale of the 4(a)(2) Rights Offering Securities and the Unsubscribed Securities issued hereunder required under applicable securities and "Blue Sky" Laws of the states of the United States following the Closing Date.  The Company shall pay all fees and expenses in connection with satisfying its obligations under this <u>Section 6.8</u>.

Section 6.9    DIP Facility.  The Company shall enter into the DIP Facility on terms and conditions that are reasonably satisfactory to the Requisite Commitment Parties, it being understood that the DIP Facility contemplated by that certain Commitment Letter, dated as of the date hereof, is deemed satisfactory to the Requisite Commitment Parties and consistent with the terms set forth in the Term Sheet and the RSA.

Section 6.10    DTC Eligibility.  Unless otherwise requested by the Requisite Commitment Parties, the Company shall use commercially reasonable efforts to promptly make all Common Shares and Jones Act Warrants deliverable to the Commitment Parties eligible for deposit with The Depository Trust Company.

Section 6.11    Use of Proceeds.  The reorganized Debtor will apply the proceeds from the exercise of the Subscription Rights and the sale of the Unsubscribed Securities for the purposes identified in the Disclosure Statement and the Plan.

Section 6.12    Securities Legend.  Each certificate evidencing all 4(a)(2) Rights Offering Securities and Unsubscribed Securities that are issued in connection with this Agreement, shall be stamped or otherwise imprinted with a legend (the "**Legend**") in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

In the event that any such 4(a)(2) Rights Offering Securities or Unsubscribed Securities are uncertificated, such 4(a)(2) Rights Offering Securities or Unsubscribed Securities shall be subject to a restrictive notation substantially similar to the Legend in the stock ledger or other appropriate records maintained by the Company or agent and the term "Legend" shall include such restrictive notation.

The Company shall remove the Legend (or restrictive notation, as applicable) set forth above from the certificates evidencing any such securities (or the stock ledger or other appropriate Company records, in the case of uncertified securities) at any time after the

WEIL:\96135016\8\51067.0003

restrictions described in such Legend cease to be applicable, including, as applicable, when such shares may be sold under Rule 144 of the Securities Act. The Company may reasonably request such opinions, certificates or other evidence that such restrictions no longer apply as a condition to removing the Legend. For the avoidance of doubt, Common Shares and Jones Act Warrants issued pursuant to the 1145 Rights Offering and Common Shares issued in satisfaction of the Commitment Premium shall not include the Legend.

Section 6.13    [Reserved].

Section 6.14    Alternative Transactions. Except as expressly provided by the RSA, the Company shall take no action, directly or indirectly that is inconsistent with this Agreement or the Plan or that would delay approvals of the Disclosure Statement, the solicitation procedures, or confirmation or consummation of the Plan, including seeking, soliciting, or supporting any Alternative Transaction; provided, that the foregoing limitations shall not apply if in response to any receipt of a written proposal to engage in an Alternative Transaction, the board of directors of the Company reasonably determines in good faith and after consultation with outside counsel that the failure to take any such action would be inconsistent with the exercise of its fiduciary duties under applicable law. If the Debtor receives a written or oral proposal or expression of interest regarding any Alternative Transaction from the date of this Agreement until the Effective Date, (i) the Debtor shall promptly notify counsel to the Commitment Parties of any such proposal or expression of interest, with such notice to include the material terms thereof, including (unless prohibited by a separate agreement) the identity of the person or group of persons involved, and (ii) the Debtor shall promptly furnish counsel to the Commitment Parties with copies of any written offer or any other information delivered to the Company in writing that they receive relating to the foregoing and shall promptly inform counsel to the Commitment Parties of any material changes to such proposals.

Section 6.15    U.S. Coastwise Trade. Each of (x) the Company, (y) any Subsidiary which owns or operates, or will own or operate, any vessel engaged in the U.S. Coastwise Trade, or (z) any Subsidiary (i) having an ownership interest in any Subsidiary which owns or operates, or will own or operate, any such vessel and (ii) which the Company relies upon to establish that such vessel is or will be owned or operated in compliance with the U.S. Citizen requirements of the Jones Act shall be, and at all times at which such entity shall own or operate any such vessel, shall remain, a U.S. Citizen.

Section 6.16    Vessel Operation and Registration.

(a)    The Company and its Subsidiaries will: (i) maintain each U.S. Vessel owned by it documented in its name under the laws and flag of the United States with a coastwise endorsement, and not do, omit to do or allow to be done anything as a result of which such documentation and coastwise endorsement might be cancelled or imperiled; (ii) maintain each other Vessel owned by it registered under such other laws and flag under which they are registered on the date hereof, and not do, omit to do or allow to be done anything as a result of which such registration might be cancelled or imperiled; and (iii) not change the name of any Vessel owned by it; provided, however, that the Company and its Subsidiaries shall not be required to comply with the requirements of Section 6.16(a)(ii) with respect to the maintenance

of the registration of the Mexican-flag vessel named COLOSO with a cabotage endorsement to operate in the Mexican coastwise trade.

(b)     The Company and its Subsidiaries shall keep each Vessel owned by it in a good and safe condition and state of repair in all material respects:  (i) consistent with standards generally followed in the offshore industry (ordinary wear and tear excepted); (ii) so as to maintain its current class, if any, with the applicable Classification Society free of all outstanding conditions and recommendations affecting its class except for any such conditions or recommendations that, with approval of the applicable Classification Society, will be remedied at such Vessel's next scheduled survey, and are in fact so remedied; (iii) so as to comply with all Laws applicable to such Vessel under its current flag and registry, or to vessel trading in any jurisdiction to which such Vessel may trade from time to time, including but not limited to the ISM Code and the ISPS Code, if applicable; and (iv) with all Operating Certificates required for the operation of such Vessel in full force and effect; provided, however, that, with respect to each of the Vessels listed in Schedule 4 as being in laid up status as of the date hereof and any Vessel that is laid up after the date hereof, the Company and its Subsidiaries shall not be required to comply with the requirements of Sections 6.16(b)(ii) and (iv) unless and until such time that such Vessel is reactivated and returned to active operations.

(c)     Neither the Company nor any Subsidiary will cause or permit any Vessel (or any other vessel it owns or operates) to be operated in any manner contrary to Law or engage in any unlawful trade or violate any Law or carry any cargo that will expose any such Vessel or vessel to penalty, confiscation, forfeiture, capture or condemnation that would, in each case, result in a Material Adverse Effect.

(d)     Except as may be required by applicable Law or the applicable Classification Society, neither the Company nor any Subsidiary shall make any modification or repairs to, or replacement of, any Vessel owned by it or equipment installed on any such Vessel as of the date hereof which would materially alter the structure or type of such Vessel or materially reduce its value, or shall remove any material part of a Vessel, or any item of equipment installed on a Vessel, unless the part or item so removed is no longer useful, necessary, profitable or advantageous in the operation of such Vessel or is forthwith replaced by a suitable part or item which is in the same condition as or better condition than the part or item removed, is free from any liens (other than Permitted Liens) in favor of any Person and becomes on installation on that Vessel the property of the Vessel owner or is equipment that can be removed without any risk of damage to the Vessel.

Section 6.17   Allocation of Common Shares and Jones Act Warrants.    All Equity Interests holders, regardless of U.S. Citizen status, on account of their Equity Interests, and all Persons determined by the Company to be U.S. Citizens after providing the Requisite Documentation shall receive Common Shares as set forth herein and the Plan.  In implementing the requirements of Sections 2.9 and 2.10, the Company agrees that the allocation of Common Shares and Jones Act Warrants to be issued to Non-U.S. Citizens (for the avoidance of doubt, other than Equity Interests holders on account of their Equity Interests) will be determined by the below priority order such that Common Shares will be issued to Non-U.S. Citizens in each category, beginning with the first category, up to the remaining balance of the Maximum Permitted Percentage before Common Shares are issued to Non-U.S. Citizens at the next

47

succeeding category until the Maximum Permitted Percentage has been reached; provided, however, that 1.0% of the Common Shares shall be reserved for Common Shares issuable to Non-U.S. Citizen management and employees under the MIP:

(a)     First, Common Shares will be issued as payment for the Commitment Premium;

(b)     Second, Common Shares will be issued for any Unsubscribed Securities purchased by the Commitment Parties pursuant to their Backstop Commitment;

(c)     Third, in proportion to their Backstop Commitment, Common Shares will be issued to Rights Offering Participants that are Commitment Parties that exercise all of the Subscription Rights allocated to them (i) for the exercise of all their Subscription Rights in the Rights Offering and (ii) on account of their Unsecured Notes Claims (under the Plan);

(d)     Fourth, Common Shares will be issued to Rights Offering Participants that are not Commitment Parties that exercise all of the Subscription Rights allocated to them (i) for the exercise of all their Subscription Rights in the Rights Offering and (ii) on account of their Unsecured Notes Claims (under the Plan); and

(e)     Fifth, Common Shares will be issued to Persons that do not exercise all the Subscription Rights allocated to them in the Rights Offering (i) to the extent of any exercise of Subscription Rights allocated to them in the Rights Offering and (ii) on account of their Unsecured Notes Claims (under the Plan).

In making the allocation described above, to the extent any allocation of Common Shares in a particular category designated by a subsection above would result in ownership of the Common Shares by Non-U.S. Citizens exceeding the Maximum Permitted Percentage, the Company will proportionately reduce the Common Shares to be issued to Non-U.S. Citizens in such category and will issue the balance in Jones Act Warrants to such Non-U.S. Citizens instead, and Non-U.S. Citizens in the succeeding categories shall receive all Jones Act Warrants instead of Common Shares.  Furthermore, the above allocation will reflect any designation made by a Commitment Party pursuant to Section 2.7 before issuance of the Funding Notice.

Section 6.18   Listing on the Effective Date.   The Company agrees to use commercially reasonable efforts to list the Common Shares and Equity Class Warrants on the New York Stock Exchange or other stock exchange specified by the Requisite Commitment Parties, reasonably acceptable to the Company on the Effective Date, or if such listing is not possible on the Effective Date, as soon as reasonably practicable after the Effective Date, in each case, subject to applicable listing requirements.  The Company also agrees to cooperate with the Commitment Parties in connection with investigation of a possible listing of the Jones Act Warrants on a stock exchange.

Section 6.19   Requisite Documentation.   The Company is not obligated to deliver Common Shares to any Person (for the avoidance of doubt, other than Equity Interest holders) who has not delivered properly completed Requisite Documentation; provided, however, that a failure to deliver an affidavit of citizenship will result in treating such Person as a

Non-U.S. Citizen, but shall not prevent such Person from receiving Common Shares (to the extent that there is capacity for Non-U.S. Citizens to receive Common Shares pursuant to Section 6.17 of this Agreement) or Jones Act Warrants, as applicable.

Section 6.20    Certificate of Incorporation.  The Certificate of Incorporation shall include Jones Act provisions in form and substance reasonably acceptable to the Company and the Requisite Commitment Parties.

Section 6.21    Milestones.   The Company shall complete the Restructuring in accordance with the deadlines specified below, which deadlines in all cases may be extended by written agreement of the Requisite Noteholders (collectively, the "**Milestones**"); provided, that, in the event that any of the Company's subsidiaries file for chapter 11 protection in accordance with the RSA, the Requisite Commitment Parties agree to engage in good faith discussions with the Company to extend the deadlines set forth in Section 6.21(f) through (i) as reasonably necessary:

(a)    by not later than May 21, 2017, the Debtor shall commence the Chapter 11 Case;

(b)    by three (3) days after the Petition Date, but in no event later than May 24, 2017, the Debtor shall file with the Bankruptcy Court motions seeking entry of orders (x) authorizing the Debtor to assume the RSA and this Agreement and the Debtor's obligations thereunder and hereunder, and (y) approving procedures for the Rights Offering (together, the "**RSA and Backstop Motions**");

(c)    by seven (7) days after the Petition Date, but in no event later than May 28, 2017, the Debtor shall file with the Bankruptcy Court the Plan, the Disclosure Statement, and a motion seeking a hearing to consider the adequacy of the Disclosure Statement and approval of the Debtor's solicitation procedures;

(d)    the Debtor shall seek to have the RSA and Backstop Motions heard at the hearing scheduled to consider the "first day" motions on a final basis (the "**Second Day Hearing**");

(e)    by the day that is the earlier of (x) the day that is two (2) business days following the Second Day Hearing, and (y) thirty-five (35) days after the Petition Date, but in no event later than June 26, 2017, the Bankruptcy Court shall have entered an order approving the RSA Motion (the "**RSA Order**");

(f)    by forty-five (45) days after the Petition Date, but in no event later than July 7, 2017, the Bankruptcy Court shall have entered an order approving the Backstop Motion (the "**Backstop Order**") and an order approving the adequacy of the Disclosure Statement and the Debtor's solicitation procedures; provided, that the Company shall use commercially reasonable efforts to seek entry of the foregoing orders as soon as reasonably practicable before July 7, 2017;

(g)    within twenty (20) business days following the entry of the Backstop Order, but in no event later than August 4, 2017, the Company shall complete the solicitation in

connection with the Rights Offering (other than funding in connection with the Backstop Commitments);

(h)     by ninety (90) days after the Petition Date, but in no event later than August 21, 2017, the Bankruptcy Court shall have entered an order confirming the Plan; <u>provided</u>, that the Company shall use commercially reasonable efforts to seek entry of the foregoing order as soon as reasonably practicable before August 21, 2017; and

(i)     by fourteen (14) days after entry of an order confirming the Acceptable Plan, but in no event later than September 4, 2017, the Effective Date shall occur.

Section 6.22     Common Shares to be Issued Upon the Exercise of Jones Act Warrants.  The Company shall authorize and reserve a sufficient number of Common Shares to be issued upon the exercise of the Jones Act Warrants.

## ARTICLE VII

## CONDITIONS TO THE OBLIGATIONS OF THE PARTIES

Section 7.1     Conditions to the Obligations of the Commitment Parties.  The obligations of each Commitment Party to consummate the transactions contemplated hereby shall be subject to (unless waived in accordance with <u>Section 7.2</u>) the satisfaction of the following conditions prior to or at the Closing in accordance with the Milestones:

(a)     <u>BCA Assumption Order; RSA Assumption Order</u>.  The Bankruptcy Court shall have entered the BCA Assumption Order and the RSA Assumption Order.

(b)     <u>Bring-Down Confirmation of Common Stock Owned by Non-U.S. Citizens</u>.  As close as practicable to the Effective Date, the Company shall deliver to the Requisite Commitment Parties a bring-down certificate setting forth the approximate number of shares of common stock of the Company owned by Non-U.S. Citizens, in the form set forth in <u>Section 4.34</u>, which may be based on the Company's reasonable reliance on additional reports with respect to the analysis of the approximate number of shares of common stock of the Company owned by Non-U.S. Citizens.

(c)     <u>Confirmation Order</u>.  The Bankruptcy Court shall have entered the Confirmation Order.

(d)     <u>Plan</u>.  The Debtor shall have complied, in all material respects, with the terms of the Plan, and the conditions to the occurrence of the Effective Date (other than any conditions relating to the occurrence of the Closing) set forth in the Plan shall have been satisfied or, with the prior consent of the Requisite Commitment Parties, waived in accordance with the terms of the Plan.

(e)     <u>Rights Offering</u>.  The Rights Offering shall have been conducted, in all material respects, in accordance with the BCA Assumption Order, the Rights Offering Procedures and this Agreement, and the Rights Offering Expiration Time shall have occurred.

WEIL:\96135016\8\51067.0003

(f) <u>Effective Date</u>.  The Effective Date shall have occurred, or shall be deemed to have occurred concurrently with the Closing, in accordance with the terms and conditions in the Plan and in the Confirmation Order.

(g) <u>Registration Rights Agreement; Reorganized Company Corporate Documents</u>.

(i)    The Registration Rights Agreement shall have been executed and delivered by the reorganized Company, shall otherwise have become effective with respect to the Commitment Parties and the other parties thereto, and shall be in full force and effect.

(ii)   The Reorganized Company Corporate Documents shall duly have been approved and adopted and shall be in full force and effect.

(h) <u>Expense Reimbursement</u>.  The Debtor or the reorganized Debtor shall have paid (or such amounts shall be paid concurrently with the Closing) all Expense Reimbursements invoiced through the Closing Date pursuant to <u>Section 3.3</u>.

(i) <u>Consents</u>.  All governmental and third-party notifications, filings, consents, waivers and approvals required for the consummation of the transactions contemplated by this Agreement and the Plan shall have been made or received.

(j) <u>[Reserved]</u>.

(k) <u>No Legal Impediment to Issuance</u>.  No Law or Order shall have been enacted, adopted or issued by any Governmental Entity of (i) the United States (including any state or subdivision thereof), (ii) the jurisdiction of incorporation or formation of the Debtor or (iii) any jurisdiction where any vessel of the Company or its subsidiaries is flagged, in each case that prohibits the implementation of the Plan or the transactions contemplated by this Agreement.

(l) <u>Representations and Warranties</u>.

(i)    The representations and warranties of the Debtor contained in <u>Sections 4.1</u>, <u>4.2</u>, <u>4.3</u>, <u>4.4</u>, <u>4.5</u>, <u>4.7</u>, <u>4.12(i)</u> and <u>4.30</u> shall be true and correct in all respects on and as of the Closing Date after giving effect to the Plan with the same effect as if made on and as of the Closing Date after giving effect to the Plan (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(ii)   The representations and warranties of the Debtor contained in <u>Sections 4.25</u>, <u>4.26</u> and <u>4.27</u> shall be true and correct in all material respects on and as of the Closing Date, or will be true and correct in all material respects on and as of the Closing Date with the same effect as if made on and as of the Closing Date after giving effect to the Plan (except for such representations and warranties made as of a specified date, which shall be true and correct in all material respects only as of the specified date).

(iii)    The representations and warranties of the Debtors contained in this Agreement other than those referred to in clauses (i) and (ii) above shall be true and correct (disregarding all materiality or Material Adverse Effect qualifiers) on and as of the Closing Date after giving effect to the Plan with the same effect as if made on and as of the Closing Date or will be true and correct in all material respects on and as of the Closing Date (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), except where the failure to be so true and correct does not constitute, individually or in the aggregate, a Material Adverse Effect.

(m)    Covenants.  The Debtor or the reorganized Debtor shall have performed and complied, in all material respects, in the reasonable determination of the Requisite Commitment Parties, with all of their respective covenants and agreements contained in this Agreement that contemplate, by their terms, performance or compliance prior to the Closing Date.

(n)    Material Adverse Effect.  Since December 31, 2016, there shall not have occurred, and there shall not exist, any Event that constitutes, individually or in the aggregate, a Material Adverse Effect.

(o)    Officer's Certificate.  The Commitment Parties shall have received on and as of the Closing Date a certificate of the chief executive officer or chief financial officer of the reorganized Company confirming that the conditions set forth in Sections 7.1(l), (m), and (n) have been satisfied.

(p)    [Reserved].

(q)    Exit Facilities.  The Exit Facilities shall have been entered into by the parties thereto and be in effect.

(r)    RSA.  The RSA shall not have terminated.

(s)    Commitment Premium.  The reorganized Debtor shall have paid (or such amounts shall be paid concurrently with the Closing) to each Commitment Party the applicable Commitment Premium as set forth in Section 3.2, Section 2.3(b) and Section 9.5(c).

(t)    Funding Notice.  The Commitment Parties shall have received the Funding Notice in accordance with the terms of this Agreement.

(u)    Vessels.  Within five (5) Business Days prior to the Closing Date, the Company will provide a complete and accurate list of all Vessels owned by the Company and its Subsidiaries as of a date not more than three (3) Business Days prior to the date of delivery of such list, certifying that, in all material respects:

(i)    Each U.S. Vessel included on such list is duly documented in the name of the Company or one of its Subsidiaries under the U.S. flag with a coastwise endorsement.

(ii)    Each other Vessel included on such list is duly registered under the laws and flag of the jurisdiction indicated.

(iii)    Each Vessel included on such list is classed, if applicable, with the Classification Society indicated and is in class as set forth in Section 6.16(b), subject to the proviso therein with respect to laid up Vessels.

(v)    <u>Vessel-Related Documents</u>.

(i)    The Company shall have delivered to the Commitment Parties in respect of each Vessel, each dated not more than thirty (30) days prior to the Closing Date (x) a Certificate of Ownership and Encumbrance, a Certificate of Ownership, or similar certificate as appropriate from the flag state for such Vessel, and (y) a certificate of insurances and/or certificate of entry with respect to such Vessel.

(ii)    The Company shall have delivered to the Commitment Parties in respect of each vessel owned or operated by the Company or its Subsidiaries in the U.S. Coastwise Trade, including the U.S. Vessels, a copy of such vessel's current Certificate of Documentation with a coastwise endorsement.

Section 7.2    Waiver of Conditions to Obligations of Commitment Parties.  All or any of the conditions set forth in <u>Sections 7.1(d)</u>, <u>(e)</u>, <u>(g)</u>, <u>(i)</u>, <u>(j)</u>, <u>(l)</u>, <u>(m)</u>, <u>(n)</u>, <u>(o)</u>, <u>(p)</u>, <u>(u)</u> and <u>(v)</u> may only be waived in whole or in part with respect to all Commitment Parties by a written instrument executed by the Requisite Commitment Parties in their sole discretion and if so waived, all Commitment Parties shall be bound by such waiver.  Any of the conditions not listed in the preceding sentence may only be waived in whole or in part with respect to all Commitment Parties by a written instrument executed by all Commitment Parties.

Section 7.3    Conditions to the Obligations of the Debtor.  The obligations of the Debtors to consummate the transactions contemplated hereby with any Commitment Party is subject to (unless waived by the Company in writing in its sole discretion) the satisfaction of each of the following conditions:

(a)    <u>BCA Assumption Order; RSA Assumption Order</u>.  The Bankruptcy Court shall have entered the BCA Assumption Order and the RSA Assumption Order, and such Orders shall be Final Orders.

(b)    [Reserved].

(c)    <u>Confirmation Order</u>.  The Bankruptcy Court shall have entered the Confirmation Order.

(d)    <u>Effective Date</u>.  The Effective Date shall have occurred, or shall be deemed to have occurred concurrently with the Closing, in accordance with the terms and conditions in the Plan and in the Confirmation Order.

WEIL:\96135016\8\51067.0003

(e)    <u>Rights Offering</u>.    The Rights Offering Expiration Time shall have occurred, and the Debtor shall have received the Rights Offering Amount in full in cash pursuant to the Rights Offering.

(f)    [Reserved].

(g)    <u>No Legal Impediment to Issuance</u>.    No Law or Order shall have been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Plan or the transactions contemplated by this Agreement.

(h)    <u>Representations and Warranties</u>.    The representations and warranties of the Commitment Parties contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same effect as if made on and as of the Closing Date (except for such representations and warranties made as of a specified date, which shall be true and correct in all material respects only as of the specified date).

(i)    <u>Consents</u>.    All governmental and third-party notifications, filings, consents, waivers and approvals required for the consummation of the transactions contemplated by this Agreement and the Plan shall have been made or received.

(j)    <u>Covenants</u>.    The Commitment Parties shall have performed and complied, in all material respects, with all of their respective covenants and agreements contained in this Agreement that contemplate, by their terms, performance or compliance prior to the Closing Date.

(k)    <u>Exit Facilities</u>.    The Exit Facilities shall have been executed by the parties thereto and be in effect.

(l)    <u>RSA</u>. The RSA shall not have terminated.

ARTICLE VIII

**INDEMNIFICATION AND CONTRIBUTION**

Section 8.1    Indemnification Obligations.    Following the entry of the BCA Assumption Order, the Company (the "**Indemnifying Party**") shall, jointly and severally, indemnify and hold harmless each Commitment Party and its Affiliates, equity holders, members, partners, general partners, managers and its and their respective Representatives and controlling persons (each, an "**Indemnified Person**") from and against any and all losses, claims, damages, liabilities and costs and expenses (other than Taxes arising out of a claim asserted by a third party (collectively, "**Losses**")) that any such Indemnified Person may incur or to which any such Indemnified Person may become subject arising out of or in connection with this Agreement and the transactions contemplated hereby, including the Backstop Commitment, the Rights Offering, the payment of the Commitment Premium or the Termination Fee or the use of the proceeds of the Rights Offering, or any claim, challenge, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such proceedings are brought by the Company, its equity holders, Affiliates, creditors or any other Person, and reimburse each Indemnified Person upon demand

54

for reasonable documented out-of-pocket (with such documentation subject to redaction only to preserve attorney client and work product privileges) legal or other third-party expenses actually incurred in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other proceeding relating to any of the foregoing (including in connection with the enforcement of the indemnification obligations set forth herein), irrespective of whether or not the transactions contemplated by this Agreement or the Plan are consummated or whether or not this Agreement is terminated; provided, that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses (a) as to a Defaulting Commitment Party, its Related Parties or any Indemnified Person related thereto, related to a Commitment Party Default by such Commitment Party or any breach of this Agreement by such Commitment Party, or (b) to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the bad faith, willful misconduct or gross negligence of such Indemnified Person.

        Section 8.2    Indemnification Procedure.    Promptly after receipt by an Indemnified Person of notice of the commencement of any claim, challenge, litigation, investigation or proceeding (an "**Indemnified Claim**"), such Indemnified Person will, if a claim is to be made hereunder against the Indemnifying Party in respect thereof, notify the Indemnifying Party promptly in writing of the commencement thereof; provided, that (a) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure and (b) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have to such Indemnified Person otherwise than on account of this Agreement.  In case any such Indemnified Claims are brought against any Indemnified Person and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, at its election by providing written notice to such Indemnified Person, the Indemnifying Party will be entitled to assume the defense thereof, with counsel reasonably acceptable to such Indemnified Person; provided, that if the parties (including any impleaded parties) to any such Indemnified Claims include both such Indemnified Person and the Indemnifying Party and based on advice of such Indemnified Person's counsel there are legal defenses available to such Indemnified Person that are different from or additional to those available to the Indemnifying Party, such Indemnified Person shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Indemnified Claims.    Upon receipt of notice from the Indemnifying Party to such Indemnified Person of its election to so assume the defense of such Indemnified Claims with counsel reasonably acceptable to the Indemnified Person, the Indemnifying Party shall not be liable to such Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof or participation therein (other than reasonable documented out-of-pocket costs of investigation) unless (i) such Indemnified Person shall have employed separate counsel (in addition to any local counsel) in connection with the assertion of legal defenses in accordance with the proviso to the immediately preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel representing the Indemnified Persons who are parties to such Indemnified Claims (in addition to one local counsel in each jurisdiction in which local counsel is required)), (ii) the Indemnifying Party shall not have employed counsel reasonably acceptable to such Indemnified Person to represent such Indemnified Person within a reasonable time after the Indemnifying Party has received notice of commencement of the Indemnified Claims from,

55

or delivered on behalf of, the Indemnified Person, (iii) after the Indemnifying Party assumes the defense of the Indemnified Claims, the Indemnified Person determines in good faith that the Indemnifying Party has failed or is failing to defend such claim and provides written notice of such determination and the basis for such determination, and such failure is not reasonably cured within ten (10) Business Days following receipt of such notice by the Indemnifying Party, or (iv) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person.

Section 8.3     Settlement of Indemnified Claims.    In connection with any Indemnified Claim for which an Indemnified Person is assuming the defense in accordance with this Article VIII, the Indemnifying Party shall not be liable for any settlement of any Indemnified Claims effected by such Indemnified Person without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, conditioned or delayed).    If any settlement of any Indemnified Claims is consummated with the written consent of the Indemnifying Party or if there is a final judgment for the plaintiff in any such Indemnified Claims, the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all Losses by reason of such settlement or judgment to the extent such Losses are otherwise subject to indemnification by the Indemnifying Party hereunder in accordance with, and subject to the limitations of, this Article VIII.    The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall not be unreasonably withheld, conditioned or delayed), effect any settlement of any pending or threatened Indemnified Claims in respect of which indemnity or contribution has been sought hereunder by such Indemnified Person unless (i) such settlement includes an unconditional release of such Indemnified Person in form and substance reasonably satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such Indemnified Claims and (ii) such settlement does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

Section 8.4     Contribution.    If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless from Losses that are subject to indemnification pursuant to Section 8.1, then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Person as a result of such Loss in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, but also the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, as well as any relevant equitable considerations.    It is hereby agreed that the relative benefits to the Indemnifying Party, on the one hand, and all Indemnified Persons, on the other hand, shall be deemed to be in the same proportion as (a) the total value received or proposed to be received by the Company pursuant to the issuance and sale of the Rights Offering Securities contemplated by this Agreement and the Plan bears to (b) the Commitment Premium paid or proposed to be paid to the Commitment Parties.    Subject to Section 9.6, the Indemnifying Party also agrees that no Indemnified Person shall have any liability based on their comparative or contributory negligence to the Indemnifying Party in connection with an Indemnified Claim.

Section 8.5     Treatment of Indemnification Payments.    All amounts paid by an Indemnifying Party to an Indemnified Person under this Article VIII shall, to the extent permitted by applicable Law, be treated as adjustments to the applicable Commitment Premium

solely for Tax purposes.   The provisions of this <u>Article VIII</u> are an integral part of the transactions contemplated by this Agreement and without these provisions the Commitment Parties would not have entered into this Agreement.   The BCA Assumption Order shall provide that the obligations of the Company under this <u>Article VIII</u> shall constitute allowed administrative expenses of the Debtor's estate under Sections 503(b) and 507 of the Bankruptcy Code and are payable without further Order of the Bankruptcy Court, and that the Company may comply with the requirements of this <u>Article VIII</u> without further Order of the Bankruptcy Court.

Section 8.6    No Survival.    All representations, warranties, covenants and agreements made in this Agreement shall not survive the Closing Date except for covenants and agreements that by their express terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

ARTICLE IX

**TERMINATION**

Section 9.1    Consensual Termination.  This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date by mutual written consent of the Company and the Requisite Commitment Parties.

Section 9.2    Automatic Termination.   Except as otherwise provided in this <u>Article IX</u>, this Agreement shall terminate automatically without further action or notice by any Party if any of the following occurs:

(a)    the RSA is terminated in accordance with its terms;

(b)    any applicable Law or final and non-appealable Order shall have been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Agreement or the other Transaction Agreements; or

(c)    (i) the Chapter 11 Case shall have been dismissed or converted to a chapter 7 case or (ii) a chapter 11 trustee with plenary powers or an examiner with enlarged powers relating to the operation of the businesses of the Debtor beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in the Chapter 11 Case or the Debtor shall file a motion or other request for such relief.

Section 9.3    Termination by the Company.  This Agreement may be terminated by the Company upon written notice to each Commitment Party if:

(a)    the Bankruptcy Court denies entry of the BCA Assumption Order or the RSA Assumption Order;

(b)    the Closing Date has not occurred by the Outside Date (as the same may be extended pursuant to <u>Section 9.4(i)</u> or <u>Section 2.3(a)</u>), unless prior thereto, the Effective Date occurs and the Rights Offering has been consummated; <u>provided</u>, <u>that</u> the Company shall not

have the right to terminate this Agreement pursuant to this <u>Section 9.3(b)</u> if it is then in breach of this Agreement;

(c)　　one or more of the Consenting Noteholders materially breaches its obligations under the RSA, such that the Commitment Party or the Commitment Parties not then in breach of the RSA (the "**Non-Breaching RSA Commitment Parties**") at any time hold collectively less than forty percent (40%) of the principal amount of all Unsecured Notes Claims;

(d)　　subject to the right of the Commitment Parties to arrange a Commitment Party Replacement in accordance with <u>Section 2.3(a)</u> (which will be deemed to cure any breach by the replaced Commitment Party pursuant to this <u>subsection (d)</u>, (i) any Commitment Party shall have breached any representation, warranty, covenant or other agreement made by such Commitment Party in this Agreement or any such representation or warranty shall have become inaccurate and such breach or inaccuracy would or would reasonably be expected to, individually or in the aggregate, cause a condition set forth in <u>Section 7.3(h)</u> or <u>Section 7.3(j)</u> not to be satisfied, (ii) the Company shall have delivered written notice of such breach or inaccuracy to such Commitment Party, and (iii) such breach or inaccuracy is not cured by such Commitment Party by the fifth (5th) Business Day after receipt of such notice; <u>provided</u>, that the Company shall not have the right to terminate this Agreement pursuant to this <u>Section 9.3(d)</u> if it is then in breach of this Agreement;

(e)　　the board of directors of the Company determines in good faith, after consultation with outside counsel, that the continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties; <u>provided</u>, that concurrently with such termination, the Company pays the Termination Fee pursuant to <u>Section 9.6(b)</u> to the extent such Termination Fee is otherwise payable under this Agreement;

(f)　　any of the BCA Assumption Order, RSA Assumption Order or the Confirmation Order is reversed, stayed, dismissed, vacated, or reconsidered; or

(g)　　if the Company shall not receive the Rights Offering Amount pursuant to the Rights Offering and this Agreement; <u>provided</u>, that any termination pursuant to this <u>Section 9.3(g)</u> shall not relieve or otherwise limit the liability of any Defaulting Commitment Party hereto for any breach or violation of its obligations under this Agreement or any documents or instruments delivered in connection herewith.

Section 9.4　　Termination by the Requisite Commitment Parties.　　This Agreement may be terminated by the Requisite Commitment Parties upon written notice to the Company if:

(a)　　the Bankruptcy Court denies entry of the BCA Assumption Order or the RSA Assumption Order;

(b)　　any of the BCA Assumption Order, RSA Assumption Order or the Confirmation Order is reversed, stayed, dismissed, vacated, reconsidered or is modified or amended in any material respect after entry without the prior written consent of the Requisite Commitment Parties;

(c)     any of the Transaction Agreements, the RSA, the Rights Offering Procedures, or any of the other Definitive Documentation is amended or modified in any material respect without the prior written consent of the Requisite Commitment Parties (which consent, other than as to the RSA, shall not be unreasonably withheld);

(d)     the Company files any cause of action against and/or seeking to restrict or hinder the enforcement of any rights of the holders of Unsecured Notes Claims in their capacity as such that is inconsistent with this Agreement (or if the Company supports any such motion, application or adversary proceeding commenced by any third party or consents to the standing of any such third party) other than the enforcement by the Debtor of the automatic stay provisions of the Bankruptcy Code;

(e)     (i)(A) the Debtor has breached its obligations under Section 6.14, (B) a Commitment Party delivers written notice of such breach to the Company, and (C) such breach is not cured by the Company by the fifth (5th) Business Day after receipt of such notice, (ii) the Bankruptcy Court approves or authorizes an Alternative Transaction or (iii) the Company or any of its Subsidiaries enters into any Contract or written agreement in principle providing for the consummation of any Alternative Transaction;

(f)     the Company (i) amends or modifies, or files a pleading seeking authority to amend or modify, any of the Transaction Agreements or any of the other Definitive Documentation in a manner that is materially inconsistent with this Agreement; (ii) suspends or revokes the Transaction Agreements; or (iii) publicly announces its intention to take any such action listed in sub-clauses (i) and (ii) of this subsection;

(g)     the failure to meet any of the Milestones in Section 6.21 unless such Milestone(s) is extended in accordance with Section 6.21;

(h)     except as provided by the RSA, the modification or amendment of any interim or final cash collateral Order entered in the Chapter 11 Case that is not reasonably satisfactory, in their sole discretion, to the Requisite Commitment Parties;

(i)     the Closing Date has not occurred by 11:59 p.m., New York City time on the date that is twenty (20) days following the date set forth in Section 6.21(h) (as it may be extended pursuant to this Section 9.4(i) or Section 2.3(a), the "**Outside Date**"), unless prior thereto, the Effective Date occurs and the Rights Offering has been consummated; provided, that, the Outside Date may be waived or extended with the prior written consent of the Company and the Requisite Commitment Parties up to the date that is twenty (20) days following the Outside Date (the "**Final Outside Date**");

(j)     (i) the Company shall have breached any representation, warranty, covenant or other agreement made by the Company in this Agreement or any such representation or warranty shall have become inaccurate and such breach or inaccuracy would, individually or in the aggregate, cause a condition set forth in Sections 7.1(l), 7.1(m) or 7.1(n) not to be satisfied, (ii) the Commitment Parties shall have delivered written notice of such breach or inaccuracy to the Company, (iii) such breach or inaccuracy is not cured by the Company by the tenth (10th) Business Day after receipt of such notice, and (iv) as a result of such failure to cure,

any condition set forth in Sections 7.1(l), 7.1(m) or 7.1(n) is not capable of being satisfied; provided, that, this Agreement shall not terminate pursuant to this Section 9.4(j) if the Requisite Commitment Parties are then in willful or intentional breach of this Agreement;

(k)    since December 31, 2016, there shall have occurred any Event that, individually, or together with all other Events, has had or would reasonably be expected to have a Material Adverse Effect, except as disclosed in the Company SEC Documents as of the date hereof;

(l)    if any Law or Order shall have been enacted, adopted or issued by any Governmental Entity of (i) the United States (including any state or subdivision thereof), (ii) the jurisdiction of incorporation or formation of the Debtor or (iii) any jurisdiction where any Vessel of the Company or its Subsidiaries is flagged, in each case that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Agreement or the other Transaction Agreements; or

(m)    if the Company shall not receive the Rights Offering Amount pursuant to the Rights Offering and this Agreement; provided, that any termination pursuant to this Section 9.4(m) shall not relieve or otherwise limit the liability of any Defaulting Commitment Party for any breach or violation of its obligations under this Agreement or any documents or instruments delivered in connection herewith.

Section 9.5    Termination by any Commitment Party.    (a)    This Agreement may be terminated by any Commitment Party, as to itself only, upon written notice to the Company if (i) the Closing Date has not occurred by the Final Outside Date or the RSA has been terminated with respect to such Commitment Party pursuant to Section 7(c) of the RSA, (ii) the Company shall not receive at least $100,000,000 pursuant to the Rights Offering and this Agreement, or (iii) five (5) days prior to the hearing to consider confirmation of the Plan, the Company does not obtain commitments for an Exit Facility of at least $100,000,000 in the principal amount, with terms and conditions that are acceptable to each Consenting Noteholder.

(b)    Upon the occurrence of any termination by a Commitment Party (the "**Withdrawing Commitment Party**") pursuant to Section 9.5(a), the remaining Commitment Parties (other than any Withdrawing Commitment Party) shall have the right, but not the obligation, within five (5) Business Days after receipt of written notice from the Company to all Commitment Parties of such withdrawal, which notice shall be given promptly following the occurrence of such withdrawal and to all Commitment Parties substantially concurrently (such five (5) Business Day period, the "**Commitment Party Withdrawal Replacement Period**"), to make arrangements for one or more of the Commitment Parties (other than the Withdrawing Commitment Party) to purchase all or any portion of the Available Securities (such purchase, a "**Commitment Party Withdrawal Replacement**") on the terms and subject to the conditions set forth in this Agreement (and subject to, if necessary, an allocation of the Available Securities between Rights Offering Shares and Rights Offering Warrants as reasonably determined by the Company and agreed to by the Requisite Commitment Parties in order to maintain Jones Act Compliance and in such amounts as may be agreed upon by all of the Commitment Parties electing to purchase all or any portion of the Available Securities (such Commitment Parties, the "**Withdrawal Replacement Commitment Parties**")).  Any such Available Securities purchased

by a Withdrawal Replacement Commitment Party shall be included, among other things, in the determination of (x) the Unsubscribed Securities to be purchased by such Withdrawal Replacement Commitment Party for all purposes hereunder, (y) the Backstop Commitment Percentage of such Withdrawal Replacement Commitment Party for all purposes hereunder, including the allocations of the Commitment Premium, and (z) the Backstop Commitment of such Withdrawal Replacement Commitment Party for purposes of the definition of Requisite Commitment Parties.  If a Commitment Party withdrawal occurs, the Outside Date shall be delayed only to the extent necessary to allow for the Commitment Party Withdrawal Replacement to be completed within the Commitment Party Withdrawal Replacement Period.

(c)     Subject to the Company's prior written consent (which consent may be granted in its sole discretion), the amount of the Commitment Premium payable by the Company to a Withdrawal Replacement Commitment Party with respect to any Available Securities purchased by such Withdrawal Replacement Commitment Party in a Commitment Party Withdrawal Replacement pursuant to Article IX shall be multiplied by 150%.  For the avoidance of doubt, any such increase in the Commitment Premium will result in an overall increase in the Commitment Premium and not in a reallocation from other Commitment Parties.

(d)     Nothing in this Agreement shall be deemed to require a Commitment Party to purchase more than its Backstop Commitment Percentage of the Unsubscribed Securities, unless otherwise agreed by such Commitment Party pursuant to Section 2.2.

Section 9.6     Effect of Termination.  (a) Upon termination of this Agreement pursuant to this Article IX, this Agreement shall forthwith become void and of no force or effect and there shall be no further obligations or liabilities on the part of the Parties; provided, that (i) subject to Section 2.3(c), the obligations of the Debtor to pay the Expense Reimbursement pursuant to Article III, to satisfy its indemnification obligations pursuant to Article VIII and to pay the Termination Fee pursuant to Section 9.6(b) shall survive the termination of this Agreement and shall remain in full force and effect, in each case, until such obligations have been satisfied, (ii) the provisions set forth in Section 6.4(b), this Section 9.6 and Article X shall survive the termination of this Agreement in accordance with their terms and (iii) subject to Section 10.10, nothing in this Section 9.6 shall relieve any Party from liability for its gross negligence, willful misconduct or any willful or intentional breach of this Agreement.  For purposes of this Agreement, "**willful or intentional breach**" means a breach of this Agreement that is a consequence of an act undertaken by the breaching party with the knowledge that the taking of such act would, or would reasonably be expected to, cause a breach of this Agreement.

(b)     If this Agreement shall be terminated (w) pursuant to Section 9.2(a) (unless such termination is due to (A) a breach by a Commitment Party or (B) termination by a Commitment Party prior to the Final Outside Date other than for a breach by the Company or an action, event or development that would give rise to a payment of the Termination Fee pursuant to this Section 9.6(b) if this Agreement were terminated due to such action, event or development), (b) or (c); (x) by the Company (other than pursuant to Section 9.3(a), (c) (only in the case any such Consenting Noteholder is a Commitment Party hereunder), (d) or (g) (if such termination is caused by a Commitment Party Default)); (y) by the Requisite Commitment Parties pursuant to Section 9.4 (c), (d), (e), (f), (i) (to the extent the Closing Date has not occurred by the Final Outside Date), (j), (k), (l) or (m) (unless such termination is caused by a

Commitment Party Default); or (z) by any Commitment Party pursuant to Section 9.5(a)(ii) (unless such termination is caused by a Commitment Party Default) or 9.5(a)(iii) (unless a court determines by a Final Order that such Commitment Party's termination was unreasonable), then the Debtor shall, promptly after the date of such termination, pay the Termination Fee entirely in cash to the Commitment Parties or their designees in accordance with Section 3.2. The parties acknowledge and agree that the payment of the Termination Fee pursuant to this Section 9.6(b) will constitute liquidated damages.  To the extent that all amounts due in respect of the Termination Fee pursuant to this Section 9.6(b) have actually been paid by the Debtor to the Commitment Parties in connection with a termination of this Agreement, the Commitment Parties shall not have any additional recourse against the Debtor for any obligations or liabilities relating to or arising from this Agreement, except for, subject to Section 10.10, liability for willful misconduct or any willful or intentional breach of this Agreement pursuant to Section 9.6(a).  Except as expressly set forth in this Section 9.6(b), the Termination Fee shall not be payable upon the termination of this Agreement.  The Termination Fee shall, pursuant to the BCA Assumption Order, constitute allowed administrative expenses of the Debtor's estate under Sections 503(b) and 507 of the Bankruptcy Code.

ARTICLE X

**GENERAL PROVISIONS**

Section 10.1   Notices.  All notices and other communications in connection with this Agreement shall be in writing and shall be deemed given if delivered personally, sent via electronic facsimile (with confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the Parties at the following addresses (or at such other address for a Party as may be specified by like notice):

(a)   If to the Debtor:

GulfMark Offshore, Inc.
842 West Sam Houston Parkway North, Suite 400
Houston, Texas 77024
Attention:   James M. Mitchell
Facsimile:   (713) 369-7386
Email:   james.mitchell@gulfmark.com

with a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention:   Gary Holtzer
   Ted Waksman
Facsimile:   (212) 310-8007
Email:   gary.holtzer@weil.com
   ted.waksman@weil.com

(b)     If to the Commitment Parties (or to any of them) or any other Person to which notice is to be delivered hereunder, to the address set forth opposite each such Commitment Party's name on Schedule 3,

with a copy (which shall not constitute notice) to:

Milbank, Tweed, Hadley & McCloy LLP
Attn:  Evan Fleck
28 Liberty Street
New York, New York 10005
Tel:     (212) 530-5567
Fax:     (212) 822-5567
Email: efleck@milbank.com

Section 10.2     Assignment; Third-Party Beneficiaries.     Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned by any Party (whether by operation of Law or otherwise) without the prior written consent of the Company and the Requisite Commitment Parties, other than an assignment by a Commitment Party expressly permitted by Section 2.3 or Section 2.6 and any purported assignment in violation of this Section 10.2 shall be void *ab initio* and of no force or effect.  Except as expressly provided in Article VIII with respect to the Indemnified Persons, this Agreement (including the documents and instruments referred to in this Agreement) is not intended to and does not confer upon any Person any rights or remedies under this Agreement other than the Parties.

Section 10.3     Prior Negotiations; Entire Agreement.     (a)  This Agreement (including the agreements attached as Exhibits to and the documents and instruments referred to in this Agreement) constitutes the entire agreement of the Parties and supersedes all prior agreements, arrangements or understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement, except that the Parties hereto acknowledge that any confidentiality agreements heretofore executed between or among the Parties and the RSA (including the Term Sheet) will each continue in full force and effect in accordance with their terms.

(b)     Notwithstanding anything to the contrary in the Plan (including any amendments, supplements or modifications thereto) or the Confirmation Order (and any amendments, supplements or modifications thereto) or an affirmative vote to accept the Plan submitted by any Commitment Party, nothing contained in the Plan (including any amendments, supplements or modifications thereto) or Confirmation Order (including any amendments, supplements or modifications thereto) shall alter, amend or modify the rights of the Commitment Parties under this Agreement unless such alteration, amendment or modification has been made in accordance with Section 10.7.

Section 10.4     Governing Law; Venue.     THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH (A) THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD FOR ANY CONFLICTS OF LAW PRINCIPLES THAT WOULD APPLY THE LAWS OF ANY OTHER JURISDICTION, AND (B) TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.   THE PARTIES

WEIL:\96135016\8\51067.0003

CONSENT AND AGREE THAT ANY ACTION TO ENFORCE THIS AGREEMENT OR ANY DISPUTE, WHETHER SUCH DISPUTES ARISE IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE AGREEMENTS, INSTRUMENTS AND DOCUMENTS CONTEMPLATED HEREBY SHALL BE BROUGHT EXCLUSIVELY IN THE BANKRUPTCY COURT (OR, SOLELY TO THE EXTENT THE BANKRUPTCY COURT DECLINES JURISDICTION OVER SUCH ACTION OR DISPUTE, IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK OR ANY NEW YORK STATE COURT SITTING IN NEW YORK CITY).  THE PARTIES CONSENT TO AND AGREE TO SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT.  EACH OF THE PARTIES HEREBY WAIVES AND AGREES NOT TO ASSERT IN ANY SUCH DISPUTE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY CLAIM THAT (I) SUCH PARTY IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF THE BANKRUPTCY COURT, (II) SUCH PARTY OR SUCH PARTY'S PROPERTY IS IMMUNE FROM ANY LEGAL PROCESS ISSUED BY THE BANKRUPTCY COURT OR (III) ANY LITIGATION OR OTHER PROCEEDING COMMENCED IN THE BANKRUPTCY COURT IS BROUGHT IN AN INCONVENIENT FORUM.  THE PARTIES HEREBY AGREE THAT MAILING OF PROCESS OR OTHER PAPERS IN CONNECTION WITH ANY SUCH ACTION OR PROCEEDING TO THE ADDRESS OF THE RECIPIENT SET FORTH IN <u>SECTION 10.1</u> SHALL BE VALID AND SUFFICIENT SERVICE THEREOF AND HEREBY WAIVE ANY OBJECTIONS TO SERVICE ACCOMPLISHED IN THE MANNER HEREIN PROVIDED.

Section 10.5   Waiver of Jury Trial.  EACH PARTY HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY JURISDICTION IN ANY ACTION, SUIT OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE AMONG THE PARTIES UNDER THIS AGREEMENT, WHETHER IN CONTRACT, TORT OR OTHERWISE.

Section 10.6   Counterparts.  This Agreement may be executed in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the Parties and delivered to each other Party (including via facsimile or other electronic transmission), it being understood that each Party need not sign the same counterpart.  Any facsimile or electronic signature shall be treated in all respects as having the same effect as having an original signature.

Section 10.7   Waivers and Amendments; Rights Cumulative; Consent.  This Agreement may be amended, restated, modified or changed only by a written instrument signed by the Company and the Requisite Commitment Parties; <u>provided</u>, that (a) any Commitment Party's prior written consent shall be required for any amendment that would, directly or indirectly:  (i) modify such Commitment Party's Backstop Commitment Percentage, (ii) increase the applicable Purchase Price to be paid in respect of the Unsubscribed Securities, or (iii) have a materially adverse and disproportionate effect on such Commitment Party and (b) the prior written consent of each Commitment Party shall be required for any amendment that would, directly or indirectly modify the Rights Offering Amount, a Significant Term, the definition "Significant Term" and this <u>Section 10.7</u>.  Notwithstanding the foregoing, <u>Schedule 1</u> shall be revised as necessary without requiring a written instrument signed by the Company and the Requisite Commitment Parties to reflect conforming changes in the composition of the Backstop Parties and Backstop Commitment Percentages as a result of Transfers permitted and

consummated in compliance with the terms and conditions of this Agreement.  The terms and conditions of this Agreement (other than the conditions set forth in Sections 7.1 and 7.3, the waiver of which shall be governed solely by Article VII) may be waived (A) by the Debtor only by a written instrument executed by the Company and (B) by the Requisite Commitment Parties only by a written instrument executed by the Requisite Commitment Parties.  No delay on the part of any Party in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any Party of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement.

Section 10.8   Headings.   The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Agreement.

Section 10.9   Specific Performance.   The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to an injunction or injunctions without the necessity of posting a bond to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity.  Unless otherwise expressly stated in this Agreement, no right or remedy described or provided in this Agreement is intended to be exclusive or to preclude a Party from pursuing other rights and remedies to the extent available under this Agreement, at law or in equity.

Section 10.10  Damages.   Notwithstanding anything to the contrary in this Agreement, none of the Parties will be liable for, and none of the Parties shall claim or seek to recover, any punitive, special, indirect or consequential damages or damages for lost profits in connection with the breach or termination of this Agreement.

Section 10.11  No Reliance.  No Commitment Party or any of its Related Parties shall have any duties or obligations to the other Commitment Parties in respect of this Agreement, the Plan or the transactions contemplated hereby or thereby, except those expressly set forth herein.  Without limiting the generality of the foregoing, (a) no Commitment Party or any of its Related Parties shall be subject to any fiduciary or other implied duties to the other Commitment Parties, (b) no Commitment Party or any of its Related Parties shall have any duty to take any discretionary action or exercise any discretionary powers on behalf of any other Commitment Party, (c) no Commitment Party or any of its Related Parties shall have any duty to the other Commitment Parties to obtain, through the exercise of diligence or otherwise, to investigate, confirm, or disclose to the other Commitment Parties any information relating to the Company or any of its Subsidiaries that may have been communicated to or obtained by such Commitment Party or any of its Affiliates in any capacity, (d) no Commitment Party may rely, and confirms that it has not relied, on any due diligence investigation that any other Commitment Party or any Person acting on behalf of such other Commitment Party may have conducted with respect to the Company or any of its Affiliates or any of their respective securities, and (e) each Commitment Party acknowledges that no other Commitment Party is acting as a placement agent, initial purchaser, underwriter, broker or finder with respect to its Unsubscribed Securities or Backstop Commitment Percentage of its Backstop Commitment.

WEIL:\96135016\8\51067.0003

Section 10.12  Publicity.   At all times prior to the Closing Date or the earlier termination of this Agreement in accordance with its terms, the Company and the Commitment Parties shall consult with each other prior to issuing any press releases (and provide each other a reasonable opportunity to review and comment upon such release) or otherwise making public announcements with respect to the transactions contemplated by this Agreement, it being understood that nothing in this Section 10.12 shall prohibit any Party from filing any motions or other pleadings or documents with the Bankruptcy Court in connection with the Chapter 11 Case.

Section 10.13  Settlement Discussions.   This Agreement and the transactions contemplated herein are part of a proposed settlement of a dispute between the Parties.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Section 408 of the U.S. Federal Rule of Evidence and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any Legal Proceeding, except to the extent filed with, or disclosed to, the Bankruptcy Court in connection with the Chapter 11 Case (other than a Legal Proceeding to approve or enforce the terms of this Agreement).  The Parties agree that any valuations of the Company's assets or estates, whether implied or otherwise, arising from this Agreement shall not be binding for any other purpose, including determining recoveries under the Plan, and that this Agreement does not limit the Parties' rights regarding valuation in the Chapter 11 Case.

Section 10.14  No Recourse.   Notwithstanding anything that may be expressed or implied in this Agreement, and notwithstanding the fact that certain of the Parties may be partnerships or limited liability companies, each Party covenants, agrees and acknowledges that no recourse under this Agreement or any documents or instruments delivered in connection with this Agreement shall be had against any Party's Affiliates or any of the respective Related Parties of such Party or of the Affiliates of such Party (in each case other than the Parties to this Agreement and each of their respective successors and permitted assignees under this Agreement), whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any applicable Law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any of such Related Parties, as such, for any obligation or liability of any Party under this Agreement or any documents or instruments delivered in connection herewith for any claim based on, in respect of or by reason of such obligations or liabilities or their creation; provided, however, nothing in this Section 10.14 shall relieve or otherwise limit the liability of any Party hereto or any of their respective successors or permitted assigns for any breach or violation of its obligations under this Agreement or such other documents or instruments.  For the avoidance of doubt, none of the Parties will have any recourse, be entitled to commence any proceeding or make any claim under this Agreement or in connection with the transactions contemplated hereby except against any of the Parties or their respective successors and permitted assigns, as applicable.

Section 10.15  Severability.   In the event that any one or more of the provisions contained in this Agreement is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions contained herein will not be in any way impaired thereby, it being

WEIL:\96135016\8\51067.0003

intended that all of the rights and privileges of the parties hereto will be enforceable to the fullest extent permitted by law.

[*Signature Pages Follow*]

WEIL:\96135016\8\51067.0003

SCHEDULE 4 – VESSELS

[See attached]

| Vessel Name | IMO Number | Offical Number | Flag | Region | Type | Year Built | Length | Brake Horsepower (BHP) | Deadweight Tons | Status of Operting Certificate |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. AUSTRAL ABROLHOS | 9273258 | DNV- 3810512036 | Brazil | Americas | SpV | 2004 | 215 | 7,100 | 2,000 | Vessel out on BB contract - all certs appear valid |
| 2. COLOSO | 9326615 | 2701332535-5 | Mexico | Americas | AHTS | 2006 | 199 | 5,916 | 1,674 | Active |
| 3. HIGHLAND BUGLER | 9249441 | 906489 | British | North Sea | LgSPV | 2002 | 221 | 54,550 | 3,115 | Laid up class status, stats expired |
| 4. HIGHLAND CHALLENGER | 9169677 | 919619 | British | North Sea | LgSPV | 1997 | 221 | 5,450 | 1,850 | Laid up class status, some stats expired |
| 5. HIGHLAND CHIEFTAIN | 9639359 | 919134 | British | North Sea | PSV | 2013 | 260 | 9,598 | 4,000 | Active |
| 6. HIGHLAND CITADEL | 9262857 | 907000 | British | North Sea | LgSPV | 2003 | 236 | 5,450 | 3,200 | Active |
| 7. HIGHLAND COURAGE | 9249491 | 906390 | Malta | North Sea | AHTS | 2002 | 260 | 16,320 | 2,750 | Laid up class status, stats expired |
| 8. HIGHLAND DEFENDER | 9639335 | 919133 | British | North Sea | PSV | 2013 | 286 | 9,598 | 4,975 | Active |
| 9. HIGHLAND DUKE | 9499682 | 918012 | British | North Sea | PSV | 2012 | 246 | 7,482 | 3,133 | Laid up class status, stats expired |
| 10. HIGHLAND EAGLE | 9249465 | 906919 | British | North Sea | PSV | 2003 | 236 | 5,450 | 3,200 | Active |
| 11. HIGHLAND ENDURANCE | 9249518 | 908123 | British | North Sea | AHTS | 2003 | 260 | 16,320 | 2,750 | Active |
| 12. HIGHLAND FORTRESS | 9239343 | 9239343 | Malta | North Sea | LgSPV | 2001 | 236 | 5,450 | 3,200 | Laid up class status, stats expired |
| 13. HIGHLAND GUARDIAN | 9639347 | 919135 | British | North Sea | PSV | 2013 | 286 | 9,601 | 5,096 | Active |
| 14. HIGHLAND KNIGHT | 9643855 | 919136 | British | North Sea | PSV | 2013 | 246 | 7,482 | 3,116 | Active |
| 15. HIGHLAND LAIRD | 9361615 | 912007 | British | North Sea | PSV | 2006 | 236 | 7,482 | 3,184 | Laid up class status, stats expired |
| 16. HIGHLAND MONARCH | 9249453 | 907345 | British | North Sea | LgSPV | 2003 | 221 | 5,450 | 3,115 | Active |
| 17. HIGHLAND NAVIGATOR | 9239769 | 9239769 | Malta | North Sea | LgSPV | 2002 | 275 | 9,600 | 4,250 | Active |
| 18. HIGHLAND PRESTIGE | 9364021 | 912428 | British | North Sea | LgSPV | 2007 | 284 | 10,767 | 4,993 | Active |
| 19. HIGHLAND PRINCE | 9439450 | 916072 | British | North Sea | LgSPV | 2009 | 284 | 10,738 | 4,850 | Active |
| 20. HIGHLAND PRINCESS | 9643867 | 919138 | British | North Sea | PSV | 2014 | 246 | 7,482 | 3,116 | Active |
| 21. HIGHLAND ROVER | 9161338 | 9161338 | Malta | North Sea | PSV | 1998 | 236 | 5,450 | 3,200 | Laid up class status, stats expired |
| 22. HIGHLAND SCOUT | 9215220 | 9215220 | Panama | Americas | PSV | 1999 | 218 | 4,640 | 2,800 | Laid up class status, stats expired |
| a 23. HIGHLAND VALOUR | 9249506 | 907229 | Malta | North Sea | AHTS | 2003 | 261 | 16,320 | 2,750 | Active |
| 24. SEA APACHE | 9375381 | 08171946 | Panama | SEA | AHTS | 2008 | 250 | 10,700 | 2,700 | laid up status. Stats expired |
| 25. SEA CHEROKEE | 9421192 | 09171949 | Panama | SEA | AHTS | 2009 | 250 | 10,700 | 2,700 | Cold Stacked on laid up status |
| 26. SEA CHEYENNE | 9375379 | 07171945 | Panama | SEA | AHTS | 2007 | 250 | 10,700 | 2,700 | Active |
| 27. SEA CHOCTAW | 9375408 | 08171948 | Malaysia | SEA | AHTS | 2008 | 250 | 10,700 | 2,700 | Active |
| 28. SEA COMANCHE | 9421207 | 09171950 | Panama* pending flag change to Malaysia | SEA | AHTS | 2006 | 250 | 10,700 | 2,700 | Active |
| 29. SEA KIOWA | 9375393 | 08171947 | Panama | SEA | AHTS | 2008 | 250 | 10,700 | 2,700 | Active |
| 30. SEA SOVEREIGN | 9376139 | 06166285 | Panama | SEA | AHTS | 2006 | 230 | 5,500 | 1,800 | Active |
| 31. SEA SUPPORTER | 9390745 | 07170287 | Panama | SEA | AHTS | 2007 | 225 | 7,954 | 2,630 | Active |
| 32. TITAN | 9326627 | 5145922 | Mexico | Americas | AHTS | 2005 | 199 | 5,916 | 1,674 | Laid up status. Stats expired |
| 33. SEA VALIANT | 9477012 | 900061 | Malaysia | SEA | AHTS | 2010 | 213 | 10,188 | 2,301 | Cold Stacked on laid up status |
| 34. SEA VICTOR | 9477024 | 900060 | Malaysia | SEA | AHTS | 2010 | 230 | 10,188 | 2,058 | Cold Stacked on laid up status |
| 35. NORTH CRUYS | 9654098 | DnV 32377 | Norwegian | North Sea | PSV | 2014 | 304 | 12,000 | 5,000 | Active |
| 36. NORTH MARINER | 9244609 | Dnv 23252 | Norwegian | North Sea | PSV | 2002 | 276 | 9,600 | 4,400 | Active |
| a 37. NORTH PROMISE | 9364033 | DnV 27000 | Norgwegian | North Sea | PSV | 2007 | 284 | 10,767 | 4,993 | Active |
| 38. NORTH STREAM | 9158678 | DnV 19690 | Norgwegian | North Sea | PSV | 1998 | 276 | 9,600 | 4,585 | laid up status, stats overdue |
| 39. NORTH POMOR | 9643465 | Dnv 32339 | Norgwegian | North Sea | PSV | 2013 | 304 | 11,465 | 5,000 | Active |
| 40. NORTH PURPOSE | 9439462 | DnV 29018 | Norgwegian | North Sea | PSV | 2010 | 284 | 10,738 | 4,850 | Active |
| 41. ORLEANS | 9315501 | 1151394 | USA | Americas | PSV | 2004 | 252 | 6,342 | 2,929 | Active |
| 42. BOURBON | 9315513 | 1156133 | USA | Americas | PSV | 2004 | 252 | 6,342 | 2,929 | Warm Stacked on laid up status |
| 43. ROYAL | 9315525 | 1159200 | USA | Americas | PSV | 2004 | 252 | 6,342 | 2,929 | Active |
| 44. CHARTRES | 9285263 | 1160318 | Mexican | Americas | PSV | 2004 | 252 | 6,342 | 2,929 | Active |
| 45. IBERVILLE | 9285275 | 1163367 | USA | Americas | PSV | 2004 | 252 | 6,342 | 2,929 | Active |
| 46. BIENVILLE | 9285287 | 1163970 | USA | Americas | PSV | 2005 | 252 | 6,342 | 2,929 | Active |
| 47. CONTI | 9285299 | 1166313 | USA | Americas | PSV | 2005 | 252 | 6,342 | 2,929 | laid up but everything valid |
| 48. ST LOUIS | 9285304 | 1167668 | USA | Americas | PSV | 2005 | 252 | 6,342 | 2,929 | laid up status, stats overdue |
| 49. TOULOUSE | 9285316 | 1169977 | USA | Americas | PSV | 2005 | 252 | 6,342 | 2,929 | laid up status, stats overdue |
| 50. ESPLANADE | 9285330 | 1173548 | USA | Americas | PSV | 2005 | 252 | 6,342 | 2,929 | Warm Stacked on laid up status |
| 51. FIRST AND TEN | 9382267 | 1195773 | USA | Americas | PSV | 2007 | 190 | 3,894 | 1,686 | laid up status, stats overdue |
| 52. DOUBLE EAGLE | 9382279 | 1200748 | USA | Americas | PSV | 2007 | 190 | 3,894 | 1,686 | laid up status, stats overdue |
| 53. TRIPLE PLAY | 9382310 | 1203989 | USA | Americas | PSV | 2007 | 190 | 3,894 | 1,686 | laid up status, stats overdue |
| 54. GRAND SLAM | 9382308 | 1204678 | USA | Americas | PSV | 2007 | 225 | 3,894 | 2,151 | laid up status, stats overdue |
| 55. SLAM DUNK | 9382293 | 1204681 | USA | Americas | PSV | 2007 | 225 | 3,894 | 2,151 | laid up status, stats overdue |
| 56. TOUCHDOWN | 9382281 | 1204682 | USA | Americas | PSV | 2008 | 225 | 3,894 | 2,151 | laid up status, stats overdue |
| 57. HAT TRICK | 9382346 | 1204683 | USA | Americas | PSV | 2008 | 190 | 3,894 | 1,686 | laid up status, stats overdue |
| 58. JERMAINE GIBSON | 9382334 | 1204684 | USA | Americas | PSV | 2008 | 225 | 3,894 | 2,151 | laid up status, stats overdue |
| 59. HOMERUN | 9382358 | 1204685 | USA | Americas | PSV | 2008 | 225 | 3,894 | 2,151 | laid up status, stats overdue |
| 60. KNOCKOUT | 9382322 | 1204686 | USA | Americas | PSV | 2008 | 225 | 3,894 | 2,151 | laid up status, stats overdue |
| 61. HAMMERHEAD | 9406223 | 1203577 | USA | Americas | FSV | 2008 | 552 | 7,200 | 552 | laid up status, stats overdue |
| 62. THOMAS WAINWRIGHT | 9579925 | 1223869 | USA | Americas | PSV | 2010 | 242 | 7,200 | 4,200 | laid up status, stats overdue |
| 63. MAKO | | 1207717 | | | | | | | | sold |
| 64. TIGER | | 1207719 | | | | | | | | sold |
| 65. POLARIS | 9582312 | 1249448 | USA | Americas | PSV | 2014 | 272 | 10,245 | 3,580 | Active |
| 66. REGULUS | 9582324 | 1249449 | USA | Americas | PSV | 2015 | 272 | 9,601 | 3,580 | Active |
| 67. HERCULES | 9677923 | 16248367 | USA | Americas | OSV | 2016 | 288 | 8,065 | 5,165 | Active |
| 68. NORTH BARENTS | 9742766 | Dnv 34384 | Norwegian | Norway | PSV | 2017 | 304 | 11,465 | 5,000 | Active |

SCHEDULE 5 – COMPANY DISCLOSURE SCHEDULE

[See Attached]

EXHIBIT A-1 – FORM OF 1145 RIGHTS OFFERING PROCEDURES

[See Attached]

## GULFMARK OFFSHORE, INC. (THE "COMPANY")

## 1145 RIGHTS OFFERING PROCEDURES

Each of the 1145 Rights Offering Securities (as defined below) is being distributed and issued by the Debtor without registration under the Securities Act of 1933, as amended (the "Securities Act")[1], in reliance upon the exemption provided in Section 1145 of the Bankruptcy Code. None of the 1145 Subscription Rights (as defined below) or the 1145 Rights Offering Securities issuable upon exercise of such rights distributed pursuant to these 1145 Rights Offering Procedures have been or will be registered under the Securities Act, nor any state or local law requiring registration for the offer and sale of a security.

The 1145 Subscription Rights are not detachable from the Notes or the allowed Unsecured Notes Claim(s) and may not be sold, transferred, assigned, pledged, hypothecated, participated, donated or otherwise encumbered or disposed of, directly or indirectly (including through derivatives, options, swaps, forward sales or other transactions in which any person receives the right to own or acquire any current or future interest in the 1145 Subscription Rights, the 1145 Rights Offering Shares or the 1145 Rights Offering Warrants) (each of the above, a "Transfer").  If the Notes or any portion of allowed Unsecured Notes Claim(s) is or has been Transferred after the Record Date by an 1145 Eligible Holder, the corresponding 1145 Subscription Rights will be cancelled automatically, and neither such 1145 Eligible Holder nor the transferee of such allowed Unsecured Notes Claim(s) will receive any 1145 Rights Offering Securities in connection with such transferred Notes or allowed Unsecured Notes Claim(s).

The Disclosure Statement (as defined below) has previously been distributed in connection with the Debtor's solicitation of votes to accept or reject the Plan (as defined below) and that document sets forth important information, including risk factors, that should be carefully read and considered by each 1145 Eligible Holder (as defined below) prior to making a decision to participate in the 1145 Rights Offering. Additional copies of the Disclosure Statement are available upon request from Prime Clerk LLC (the "Rights Offering Subscription Agent").

The 1145 Rights Offering is being conducted by the Company on behalf of the reorganized Company in good faith and in compliance with the Bankruptcy Code. In accordance with Section 1125(e) of the Bankruptcy Code, a debtor or any of its agents that participate, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security, offered or sold under the plan of the debtor, of an affiliate participating in a joint plan with the

---

[1] Terms used and not defined herein shall have the meaning assigned to them in the [*Chapter 11 Plan of Reorganization of GulfMark Offshore, Inc.*] (as may be amended, modified, or supplemented from time to time, the "Plan").

**debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such participation, for violation of any applicable law, rule, or regulation governing the offer, issuance, sale or purchase of securities.**

1145 Eligible Holders should note the following times relating to the 1145 Rights Offering:

| Date | Calendar Date | Event |
|---|---|---|
| Record Date ………………… | [●], 2017 | The date fixed by the Company for the determination of the holders eligible to participate in the 1145 Rights Offering. |
| Subscription Commencement Date ………………………… | [●], 2017 | Commencement of the 1145 Rights Offering. |
| Subscription Expiration Deadline …………………… | [● p.m.] [New York City time] on [●], 2017[2] | The deadline for 1145 Eligible Holders to subscribe for 1145 Rights Offering Securities. An 1145 Eligible Holder's applicable 1145 Beneficial Holder Subscription Form(s) (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable, and Requisite Documentation (as defined below)) must be received by the 1145 Eligible Holder's Nominee (as defined below) in sufficient time to allow such Nominee to deliver the Master 1145 Subscription Form to the Rights Offering Subscription Agent by the Subscription Expiration Deadline. 1145 Eligible Holders who are not Commitment Parties must deliver the aggregate Purchase Price (as defined below) by the Subscription Expiration Deadline. 1145 Eligible Holders who are Commitment Parties must deliver the aggregate Purchase Price no later than the deadline specified in the Funding Notice (as defined below) in accordance with the terms of the Backstop Commitment Agreement (the "GulfMark Backstop Agreement"). |

---

[2] 15 BDs after the Subscription Commencement Date.

To 1145 Eligible Holders and Nominees of 1145 Eligible Holders:

On [●], 2017, the Debtor filed the Plan with the United States Bankruptcy Court for the District of Delaware, and the [*Disclosure Statement for the Chapter 11 Plan of Reorganization of GulfMark Offshore, Inc. (*as may be amended from time to time in accordance with its terms, the "Disclosure Statement")]. Pursuant to the Plan, each holder of an allowed Unsecured Notes Claim as of the Record Date (each such holder, an "1145 Eligible Holder") has a right to participate in the 1145 Rights Offering in accordance with the terms and conditions of these 1145 Rights Offering Procedures.

Pursuant to the Plan, each 1145 Eligible Holder is entitled to rights to subscribe for its *pro rata* portion of the 1145 Rights Offering of those certain shares of Class A common stock issued by the reorganized Company (the "1145 Rights Offering Shares"), or to ensure compliance with the Jones Act (as discussed below and in the Disclosure Statement), warrants in lieu of such 1145 Rights Offering Shares (the "1145 Rights Offering Warrants," together with the 1145 Rights Offering Shares, the "1145 Rights Offering Securities"), in an aggregate amount of $[●], provided that it timely and properly executes and delivers its applicable 1145 Beneficial Holder Subscription Form(s) (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable, and Requisite Documentation) to its Nominee in advance of the Subscription Expiration Deadline. Each such Nominee will receive a Master 1145 Subscription Form which it shall use to summarize the 1145 Subscription Rights exercised by each 1145 Eligible Holder that timely returns the applicable properly filled out 1145 Beneficial Holder Subscription Form(s) to such Nominee. 1145 Beneficial Holder Subscription Forms should not be returned directly to the Rights Offering Subscription Agent because no beneficial holders hold their Unsecured Notes Claim directly on the books of the indenture trustee.

Please note that all 1145 Beneficial Holder Subscription Forms (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable, and Requisite Documentation) must be returned to the applicable Nominee in sufficient time to allow such Nominee to process and deliver the Master 1145 Subscription Form and copies of all 1145 Beneficial Holder Subscription Forms, and the accompanying IRS Forms and Requisite Documentation prior to the Subscription Expiration Deadline. To the extent of any discrepancy between the Master 1145 Subscription Form and the 1145 Beneficial Holder Subscription Form(s) regarding the 1145 Eligible Holder's principal amount, the Master 1145 Subscription Form shall govern. While the amount of time necessary for a Nominee to process and deliver the Master 1145 Subscription Form to the Rights Offering Subscription Agent will vary from Nominee to Nominee, 1145 Eligible Holders are urged to consult with their Nominees to determine the necessary deadline to return their 1145 Beneficial Holder Subscription Forms. Failure to submit such 1145 Beneficial Holder Subscription Forms on a timely basis will result in forfeiture of an 1145 Eligible Holder's rights to participate in the 1145 Rights Offering. None of the Company, the Rights Offering Subscription Agent or any of the Commitment Parties will have any liability for any such failure.

No 1145 Eligible Holder shall be entitled to participate in the 1145 Rights Offering unless the aggregate Purchase Price (as defined below) for the 1145 Rights Offering Securities it subscribes for is received by the Rights Offering Subscription Agent (i) in the case of an

1145 Eligible Holder that is not a Commitment Party, by the Subscription Expiration Deadline, and (ii) in the case of an 1145 Eligible Holder that is a Commitment Party, no later than the deadline specified in a written notice (a "Funding Notice") delivered by or on behalf of the Debtor to the Commitment Parties in accordance with Section 2.4 of the GulfMark Backstop Agreement (the "Backstop Funding Deadline"), provided that the Commitment Parties may deposit their aggregate Purchase Price in the Subscription Account (as defined below), in accordance with the terms of the GulfMark Backstop Agreement. No interest is payable on any advanced funding of the Purchase Price. If the 1145 Rights Offering is terminated for any reason, the aggregate Purchase Price previously received by the Rights Offering Subscription Agent will be returned to 1145 Eligible Holders as provided in Section 6 hereof. No interest will be paid on any returned Purchase Price. Any 1145 Eligible Holder who is not a Commitment Party submitting payment via its Nominee must coordinate such payment with its Nominee in sufficient time to allow the Nominee to forward such payment to the Rights Offering Subscription Agent by the Subscription Expiration Deadline.

*Jones Act Limitations*

Certain of the Debtor's operations are conducted in the U.S. coastwise trade and are governed by the U.S. citizenship and cabotage laws principally contained in 46 U.S.C. § 50501(a), (b) and (d) and 46 U.S.C. Chapters 121 and 551 and known collectively as the "Jones Act" and any successor statutes thereto, together with the rules and regulations promulgated thereunder by the U.S. Coast Guard and the U.S. Maritime Administration and their practices enforcing, administering, and interpreting such laws, statutes, rules, and regulations, in each case as amended or supplemented from time to time. The Jones Act restricts waterborne transportation of goods and passengers between points in the United States to vessels owned and controlled by "citizens of the United States" within the meaning of the Jones Act (such a person, a "U.S. Citizen"). The Debtor could lose its privilege of owning and operating vessels in the Jones Act trade if non-U.S. Citizens were to own or control, in the aggregate, more than 25% of any class or series of the equity interests in the Company. Furthermore, to comply with the Jones Act, the Company's Certificate of Incorporation will provide that non-U.S. Citizens in the aggregate may not own more than 24% of the Common Shares to be issued and outstanding as of the Effective Date.  Therefore, in order to ensure that at least 76% of the Company's equity interests will be owned by U.S. Citizens, the allocation of 1145 Rights Offering Shares and 1145 Rights Offering Warrants will be determined by the priority order set forth in the Plan such that 1145 Rights Offering Warrants will be issued in lieu of 1145 Rights Offering Shares to non-U.S. Citizens to ensure compliance with the Jones Act.

In all cases, an Eligible Holder (or its Nominee) that provides an Affidavit of United States Citizenship (the "Affidavit of Citizenship") in the form provided with these 1145 Rights Offering Procedures and any other documentation as the Company deems advisable to fulfill the purpose or implement the provisions of its Certificate of Incorporation in order to maintain compliance with the Jones Act (the "Requisite Documentation") and that is determined by the Company in its reasonable discretion to be a U.S. Citizen shall receive 1145 Rights Offering Shares as set forth in the Disclosure Statement and the Plan; provided, that the Company may in its reasonable discretion, in consultation with the Requisite Commitment Parties, request a bring-down confirmation of an Affidavit of Citizenship from an Eligible Holder whose original

Affidavit of Citizenship was not executed within the thirty (30) calendar days immediately preceding the request. The maximum aggregate percentage of 1145 Rights Offering Shares that will be issued to non-U.S. Citizens and any Persons that fail to deliver the Requisite Documentation, pursuant to the allocation set forth in the Plan shall be 24%.

**In order to participate in the 1145 Rights Offering, an 1145 Eligible Holder (or its Nominee) must complete all of the steps outlined below. If all of the steps outlined below are not completed by the Subscription Expiration Deadline or the Backstop Funding Deadline, as applicable, an 1145 Eligible Holder shall be deemed to have forever and irrevocably relinquished and waived its right to participate in the 1145 Rights Offering.**

1.      **1145 Rights Offering**

1145 Eligible Holders have the right, but not the obligation, to participate in the 1145 Rights Offering. 1145 Eligible Holders shall receive rights to subscribe for their *pro rata* portion of the 1145 Rights Offering Securities.

Subject to the terms and conditions set forth in the Plan and these 1145 Rights Offering Procedures, each 1145 Eligible Holder is entitled to subscribe for up to [●] 1145 Rights Offering Shares per $1,000 of Principal Amount of the 6.375% Unsecured Notes due 2022. To ensure that the Company remains a U.S. Citizen in compliance with the Jones Act, as discussed above, 1145 Rights Offering Warrants may be issued in lieu of 1145 Rights Offering Shares, based on the priority order set forth in the Plan. Subscriptions will be made at a purchase price of $[●] per 1145 Rights Offering Share (the "1145 Rights Offering Common Share Purchase Price") and a purchase price of $[●] per 1145 Rights Offering Warrant (the "1145 Rights Offering Warrant Purchase Price," and together with the 1145 Rights Offering Common Share Purchase Price, the "Purchase Price").

There will be no over-subscription privilege in the 1145 Rights Offering. Any 1145 Rights Offering Shares that are unsubscribed by the 1145 Eligible Holders entitled thereto will not be offered to other 1145 Eligible Holders but will be purchased by the applicable Commitment Parties in accordance with the GulfMark Backstop Agreement. Subject to the terms and conditions of the GulfMark Backstop Agreement, each Commitment Party is obligated to purchase its *pro rata* portion of the Unsubscribed Securities.

Any 1145 Eligible Holder that subscribes for 1145 Rights Offering Securities and is deemed to be an "underwriter" under Section 1145(b) of the Bankruptcy Code will be subject to restrictions under the Securities Act on its ability to resell those securities. Resale restrictions are discussed in more detail in Article [●] of the Disclosure Statement, entitled "[●]."

**SUBJECT TO THE TERMS AND CONDITIONS OF THE 1145 RIGHTS OFFERING PROCEDURES AND THE GULFMARK BACKSTOP AGREEMENT IN THE CASE OF ANY COMMITMENT PARTY, ALL SUBSCRIPTIONS SET FORTH IN THE 1145 BENEFICIAL HOLDER SUBSCRIPTION FORM(S) ARE IRREVOCABLE.**

2.      **Subscription Period**

The 1145 Rights Offering will commence on the Subscription Commencement Date and will expire at the Subscription Expiration Deadline. Each 1145 Eligible Holder intending to purchase 1145 Rights Offering Securities in the 1145 Rights Offering must affirmatively elect to exercise its 1145 Subscription Rights in the manner set forth in the Subscription Form by the Subscription Expiration Deadline.

Any exercise of 1145 Subscription Rights by an 1145 Eligible Holder after the Subscription Expiration Deadline will not be allowed and any purported exercise received by the Rights Offering Subscription Agent after the Subscription Expiration Deadline, regardless of when the documents or payment relating to such exercise were sent, will not be honored, except that the Company shall have the discretion, with the consent of the Requisite Commitment Parties, to allow any exercise of 1145 Subscription Rights after the Subscription Expiration Deadline.

The Subscription Expiration Deadline may be extended with the consent of the Requisite Commitment Parties, or as required by law.

### 3.      Delivery of Subscription Documents

Each 1145 Eligible Holder may exercise all or any portion of such 1145 Eligible Holder's 1145 Subscription Rights, but subject to the terms and conditions contained herein. In order to facilitate the exercise of the 1145 Subscription Rights, beginning on the Subscription Commencement Date, the 1145 Subscription Form and these 1145 Rights Offering Procedures will be sent to the Nominees of each 1145 Eligible Holder, with instructions for such Nominees to forward the 1145 Subscription Form and these 1145 Rights Offering Procedures to the 1145 Eligible Holder, together with appropriate instructions for the proper completion, due execution and timely delivery of the executed 1145 Subscription Form and the payment of the applicable aggregate Purchase Price for its 1145 Rights Offering Securities.

### 4.      Exercise of 1145 Subscription Rights

(a)      In order to validly exercise its 1145 Subscription Rights, each 1145 Eligible Holder that is not a Commitment Party must:

i.    return duly completed and executed 1145 Beneficial Holder Subscription Form(s) (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable, and Requisite Documentation) to its Nominee so that such documents may be transmitted to the Rights Offering Subscription Agent by the Nominee, so that such documents are actually received by the Rights Offering Subscription Agent by the Subscription Expiration Deadline; and

ii.   at the same time it returns its 1145 Beneficial Holder Subscription Form(s) to its Nominee, but in no event later than the Subscription Expiration Deadline, pay, or arrange for the payment by its Nominee of, the applicable Purchase Price to the Rights Offering Subscription Agent by wire transfer **ONLY** of immediately available funds in accordance with the instructions included in the 1145 Beneficial Holder Subscription Form(s).

(b)    In order to validly exercise its 1145 Subscription Rights, each 1145 Eligible Holder that is a Commitment Party must:

i.    return duly completed and executed applicable 1145 Beneficial Holder Subscription Form(s) (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable, and Requisite Documentation) to its Nominee so that such documents may be transmitted to the Rights Offering Subscription Agent by the Nominee, so that such documents are actually received by the Rights Offering Subscription Agent by the Subscription Expiration Deadline; and

ii.    no later than the Backstop Funding Deadline, pay the applicable Purchase Price to the account established and maintained by a third party satisfactory to the Commitment Parties, which account may be an escrow account pursuant to Section 2.4(b) of the GulfMark Backstop Agreement (the "Subscription Account"), by wire transfer **ONLY** of immediately available funds in accordance with the wire instructions included in the Funding Notice.

**ALL COMMITMENT PARTIES MUST PAY THEIR APPLICABLE PURCHASE PRICE DIRECTLY TO THE SUBSCRIPTION ACCOUNT AND SHOULD NOT PAY THEIR NOMINEE(S).**

(c)    With respect to 4(a) and (b) above, each 1145 Eligible Holder must duly complete, execute and return the applicable 1145 Beneficial Holder Subscription Form(s) in accordance with the instructions herein to its Nominee in sufficient time to allow its Nominee to process its instructions and deliver to the Rights Offering Subscription Agent the Master 1145 Subscription Form, its completed 1145 Beneficial Holder Subscription Form(s) (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable), and, solely with respect to the 1145 Eligible Holders that are not Commitment Parties, payment of the applicable Purchase Price, payable for the 1145 Rights Offering Securities elected to be purchased by such 1145 Eligible Holder, by the Subscription Expiration Deadline. 1145 Eligible Holders that are Commitment Parties must deliver their payment of the applicable Purchase Price payable for the 1145 Rights Offering Securities elected to be purchased by such Commitment Party directly to the Subscription Account no later than the Backstop Funding Deadline.

(d)    In the event that the funds received by the Rights Offering Subscription Agent or the Subscription Account, as applicable, from any 1145 Eligible Holder do not correspond to the Purchase Price payable for the 1145 Rights Offering Securities elected to be purchased by such 1145 Eligible Holder, the number of the 1145 Rights Offering Securities deemed to be purchased by such 1145 Eligible Holder will be the lesser of (a) the number of the 1145 Rights Offering Securities elected to be purchased by such 1145 Eligible Holder and (b) a number of the 1145 Rights Offering Securities determined by dividing the amount of the funds received by the Purchase Price, in each case up to such 1145 Eligible Holder's *pro rata* portion of 1145 Rights Offering Securities. If, as a result of an allocation

of 1145 Rights Offering Warrants in lieu of 1145 Rights Offering Shares, the funds received from any 1145 Eligible Holder are greater than the Purchase Price payable for the 1145 Rights Offering Securities to be purchased by such 1145 Eligible Holder because of a pricing differential between the 1145 Rights Offering Shares and 1145 Rights Offering Warrants, then the excess funds will be repaid to such 1145 Eligible Holder, provided that such excess funds are greater than $100 after accounting for all applicable transaction costs.

(e)     The cash paid to the Rights Offering Subscription Agent in accordance with these 1145 Rights Offering Procedures will be deposited and held by the Rights Offering Subscription Agent in a segregated account until released to the Debtor in connection with the settlement of the 1145 Rights Offering on the Effective Date. The Rights Offering Subscription Agent may not use such cash for any other purpose prior to the Effective Date and may not encumber or permit such cash to be encumbered with any lien or similar encumbrance. The cash held by the Rights Offering Subscription Agent hereunder shall not be deemed part of the Debtor's bankruptcy estates.

**5.      Transfer Restriction; Revocation**

The 1145 Subscription Rights are not detachable from the Notes or the allowed Unsecured Notes Claim(s) and may not be sold, transferred, assigned, pledged, hypothecated, participated, donated or otherwise encumbered or disposed of, directly or indirectly (including through derivatives, options, swaps, forward sales or other transactions in which any person receives the right to own or acquire any current or future interest in the 1145 Subscription Rights, the 1145 Rights Offering Shares or the 1145 Rights Offering Warrants) (each of the above, a "Transfer"). If the Notes or any portion of allowed Unsecured Notes Claim(s) is or has been Transferred after the Record Date by an 1145 Eligible Holder, the corresponding 1145 Subscription Rights will be cancelled automatically, and neither such 1145 Eligible Holder nor the transferee of such allowed Unsecured Notes Claim(s) will receive any 1145 Rights Offering Securities in connection with such transferred Notes or allowed Unsecured Notes Claim(s).

Once an 1145 Eligible Holder has properly exercised its 1145 Subscription Rights, subject to the terms and conditions contained in these 1145 Rights Offering Procedures and the GulfMark Backstop Agreement in the case of any Commitment Party, such exercise will be irrevocable.

**6.      Termination/Return of Payment**

Unless the Effective Date has occurred, the 1145 Rights Offering will be deemed automatically terminated without any action of any party upon the earlier of (i) termination of the Plan or rejection of the Plan by all classes entitled to vote, (ii) termination of the Restructuring Support Agreement in accordance with its terms, (iii) termination of the GulfMark Backstop Agreement in accordance with its terms and (iv) the Outside Date (as defined in the GulfMark Backstop Agreement) (as such date may be extended pursuant to the terms of the GulfMark Backstop Agreement). In the event the 1145 Rights Offering is terminated, any payments

received pursuant to these 1145 Rights Offering Procedures will be returned, without interest, to the applicable 1145 Eligible Holder as soon as reasonably practicable, but in any event, within six (6) Business Days after the date of termination.

### 7.      Settlement of the 1145 Rights Offering and Distribution of the 1145 Rights Offering Securities

The settlement of the 1145 Rights Offering is conditioned on confirmation of the Plan by the Bankruptcy Court, compliance by the Debtor with these 1145 Rights Offering Procedures, and the simultaneous occurrence of the Effective Date. The Debtor intends that the 1145 Rights Offering Securities will be issued to the 1145 Eligible Holders and/or to any party that an 1145 Eligible Holder so designates in the 1145 Beneficial Holder Subscription Form(s), in book-entry form, and that DTC, or its nominee, will be the holder of record of such 1145 Rights Offering Securities. To the extent DTC is unwilling or unable to make the 1145 Rights Offering Securities eligible on the DTC system, the 1145 Rights Offering Securities will be issued directly to the 1145 Eligible Holder or its designee.  For the avoidance of doubt, any such 1145 Eligible Holder, and not a designee, shall remain responsible for the exercise and payment of its 1145 Subscription Rights.

### 8.      Fractional Shares

No fractional rights or 1145 Rights Offering Securities will be issued in the 1145 Rights Offering. All share allocations (including each 1145 Eligible Holder's 1145 Rights Offering Securities) will be calculated and rounded down to the nearest whole share.

### 9.      Validity of Exercise of 1145 Subscription Rights and Delivery of 1145 Rights Offering Materials

All questions concerning the timeliness, viability, form and eligibility of any exercise of 1145 Subscription Rights will be determined in good faith by the Debtor in consultation with the Requisite Commitment Parties, and, if necessary, subject to a final and binding determination by the Bankruptcy Court. The Debtor, with the consent of the Requisite Commitment Parties, may waive or reject any defect or irregularity in, or permit such defect or irregularity to be corrected within such time as they may determine in good faith, the purported exercise of any 1145 Subscription Rights. Subscription Forms will be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtor determines in good faith with the consent of the Requisite Commitment Parties.

*Before exercising any 1145 Subscription Rights, 1145 Eligible Holders should read the Disclosure Statement and the Plan for information relating to the Debtor and the risk factors to be considered.*

All calculations, including, to the extent applicable, the calculation of (a)(i) the value of any 1145 Eligible Holder's allowed Unsecured Notes Claims for the purposes of the 1145 Rights Offering and (ii) any 1145 Eligible Holder's 1145 Rights Offering Securities, shall be made in good faith by the Company with the consent of the Requisite Commitment Parties and in each

case in accordance with any Claim amounts included in the Plan, and any disputes regarding such calculations shall be subject to a final and binding determination by the Bankruptcy Court.

Delivery by the Rights Offering Subscription Agent of the 1145 Subscription Form and these 1145 Rights Offering Procedures to the Nominees reflected on the securities position report provided by DTC as of the Record Date (with instructions to forward such documents to the Nominees' 1145 Eligible Holder clients) shall constitute valid and sufficient delivery of such documents, and satisfy the obligations of the Rights Offering Subscription Agent with respect thereto. Nominees may utilize an agent to distribute the 1145 Subscription Form and these 1145 Rights Offering Procedures to their client 1145 Eligible Holders and seek reasonable reimbursement of the costs associated therewith by submitting a timely invoice to the Rights Offering Subscription Agent.

### 10.    Modification of Procedures

With the prior written consent of the Requisite Commitment Parties, the Debtor reserves the right to modify these 1145 Rights Offering Procedures, or adopt additional procedures consistent with these 1145 Rights Offering Procedures to effectuate the 1145 Rights Offering and to issue the 1145 Rights Offering Securities, provided, however, that the Debtor shall provide prompt written notice to each 1145 Eligible Holder of any material modification to these 1145 Rights Offering Procedures made after the Subscription Commencement Date, provided further that any amendments or modifications to the terms of the 1145 Rights Offerings are subject to the provisions of Section 10.7 of the GulfMark Backstop Agreement. In so doing, and subject to the consent of the Requisite Commitment Parties, the Debtor may execute and enter into agreements and take further action that the Debtor determines in good faith is necessary and appropriate to effectuate and implement the 1145 Rights Offering and the issuance of the 1145 Rights Offering Securities.

### 11.    Inquiries And Transmittal of Documents; Rights Offering Subscription Agent

The 1145 Rights Offering Instructions for 1145 Eligible Holders attached hereto should be carefully read and strictly followed by the 1145 Eligible Holders.

Questions relating to the 1145 Rights Offering should be directed to the Rights Offering Subscription Agent via email to gulfmarksubscription@primeclerk.com (please reference "GulfMark 1145 Rights Offering" in the subject line) or at the following applicable phone number: (844) 822-9230 (domestic) or (347) 338-6503 (international).

The risk of non-delivery of all documents and payments to the Rights Offering Subscription Agent, the Subscription Account and any Nominee is on the 1145 Eligible Holder electing to exercise its 1145 Subscription Rights and not the Debtor, the Rights Offering Subscription Agent, or the Commitment Parties.

# GULFMARK OFFSHORE, INC.

## 1145 RIGHTS OFFERING INSTRUCTIONS FOR 1145 ELIGIBLE HOLDERS

**Terms used and not defined herein shall have the meaning assigned to them in the Plan.**

**To elect to participate in the 1145 Rights Offering, you must follow the instructions set out below:**

1. **Insert** the principal amount of the allowed Unsecured Notes Claims that you held as of the Record Date in Item 1 of your 1145 Beneficial Holder Subscription Form(s) (if you do not know such amount, please contact your Nominee immediately).

2. **Complete** the calculation in Item 2a of your 1145 Beneficial Holder Subscription Form(s), which calculates the maximum number of 1145 Rights Offering Securities available for you to purchase. Such amount must be rounded down to the nearest whole share.

3. **Complete** the calculation in Item 2b of your 1145 Beneficial Holder Subscription Form(s) to indicate the number of 1145 Rights Offering Securities that you elect to purchase and calculate the aggregate Purchase Price for the 1145 Rights Offering Securities that you elect to purchase.

4. **Confirm** whether you are a Commitment Party pursuant to the representation in Item 3 of your 1145 Beneficial Holder Subscription Form(s). (*This section is only for Commitment Parties, each of whom is aware of their status as a Commitment Party*).

5. **Read, complete and sign** the certification in Item 5 of your 1145 Beneficial Holder Subscription Form(s). Such execution shall indicate your acceptance and approval of the terms and conditions set forth in these 1145 Rights Offering Procedures.

6. **Read, complete and sign** an IRS Form W-9 if you are a U.S. person. If you are a non-U.S. person, read, complete and sign an appropriate IRS Form W-8. These forms may be obtained from the IRS at its website: www.irs.gov.

7. **Read, complete and sign**, if you are a U.S. Citizen, the attached Affidavit of Citizenship. If you do not return an Affidavit of Citizenship, you will be treated as a non-U.S. Citizen for all purposes relevant to the Company's compliance with the Jones Act.

8. **Return** your signed 1145 Beneficial Holder Subscription Form(s) (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and, if applicable, your Affidavit of Citizenship, to your Nominee in sufficient time to allow your Nominee to process your instructions and prepare and deliver the Master 1145 Subscription Form to the Rights Offering Subscription Agent by the Subscription Expiration Deadline.

9. **Arrange for full payment** of the aggregate Purchase Price by wire transfer of

12

immediately available funds, calculated in accordance with Item 2b of your 1145 Beneficial Holder Subscription Form(s). For 1145 Eligible Holders that are not Commitment Parties, please instruct your Nominee to coordinate payment of the Purchase Price and transmit and deliver such payment to the Rights Offering Subscription Agent by the Subscription Expiration Deadline. The Nominee of an 1145 Eligible Holder that is not a Commitment Party should follow the payment instructions as provided in the Master 1145 Subscription Form. Any Commitment Party should follow the payment instructions that will be provided in the Funding Notice.

---

**The Subscription Expiration Deadline is [●] [p.m.] [New York City time] on [●], 2017.**

**Please note that the 1145 Beneficial Holder Subscription Form(s) (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and, if applicable, your Affidavit of Citizenship, must be received by your broker, bank, commercial bank, transfer agent, trust company, dealer, or other agent or nominee (as applicable, the "<u>Nominee</u>") in sufficient time to allow such Nominee to process and deliver the Master 1145 Subscription Form to the Rights Offering Subscription Agent, by the Subscription Expiration Deadline, along with the appropriate funding (with respect to 1145 Eligible Holders that are not Commitment Parties) or the subscription represented by your applicable 1145 Beneficial Holder Subscription Form(s) will not be counted and you will be deemed forever to have relinquished and waived your right to participate in the 1145 Rights Offering.**

**1145 Eligible Holders that are Commitment Parties must deliver the appropriate funding directly to the Subscription Account pursuant to the Funding Notice no later than the Backstop Funding Deadline.**

---

EXHIBIT A-2 – FORM OF 4(a)(2) RIGHTS OFFERING PROCEDURES

[See Attached]

**GULFMARK OFFSHORE, INC. (THE "<u>COMPANY</u>")**

**4(a)(2) RIGHTS OFFERING PROCEDURES**

Each of the 4(a)(2) Rights Offering Securities (as defined below) is being distributed and issued by the Debtor without registration under the Securities Act of 1933, as amended (the "<u>Securities Act</u>")[1], in reliance upon the exemption provided by Section 4(a)(2) thereof and/or Regulation D promulgated thereunder. None of the 4(a)(2) Subscription Rights (as defined below) or the 4(a)(2) Rights Offering Securities issuable upon exercise of such rights distributed pursuant to these 4(a)(2) Rights Offering Procedures have been or will be registered under the Securities Act, nor any state or local law requiring registration for the offer and sale of a security.

The 4(a)(2) Subscription Rights are not detachable from the Notes or the allowed Unsecured Notes Claim(s) and may not be sold, transferred, assigned, pledged, hypothecated, participated, donated or otherwise encumbered or disposed of, directly or indirectly (including through derivatives, options, swaps, forward sales or other transactions in which any person receives the right to own or acquire any current or future interest in the 4(a)(2) Subscription Rights, the 4(a)(2) Rights Offering Shares or the 4(a)(2) Rights Offering Warrants) (each of the above, a "<u>Transfer</u>").  If the Notes or any portion of an allowed Unsecured Notes Claim(s) is or has been Transferred after the Record Date by a 4(a)(2) Eligible Holder, the corresponding 4(a)(2) Subscription Rights will be cancelled automatically, and neither such 4(a)(2) Eligible Holder nor the transferee of such allowed Unsecured Notes Claim(s) will receive any 4(a)(2) Rights Offering Securities in connection with such transferred Notes or allowed Unsecured Notes Claim(s).

The Disclosure Statement (as defined below) has previously been distributed in connection with the Debtor's solicitation of votes to accept or reject the Plan (as defined below) and that document sets forth important information, including risk factors, that should be carefully read and considered by each 4(a)(2) Eligible Holder (as defined below) prior to making a decision to participate in the 4(a)(2) Rights Offering. Additional copies of the Disclosure Statement are available upon request from Prime Clerk LLC (the "<u>Rights Offering Subscription Agent</u>").

None of the 4(a)(2) Rights Offering Securities has been registered under the Securities Act, nor any state or local law requiring registration for the offer or sale of a security, and no 4(a)(2) Rights Offering Securities may be sold or Transferred absent registration under the Securities Act or pursuant to an exemption from registration under the Securities Act.

---

[1] Terms used and not defined herein shall have the meaning assigned to them in the [*Chapter 11 Plan of Reorganization of GulfMark Offshore, Inc.*] (as may be amended, modified, or supplemented from time to time, the "<u>Plan</u>").

#4812-6928-9287v3

Each of the 4(a)(2) Rights Offering Securities issued upon exercise of a 4(a)(2) Subscription Right, and each book entry position or certificate issued in exchange for or upon the Transfer, sale or assignment of any such 4(a)(2) Rights Offering Security, shall be deemed to contain or be stamped or otherwise imprinted with, as applicable, a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [ISSUANCE DATE], HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEPMPTION FROM REGISTRATION THEREUNDER."

The 4(a)(2) Rights Offering is being conducted by the Company on behalf of the reorganized Company in good faith and in compliance with the Bankruptcy Code. In accordance with Section 1125(e) of the Bankruptcy Code, a debtor or any of its agents that participate, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security, offered or sold under the plan of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such participation, for violation of any applicable law, rule, or regulation governing the offer, issuance, sale or purchase of securities.

4(a)(2) Eligible Holders should note the following times relating to the 4(a)(2) Rights Offering:

| Date | Calendar Date | Event |
|---|---|---|
| Record Date ………………. | [●], 2017 | The date fixed by the Company for the determination of the holders eligible to participate in the 4(a)(2) Rights Offering. |
| Subscription Commencement Date …… | [●], 2017 | Commencement of the 4(a)(2) Rights Offering. |
| Subscription Expiration Deadline ………………… | [● p.m.] [New York City time] on [●], 2017[2] | The deadline for 4(a)(2) Eligible Holders to subscribe for 4(a)(2) Rights Offering Securities. A 4(a)(2) Eligible Holder's applicable 4(a)(2) Beneficial Holder Subscription Form(s) (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable, and Requisite Documentation (as defined below)) must be received by the 4(a)(2) Eligible Holder's Nominee (as defined below) in sufficient time to allow such Nominee to deliver the Master 4(a)(2) Subscription Form to the Rights Offering Subscription Agent by the Subscription Expiration Deadline._____4(a)(2) Eligible Holders who are not Commitment Parties must deliver the aggregate Purchase Price (as defined below) by the Subscription Expiration Deadline._____4(a)(2) Eligible Holders who are Commitment Parties must deliver the aggregate Purchase Price no later than the deadline specified in the Funding Notice (as defined below) in accordance with the terms of the Backstop Commitment Agreement (the "GulfMark Backstop Agreement"). |

---

[2] 15 BDs after the Subscription Commencement Date.

To 4(a)(2) Eligible Holders and Nominees of 4(a)(2) Eligible Holders:

On [●], 2017, the Debtor filed the Plan with the United States Bankruptcy Court for the District of Delaware, and the [*Disclosure Statement for the Chapter 11 Plan of Reorganization of GulfMark Offshore, Inc. (*as may be amended from time to time in accordance with its terms, the "Disclosure Statement")]. Pursuant to the Plan, each holder of an allowed Unsecured Notes Claim as of the Record Date that is an "accredited investor" (as defined in Rule 501(a) promulgated under Regulation D under the Securities Act) (an "Accredited Investor") and that is acquiring the 4(a)(2) Rights Offering Securities for its own account (a "4(a)(2) Eligible Holder") has a right to participate in the 4(a)(2) Rights Offering in accordance with the terms and conditions of these 4(a)(2) Rights Offering Procedures. Only holders of allowed Unsecured Notes Claims that timely and validly complete and return the Accredited Investor Questionnaire included as Exhibit A to the 4(a)(2) Beneficial Holder Subscription Form may participate in the 4(a)(2) Rights Offering of the 4(a)(2) Rights Offering Securities.

Pursuant to the Plan, each 4(a)(2) Eligible Holder that has timely and validly completed and returned the Accredited Investor Questionnaire to its Nominee in advance of the Subscription Expiration Deadline is entitled to rights to subscribe for its *pro rata* portion of the 4(a)(2) Rights Offering of those certain shares of Class A common stock issued by the reorganized Company (the "4(a)(2) Rights Offering Shares"), or to ensure compliance with the Jones Act (as discussed below and in the Disclosure Statement), warrants in lieu of such 4(a)(2) Rights Offering Shares (the "4(a)(2) Rights Offering Warrants," together with the 4(a)(2) Rights Offering Shares, the "4(a)(2) Rights Offering Securities"), in an aggregate amount of $[●], provided that it timely and properly executes and delivers its applicable 4(a)(2) Beneficial Holder Subscription Form(s) (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable, and Requisite Documentation) to its Nominee in advance of the Subscription Expiration Deadline. Each such Nominee will receive a Master 4(a)(2) Subscription Form which it shall use to summarize the 4(a)(2) Subscription Rights exercised by each 4(a)(2) Eligible Holder that timely returns the applicable properly filled out 4(a)(2) Beneficial Holder Subscription Form(s) to such Nominee. 4(a)(2) Beneficial Holder Subscription Forms should not be returned directly to the Rights Offering Subscription Agent because no beneficial holders hold their Unsecured Notes Claim directly on the books of the indenture trustee.

Please note that all 4(a)(2) Beneficial Holder Subscription Forms (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable, Requisite Documentation and Accredited Investor Questionnaire) must be returned to the applicable Nominee in sufficient time to allow such Nominee to process and deliver the Master 4(a)(2) Subscription Form and copies of all 4(a)(2) Beneficial Holder Subscription Forms, and the accompanying IRS Forms, Requisite Documentation and Accredited Investor Questionnaires prior to the Subscription Expiration Deadline. To the extent of any discrepancy between the Master 4(a)(2) Subscription Form and the 4(a)(2) Beneficial Holder Subscription Form(s) regarding the 4(a)(2) Eligible Holder's principal amount, the Master 4(a)(2) Subscription Form shall govern. While the amount of time necessary for a Nominee to process and deliver the Master 4(a)(2) Subscription Form to the Rights Offering Subscription Agent will vary from Nominee to Nominee, 4(a)(2) Eligible Holders are urged to consult with their Nominees to determine the necessary deadline to return their 4(a)(2) Beneficial Holder Subscription Forms. Failure to submit such 4(a)(2)

Beneficial Holder Subscription Forms on a timely basis will result in forfeiture of a 4(a)(2) Eligible Holder's rights to participate in the 4(a)(2) Rights Offering. None of the Company, the Rights Offering Subscription Agent or any of the Commitment Parties will have any liability for any such failure.

No 4(a)(2) Eligible Holder shall be entitled to participate in the 4(a)(2) Rights Offering unless the aggregate Purchase Price (as defined below) for the 4(a)(2) Rights Offering Securities it subscribes for is received by the Rights Offering Subscription Agent (i) in the case of a 4(a)(2) Eligible Holder that is not a Commitment Party, by the Subscription Expiration Deadline, and (ii) in the case of a 4(a)(2) Eligible Holder that is a Commitment Party, no later than the deadline specified in a written notice (a "Funding Notice") delivered by or on behalf of the Debtor to the Commitment Parties in accordance with Section 2.4 of the GulfMark Backstop Agreement (the "Backstop Funding Deadline"), provided that the Commitment Parties may deposit their aggregate Purchase Price in the Subscription Account (as defined below), in accordance with the terms of the GulfMark Backstop Agreement. No interest is payable on any advanced funding of the Purchase Price. If the 4(a)(2) Rights Offering is terminated for any reason, the aggregate Purchase Price previously received by the Rights Offering Subscription Agent will be returned to 4(a)(2) Eligible Holders as provided in Section 6 hereof. No interest will be paid on any returned Purchase Price. Any 4(a)(2) Eligible Holder who is not a Commitment Party submitting payment via its Nominee must coordinate such payment with its Nominee in sufficient time to allow the Nominee to forward such payment to the Rights Offering Subscription Agent by the Subscription Expiration Deadline.

*Jones Act Limitations*

Certain of the Debtor's operations are conducted in the U.S. coastwise trade and are governed by the U.S. citizenship and cabotage laws principally contained in 46 U.S.C. § 50501(a), (b) and (d) and 46 U.S.C. Chapters 121 and 551 and known collectively as the "Jones Act" and any successor statutes thereto, together with the rules and regulations promulgated thereunder by the U.S. Coast Guard and the U.S. Maritime Administration and their practices enforcing, administering, and interpreting such laws, statutes, rules, and regulations, in each case as amended or supplemented from time to time. The Jones Act restricts waterborne transportation of goods and passengers between points in the United States to vessels owned and controlled by "citizens of the United States" within the meaning of the Jones Act (such a person, a "U.S. Citizen"). The Debtor could lose its privilege of owning and operating vessels in the Jones Act trade if non-U.S. Citizens were to own or control, in the aggregate, more than 25% of any class or series of the equity interests in the Company. Furthermore, to comply with the Jones Act, the Company's Certificate of Incorporation will provide that non-U.S. Citizens in the aggregate may not own more than 24% of the Common Shares to be issued and outstanding as of the Effective Date. Therefore, in order to ensure that at least 76% of the Company's equity interests will be owned by U.S. Citizens, the allocation of 4(a)(2) Rights Offering Shares and 4(a)(2) Rights Offering Warrants will be determined by the priority order set forth in the Plan such that 4(a)(2) Rights Offering Warrants will be issued in lieu of 4(a)(2) Rights Offering Shares to non-U.S. Citizens to ensure compliance with the Jones Act.

In all cases, an Eligible Holder (or its Nominee) that provides an Affidavit of United States Citizenship (the "Affidavit of Citizenship") in the form provided with these 4(a)(2) Rights Offering Procedures and any other documentation as the Company deems advisable to fulfill the purpose or implement the provisions of its Certificate of Incorporation in order to maintain compliance with the Jones Act (the "Requisite Documentation") and that is determined by the Company in its reasonable discretion to be a U.S. Citizen shall receive 4(a)(2) Rights Offering Shares as set forth in the Disclosure Statement and the Plan; provided, that the Company may in its reasonable discretion, in consultation with the Requisite Commitment Parties, request a bring-down confirmation of an Affidavit of Citizenship from an Eligible Holder whose original Affidavit of Citizenship was not executed within the thirty (30) calendar days immediately preceding the request. The maximum aggregate percentage of 4(a)(2) Rights Offering Shares that will be issued to non-U.S. Citizens, and any Persons that fail to deliver the Requisite Documentation, pursuant to the allocation set forth in the Plan shall be 24%.

**In order to participate in the 4(a)(2) Rights Offering, a 4(a)(2) Eligible Holder (or its Nominee) must complete all of the steps outlined below. If all of the steps outlined below are not completed by the Subscription Expiration Deadline or the Backstop Funding Deadline, as applicable, a 4(a)(2) Eligible Holder shall be deemed to have forever and irrevocably relinquished and waived its right to participate in the 4(a)(2) Rights Offering.**

### 1.    4(a)(2) Rights Offering

4(a)(2) Eligible Holders have the right, but not the obligation, to participate in the 4(a)(2) Rights Offering. 4(a)(2) Eligible Holders shall receive rights to subscribe for their *pro rata* portion of the 4(a)(2) Rights Offering Securities.

Subject to the terms and conditions set forth in the Plan and these 4(a)(2) Rights Offering Procedures, each 4(a)(2) Eligible Holder is entitled to subscribe for up to [●] 4(a)(2) Rights Offering Shares per $1,000 of Principal Amount of the 6.375% Unsecured Notes due 2022. To ensure that the Company remains a U.S. Citizen in compliance with the Jones Act, as discussed above, 4(a)(2) Rights Offering Warrants may be issued in lieu of 4(a)(2) Rights Offering Shares, based on the priority order set forth in the Plan. Subscriptions will be made at a purchase price of $[●] per 4(a)(2) Rights Offering Share (the "4(a)(2) Rights Offering Common Share Purchase Price") and a purchase price of $[●] per 4(a)(2) Rights Offering Warrant (the "4(a)(2) Rights Offering Warrant Purchase Price," and together with the 4(a)(2) Rights Offering Common Share Purchase Price, the "Purchase Price"). Only holders of allowed Unsecured Notes Claims that are 4(a)(2) Eligible Holders that complete the Accredited Investor Questionnaire included as Exhibit A to the 4(a)(2) Beneficial Holder Subscription Form(s) may participate in the 4(a)(2) Rights Offering.

There will be no over-subscription privilege in the 4(a)(2) Rights Offering. Any 4(a)(2) Rights Offering Shares that are unsubscribed by the 4(a)(2) Eligible Holders entitled thereto will not be offered to other 4(a)(2) Eligible Holders but will be purchased by the applicable Commitment Parties in accordance with the GulfMark Backstop Agreement. Subject to the terms and conditions of the GulfMark Backstop Agreement, each Commitment Party is obligated to purchase its *pro rata* portion of the Unsubscribed Securities.

**SUBJECT TO THE TERMS AND CONDITIONS OF THE 4(a)(2) RIGHTS OFFERING PROCEDURES AND THE GULFMARK BACKSTOP AGREEMENT IN THE CASE OF ANY COMMITMENT PARTY, ALL SUBSCRIPTIONS SET FORTH IN THE 4(a)(2) BENEFICIAL HOLDER SUBSCRIPTION FORM(S) ARE IRREVOCABLE.**

2. **Subscription Period**

The 4(a)(2) Rights Offering will commence on the Subscription Commencement Date and will expire at the Subscription Expiration Deadline. Each 4(a)(2) Eligible Holder intending to purchase 4(a)(2) Rights Offering Securities in the 4(a)(2) Rights Offering must affirmatively elect to exercise its 4(a)(2) Subscription Rights in the manner set forth in the Subscription Form by the Subscription Expiration Deadline.

Any exercise of 4(a)(2) Subscription Rights by a 4(a)(2) Eligible Holder after the Subscription Expiration Deadline will not be allowed and any purported exercise received by the Rights Offering Subscription Agent after the Subscription Expiration Deadline, regardless of when the documents or payment relating to such exercise were sent, will not be honored, except that the Company shall have the discretion, with the consent of the Requisite Commitment Parties, to allow any exercise of 4(a)(2) Subscription Rights after the Subscription Expiration Deadline.

The Subscription Expiration Deadline may be extended with the consent of the Requisite Commitment Parties, or as required by law.

3. **Delivery of Subscription Documents**

Each 4(a)(2) Eligible Holder may exercise all or any portion of such 4(a)(2) Eligible Holder's 4(a)(2) Subscription Rights, but subject to the terms and conditions contained herein. In order to facilitate the exercise of the 4(a)(2) Subscription Rights, beginning on the Subscription Commencement Date, the 4(a)(2) Subscription Form and these 4(a)(2) Rights Offering Procedures will be sent to the Nominees of each 4(a)(2) Eligible Holder, with instructions for such Nominees to forward the 4(a)(2) Subscription Form and these 4(a)(2) Rights Offering Procedures to the 4(a)(2) Eligible Holder, together with appropriate instructions for the proper completion, due execution and timely delivery of the executed 4(a)(2) Subscription Form and the payment of the applicable aggregate Purchase Price for its 4(a)(2) Rights Offering Securities.

4. **Exercise of 4(a)(2) Subscription Rights**

(a) In order to validly exercise its 4(a)(2) Subscription Rights, each 4(a)(2) Eligible Holder that is not a Commitment Party must:

i. return duly completed and executed 4(a)(2) Beneficial Holder Subscription Form(s) (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable, Requisite Documentation and Accredited Investor Questionnaire) to its Nominee so that such documents may be transmitted to the Rights Offering Subscription Agent by the Nominee, so that such documents are actually received by the Rights Offering

Subscription Agent by the Subscription Expiration Deadline; and

ii.   at the same time it returns its 4(a)(2) Beneficial Holder Subscription Form(s) to its Nominee, but in no event later than the Subscription Expiration Deadline, pay, or arrange for the payment by its Nominee of, the applicable Purchase Price to the Rights Offering Subscription Agent by wire transfer **ONLY** of immediately available funds in accordance with the instructions included in the 4(a)(2) Beneficial Holder Subscription Form(s).

(b)   In order to validly exercise its 4(a)(2) Subscription Rights, each 4(a)(2) Eligible Holder that is a Commitment Party must:

i.   return duly completed and executed applicable 4(a)(2) Beneficial Holder Subscription Form(s) (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable, and Requisite Documentation) to its Nominee so that such documents may be transmitted to the Rights Offering Subscription Agent by the Nominee, so that such documents are actually received by the Rights Offering Subscription Agent by the Subscription Expiration Deadline; and

ii.   no later than the Backstop Funding Deadline, pay the applicable Purchase Price to the account established and maintained by a third party satisfactory to the Commitment Parties, which account may be an escrow account pursuant to Section 2.4(b) of the GulfMark Backstop Agreement (the "Subscription Account"), by wire transfer **ONLY** of immediately available funds in accordance with the wire instructions included in the Funding Notice.

**ALL COMMITMENT PARTIES MUST PAY THEIR APPLICABLE PURCHASE PRICE DIRECTLY TO THE SUBSCRIPTION ACCOUNT AND SHOULD NOT PAY THEIR NOMINEE(S).**

(c)   With respect to 4(a) and (b) above, each 4(a)(2) Eligible Holder must duly complete, execute and return the applicable 4(a)(2) Beneficial Holder Subscription Form(s) in accordance with the instructions herein to its Nominee in sufficient time to allow its Nominee to process its instructions and deliver to the Rights Offering Subscription Agent the Master 4(a)(2) Subscription Form, its completed 4(a)(2) Beneficial Holder Subscription Form(s) (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable, Requisite Documentation and Accredited Investor Questionnaires), and, solely with respect to the 4(a)(2) Eligible Holders that are not Commitment Parties, payment of the applicable Purchase Price, payable for the 4(a)(2) Rights Offering Securities elected to be purchased by such 4(a)(2) Eligible Holder, by the Subscription Expiration Deadline. 4(a)(2) Eligible Holders that are Commitment Parties must deliver their payment of the applicable Purchase Price payable for the 4(a)(2) Rights Offering Securities elected to be purchased by such Commitment Party directly to the Subscription Account no later than the Backstop Funding Deadline.

(d)   In the event that the funds received by the Rights Offering Subscription Agent or

8

the Subscription Account, as applicable, from any 4(a)(2) Eligible Holder do not correspond to the Purchase Price payable for the 4(a)(2) Rights Offering Securities elected to be purchased by such 4(a)(2) Eligible Holder, the number of the 4(a)(2) Rights Offering Securities deemed to be purchased by such 4(a)(2) Eligible Holder will be the lesser of (a) the number of the 4(a)(2) Rights Offering Securities elected to be purchased by such 4(a)(2) Eligible Holder and (b) a number of the 4(a)(2) Rights Offering Securities determined by dividing the amount of the funds received by the Purchase Price, in each case up to such 4(a)(2) Eligible Holder's *pro rata* portion of 4(a)(2) Rights Offering Securities. If, as a result of an allocation of 4(a)(2) Rights Offering Warrants in lieu of 4(a)(2) Rights Offering Shares, the funds received from any 4(a)(2) Eligible Holder are greater than the Purchase Price payable for the 4(a)(2) Rights Offering Securities to be purchased by such 4(a)(2) Eligible Holder because of a pricing differential between the 4(a)(2) Rights Offering Shares and 4(a)(2) Rights Offering Warrants, then the excess funds will be repaid to such 4(a)(2) Eligible Holder, provided that such excess funds are greater than $100 after accounting for all applicable transaction costs.

(e)   The cash paid to the Rights Offering Subscription Agent in accordance with these 4(a)(2) Rights Offering Procedures will be deposited and held by the Rights Offering Subscription Agent in a segregated account until released to the Debtor in connection with the settlement of the 4(a)(2) Rights Offering on the Effective Date. The Rights Offering Subscription Agent may not use such cash for any other purpose prior to the Effective Date and may not encumber or permit such cash to be encumbered with any lien or similar encumbrance. The cash held by the Rights Offering Subscription Agent hereunder shall not be deemed part of the Debtor's bankruptcy estates.

## 5.   Transfer Restriction; Revocation

The 4(a)(2) Subscription Rights are not detachable from the Notes or the allowed Unsecured Notes Claim(s) and may not be sold, transferred, assigned, pledged, hypothecated, participated, donated or otherwise encumbered or disposed of, directly or indirectly (including through derivatives, options, swaps, forward sales or other transactions in which any person receives the right to own or acquire any current or future interest in the 4(a)(2) Subscription Rights, the 4(a)(2) Rights Offering Shares or the 4(a)(2) Rights Offering Warrants) (each of the above, a "Transfer"). If the Notes or any portion of allowed Unsecured Notes Claim(s) is or has been Transferred after the Record Date by an 4(a)(2) Eligible Holder, the corresponding 4(a)(2) Subscription Rights will be cancelled automatically, and neither such 4(a)(2) Eligible Holder nor the transferee of such allowed Unsecured Notes Claim(s) will receive any 4(a)(2) Rights Offering Securities in connection with such transferred Notes or allowed Unsecured Notes Claim(s).

Once a 4(a)(2) Eligible Holder has properly exercised its 4(a)(2) Subscription Rights, subject to the terms and conditions contained in these 4(a)(2) Rights Offering Procedures and the GulfMark Backstop Agreement in the case of any Commitment Party, such exercise will be

irrevocable.

### 6.    Termination/Return of Payment

Unless the Effective Date has occurred, the 4(a)(2) Rights Offering will be deemed automatically terminated without any action of any party upon the earlier of (i) termination of the Plan or rejection of the Plan by all classes entitled to vote, (ii) termination of the Restructuring Support Agreement in accordance with its terms, (iii) termination of the GulfMark Backstop Agreement in accordance with its terms and (iv) the Outside Date (as defined in the GulfMark Backstop Agreement) (as such date may be extended pursuant to the terms of the GulfMark Backstop Agreement). In the event the 4(a)(2) Rights Offering is terminated, any payments received pursuant to these 4(a)(2) Rights Offering Procedures will be returned, without interest, to the applicable 4(a)(2) Eligible Holder as soon as reasonably practicable, but in any event, within six (6) Business Days after the date of termination.

### 7.    Settlement of the 4(a)(2) Rights Offering and Distribution of the 4(a)(2) Rights Offering Securities

The settlement of the 4(a)(2) Rights Offering is conditioned on confirmation of the Plan by the Bankruptcy Court, compliance by the Debtor with these 4(a)(2) Rights Offering Procedures, and the simultaneous occurrence of the Effective Date. The Debtor intends that the 4(a)(2) Rights Offering Securities will be issued to the 4(a)(2) Eligible Holders and/or to any party that a 4(a)(2) Eligible Holder so designates in the 4(a)(2) Beneficial Holder Subscription Form(s), in book-entry form, and that DTC, or its nominee, will be the holder of record of such 4(a)(2) Rights Offering Securities. To the extent DTC is unwilling or unable to make the 4(a)(2) Rights Offering Securities eligible on the DTC system, the 4(a)(2) Rights Offering Securities will be issued directly to the 4(a)(2) Eligible Holder or its designee. For the avoidance of doubt, any such 4(a)(2) Eligible Holder, and not a designee, shall remain responsible for the exercise and payment of its 4(a)(2) Subscription Rights.

### 8.    Fractional Shares

No fractional rights or 4(a)(2) Rights Offering Securities will be issued in the 4(a)(2) Rights Offering. All share allocations (including each 4(a)(2) Eligible Holder's 4(a)(2) Rights Offering Securities) will be calculated and rounded down to the nearest whole share.

### 9.    Validity of Exercise of 4(a)(2) Subscription Rights and Delivery of 4(a)(2) Rights Offering Materials

All questions concerning the timeliness, viability, form and eligibility of any exercise of 4(a)(2) Subscription Rights will be determined in good faith by the Debtor in consultation with the Requisite Commitment Parties, and, if necessary, subject to a final and binding determination by the Bankruptcy Court. The Debtor, with the consent of the Requisite Commitment Parties, may waive or reject any defect or irregularity in, or permit such defect or irregularity to be corrected within such time as they may determine in good faith, the purported exercise of any 4(a)(2) Subscription Rights. Subscription Forms will be deemed not to have been received or

accepted until all irregularities have been waived or cured within such time as the Debtor determines in good faith with the consent of the Requisite Commitment Parties.

*Before exercising any 4(a)(2) Subscription Rights, 4(a)(2) Eligible Holders should read the Disclosure Statement and the Plan for information relating to the Debtor and the risk factors to be considered.*

All calculations, including, to the extent applicable, the calculation of (a)(i) the value of any 4(a)(2) Eligible Holder's allowed Unsecured Notes Claims for the purposes of the 4(a)(2) Rights Offering and (ii) any 4(a)(2) Eligible Holder's 4(a)(2) Rights Offering Securities, shall be made in good faith by the Company with the consent of the Requisite Commitment Parties and in each case in accordance with any Claim amounts included in the Plan, and any disputes regarding such calculations shall be subject to a final and binding determination by the Bankruptcy Court.

Delivery by the Rights Offering Subscription Agent of the 4(a)(2) Subscription Form and these 4(a)(2) Rights Offering Procedures to the Nominees reflected on the securities position report provided by DTC as of the Record Date (with instructions to forward such documents to the Nominees' 4(a)(2) Eligible Holder clients) shall constitute valid and sufficient delivery of such documents, and satisfy the obligations of the Rights Offering Subscription Agent with respect thereto. Nominees may utilize an agent to distribute the 4(a)(2) Subscription Form and these 4(a)(2) Rights Offering Procedures to their client 4(a)(2) Eligible Holders and seek reasonable reimbursement of the costs associated therewith by submitting a timely invoice to the Rights Offering Subscription Agent.

## 10.    Modification of Procedures

With the prior written consent of the Requisite Commitment Parties, the Debtor reserves the right to modify these 4(a)(2) Rights Offering Procedures, or adopt additional procedures consistent with these 4(a)(2) Rights Offering Procedures to effectuate the 4(a)(2) Rights Offering and to issue the 4(a)(2) Rights Offering Securities, provided, however, that the Debtor shall provide prompt written notice to each 4(a)(2) Eligible Holder of any material modification to these 4(a)(2) Rights Offering Procedures made after the Subscription Commencement Date, provided further that any amendments or modifications to the terms of the 4(a)(2) Rights Offerings are subject to the provisions of Section 10.7 of the GulfMark Backstop Agreement. In so doing, and subject to the consent of the Requisite Commitment Parties, the Debtor may execute and enter into agreements and take further action that the Debtor determines in good faith is necessary and appropriate to effectuate and implement the 4(a)(2) Rights Offering and the issuance of the 4(a)(2) Rights Offering Securities.

## 11.    Inquiries And Transmittal of Documents; Rights Offering Subscription Agent

The 4(a)(2) Rights Offering Instructions for 4(a)(2) Eligible Holders attached hereto should be carefully read and strictly followed by the 4(a)(2) Eligible Holders.

Questions relating to the 4(a)(2) Rights Offering should be directed to the Rights

Offering Subscription Agent via email to gulfmarksubscription@primeclerk.com (please reference "GulfMark 4(a)(2) Rights Offering" in the subject line) or at the following phone number: (844) 822-9230 (domestic) or (347) 338-6503 (international).

The risk of non-delivery of all documents and payments to the Rights Offering Subscription Agent, the Subscription Account and any Nominee is on the 4(a)(2) Eligible Holder electing to exercise its 4(a)(2) Subscription Rights and not the Debtor, the Rights Offering Subscription Agent, or the Commitment Parties.

# GULFMARK OFFSHORE, INC.

## 4(a)(2) RIGHTS OFFERING INSTRUCTIONS FOR 4(a)(2) ELIGIBLE HOLDERS

**Terms used and not defined herein shall have the meaning assigned to them in the Plan.**

**To elect to participate in the 4(a)(2) Rights Offering, you must follow the instructions set out below:**

1.  **Insert** the principal amount of the allowed Unsecured Notes Claims that you held as of the Record Date in Item 1 of your 4(a)(2) Beneficial Holder Subscription Form(s) (if you do not know such amount, please contact your Nominee immediately).

2.  **Complete** the calculation in Item 2a of your 4(a)(2) Beneficial Holder Subscription Form(s), which calculates the maximum number of 4(a)(2) Rights Offering Securities available for you to purchase. Such amount must be rounded down to the nearest whole share.

3.  **Complete** the calculation in Item 2b of your 4(a)(2) Beneficial Holder Subscription Form(s) to indicate the number of 4(a)(2) Rights Offering Securities that you elect to purchase and calculate the aggregate Purchase Price for the 4(a)(2) Rights Offering Securities that you elect to purchase.

4.  **Read and complete** the certification in Item 2c and Exhibit A of your 4(a)(2) Beneficial Holder Subscription Form(s) certifying that you are an Accredited Investor and you are acquiring the 4(a)(2) Rights Offering Securities for your own account.

5.  **Confirm** whether you are a Commitment Party pursuant to the representation in Item 3 of your 4(a)(2) Beneficial Holder Subscription Form(s). (*This section is only for Commitment Parties, each of whom is aware of their status as a Commitment Party*).

6.  **Read, complete and sign** the certification in Item 5 of your 4(a)(2) Beneficial Holder Subscription Form(s). Such execution shall indicate your acceptance and approval of the terms and conditions set forth in these 4(a)(2) Rights Offering Procedures.

7.  **Read, complete and sign** an IRS Form W-9 if you are a U.S. person. If you are a non-U.S. person, read, complete and sign an appropriate IRS Form W-8. These forms may be obtained from the IRS at its website: www.irs.gov.

8.  **Read, complete and sign**, if you are a U.S. Citizen, the attached Affidavit of Citizenship. If you do not return an Affidavit of Citizenship, you will be treated as a non-U.S. Citizen for all purposes relevant to the Company's compliance with the Jones Act.

9.  **Return** your signed 4(a)(2) Beneficial Holder Subscription Form(s) (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable, and Accredited Investor Questionnaire) and, if applicable, your Affidavit of Citizenship, to your Nominee in

13

sufficient time to allow your Nominee to process your instructions and prepare and deliver the Master 4(a)(2) Subscription Form to the Rights Offering Subscription Agent by the Subscription Expiration Deadline.

10.  **Arrange for full payment** of the aggregate Purchase Price by wire transfer of immediately available funds, calculated in accordance with Item 2b of your 4(a)(2) Beneficial Holder Subscription Form(s). For 4(a)(2) Eligible Holders that are not Commitment Parties, please instruct your Nominee to coordinate payment of the Purchase Price and transmit and deliver such payment to the Rights Offering Subscription Agent by the Subscription Expiration Deadline. The Nominee of a 4(a)(2) Eligible Holder that is not a Commitment Party should follow the payment instructions as provided in the Master 4(a)(2) Subscription Form. Any Commitment Party should follow the payment instructions that will be provided in the Funding Notice.

---

**The Subscription Expiration Deadline is [●] [p.m.] [New York City time] on [●], 2017.**

**Please note that the 4(a)(2) Beneficial Holder Subscription Form(s) (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable, and Accredited Investor Questionnaire) and, if applicable, your Affidavit of Citizenship, must be received by your broker, bank, commercial bank, transfer agent, trust company, dealer, or other agent or nominee (as applicable, the "<u>Nominee</u>") in sufficient time to allow such Nominee to process and deliver the Master 4(a)(2) Subscription Form to the Rights Offering Subscription Agent, by the Subscription Expiration Deadline, along with the appropriate funding (with respect to 4(a)(2) Eligible Holders that are not Commitment Parties) or the subscription represented by your applicable 4(a)(2) Beneficial Holder Subscription Form(s) will not be counted and you will be deemed forever to have relinquished and waived your right to participate in the 4(a)(2) Rights Offering.**

**4(a)(2) Eligible Holders that are Commitment Parties must deliver the appropriate funding directly to the Subscription Account pursuant to the Funding Notice no later than the Backstop Funding Deadline.**

---

EXHIBIT B – FORM OF JOINDER FOR RELATED PURCHASER

**Joinder to BACKSTOP COMMITMENT AGREEMENT**

JOINDER TO BACKSTOP COMMITMENT AGREEMENT (this "**Joinder**") dated as of [●], 20[●], by and among [_____] (the "**Transferor**") and [_____] (the "**Transferee**").

W I T N E S S E T H:

WHEREAS, GulfMark Offshore, Inc. (the "**Company**") and the Commitment Parties party thereto have heretofore executed and delivered a Backstop Commitment Agreement, dated as of [●], 2017 (as amended, supplemented restated or otherwise modified from time to time, the "**Agreement**");

WHEREAS, pursuant to Section 2.6(b) of the Agreement, each Commitment Party shall have the right to Transfer all or any portion of its Backstop Commitment to any creditworthy Affiliate or Related Fund (other than any Portfolio Company of such Commitment Party or its Affiliates), subject to the terms and conditions set forth in the Agreement;

WHEREAS, Transferor desires to sell to Transferee and Transferee desires to purchase from Transferor the percentage of its Backstop Commitment set forth beneath its signature in the signature page hereto (the "**Subject Transfer**");

NOW, THEREFORE, in consideration of the foregoing and for good and valuable consideration, the receipt of which his hereby acknowledged, the Transferor, the Transferee and the Company covenant and agree as follows:

1.      Defined Terms.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement. The "General Provisions" set forth in Article X of the Agreement shall be deemed to apply to this Joinder and is incorporated herein by reference, *mutatis mutandis*.

2.      Agreement to Transfer.   The Transferor hereby agrees to Transfer to the Transferee, pursuant and subject to the terms and conditions set forth in the Agreement and the BCA Assumption Order, the Backstop Commitment Percentage set forth beneath its signature in the signature page hereto (and Schedule 1 to the Agreement shall be deemed to have been revised in accordance with the Agreement).

3.      Agreement to be Bound.  The Transferee hereby agrees (a) to become a party to the Agreement as a Commitment Party and Party and as such will have all the rights and be subject to all of the obligations and agreements of a Commitment Party under the Agreement and (b) to purchase, pursuant and subject to the terms and conditions set forth in the Agreement and the BCA Assumption Order, such number of Unsubscribed Securities as corresponds to the Transferee's Backstop Commitment Percentage.  For the avoidance of doubt, the Transferee's Backstop Commitment Percentage as of the date hereof is set forth on the signature page hereto (and Schedule 1 to the Agreement shall be deemed to have been revised in accordance with the Agreement); provided, however, that such Transferee's Backstop Commitment Percentage may

be increased or decreased after the date hereof as provided in the Agreement and the BCA Assumption Order.

4. <u>Representations and Warranties of the Transferor</u>.   The Transferor hereby represents and warrants that (a) the Transferee is an Affiliate or a Related Fund of the Transferor; (b) the Transferee is not a Portfolio Company of the Transferor or the Transferor's Affiliates; (c) the Subject Transfer does not violate any of the provisions contained in Section 2.6(e) of the Agreement; and (d) the Transferee is creditworthy.

5. <u>Representations and Warranties of the Transferee</u>.  The Transferee hereby makes, to each of the other Parties, as to itself only and (unless otherwise set forth therein) as of the date hereof and as of the Closing Date, the representations and warranties set forth in <u>Article V</u> of the Agreement; <u>provided</u>, <u>however</u>, for purposes of <u>Sections 5.7(a)</u> and <u>5.7(b)</u> of the Agreement, the Transferee's aggregate principal amount of Unsecured Notes Claims as of the date hereof is as set forth on the signature page hereto.  The Transferee further agrees to provide the Requisite Documentation and any other information or documentation as Transferor or the Company may reasonably request to ensure the transfer is compliant with the Jones Act or other applicable law; <u>provided</u>, <u>however</u>, that a failure to deliver an affidavit of citizenship will result in treating such Commitment Party as a Non-U.S. Citizen, but shall not prevent such Commitment Party from receiving Common Shares (to the extent that there is capacity for Non-U.S. Citizens to receive Common Shares pursuant to Section 6.17 of the Agreement) or Jones Act Warrants.

6. <u>Acknowledgement of Restrictions on Transfers</u>.   The Transferee hereby acknowledges the restrictions on the Transfer of Subscription Rights, pursuant to Section 2.9 of the Agreement, and the Company's right pursuant to Sections 2.10 and 6.17 of the Agreement to reallocate Rights Offering Shares as Rights Offering Warrants in order to maintain Jones Act Compliance.

7. <u>Governing Law</u>.  This Joinder shall be governed by and construed in accordance with the laws of the State of New York without regard for any conflict of law principles that would apply the laws of any other jurisdiction, and, to the extent applicable, the Bankruptcy Code.

8. <u>Notice</u>.  All notices and other communications given or made to the Transferee in connection with the Agreement shall be made in accordance with <u>Section 10.1</u> of the Agreement, to the address set forth under the Transferee's signature in the signature pages hereto (and the Agreement shall be deemed to have been updated to include such notice information for the Transferee).

*[Signature pages follow]*

IN WITNESS WHEREOF, each of the undersigned parties has caused this Joinder to be executed as of the date first written above.

TRANSFEROR:
[                    ]

By: _____
    Name:
    Title:

    Address 1:

    Address 2:

    Attention:

    Facsimile:

    Backstop Commitment Percentage:

    Unsecured Notes Claims:


TRANSFEREE:
[                ]

By: _____
    Name:
    Title:

    Address 1:

    Address 2:

    Attention:

    Facsimile:

    Backstop Commitment Percentage:

    Unsecured Notes Claims:

Acknowledged and Agreed to:

GULFMARK OFFSHORE, INC.


By: _____
Name:
Title:

EXHIBIT C-1 – FORM OF JOINDER FOR EXISTING COMMITMENT PARTY PURCHASER

**JOINDER TO BACKSTOP COMMITMENT AGREEMENT**

JOINDER TO BACKSTOP COMMITMENT AGREEMENT (this "**Joinder**") dated as of [●], 20[●], by and among [_____] (the "**Transferor**") and [_____] (the "**Transferee**").

W̲ I̲ T̲ N̲ E̲ S̲ S̲ E̲ T̲ H̲:

WHEREAS, GulfMark Offshore, Inc. (the "**Company**") and the Commitment Parties party thereto have heretofore executed and delivered a Backstop Commitment Agreement, dated as of [●], 2017 (as amended, supplemented restated or otherwise modified from time to time, the "**Agreement**");

WHEREAS, pursuant to Section 2.6(c) of the Agreement, each Commitment Party shall have the right to Transfer all or any portion of its Backstop Commitment to any other Commitment Party or such other Commitment Party's Affiliate or Related Fund (other than any Portfolio Company of such other Commitment Party or its Affiliates), subject to the terms and conditions set forth in the Agreement;

WHEREAS, the Subject Transfer has been consented to be the Requisite Commitment Parties; and

WHEREAS, Transferor desires to sell to Transferee and Transferee desires to purchase from Transferor the percentage of its Backstop Commitment set forth beneath its signature in the signature page hereto (the "**Subject Transfer**");

NOW, THEREFORE, in consideration of the foregoing and for good and valuable consideration, the receipt of which his hereby acknowledged, the Transferor, the Transferee and the Company covenant and agree as follows:

1.      <u>Defined Terms</u>.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement. The "General Provisions" set forth in <u>Article X</u> of the Agreement shall be deemed to apply to this Joinder and is incorporated herein by reference, *mutatis mutandis*.

2.      <u>Agreement to Transfer</u>.   The Transferor hereby agrees to Transfer to the Transferee, pursuant and subject to the terms and conditions set forth in the Agreement and the BCA Assumption Order, the Backstop Commitment Percentage set forth beneath its signature in the signature page hereto (and Schedule 1 to the Agreement shall be deemed to have been revised in accordance with the Agreement).

3.      <u>Agreement to be Bound</u>.  The Transferee hereby agrees (a) to become a party to the Agreement as a Commitment Party and Party and as such will have all the rights and be subject to all of the obligations and agreements of a Commitment Party under the Agreement and (b) to purchase, pursuant and subject to the terms and conditions set forth in the Agreement and

the BCA Assumption Order, such number of Unsubscribed Securities as corresponds to the Transferee's Backstop Commitment Percentage.  For the avoidance of doubt, the Transferee's Backstop Commitment Percentage as of the date hereof is set forth on the signature page hereto (and Schedule 1 to the Agreement shall be deemed to have been revised in accordance with the Agreement); provided, however, that such Transferee's Backstop Commitment Percentage may be increased or decreased after the date hereof as provided in the Agreement and the BCA Assumption Order.

4.      Release of Obligations of Transferor.   Upon consummation of the Subject Transfer, the Transferor shall be deemed to relinquish its rights (and be released from its obligations, except for any claim for breach of the Agreement that occurs prior to consummation of the Subject Transfer) under the Agreement to the extent of the Backstop Commitment Transferred in the Subject Transfer.

5.      Representations and Warranties of the Transferor.   The Transferor hereby represents and warrants that (a) the Subject Transfer has been approved by the Requisite Commitment Parties; (b) the Transferee is not a Portfolio Company of the Transferor or the Transferor's Affiliates; and (c) the Subject Transfer does not violate any of the provisions contained in Section 2.6(e) of the Agreement.

6.      Representations and Warranties of the Transferee.  The Transferee hereby makes, to each of the other Parties, as to itself only and (unless otherwise set forth therein) as of the date hereof and as of the Closing Date, the representations and warranties set forth in Article V of the Agreement; provided, however, for purposes of Sections 5.7(a) and 5.7(b) of the Agreement, the Transferee's aggregate principal amount of Unsecured Notes Claims as of the date hereof is as set forth on the signature page hereto.  The Transferee further agrees to provide the Requisite Documentation and any other information or documentation as Transferor or the Company may reasonably request to ensure the transfer is compliant with the Jones Act or other applicable law.

7.      Acknowledgement of Restrictions on Transfers.   The Transferee hereby acknowledges the restrictions on the Transfer of Subscription Rights, pursuant to Section 2.9 of the Agreement, and the Company's right pursuant to Sections 2.10 and 6.17 of the Agreement to reallocate Rights Offering Shares as Rights Offering Warrants in order to maintain Jones Act Compliance.

8.      Governing Law.  This Joinder shall be governed by and construed in accordance with the laws of the State of New York without regard for any conflict of law principles that would apply the laws of any other jurisdiction, and, to the extent applicable, the Bankruptcy Code.

9.      Notice.  All notices and other communications given or made to the Transferee in connection with the Agreement shall be made in accordance with Section 10.1 of the Agreement, to the address set forth under the Transferee's signature in the signature pages hereto (and the Agreement shall be deemed to have been updated to include such notice information for the Transferee).

*[Signature pages follow]*

IN WITNESS WHEREOF, each of the undersigned parties has caused this Joinder to be executed as of the date first written above.

TRANSFEROR:
[                    ]

By: _____
    Name:
    Title:

    Address 1:

    Address 2:

    Attention:

    Facsimile:

    Backstop Commitment Percentage:

    Unsecured Notes Claims:


TRANSFEREE:
[                    ]

By: _____
    Name:
    Title:

    Address 1:

    Address 2:

    Attention:

    Facsimile:

    Backstop Commitment Percentage:

    Unsecured Notes Claims:

Acknowledged and Agreed to:

GULFMARK OFFSHORE, INC.


By: _____
Name:
Title:

EXHIBIT C-2 – FORM OF AMENDMENT FOR EXISTING COMMITMENT PARTY PURCHASER

**AMENDMENT TO BACKSTOP COMMITMENT AGREEMENT**

AMENDMENT TO BACKSTOP COMMITMENT AGREEMENT (this "**Amendment**") dated as of [●], 20[●], by and among [_____] (the "**Transferor**") and [_____] (the "**Transferee**").

W̲ I̲ T̲ N̲ E̲ S̲ S̲ E̲ T̲ H̲:

WHEREAS, GulfMark Offshore, Inc. (the "**Company**") and the Commitment Parties party thereto have heretofore executed and delivered a Backstop Commitment Agreement, dated as of [●], 2017 (as amended, supplemented restated or otherwise modified from time to time, the "**Agreement**");

WHEREAS, pursuant to Section 2.6(c) of the Agreement, each Commitment Party shall have the right to Transfer all or any portion of its Backstop Commitment to any other Commitment Party or such other Commitment Party's Affiliate or Related Fund (other than any Portfolio Company of such other Commitment Party or its Affiliates), subject to the terms and conditions set forth in the Agreement;

WHEREAS, the Subject Transfer has been consented to be the Requisite Commitment Parties; and

WHEREAS, Transferor desires to sell to Transferee and Transferee desires to purchase from Transferor the percentage of its Backstop Commitment set forth beneath its signature in the signature page hereto (the "**Subject Transfer**");

NOW, THEREFORE, in consideration of the foregoing and for good and valuable consideration, the receipt of which his hereby acknowledged, the Transferor, the Transferee and the Company covenant and agree as follows:

10.     Defined Terms.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement. The "General Provisions" set forth in Article X of the Agreement shall be deemed to apply to this Amendment and is incorporated herein by reference, *mutatis mutandis*.

11.     Agreement to Transfer.   The Transferor hereby agrees to Transfer to the Transferee, pursuant and subject to the terms and conditions set forth in the Agreement and the BCA Assumption Order, the Backstop Commitment Percentage set forth beneath its signature in the signature page hereto (and Schedule 1 to the Agreement shall be deemed to have been revised in accordance with the Agreement).

12.     Agreement to be Bound.  The Transferee hereby agrees to purchase, pursuant and subject to the terms and conditions set forth in the Agreement and the BCA Assumption Order, such number of Unsubscribed Securities as corresponds to the Transferee's Backstop Commitment Percentage.  For the avoidance of doubt, the Transferee's Backstop Commitment

Percentage as of the date hereof is set forth on the signature page hereto (and Schedule 1 to the Agreement shall be deemed to have been revised in accordance with the Agreement); provided, however, that such Transferee's Backstop Commitment Percentage may be increased or decreased after the date hereof as provided in the Agreement and the BCA Assumption Order.

13.    Release of Obligations of Transferor.    Upon consummation of the Subject Transfer, the Transferor shall be deemed to relinquish its rights (and be released from its obligations, except for any claim for breach of the Agreement that occurs prior to consummation of the Subject Transfer) under the Agreement to the extent of the Backstop Commitment Transferred in the Subject Transfer.

14.    Representations and Warranties of the Transferor.    The Transferor hereby represents and warrants that (a) the Subject Transfer has been approved by the Requisite Commitment Parties; (b) the Transferee is not a Portfolio Company of the Transferor or the Transferor's Affiliates; and (c) the Subject Transfer does not violate any of the provisions contained in Section 2.6(e) of the Agreement.

15.    Representations and Warranties of the Transferee.    The Transferee hereby makes, to each of the other Parties, as to itself only and (unless otherwise set forth therein) as of the date hereof and as of the Closing Date, the representations and warranties set forth in Article V of the Agreement; provided, however, for purposes of Sections 5.7(a) and 5.7(b) of the Agreement, the Transferee's aggregate principal amount of Unsecured Notes Claims as of the date hereof is as set forth on the signature page hereto.  The Transferee further agrees to provide the Requisite Documentation and any other information or documentation as Transferor or the Company may reasonably request to ensure the transfer is compliant with the Jones Act or other applicable law.

16.    Acknowledgement of Restrictions on Transfers.    The Transferee hereby acknowledges the restrictions on the Transfer of Subscription Rights, pursuant to Section 2.9 of the Agreement, and the Company's right pursuant to Sections 2.10 and 6.17 of the Agreement to reallocate Rights Offering Shares as Rights Offering Warrants in order to maintain Jones Act Compliance.

17.    Governing Law.    This Amendment shall be governed by and construed in accordance with the laws of the State of New York without regard for any conflict of law principles that would apply the laws of any other jurisdiction, and, to the extent applicable, the Bankruptcy Code.

18.    Notice.    All notices and other communications given or made to the Transferee in connection with the Agreement shall be made in accordance with Section 10.1 of the Agreement, to the address set forth under the Transferee's signature in the signature pages hereto (and the Agreement shall be deemed to have been updated to include such notice information for the Transferee).

*[Signature pages follow]*

IN WITNESS WHEREOF, each of the undersigned parties has caused this Amendment to be executed as of the date first written above.

TRANSFEROR:
[                    ]

By: _____
    Name:
    Title:

    Address 1:

    Address 2:

    Attention:

    Facsimile:

    Backstop Commitment Percentage:

    Unsecured Notes Claims:

TRANSFEREE:
[                ]

By: _____
    Name:
    Title:

    Address 1:

    Address 2:

    Attention:

    Facsimile:

    Backstop Commitment Percentage:

    Unsecured Notes Claims:

Acknowledged and Agreed to:

GULFMARK OFFSHORE, INC.


By: _____
Name:
Title:

EXHIBIT D – FORM OF JOINDER FOR NEW PURCHASER

**JOINDER TO BACKSTOP COMMITMENT AGREEMENT**

JOINDER TO BACKSTOP COMMITMENT AGREEMENT (this "**Joinder**") dated as of [●], 20[●], by and among [_____] (the "**Transferor**"), [_____] (the "**Transferee**") and GulfMark Offshore, Inc. (the "**Company**").

W̲ I̲ T̲ N̲ E̲ S̲ S̲ E̲ T̲ H̲:

WHEREAS, the Company and the Commitment Parties party thereto have heretofore executed and delivered a Backstop Commitment Agreement, dated as of [●], 2017 (as amended, supplemented, restated or otherwise modified from time to time, the "**Agreement**");

WHEREAS, pursuant to Section 2.6(d) of the Agreement, each Commitment Party shall have the right to Transfer all or any portion of its Backstop Commitment to any Person, subject to the terms and conditions set forth in the Agreement;

WHEREAS, Transferor desires to sell to Transferee and Transferee desires to purchase from Transferor the percentage of its Backstop Commitment set forth beneath its signature in the signature page hereto (the "**Subject Transfer**");

WHEREAS, the Subject Transfer has been consented to be the Requisite Commitment Parties; and

WHEREAS, [the Subject Transfer has been consented to by the Company]/[the Transferor has agreed to remain obligated to fund the portion of the Backstop Commitment to be Transferred in the Subject Transfer;]

NOW, THEREFORE, in consideration of the foregoing and for good and valuable consideration, the receipt of which is hereby acknowledged, the Transferor, the Transferee and the Company covenant and agree as follows:

19.     Defined Terms.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement. The "General Provisions" set forth in Article X of the Agreement shall be deemed to apply to this Joinder and is incorporated herein by reference, *mutatis mutandis*.

20.     Agreement to Transfer.   The Transferor hereby agrees to Transfer to the Transferee, pursuant and subject to the terms and conditions set forth in the Agreement and the BCA Assumption Order, the Backstop Commitment Percentage set forth beneath its signature in the signature page hereto (and Schedule 1 to the Agreement shall be deemed to have been revised in accordance with the Agreement).

21.     Agreement to be Bound.  The Transferee hereby agrees (a) to become a party to the Agreement as a Commitment Party and Party and as such will have all the rights and be subject to all of the obligations and agreements of a Commitment Party under the Agreement and (b) to purchase, pursuant and subject to the terms and conditions set forth in the Agreement and

the BCA Assumption Order, such number of Unsubscribed Securities as corresponds to the Transferee's Backstop Commitment Percentage. For the avoidance of doubt, the Transferee's Backstop Commitment Percentage as of the date hereof is set forth on the signature page hereto (and Schedule 1 to the Agreement shall be deemed to have been revised in accordance with the Agreement); provided, however, that such Transferee's Backstop Commitment Percentage may be increased or decreased after the date hereof as provided in the Agreement and the BCA Assumption Order.

22.    [Continuing Obligations of Transferor. Nothing in this Joinder shall be construed to relieve the Transferor from any of its obligations under the Agreement.]/[Release of Obligations of Transferor. Upon consummation of the Subject Transfer, the Transferor shall be deemed to relinquish its rights (and be released from its obligations, except for any claim for breach of the Agreement that occurs prior to consummation of the Subject Transfer) under the Agreement to the extent of the Backstop Commitment Transferred in the Subject Transfer.]

23.    Representations and Warranties of the Transferor. The Transferor hereby represents and warrants that (a) the Subject Transfer has been approved by the Requisite Commitment Parties; (b) [the Subject Transfer has been consented to by the Company]/[it has agreed to remain obligated to fund the Backstop Commitment to be Transferred in the Subject Transfer] and (c) the Subject Transfer does not violate any of the provisions contained in Section 2.6(e) of the Agreement.

24.    Representations and Warranties of the Transferee. The Transferee hereby makes, to each of the other Parties, as to itself only and (unless otherwise set forth therein) as of the date hereof and as of the Closing Date, the representations and warranties set forth in Article V of the Agreement; provided, however, for purposes of Sections 5.7(a) and 5.7(b) of the Agreement, the Transferee's aggregate principal amount of Unsecured Notes Claims as of the date hereof is as set forth on the signature page hereto. The Transferee further agrees to provide the Requisite Documentation and any other information or documentation as Transferor or the Company may reasonably request to ensure the transfer is compliant with the Jones Act or other applicable law.

25.    Acknowledgement of Restrictions on Transfers. The Transferee hereby acknowledges the restrictions on the Transfer of Subscription Rights, pursuant to Section 2.9 of the Agreement, and the Company's right pursuant to Sections 2.10 and 6.17 of the Agreement to reallocate Rights Offering Shares as Rights Offering Warrants in order to maintain Jones Act Compliance.

26.    Governing Law. This Joinder shall be governed by and construed in accordance with the laws of the State of New York without regard for any conflict of law principles that would apply the laws of any other jurisdiction, and, to the extent applicable, the Bankruptcy Code.

27.    Notice. All notices and other communications given or made to the Transferee in connection with the Agreement shall be made in accordance with Section 10.1 of the Agreement, to the address set forth under the Transferee's signature in the signature pages hereto (and the Agreement shall be deemed to have been updated to include such notice information for the Transferee).

IN WITNESS WHEREOF, each of the undersigned parties has caused this Joinder to be executed as of the date first written above.

TRANSFEROR:
[                    ]


By: _____
    Name:
    Title:

    Address 1:

    Address 2:

    Attention:

    Facsimile:

    Backstop Commitment Percentage:

    Unsecured Notes Claims:


TRANSFEREE:
[                    ]


By: _____
    Name:
    Title:

    Address 1:

    Address 2:

    Attention:

    Facsimile:

    Backstop Commitment Percentage:

    Unsecured Notes Claims:

ACKNOWLEDGED:

GULFMARK OFFSHORE, INC.


By: _____
Name:
Title:

EXHIBIT E

Form of Transfer Notice

[Date]


To:     GulfMark Offshore, Inc.
        842 West Sam Houston Parkway North, Suite 400
        Houston, Texas 77024
        Attention: James M. Mitchell

with a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Gary Holtzer
            Ted Waksman

with a copy to:

Milbank, Tweed, Hadley & McCloy LLP
Attn:  Evan Fleck
28 Liberty Street
New York, New York 10005


        Reference is made to the Backstop Commitment Agreement, dated as of [●], 2017, among GulfMark Offshore, Inc. (the "Company") and the Commitment Parties party thereto (the "Backstop Commitment Agreement"). Capitalized terms used but not defined herein shall have the meanings set forth in the Backstop Commitment Agreement.

        In accordance with Section 2.6(e) of the Backstop Commitment Agreement, [*name of Commitment Party*] (the "Transferor") hereby provides this Transfer Notice to the Company that the Transferor proposes to transfer [[   ] Rights Offering Shares] [[   ] Rights Offering Warrants] (the "Transferred Subscription Commitment") to [*name of Person*] [, who represents and warrants that they are an eligible Transferee] (the "Transferee").  The Transferee hereby agrees to (i) purchase the Transferred Subscription Commitment and (ii) be fully bound by, and subject to, the Backstop Commitment Agreement.  The Transferee further agrees to provide the Requisite Documentation and any other information or documentation as Transferor or the Company may reasonably request to ensure the transfer is compliant with the Jones Act or other applicable law. The Transferor and Transferee shall effect such transfer pursuant to a customary agreement for the transfer of claims, including customary representations and warranties regarding applicable securities laws and compliance with the Backstop Commitment Agreement.

Sincerely,


[TRANSFEROR]


By: _____
Name:
Title:


[TRANSFEREE]


By: _____
Name:
Title:

# EXHIBIT C

## *FORM OF JOINDER AGREEMENT FOR CONSENTING NOTEHOLDERS*

This Joinder Agreement to the Restructuring Support Agreement, dated as of [_____], 2017 (as amended, supplemented or otherwise modified from time to time, the "Agreement"), by and among GulfMark Offshore, Inc. (the "Company") and the holders of the principal amounts outstanding under the Notes (together with their respective successors and permitted assigns, the "Consenting Noteholders" and each, a "Consenting Noteholder") is executed and delivered by _____ (the "Joining Party") as of _____, 2017. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.       Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as Annex I (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be a "Consenting Noteholder" and a "Party" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

2.       Representations and Warranties.  With respect to the aggregate principal amount of Notes, in each case, set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Noteholders set forth in Section 9 of the Agreement to each other Party to the Agreement.

3.       Governing Law.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

*[Signature Pages Follows]*

2

IN WITNESS WHEREOF, the Joining Party has caused this Joinder Agreement to be executed as of the date first written above.

**[CONSENTING CREDITOR]**


By:_____
Name:
Title:



Principal Amount of the Notes:  $_____



**Acknowledged:**

**GULFMARK OFFSHORE, INC.**


By:_____
Name:
Title:

## ANNEX 1

### *Notice of Transfer to another Consenting Noteholder*

Pursuant to this notice of transfer under the Restructuring Support Agreement,[2] dated as of May 15, 2017 (as amended, supplemented or otherwise modified from time to time, the "Agreement"), by and among GulfMark Offshore, Inc. (the "Company") and certain holders of the principal amounts outstanding under the Notes (together with their respective successors and permitted assigns, the "Consenting Noteholders" and each, a "Consenting Noteholder"):

Transferor _____ has transferred Notes with a principal amount of $_____ to Consenting Noteholder _____ who is party to the Agreement.

IN WITNESS WHEREOF, the Transferor has caused this Agreement to be executed as of _____, 2017.

**[TRANSFEROR]**

By:_____
Name:
Title:

**[CONSENTING NOTEHOLDER]**
By:_____
Name:
Title:
Principal amount of notes: $_____

_____

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribe to such terms in the Restructuring Support Agreement.

#4849-4507-1688v5
WEIL:\96134743\11\51067.0003

**<u>Exhibit B</u>**

**The GulfMark Organizational Chart**



Legend

Debtor Entity

Legal Structure Chart*
GulfMark Offshore, Inc. & Affiliates

## Exhibit C

### The Company's Vessels

| Vessel | Owned By | Region of Operation | Location | Charterer/ Status | Vessel Class | Vessel Type | Collateral |
|--------|----------|---------------------|----------|-------------------|--------------|-------------|------------|
| Hercules | GulfMark Americas | Americas | United States | LLOG Exploration Company L.L.C. | MMC 887 300 | LgPSV | Multicurrency Facility |
| Regulus | GulfMark Americas | Americas | United States | Anadarko | Thoma-Sea 280 | LgPSV | Multicurrency Facility |
| Polaris | GulfMark Americas | Americas | United States | ExxonMobil | Thoma-Sea 280 | LgPSV | Multicurrency Facility |
| Thomas Wainwright | GulfMark Americas | Americas | United States | Cold Stacked | Thoma-Sea 250 | LgPSV | Multicurrency Facility |
| Bienville | GulfMark Americas | Americas | United States | Anadarko | GM8500 | LgPSV | Multicurrency Facility |
| Orleans | GulfMark Americas | Americas | United States | Walter Oil & Gas | GM8500 | LgPSV | Multicurrency Facility |
| Bourbon | GulfMark Americas | Americas | United States | Anadarko | GM8500 | LgPSV | Multicurrency Facility |
| Royal | GulfMark Americas | Americas | United States | Available | GM8500 | LgPSV | Multicurrency Facility |
| Iberville | GulfMark Americas | Americas | United States | Walter Oil & Gas | GM8500 | LgPSV | Multicurrency Facility |
| St Louis | GulfMark Americas | Americas | United States | Cold Stacked | GM8500 | LgPSV | Multicurrency Facility |
| Toulouse | GulfMark Americas | Americas | United States | Cold Stacked | GM8500 | LgPSV | Multicurrency Facility |
| Esplanade | GulfMark Americas | Americas | United States | Warm Stacked | GM8500 | LgPSV | Multicurrency Facility |
| Grand Slam | GulfMark Americas | Americas | United States | Cold Stacked | GM6000 | LgPSV | Multicurrency Facility |
| Slam Dunk | GulfMark Americas | Americas | United States | Cold Stacked | GM6000 | LgPSV | Multicurrency Facility |
| Touchdown | GulfMark Americas | Americas | United States | Cold Stacked | GM6000 | LgPSV | Multicurrency Facility |

| Vessel | Owned By | Region of Operation | Location | Charterer/ Status | Vessel Class | Vessel Type | Collateral |
|---|---|---|---|---|---|---|---|
| Jermaine Gibson | GulfMark Americas | Americas | United States | Cold Stacked | GM6000 | LgPSV | Multicurrency Facility |
| Homerun | GulfMark Americas | Americas | United States | Cold Stacked | GM6000 | LgPSV | Multicurrency Facility |
| Knock Out | GulfMark Americas | Americas | United States | Cold Stacked | GM6000 | LgPSV | Multicurrency Facility |
| Conti | GulfMark Americas | Americas | United States | Cold Stacked | GM5000 | LgPSV | Multicurrency Facility |
| First and Ten | GulfMark Americas | Americas | United States | Cold Stacked | GM4000 | PSV | Multicurrency Facility |
| Double Eagle | GulfMark Americas | Americas | United States | Cold Stacked | GM4000 | PSV | Multicurrency Facility |
| Triple Play | GulfMark Americas | Americas | United States | Cold Stacked | GM4000 | PSV | Multicurrency Facility |
| Hat Trick | GulfMark Americas | Americas | United States | Cold Stacked | GM4000 | PSV | Multicurrency Facility |
| Hammerhead | GulfMark Americas | Americas | United States | Cold Stacked | 181 FSV | FSV | Multicurrency Facility |
| North Barents | GulfMark Rederi | North Sea | Norway | BP Norge AS | ST-216 | LgPSV | Norwegian Facility |
| North Pomor | GulfMark Rederi | North Sea | Norway | StatoilHydro AS | ST-216 | LgPSV | Norwegian Facility |
| North Cruys | GulfMark Rederi | North Sea | United Kingdom | Taqa Bratani Limited | ST-216 | LgPSV | Norwegian Facility |
| North Purpose | GulfMark Rederi | North Sea | Norway | BP Norge AS | AKER 09 CD | LgPSV | Norwegian Facility |
| North Mariner | GulfMark Rederi | North Sea | Netherlands | Nexen Petroleum (UK) Ltd. | UT 745 | LgPSV | Unencumbered |
| North Stream | GulfMark Rederi | North Sea | Norway | Cold Stacked | UT 745 | LgPSV | Unencumbered |
| Highland Endurance | GulfMark UK | Americas | Trinidad and Tobago | EOG Resources Trinidad Limited | UT 722 L | LgAHTS | Unencumbered |
| Highland Prestige | GulfMark UK | North Sea | United Kingdom | Taqa Bratani Limited | AKER 09 | LgPSV | Unencumbered |
| Highland Duke | GulfMark UK | North Sea | United Kingdom | Cold Stacked | UT 755 L | LgPSV | Unencumbered |

2

| Vessel | Owned By | Region of Operation | Location | Charterer/ Status | Vessel Class | Vessel Type | Collateral |
|--------|----------|---------------------|----------|-------------------|--------------|-------------|------------|
| Highland Laird | GulfMark UK | North Sea | United Kingdom | Cold Stacked | UT 755 L | LgPSV | Unencumbered |
| Highland Eagle | GulfMark UK | North Sea | United Kingdom | ENI Liverpool Bay Operating Co Ltd. | UT 755 L | LgPSV | Unencumbered |
| Highland Citadel | GulfMark UK | North Sea | Netherlands | Peterson SBS Den Helder BV | UT 755 L | LgPSV | Unencumbered |
| Highland Monarch | GulfMark UK | North Sea | Netherlands | Peterson SBS Den Helder BV | UT 755 | LgPSV | Unencumbered |
| Highland Bugler | GulfMark UK | North Sea | United Kingdom | Cold Stacked | UT 755 | LgPSV | Unencumbered |
| Highland Challenger | GulfMark UK | North Sea | United Kingdom | Cold Stacked | UT 755 | LgPSV | Unencumbered |
| Highland Defender | GulfMark UK | North Sea | United Kingdom | Maersk Oil North Sea UK Limited | MMC 887 CD | LgPSV | Norwegian Facility |
| Highland Guardian | GulfMark UK | North Sea | United Kingdom | Shell UK Ltd | MMC 887 CD | LgPSV | Norwegian Facility |
| Highland Prince | GulfMark UK | North Sea | United Kingdom | ASCo UK Ltd | AKER 09 CD | LgPSV | Norwegian Facility |
| North Promise | GulfMark UK | North Sea | United Kingdom | Shell UK Ltd | AKER 09 | LgPSV | Norwegian Facility |
| Highland Chieftain | GulfMark UK | North Sea | United Kingdom | Dana Petroleum | MMC 879 CD | LgPSV | Norwegian Facility |
| Highland Knight | GulfMark UK | North Sea | United Kingdom | Conoco Phillips Petroleum UK LTD | UT 755XL | LgPSV | Norwegian Facility |
| Highland Princess | GulfMark UK | North Sea | United Kingdom | Perenco UK LTD | UT 755XL | LgPSV | Norwegian Facility |

RLF1 17564271V.1